# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

05 JUN 17 PM 5:20

JUN 20 2003

CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| IN RE: AFRICAN-AMERICAN SLAVE DESCENDANTS' LITIGATION | ) MDL Docket No. 1491 |
|  | ) ALL CASES |
|  | ) Judge Charles R. Norgle, Sr. |
|  | ) |
|  | ) 02 C 7764 |
| This Document Relates To All Actions | ) |
|  | ) |
|  | ) |

To:     (See Attached Service List)

## NOTICE OF FILING

Please take notice that on June 17, 2003, we filed with the Clerk of the Northern District Court of Illinois, Eastern Division, Plaintiffs' First Consolidated and Amended Complaint and Jury Demand, a copy of which is being served upon you.

Respectfully submitted,

Lionel Jean-Baptiste, ESQ (6206176)
JEAN-BAPTISTE & ASSOCIATES
1900 Asbury Avenue
Evanston, IL 60201
(847) 424-0400
**Attorney for Plaintiffs**

Roger S. Wareham, Esq (RW 4751)
Jomo Sanga Thomas, Esq (JT 7544)
THOMAS WAREHAM & RICHARDS
572 Flatbush Avenue, Suite 2
Brooklyn, New York 11225
(718) 941-6407
**Attorney for Plaintiffs**

Diane E. Sammons (Ds-9029)
Jay J. Rice, Esq. (JR-9171)
NAGEL RICE DREIFUSS & MAZIE
301 South Livingston Avenue
Livingston, New Jersey 07039
(973) 535-3100
**Attorney for Plaintiffs**

58

Edward D. Fagan, Esq. (EF-4125)
FAGAN & ASSOCIATES
301 South Livingston Avenue
Livingston, New Jersey 07039
(973) 994-2908
**Attorney for Plaintiffs**

Gary L. Bledsoe
312 W. 12th St., Suite 307
Austin, TX 78701
(512) 322-9992
**Attorney for Plaintiffs**

Robert Notzon
509 W. 16th Street
Austin, TX 78701
(512) 474-7563
**Attorney for Plaintiffs**

Bryan R. Williams, Esq. (BW 1602)
46 Trinity Place, 4th Floor
New York, New York 10006
(212) 797-4600
**Attorney for Plaintiffs**

Morse Geller, Esq.
116-10 Queens Boulevard
Forest Hills, New York 11375
(718) 520-0300
**Attorney for Plaintiffs**

Pius A. Obioha, Esq.
1546 North Broad Street
New Orleans, Louisiana 70119
Attorney for Plaintiffs
**Attorney for Plaintiffs**

Harry E. Cantrell, Esq.
The Cantrell Law Firm
309 Baronne Street, Suite 300
New Orleans, Louisiana 70112-1605
**Attorney for Plaintiffs**

Joseph M. Wright, J.D., PhD.
Chief Deputy Court Administrator
State of Michigan
36th District Court
421 Madison Avenue, Suite 5028
Detroit, Michigan 48226
**Attorney for Plaintiffs**

Dumisa Buhle Ntsebeza, Judge Advocate
718 Hugenot Chambers
40 Queen Victoria Street
8001, Cape Town
Republic of South Africa
**Advisor for Plaintiffs**

Roland W. Burris, Esq.
1130 S. Wabash Avenue, Suite 50
Chicago, IL 60605
**Advisor for Plaintiffs**

## CERTIFICATE OF SERVICE

I, Lionel Jean-Baptiste, an attorney, state on oath that I served a copy of Plaintiffs' First Consolidated and Amended Complaint and Jury Demand to each attorney on the attached list of Defense Counsels by first class mail on June 17th, 2003.

**DEFENSE COUNSELS**

John H. Beisner
John F. Niblock
O'MELVENY & MEYERS, LLP
555 13th Street, N.W.
Suite 500 West
Washington, DC 2004
**Attorneys for Aetna Inc.**

Vincent R. Fitzpatrick, Jr.
Heather K. McDevitt
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
**Attorneys for Brown Brothers Harriman & Co.**

Andrew R. McGann
Douglas G. Smith
KIRLAND & ELLIS
200 East Randolph Drive
Chicago, IL 60601
**Attorneys for Brown & Williamson Tobacco Corp.**

Michael Barron
Michael Hannigan
CANADIAN NATIONAL RAILROAD CO.
455 North Cityfront Plaza Drive
Chicago, IL 60611-5317
**Attorneys for Canadian National Railroad Co.**

Christiana M. Tchen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)
333 West Wacker Drive
Chicago, IL 60606-1285
        and
Andrew L. Sandler
SKADDEN ARPS, SLATE, MEAGHER & FROM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
**Attorneys for FleetBoston Financial Corp.**

James W. Quinn
Arvin Maskin
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
**Attorneys for Lehman Brothers, Inc.**

**<u>DEFENSE COUNSELS</u>** *(cont'd.)*


Aaron H. Marks
Michael P. Rosenstein
KASOWITZ, BENSON, TORRES & FREIDMAN LLP
1633 Broadway
New York, NY 10019
**Attorneys for Liggett Group, Inc.**

Gay L. Tedder
SHOOK, HARDY & BACON LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64105
**Attorneys for Loews Corp.**

Chistina M. Tchen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive
Chicago, IL 60606-1285
          and
Vaughn C. Williams
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036-6522
**Attorneys for New York Life Insurance Co.**

Jack E. McClard
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 Easy Byrd Street
Richmond, VA 23219
**Attorneys for Norfolk Southern Railway Co.**

Thomas F. Gardner
Susan L. Winders
JONES DAY REAVIS & POGUE
77 West Wacker, Suite 3500
Chicago, IL 60601-1692
**Attorneys for R.J. Reynolds Tobacco Co.**


John W. Brewer
FRIED FRANK HARRIS SHRIVER & JACOBSON
One New York Plaza
New York, NY 10004
**Attorneys for The Society of Lloyd's**

**DEFENSE COUNSELS** *(cont'd.)*

Gary Senner
SONNENSCHEIN NATH & ROSENTHAL
Suite 8000 Sears Tower
233 South Wacker Drive
Chicago, IL 60606
**Attorneys for Union Pacific Railroad Co.**

Frank Carling
COLLAZO CARLING & MISH LLP
747 Third Avenue
New York, NY 10017
**Attorneys for Westpoint Stevens**

David Kroeger, Esq.
JENNER & BLOCK
1 IBM Plaza, Suite 4500
Chicago, IL 60611


LIONEL JEAN-BAPTISTE, ESQ.

Date _6/11/03_

ED-6

RECEIVED FOR DOCKETING

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

'03 JUN 17 PM 5:20

CLERK
U.S. DISTRICT COURT

JUN 20 2003

-------------------------------------- X

In Re: AFRICAN AMERICAN          :
DESCENDANTS' SLAVE LITIGATION    :   MDL No. 1491 (CRN)
                                 :
--------------------------------------X
This Pleading Relates to:        :
--------------------------------------X
United States District Court     :
Eastern District of New York     :
                                 :   02 CV 1862 (CRN)
DEADRIA FARMER-PAELLMANN,        :

$$\left( 02\,C\,7764 \right)$$

 On behalf of herself and as     :
 representative of her enslaved  :
 ancestors and all other persons :
 similarly situated              :
                    Plaintiff,   :
                                 :   FIRST CONSOLIDATED AND
             vs.                 :   AMENDED COMPLAINT AND
                                 :   JURY DEMAND
FLEETBOSTON FINANCIAL CORPORATION,:
AETNA INC., CSX, and             :
their predecessors, successors   :
and/or assigns, and              :
CORPORATE DOES NOS. 1-100,       :   Class Action
                    Defendants.  :
--------------------------------------X
United States District Court     :
Eastern District of New York     :
                                 :   02 CV 1864 (CRN)
                                 :
MARY LACEY MADISON,              :
 On behalf of herself and as     :
 representatives of her enslaved :
 ancestors and all other persons :
 similarly situated              :
                    Plaintiff,   :
                                 :
             vs.                 :
                                 :

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 1*

58

```
FLEETBOSTON FINANCIAL CORPORATION,    :
AETNA CASUALTY, CSX,                   :
    and their predecessors,           :
    successors and/or assigns, and    :
    CORPORATE DOES NOS. 1-100,         :
                    Defendants.        :
---------------------------------------X
United States District Court           :
Eastern District of New York           :
                                       : 02 CV 1863 (CRN)
ANDRÉ CARRINGTON,                      :
    On behalf of himself and as        :
    Representative of his enslaved     :
    Ancestors and all other persons    :
    Similarly situated                 :
                    Plaintiff,         :
                                       :
                                       :
             vs.                       :
                                       :
FLEETBOSTON FINANCIAL CORPORATION,    :
AETNA INC., CSX,                       :
    and their predecessors,           :
    successors and/or assigns,         :
    and CORPORATE DOES NOS. 1-1000,    :
                    Defendants.        :
---------------------------------------X
United States District Court           :
Southern District of New York          :
                                       : 02 CV 6961 (CRN)
EDDLEE BANKHEAD (by his son and        :
Guardian, John Bankhead)               :
    On behalf of himself and on        :
    behalf of his deceased, enslaved   :
    parents, ELEX and LIZA JANE        :
    BANKHEAD and all others            :
    similarly situated,                :
                    Plaintiff,         :
                                       :
             vs.                       :
                                       :
```

SOCIETY OF LLOYD'S, LEHMAN                    :
BROTHERS MORFOLK SOUTHERN,                    :
WESTPOINT STEVENS,R.J. REYNOLDS               :
TOBACCO CO., BROWN & WILLIAMSON,              :
LIGGETT GROUP, INC., LOEWS CORP.              :
and their Predecessors, successors            :
and/or Assigns, and CORPORATE DOES           :
NOS. 1-100,                                   :
                    Defendants.               :
--------------------------------------X

**United States District Court**
**District of New Jersey**                    :
                                              :  02 CV 2084 (CRN)
RICHARD E. BARBER, SR.,                        :
  On behalf of himself and as                 :
  representative of his enslaved              :
  ancestors and all persons                   :
  similarly situated,                         :
                    Plaintiff,                :
                                              :
           vs.                                :
                                              :
NEW YORK LIFE INSURANCE, BROWN                :
BROTHERS HARRIMAN & COMPANY,                  :
NORFOLK SOUTHERN,                             :
  and their predecessors,                     :
  successors and/or assigns                   :
  and CORPORATE DOES NOS. 1-100,              :
                    Defendants.               :
--------------------------------------X

**United States District Court**
**Northern District of Illinois**
**Eastern Division**                          :
                                              :  02 CV 6180 (CRN)
HANNAH JANE HURDLE-TOOMEY,                     :
MARCELLE PORTER,                              :
                                              :
                    Plaintiffs,               :
                                              :
           vs.                                :

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 9*

```
SOCIETY OF LLOYD'S, LEHMAN          :
BROTHERS, UNION PACIFIC, and their  :
predecessors, successors and/or     :
assigns, and CORPORATE DOES NOS.    :
1-100,                              :
                    Defendants.     :
-----------------------------------X
United States District Court        :
Southern District of Texas          :
                                    :  03 CV 036 (CRN)
JULIE MAE WYATT-KERVIN, an          :
incompetent, by her guardian Ad     :
Litem, BILLY GENE MCGEE; EMMA       :
MARIE CLARK, and INA HURDLE MCGEE,  :
                    Plaintiffs,     :
                                    :
        vs.                         :
                                    :
JP MORGAN CHASE, WESTPOINT          :
STEVENS, UNION PACIFIC, AIG         :
and their predecessors              :
successors and/or                   :
assigns, and CORPORATE DOES NOS.    :
        1-100,                      :
                    Defendants.     :
-----------------------------------X
United States District Court        :
Eastern District of Louisiana       :
                                    :
"C. DOE" (Upon information and      :
   belief, an African-American who  :
   is currently living and who was  :
   was formerly enslaved and        :
   physically abused, and who name  :
   is withheld for safety and       :
   security considerations),        :
     On behalf of himself and       :
     as representative of all       :
     persons similarly situated,    :
                                    :
"M. DOE, C.W. DOE, M.L. DOE,        :
 E.H. DOE, A.L. DOE, A.D. DOE,      :
```

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 4*

```
I.DOE, C.W. DOE,                        :
   (Upon information and belief         :
   children of C. Doe, who were         :
   formally enslaved,  whose            :
   names are being withheld for         :
   security reasons),                   :
        On behalf of themselves         :
        and others similarly            :
        situated,                       :
                                        :
                                        :  02 CV 2712 (CRN)
ANTOINETTE MILLER,                      :
   On behalf of herself and as         :
   representative of their             :
   enslaved ancestors and all          :
   persons similarly situated,          :
                          Plaintiffs,   :
             vs.                        :
                                        :
AETNA INC., SOCIETY OF LLOYD'S,         :
BROWN BROTHERS HARRIMAN,                :
R.J. REYNOLDS TOBACCO                   :
CO., BROWN AND WILLIAMSON TOBACCO       :
CORP, LIGGETT GROUP INC., LOEWS         :
CORPORATION, CSX CORPORATION,           :
NORFOLK SOUTHERN RAILROAD, UNION        :
PACIFIC RAILROAD, CANADIAN              :
NATIONAL RAILWAY CO., and their         :
SOUTHERN MUTUAL INSURANCE CO.           :
predecessors, successors and/or         :
assigns and CORPORATE DOES NOS.         :
1-100,                                  :
                          Defendants.   :
---------------------------------------X
```

Plaintiffs, on behalf of themselves and their enslaved ancestors, and all other persons similarly situated, state, upon information and belief, as follows:

## OVERVIEW

1.     The   plaintiff   and   plaintiff   class   are   formerly enslaved African-Americans[1] or descendants of enslaved African-Americans who were forced into slavery from which the defendants unjustly profited.

2.     The   plaintiffs   have   alleged   in   nine   (9)   separate complaints   filed   in   seven   (7)   jurisdictions   nationwide   that among other things:

a)     Defendants and/or their predecessors in interest are   corporations   in   the   textile,   transportation,   financial, insurance, and many other industries, who were unjustly enriched through the profits they earned either directly or indirectly from   the   Trans-Atlantic   Slave   Trade   and   slavery.     This enrichment was to the detriment of the plaintiff class.     All

---

[1] With the filing of this First Amended and Consolidated Complaint, we are adding as a Plaintiff and as a sub-class, living, formerly enslaved African-Americans.     While, the prospect of a living formerly enslaved African-American might to some seem improbable, cases of slavery have been documented by the NAACP through as late as the 1950's.     See, Alistar Highet, *Will America Pay for the Sins of the Past, Slavery's Past*.  THE HARTFORD ADVOCATE, February 14, 2002, quoting Dr. Ron Walters. See also, Len Cooper, *The Damned. Slavery Did Not End With The Civil War. One Man's Odyssey Into a Nation's Secret Shame*, WASHINGTON POST, June 16, 1996, at FOI; Alwyn Bar, Negroes in Texas:     *The   History   of   Black   Texans*.     University   of   Oklahoma   Press (University   of   Oklahoma   Press).     Plaintiffs   have   knowledge   of   the   possible existence   of   as   many   as   eight   (8)   other   living   formerly   enslaved   African-Americans   and   believe   the   number   could   become   greater   through   additional research and discovery.

profits have continued to compound over time to serve as a basis of tremendous current wealth[2] of many defendants.

b) Defendants and/or their predecessors in interest, individually and/or collectively, profited from the knowing and willful violation of all applicable prohibitions related to the Trans-Atlantic Slave Trade.

c) Defendants and their predecessors in interest engaged in human rights violations, international norms, and crimes against humanity against plaintiffs and/or plaintiffs' ancestors that included direct or third-party liability for conspiring with slave traders, with each other and other entities and institutions, all of whom are not yet known, to ship Africans from Africa to America, even after the slave trade was declared illegal here, to enslave Africans in America, to separate families, to dehumanize Africans, and through other acts.

3. The plaintiffs demand, among other things, that defendants:

a) provide a full accounting of their actions, including, but not limited to, turning over all documents in their possession related in any way to the slave trade and slavery;

---

[2] There have been a variety of figures by current economists that estimate the value of slave labor to the country as a whole. Estimates are provided at para. 10 and fns. 16, and 17 herein.

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 7*

b)    equitably disgorge all illicit profits;

c)    be  subject  to  and  comply  with  an  independent historical commission designed to fully examine their actions;

d)    be subject to the imposition of constructive trust;

e)    pay  restitution  in  the  amount  equivalent  to  the present  value  of  the  stolen  labor  from  the  ancestors  of  the plaintiffs' class members that was wrongfully earned, retained and has yet to be accounted for; and

f)    pay  compensatory,  exemplary  and  punitive  damages  and other relief.

4.    This  case  presents  some  of  the  most  important  issues ever  presented  to  a  United  States  Court.    The  case  involves allegations  that  blue  chip  U.S.  corporations  benefited  and continued  to  benefit  from  acts  including  piracy,  slavery, torture,  rape,  murder,  theft  of  property  and  services  and  other human  rights  violations.    The  case  also  raises  the  issue  of whether  corporations  can,  should,  and  to  what  extent  be  held accountable for their role in these horrific acts.

5.    The  historical  significance  of  the  cases  has  been underscored  by  Harvard  law  professor,  Charles  Ogletree,  Jr., who,  writing  in  the  New  York  Times,  a  week  after  the  first filing, states:

> The goal of these historic investigations is
> to bring American society to a new reckoning
> with how our past effects the current
> conditions of African-Americans and to make
> America a better place by helping the
> disadvantaged.[3]

6.    Ogletree notes the crucial importance of the judicial

system in righting slavery's wrong:

> The opportunity to use expert witnesses and
> conduct extensive discovery to get facts and
> documentation, makes the courtroom an ideal
> venue for this debate . . .reparations
> litigation will show what slavery meant, how
> it was profitable and how it continued to
> affect the opportunities of millions of
> black Americans.[4]

7.    John Friedman, reporter for *The Nation* magazine,

further references the case's historical significance:

> The lawsuits that will be heard in Judge
> Norgle's court open a new chapter in
> African-American history.[5]

Similarly, legal journalist, Andrew Brownstein, notes that these

cases are no "ordinary" cases, but rather:

> [c]onstitute the first wide-scale effort to
> bring the issue of slavery reparations from

---

[3]    Charles J. Ogletree, Jr., *Litigating the Legacy of Slavery*, N.Y. TIMES, March 31, 2002, at 9.

[4]    *Id.*

[5]    John Friedman, *Corporate Bill for Slavery* (March 10, 2003) at 24.

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 9*

college text books and T.V. talk shows into the courtroom.[6]

8.  Likewise, Bill Spriggs, Director of the National Urban League's Institute for Opportunity and Equality in Washington, notes the suit's potential historical value:

> The suits also open the door to a greater acknowledgement by the nation of the after affects of slavery and the discrimination that follows.[7]

## INTRODUCTION, JURISDICTION AND VENUE

### Historical Background

**A)  The Transatlantic Slave Trade Resulted in the Deaths of Millions and Eviscerated Culture, Languages, and Customs of the Enslaved.**

9.  Millions of Africans and their descendants were enslaved in America from 1619 to 1865.[8]  Estimates range from 8,000,000 to 50,000,000.  The practice of slavery constituted an immoral and inhumane deprivation of African life, liberty, human rights and cultural heritage.  Furthermore, it deprived them of the fruits of their own labor.  The institution of

---

[6]  Andrew Brownstein, *News & Trends, Suits Bring Debate Over Slavery Reparations Into The Courtroom*  TRIAL: JOURNAL OF THE ASSOCIATION OF TRIAL LAWYERS OF AMERICA, 38-dec, December, 2002 at 68.

[7]  Tony Pugh, Maureen Fan, and Ken Moritsugu, *Descendant Of A Slave Sues Three Firms, Seeks Reparations*, PHILADELPHIA INQUIRER, March 27, 2002, at A03.

slavery in United States and its predecessor colonies consisted of the involuntary, lifelong hereditary system of chattel servitude.

10. The Dutch slave ship that sailed into Jamestown Harbor in Virginia colony in 1619 contained only 27 captive Africans, but by the end of the Trans-Atlantic Slave trade, more than two and a half centuries later, somewhere between 8 million and 50 million Africans had arrived in America in chains.[9]

11. Historians estimate that one slave perished for every one who survived capture in the African interior and made it alive to the New World, meaning as many as 12 million perished along the way.[10]

12. Not only did the institution of slavery result in the deaths of millions of Africans, it eviscerated whole cultures: languages, religions, mores, and customs. It psychologically destroyed its victims. It wrenched from them their history, their memories, and their families on a scale never previously, nor since, witnessed.

---

[8] Of course, this end date for slavery, must be extended by the recent addition of Plaintiffs who were enslaved into the 20th Century.
[9] Brent Staples, African Holocaust, *Lessons from a Graveyard*, Portraits and Poems, Part II (http:/www.members.aol.com/fttbic/photosII.htlm) (last visited June 2, 2003).

13. The institution of slavery expanded from Jamestown Harbor to twelve (12) more colonies. When these colonies secured their independence and established their own governments, they began to develop an elaborate set of repressive statutes to regulate the relationship between slaveholder and slave. These statutes were called "Slave Codes."

**B. State Slave Codes Sought to Legitimatize Abuse, Subordinating and Exploitating Enslaved Persons, and Denying All Natural Liberties of Human Kind.**

14. States continued to regulate the relationship between slave and slaveholder by passing increasingly elaborate and abusive Slave Codes which covered every aspect of life of the enslaved African. Although the laws varied from one state to another, they all agreed on some general principles:

> enslaved Africans are not people but property; laws should protect the ownership of such property and should protect white people against any dangers that might arise from being near large numbers of enslaved Africans; enslaved Africans must be maintained in a state of subordination in order that the optimum discipline and work could be achieved.[11]

---

[10] Ira Berlin, Many Thousands Gone: The First Two Centuries of Slavery in North America, Harvard University Press (1998), cited by Brent Staples in African Holocaust, *Lessons form a Graveyard*, supra at fr. 8.

[11] John Hope Franklin, From Slavery to Freedom, at 124, Seventh Edition (1947).

15. For instance, South Carolina Law set forth that enslaved Africans:

> shall be deemed, held, taken, reputed, and adjudged in law to be chattels personal in the hands of their owners and possessors, and their executors, administrators, and assigns, to all intents, constructions, and purposes whatsoever.[12]

16. Enslaved Africans could not: testify in court against a white person, make contracts, leave the plantation without permission, strike a white person (even in self-defense), buy and sell goods, own firearms, gather without a white person present, possess any anti-slavery literature, or visit the homes of whites or free blacks.[13]

17. The killing of an enslaved person was almost never regarded as murder, and the rape of enslaved women was treated as a form of trespassing rather than a capital crime.[14]

18. Enslaved African women had to endure sexual exploitation, often bearing the children of their masters and overseers. Enslaved Africans were disciplined by whipping,

---

[12]  *Id.* citing to Statutes at Large of South Carolina, Vol. VII. p. 897, Act No. 670, Sec. 1.

[13]  Kenneth M. Stampp,  *The Peculiar Institution: Slavery in the Antebellum South,* 206-216 (1956).

imprisonment, torture, and mutilation -- sometimes leading to death -- and being sold off.

19. Some examples of cruel and inhumane acts committed against enslaved Africans in the practice of slavery under state Slave Codes are evident in the following advertisements for run-a-way slaves:

> Twenty dollars reward. Runaway from the subscriber, a negro woman and two children; the woman is tall and black, and a few days before she went off burnt her on the left side of her face with the letter M. Her children are both boys, the oldest is in his seventh year; he is a mulatto and has blue eyes; the youngest is a black, and is in his fifth year.[15]

> A wealthy man here had a boy named Reuben, almost white, whom he caused to be branded in the face with the words; 'A slave for life'.[16]

> A negro man who says his name is Josiah, that he belongs to Mr. John Martin, living in Louisiana, twenty miles below Natchez. Josiah is five feet eight inches high, heavy built, copper colour; his back very much scarred with the whip, and branded on the thigh and hips in three or four places thus: 'J.M.' The rim of his right ear has been bitten or cut off. He is about 31 years of age. Had on, when committed, pantaloons, made of bed-ticking, cotton coat, and an old fur hat very much worn. The owner of the above described negro

---

[14]   http://www.pbs.org/wgbh/aia/part4/4p2956.html, September 9, 2002. (Rape committed by enslaved Africans against white women was a capital crime).

[15]   *North Carolina Standard*, (July 28, 1838)

[16]   *St. Louis Gazette*, (November 6, 1845).

is requested to comply requisitions of law, in such, cases made and provided for.[17]

**C)  Enslaved Africans Built Our Nation, Yet All Were Denied the Basic Fruits of their Labor.**

20.  Although, it is a common perception that the South alone received the enslaved Africans, many of them arrived in ports throughout the North, including, the Dutch colony of New Amsterdam that later became New York City and parts of New Jersey.  Integral to the colony from the start, slaves helped build Trinity Church, the streets of the city, including Broadway, and the wall, from which Wall Street takes its name, that protected the colony from military strikes.[18]

21.  Enslaved Africans in New York lived in attics, hallways and beneath porches, cheek to jowl with their master and mistresses.  In death, many of these same Africans were banished to a separate burial ground, which lay a mile outside the contemporary city limits and contained thousands of bodies heaped one on top of another with little regard for the sanctity of their lives, even in death.

---

[17]  *Mississippi Gazette,* (July 23, 1836).

[18]  Brent Staples, *African Holocaust, Lessons from a Graveyard,* supra. at fn. 8, quoting in part from Dr. Michael Blakey, Howard University, ("strain on the muscles and ligaments was so extreme that muscle attachments were commonly ripped away from the skeleton talking chunks of bone with them leaving the body in perpetual pain").

22. Research conducted by Howard University of 400 skeletons of buried slaves revealed that a significant portion were children under the age of 15 and the most common cause of death was malnutrition. The skeletons of the children revealed they had rickets, scurvy, anemia or related diseases. The adult skeletons show that many were simply worked to death. The highest mortality rate is found among women ages 15 to 20. Investigators have concluded that many slaves died of illnesses acquired in the holds of slave ships, from exposure to the cold, and from the trauma of being torn from their families and shipped in chains halfway around the globe. Researchers also concluded that slaves were worked to death by owners who then simply went out and bought new slaves.[19]

23. On a more national scale, recent research has revealed that many of our esteemed and celebrated institutions of learning had their origins in the profits derived from the slave trade. For instance, money from the slave trade financed Yale University's first endowed professorship, its first endowed

_____

[19] Brent Staples, African Holocaust, *Lessons from a Graveyard,* supra. at fn. 8, quoting in part from Dr. Michael Blakey, Howard University, ("strain on the muscles and ligaments was so extreme that muscle attachments were commonly ripped away from the skeleton taking chunks of bone with them leaving the body in perpetual pain").

scholarships and its first endowed library fund.[20]  Moreover, in the 1830's, Yale officials led the opposition that prevented the building of the first African-American college, on the grounds that such an institution would have been "incompatible with the existence of Yale".[21]   Nicholas and John Brown, two of the founders of what became Brown University were slave traders. Likewise, Harvard Law School was endowed by money its founder earned selling slaves in Antigua's cane fields.[22]

24.  Most early American industries were based on the cotton, sugar, rice, tobacco, and other products African labor produced.   Railroads and shipping companies, the banking industry and many other businesses made huge profits from the commerce generated by the output of enslaved labor.

25.  Enslaved Africans built the U.S. Capitol, cast and hoisted the statue of freedom on top of its dome, and cleared the forest between the Capitol and the White House.[23]

---

[20]   Antony Dugdale, J.J. Fueser, J. Celso de Castro Alves, *Yale, Slavery and Abolition,* at 3-5. (The Amistad Committee Inc.) (2001) (http://www.yaleslavery.org) (last visited June 3, 2003).

[21]   *Id.* at 12-21.

[22]   Kate Zernike, *Slave Trader's in Yale's Past Fuel Debate on Restitution,* NEW YORK TIMES, August 13, 2001, at B1.

[23]   Randall Robinson, *The Debt,* LOS ANGELES TIMES at 4-5 (2000).

26. Slavery fueled the prosperity our young nation. From 1790 to 1860 alone, the U.S. economy and corporate America reaped the benefits of as much as $40 million in unpaid labor.[24] Some estimate the current value of this unpaid labor at 1.4 trillion dollars.[25]

**D. State and Federal Government Outlaw the Trade from 1807-forward.**

27. As early as 1799, many individual states outlawed the slave trade, years before it was abolished by the federal government.[26]

28. In 1794, the Third U.S. Congress enacted a law barring the building or equipping of vessels fitted for the "carrying on of the slave trade."[27] As part of that law, Congress required

---

[24] Tim Wise, *Breaking the Cycle of White Dependency*, Znet, June 12, 2001, listed on Zmag website as May 19, 2001 found on http://www.altenet.org/story.htmf, Story ID = 11018 (5/22/02).

[25] Tamara Audi, *Payback for Slavery: Growing Push for Reparations Tries to Fulfill Broken Promise*, DETROIT FREE PRESS, September 18, 2000, quoting Randall Robinson, (http://www.freep.com/news/nw/repay18_20000918.htm).

[26] As to early states that abolished slavery, the following is a partial listing: Massachusetts 1780 (judicial decision), Pennsylvania in 1780 (gradual emancipation act) New Hampshire 1783 (constitutional interpretation) Rhode Island 1784 (gradual emancipation act) Connecticut 1784 and 1797 (gradual emancipation act) New York 1799 and 1817 (gradual emancipation act) New Jersey 1804 (gradual emancipation act) See,http://www.learner.org/biographyofamerica/prog10/feature/index_text.html (Last visited June 17, 2003).

forfeiture and payment of $20,000 by "all and every person, so building, fitting out, equipping, loading, or otherwise preparing, or sending away, any ship or vessel, knowing or intending that the same shall be employed in such trade or business . . .or any ways aiding or abetting therein."[28]

29.  In 1800, the US Congress made it unlawful for any U.S. citizen or resident "directly or indirectly: to have any interest in a slave-trade vessel, and granted jurisdiction to the federal courts to handle violations of the law.[29]

30.  In 1807, the United States enacted a law prohibiting the importation of slaves and required forfeiture and payment of $20,000 by persons who aided or abetted in the "building, fitting out, equipping, loading, or otherwise preparing or sending away"[30] of vessels intended for the importation of slaves.

---

[27] Statute of March 22, 1794 "An Act to prohibit the carrying on the Slave Trade from the United States to any foreign place or country," Ch. 11 Sec. 1, 1 Stat. 347.

[28] Statute of March 22, 1794 "An Act to prohibit the carrying on the Slave Trade from the United States to any foreign place or Country," Ch. 11, Sec.2, 1 Stat. 347.

[29] Act of May 10, 1800, "An Act in addition to the act intialed [sic] 'An Act to prohibit the carrying on the Slave Trade from the United States to any foreign place or country,' Chapter 51 Sec. 1,5, 2 Stat. 70.

[30] Act of March 2, 1807, "An Act to prohibit the importation of Slaves into any port or place within the jurisdiction of the United States," Ch. 22, Sec.3, 2 Stat. 426.

31.    In 1820, Congress determined that the slave trade was so repugnant that perpetrators as well as their aiders and abettors should be subject to the death penalty and the slave trade should be formally equated to the international crime of piracy.[31] Although, the slave trade was formally abolished by England in 1807 and by the United States in 1808, individuals, industries and the government, wholly dependent upon the economic benefits derived from the use of unpaid labor, continued to keep the trade alive by aiding and abetting in the illegal smuggling of enslaved Africans and by aiding and abetting in the institution of "breeding" enslaved Africans. Breeding continued since every child born enslaved, bore a capital value to its owner that far exceeded the cost to raise the enslaved child.[32]

**E.    A Body of Law Develops Finding Slavery a Breach of Established and Fundamental Natural Law of Man.**

32.    As states abolished the slave trade before the federal government did, so too, did both state and federal courts create

---

[31]    [16th Congress. Session 1, Ch. 113, May 15, 1820].

[32]    Clement Price, Freedom Not Far Distant, (1980).[NEED PG. CITATION HERE]; Born in Slavery: Slave Narratives from the Federal Writers' Project, Texas Narrative Vol. XVI, Part 1 (Elgie Davison narrative at para. 6-10) http://memory.loc.gov/ammem/snhtml/snhome.html; Donna Wyatt Howell, I Was Born A Slave, Book 4, The Breeding of Slaves, 11-54, (American Legacy Books 1999).

a body of common law finding slavery a violation of the natural law of man. As early as 1781, in one of the famous Quark Walker cases, Commonwealth v. Jennison,[33] Chief Justice William Cushing of the Supreme Judicial Court of Massachusetts charged its jury as to the natural law against slavery:

> whatever usage formally prevailed or slid in upon as by the examples of others on the subject, they can no longer exist... sentiments more favorable to the natural rights of mankind, and to that innate desire for liberty which heaven, without regard to complexion or shape, has planted in the human breast - - have prevailed since the glorious struggle for our rights [the Revolution] began . . . slavery is in my judgment as effectively abolished as it can be by the granting of rights and privileges wholly incompatible and repugnant to its existence.

(emphasis added)

33. Several years later in 1789 in a First Circuit case, Justice Joseph Story in the La Jeune Eugenie case, concluded that the international slave trade violated the natural law of man in that it was:

> repugnant to the great principals of Christian duty, the dictates of natural religion, the obligation of good faith and morality, and the eternal maxims of social justice [and]... was inconsistent with any

---

[33] William M. Wiecek, *Somerset: Lord Manfield and the Legitimacy of Slavery in the Anglo-American World*, at 42., Rev. 124-125 (1974), citing from the unreported decision. (emphasis added)

> system of law that purports to rest on the
> authority of reason or revelation. And it
> is sufficient to stamp any trade as
> interdicted by public law, when it can be
> justly affirmed that it is repugnant to the
> general principles of justice and humanity.[34]

34. Moreover, in <u>Anderson v. Poindexter</u>, 6 Ohio St. 623 (1857), the Ohio Supreme Court held that a slave coming into a free jurisdiction (with the consent of the master) for a temporary sojourn was automatically freed because slavery was repugnant to reason and the principals of natural law.[35]

35. In fact, current-day legal scholars continue to write extensively about slavery always having been contrary to fundamental laws of our nation and the world. One esteemed Justice of the Supreme Court, Clarence Thomas, wrote in 1987 about a "higher law" that condemns inequality and hence, slavery. Thomas argues the "original intent" of the Constitution must follow the ideals of the Declaration of Independence, which should be read as hostile to slavery in order to conform with the "higher" principals of our nation that rest on natural law:

---

[34] <u>Id.</u> at 130, citing, <u>La Jeune Eugenie</u>, 233 U.S. (10 Wheat) at 122 (1789).

[35] Ohio St. 623 (1853); <u>see</u>, also similar holding in <u>Lemmon v. The People</u>, 20 N.Y. 562 (1860).

Paine captured well the revolutionary meaning of basing a particular nation on a universal truth, the truth of human equality. Edwin S. Corwin described this many years ago as the 'higher law background' of the Constitution. And Martin Luther King, Jr. brought out the contemporary significance of 'higher law' well in his famous letter from a Birmingham Jail. Paraphrasing St. Thomas Aquinas, King declared, 'A just law is a man-made code that squares with the moral law or the law of God … An unjust law is a human law that is not rooted in eternal law and natural law.'[36]

36. Like Justice Thomas' argument, that slavery has to be legally interpreted as against the specific intent of the Founding Fathers, Professor Hylton asserts, in 2003, that slavery cannot be viewed not as an institution sanctioned by law, but rather, "as a corruption or displacement of law":

> We have to reject the notion that anything we would wish to call law would ever sanction such an institution. For the institution is founded on the absence of law.
>
> • • •
>
> Law and slavery are, in essence, 'universal complements,' in the sense that one can exist in the space where the other is absent. Hence, the only morally consistent position that a state can take with respect to slavery is that it never cohabited with the institution.[37]

---

[36] Clarence Thomas, *An African-American Perspective: Toward a Plain Reading of the Constitution – The Declaration of Independence in Constitutional Interpretation;* 1987 How.L.J. 691, 697.
[37] Hylton, *Slavery and Tort Law, supra.* at 10-11.

37. Although the institution of slavery in the United States was officially outlawed in 1865, the smuggling of enslaved African slaves continued, de facto, beyond the 1950's. National archive records reveal that in the 1920's and 1930's, the NAACP received letters from African-Americans claiming to still be on plantations and forced to work without pay. Several claims were investigated and were found to be legitimate. Moreover, as late as 1954, the Justice Department prosecuted the Dial brothers in Sumpter County, Alabama because they held blacks in involuntary servitude.[38]   A vivid example of this phenomenon is presented in greater detail herein with the 104 year old Louisiana plaintiff, C. Doe, who was a former slave who did not learn of his emancipation until years afterwards and was subjected to horrendous abuse, intentionally designed to intimidate him from exercising his rights as a free man.

38. Measures called "Black Codes" guaranteed continued control of Blacks by white employers.   As John Hope Franklin noted in *From Slavery to Freedom*:

> the control of blacks by white employers was about as great as that which slaveholders had exercised.   Blacks who quit their job

---

[38] Alistair Highet, *Will America Pay for the Sins of the Past, Slavery's Past*, THE HARTFORD ADVOCATE, February 14, 2002, quoting, Dr. Ronald Walters, Len Cooper, *The Damned Slavery Did Not End With the Civil War.   One Man's Odyssey Into a Nation's Secret Shame*, WASHINGTON POST, June 16, 1996 at F0I.

> could be arrested and imprisoned for breach
> of contract. They were not allowed to
> testify in court except in cases involving
> members of their own race; numerous fines
> were imposed for seditious speeches,
> insulting gestures or acts, absence from
> work, violating curfews and the possession
> of firearms. There was of course no
> enfranchisement of blacks and no indication
> that in the future they could look forward
> to full citizenship and participation in
> democracy.[39]

39. Ten of eleven former confederate states instituted these "Black Codes" which were nothing more than a thinly-veiled attempt to circumvent emancipation. Illegal contracts for labor were signed by the uneducated formerly enslaved with unconscionable provisions purposely designed to continue a system of unpaid servitude. The Codes, and other practices that developed that were specifically designed to subvert emancipation, were the result of a callous and intentional collaboration between the landed elite, the police (state) and commercial merchants in order to perpetuate a ready pool of landless, impoverished, and dependant workers.

40. The post-Reconstruction practices of peonage and sharecropping which continued well into the twentieth century

---

[39] Franklin, John Hope. *From Slavery to Freedom*, New York; Knopf (1947).

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 25*

were direct outgrowths of slavery that continued a system of complete control by the dominant culture. Peonage was a complex system where a black man would be arrested for "vagrancy", ordered to pay a fine that he could not afford, and then incarcerated. A plantation owner or other white citizen or business owner would pay the fine and then hire the indebted prisoner until he could afford to pay off the fine. The peon was forced to work, locked up at night and if he escaped, was chased by bloodhounds until recaptured.[40]

41. Likewise, from 1865 through the period well into early mid-1900's, African-Americans became sharecroppers on land leased from whites whose grandparents had owned their ancestors. These African-Americans were not allowed to vote, and were socially and economically relegated to the left-overs in education, earnings, and freedoms.

42. The commercial industries continued to knowingly benefit from these illegally constituted, but state-sanctioned, forms of slavery.[41]

---

[40] Yuval Taylor, *I Was Born a Slave*, Introduction, at xxviii *(Vol. I. Chicago: Lawrence Hill 1999)*.

[41] Pete Daniels. *The Shadow of Slavery*, at 21-25. (Describes the immense benefit that certain southern railroads and turpentine farm owners derived from peonage and forced labor systems through the 1920s.

43. In fact, the long and continued resistance of the South to emancipation led to the stubborn and entrenched belief that white Southerners did not have to pay African-Americans for their labor. This led to a "dual ethic", a code of treating white people according to a different standard as compared to black people.

44. Thus, even after Emancipation, the lives of African-Americans remained locked in quasi-servitude, due to legal, economic and psychic restraints that effectively blocked their economic, political and social advancement.

45. Also, during this period, terror was used as a tool to keep African-Americans tied to their former masters.[42] The wholesale murder and terrorization of African-Americans continued with the rise of the Ku Klux Klan and other like organizations. Over 3,400 African-Americans were lynched between 1882 and 1930.[43]

---

[42] Nell Irvin Painter, The Exodusters. (describes a movement in the 1879-1880 in the Mississippi Valley where extraordinary amounts of physical violence were used to continue to 'enslave'". As the "enslaved" attempted to escape farmers patrolled with shotguns along the riverbanks to prevent escape those enslaved seeking to escape would set free along river banks to alert steam ships who would sometimes carry them to freedom in exchange for fees.

[43] *Anti-Lynching Crusade of Ida B. Wells,* (http:/www.ku.edu/Kansas/crossing boundrieds/page6d2.html).

F)   **Legacy of Slavery:   Racism and Traceable Disparities in Education Health Care, Housing, Economic Net Worth, Infant Mortality Rate, Literacy, Etc.**

46.   When the actual institution of slavery was finally formally ended, the vestiges, racial inequalities and cultural psychic scars[44] left a disproportionate number of United States slaves and slave descendants injured and heretofore without remedy.   It left all Americans with ingrained beliefs of the superiority of the Caucasion population which insured that inequality would continue as it has through to the present day in the form of racism.[45]

47.   This connection between our slavery past and lingering racism today is aptly described by Law Professor Keith N. Hylton who first describes the direct connection between racism and slavery:

> American slavery, unlike Roman slavery, contributed greatly to the spread and resilience of racism.   Slavery gave racist attitudes an economic function that would otherwise not have existed.   First, the propagation of racist beliefs served the dominant slaveholding class by reducing likelihood that bonds would form between

_____

[44] Numerous authors document the "spiritual injuries" arising out of slavery. See, e.g. Vincene Verdun.   If the Shoe Fits, Wear It:   An Analysis Reparations to African Americans, 67 Tul. L.Rev. 597, 633-635; n.37 (1993).

[45] Ethan Watters, Claude Steel Has Scores to Settle, N.Y. TIMES, September 17,1995 at 45.   (Steele revealed in testing that lower scores by African Americans in standardrized apptitude tests were due to sense of inferiority with which African-Americans go into testing situations) footnote. Id.

poor whites and slaves, whose economic
interests were in many respects perfectly
aligned. Second, racism served an economic
function by reducing the payoff to slaves
from gaining freedom . . . The third reason
slavery gave racism an economic function is
the need to deter slave resurrections. This
need . . . justified the use of oppressive
force . . . Like a resilient virus, racism
has a tendency to replicate itself in
successive generations. The racist belief
structure promoted in order to justify the
oppression of slavery replicates itself
overtime and is to some extent self-
confirming.[46]

48. Hylton continues to describe how our slavery past

begets successive replications of racism over generations:

It replicates itself over time because the
first generation within an agency such as a
police force will tend to screen for
applicants that hold the same views. They
will do this because of the tendency to
train according to the methods that have
been used in past, and in order to avoid
dissension within the agency. Thus racism
once imbedded in an institution is likely to
remain for several generations until it
works itself out.[47]

49. More recently, a 1998 census report shows that twenty-

six (26) percent of African-Americans in the United States live

in poverty compared to eight (8) percent of whites. The 1998

---

[46] Keith M. Hylton, *Slavery and Tort Law*, Boston University School of Law,
Working Paper Series, Public Law & Legal Theory, Working Paper No. 03-02
(2003) at 30-34 (http://www.bu.edu/law/faculty/papers).

Census Report also showed that 14.7 percent of African-Americans have four-year college degrees, compared with 25 percent of whites. The same year, African-American infant-mortality rates were more than twice as high as those among whites. Federal figures also show that a black person born in 1996 can expect to live, on average, 6.6 fewer years than a white person born the same year.

50. African-Americans are more likely to go to jail, to be there longer and if their crime is eligible, to receive the death penalty. They lag behind whites according to every social yardstick: literacy, life expectancy, income and education. They are more likely to be murdered and less likely to have a father at home.

51. The economic depravation resulting from slavery can be gleaned from discrepancies in earnings between whites and blacks. Black families earn only $580 for every $1,000 earned by white families. Only 3.4% of all Black men earned $50,000 or more compared to 12.1% of white men. Additionally, 44.8% of black children live below the poverty line, compared to 15.9% of white children.[48]

---

[47] *Id.*

[48] Rhonda V. Magee, *The Masters Tools From the Bottom Up: Responses to African-American Reparations Theory on Mainstream and Outsiders Remedies Discourse,* 79 Va. L. Rev. 863, 870 (1993).

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 30*

52. Documented discrepancies in net worth are a direct outgrowth of slavery and the lost inheritance from slave ancestors to their descendents. A comparison of income, net worth and net financial assets for black and white, middle-class families shows that, although blacks in the sample earned 70-85% of the income that whites earned, their net worth was only 16-18% of whites' net worth, and their net financial assets were zero.[49] Another study showed that a typical white family enjoys a net worth that is more than eight times that of its black counterpart.[50] This inequity is partly a result of the head start whites enjoy in accumulating and passing on assets. Some economists estimate that 80% of lifetime wealth accumulation results from gifts from earlier generations.[51]

53. Defendants, through their predecessors-in-interest, conspired and/or aided and abetted with slave traders, with each other and other entities and institutions (whose identities are not yet specifically identified, but which are described herein as CORPORATE DOES # 1-100) and other un-named entities and/or financial institutions to commit and/or knowingly facilitate

---

[49] Tuneen E. Chisolm, *Sweep Around Your Own Front Door: Examining the Argument For Legislative African American Reparations*, 147 U.Pa.L.Rev. 677, 689 (1999).
[50] Dalton Conley, *The Cost of Slavery*, NY TIMES, February 15, 2003 at 25.
[51] *Id.*

crimes against humanity, and to further illicitly profit from slave labor.

54. Plaintiffs and the plaintiff class are formerly enslaved Africans and African-Americans and their descendants who were forced into servitude from which the defendants unjustly profited.

55. Plaintiffs seek an accounting, constructive trust, restitution, disgorgement and compensatory and punitive damages arising out of defendants' past and continued wrongful conduct.

## JURISDICTION AND VENUE

56. This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332(a) since the amount in controversy exceeds $75,000 per plaintiff exclusive of interests and costs and there is diversity of citizenship. Jurisdiction may also be predicated upon 28 U.S.C. § 1331 due to the claims made within this complaint based on the Civil Rights Act of 1866, codified as 42.U.S.C.§ 1982.

57. The Court has personal jurisdiction over the parties in that the defendants conduct systematic and continuous business within the various states and districts in which the original and/or underlying complaints were filed.

58.    Venue is proper in this Court since the defendants do business and may be found in the District within the meaning of 28 U.S.C. Sec. 1391(a), as well as, 28 U.S.C. Sec. 1350.

59.    The Complaint also alleges violations of the following state unfair competition and consumer protection laws and seeks equitable relief as well as civil penalties based on these claims: California's Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200 et seq.; Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/1 et seq.; Louisiana's Unfair Trade Practices and Consumer Protection Law, La R.S. 51:1401 et seq.; New Jersey's Unfair Trade Practice Law, N.J. Stat. § 56:8-1; New York's Consumer Protection From Deceptive Acts and Practices Laws, NY CLS Gen Bus § 349 and § 350; and Texas' Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. and Com. Code § 17.41.    This Court has jurisdiction over these claims pursuant to diversity jurisdiction, 28 USC 1332(a).    In the alternative, the Court has supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367(a). The State-law claims are so related to the equitable and federal-law claims raised in this complaint that they form part of the same case or controversy under Article III of the United States Constitution. The issues raised by the State-law

claims are no more novel or complex than the federal law claims, nor do they substantially predominate over the federal-law claims. Supplemental jurisdiction would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience and fairness.

60. The Court has jurisdiction under 28 U.S.C. Sect. 1350, the Alien Torture Claims Act which provides, "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the laws of nations or a treaty of the United States·

### DESCRIPTION OF PUTATIVE CLASS REPRESENTATIVES

60. Plaintiffs and the plaintiff class are formerly enslaved African-Americans and descendants of formerly enslaved Africans.

### Deadria Farmer-Paellmann – Class Representative

61. Plaintiff DEADRIA FARMER-PAELLMANN, is a New York resident and lead plaintiff in these consolidated actions, submits this complaint on behalf of all Africans enslaved in the United States, and to honor the memory of the many pioneers in the struggle for slavery reparations· Of particular note is the pioneer Queen Mother Audley E. Moore whose legacy of justice

continues through the work of Queen Mother Dr. Delois N. Blakely, Community and Honorary Mayor of Harlem, New York.[52]

62. Queen Mother Audley Moore was born on July 27, 1898, in New Iberia, Louisiana. Her grandmother, Nora Henry, was born into slavery, the daughter of an African woman who was raped by her slave master who was a doctor. Queen Mother Moore devoted her life to active struggle on behalf of all people of African descent. She was recognized for having organized on many fronts, from the great influenza epidemic of 1918 in Muscle Shoals, Alabama, where she worked as a volunteer nurse, to the United Nations, where she presented petitions in the 1950's charging genocide and demanding reparations to descendents of former slaves. She was a life member of the Universal Negro Improvement Association (UNIA) and the National Moorish Council of Negro Women. She joined Marcus Garvey's UNIA while living in Louisiana. She participated in Garvey's first international convention in New York City, owned stock in the Black Star Line, and came to New York when UNIA launched the Black Star Line's first ship. On May 2, 1997, Queen Mother Moore, a life-long "Warrior Woman," died at the age of 99.[53]

---

[52] Alan Fuer, *Harlem's Queen Mother, by Acclaim: Honorary Mayor Traded Convent for Life of Street Charity*, NY TIMES, P.B1, (5/20/2003).
[53] http://hiergraphics.org/mothermoorebio.htm, (8/24/2002). Prepared by Honorable Delois Naewoaang Blakely, Deputy Mayor of Harlem, New York, 1993.

63. Plaintiff Deadria C. Farmer-Paellmann is a law school graduate and political campaign manager. She is the great-great-granddaughter of Clara and Abel Hinds, Africans who were enslaved on a South Carolina sea island rice plantation. On the eve of the Civil War, Clara and Abel Hinds ran-away from their slave master. For two weeks they hid in swamps as they crept toward freedom. They later settled in Georgetown, South Carolina where three generations of their progeny were born including Farmer-Paellmann's: great-grandmother, Alice Hinds-Capers: grandfather, Willie Capers; mother, Wilhelmina Capers-Farmer; and her maternal aunt Rosa Capers-Jones. Farmer-Paellmann is a pioneer in the effort to uncover the connection between slavery and existing corporations and private estates. It is due to her groundbreaking research and public education efforts on the complicity of corporations in slavery that these lawsuits are possible. Many of the defendants in these consolidated actions were initially contacted by Farmer-Paellmann with requests for apologies and demands for restitution to be paid into a trust fund to benefit the 35 million descendants of enslaved Africans.

## Mary Lacey Madison – Class Representative

64. Plaintiff MARY LACEY MADISON is a New York resident, born in Norfolk, Virginia in 1910, to James and Martha Doles Lacey whose ancestors were slaves in the agricultural industry in Virginia and North Carolina. Mary was told that her maternal grandfather was, as a child, given to his last owner as a Christmas present. Mary's paternal great aunt, Elizabeth Browning, used to tell Mary how at the end of slavery she went into the kitchen of her former mistress, mixed some yogurt and dared her "to slap me in the face," which was what the mistress had regularly done during slavery.

65. As a teenager, Mary left Norfolk for New York City, where, although not completing high school, she began to work for the City as a hospital attendant, eventually achieving the position of Licensed Practical Nurse, who was delegated the responsibilities of a Registered Nurse. She has spent her adult life as an activist fighting for the betterment of her community.

## André Carrington – Class Representative

66. Plaintiff ANDRÉ CARRINGTON is a Bronx, New York resident whose ancestors on both his mother and father's side, were slaves in North Carolina, and upon information and belief,

were involved in the cotton and tobacco industries. Andre Carrington is 46 years old. He is a surface line dispatcher for the New York Metropolitan Transit Authority. His great-great grandfather, Charlie Wright Williams was a slave in Dublin County, North Carolina. The town is Wallace North Carolina. Charlie Wright was a slave until the age of 12. He was married to Phyllis Murry Williams. Charlie's mother, Martha Katherine was born a slave in 1835 and married Charlie's father, a slave named James Williams. André first became interested in this history when reading the tombstones at the family's cemetery in Wallace. He then researched birth and death records at the County Clerk's office. This research has been conducted over a number of years.

### Richard E. Barber, Sr. – Class Representative

67. Plaintiff Richard E. Barber, Sr. is a New Jersey resident whose ancestors were enslaved in the agricultural industry and other industries. Plaintiff is a resident of Somerset, New Jersey. Mr. Barber is the grandson and great-grandson of enslaved Africans. His great-grandfather, Peter Barber, was born into slavery in 1820 in Trenton, North Carolina. His grandfather, William Mae Barber, was likewise

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 38*

born into slavery in 1840, along with his three sisters, Anna, Hula, and Julia and his two brothers, John and Seth. Peter Barber was a farmer and William Mae, was a master carpenter. William Mae Barber built many of the stately homes that still stand along Route 58 South in Trenton, North Carolina. The plaintiff, Richard Barber, recalls delivering newspapers, cutting lawns and raking leaves of many of the residents of the homes his grandfather built. Richard Barber's father, John, was a sharecropper. Richard Barber recalls stories about slavery told to him by his great-Aunt Anna.

### Hannah Jane Hurdle-Toomey — Class Representative

68. Plaintiff Ms. Hannah Jane Hurdle-Toomey lives in Belleview, Illinois. She is the youngest surviving daughter of Andrew Jackson Hurdle.

69. Andrew Jackson Hurdle was born on 12/25/1845 and died on 11/27/1935. He had 25 children, 3 of whom are still alive. Mr. Jackson Hurdle was 10 years old when he was sold away from his family and brought to Dangerfield, Texas as a playmate for T. H. Turner's son, James, who had a severe stutter. Hurdle spent some of his time using tiny pebbles to correct James' speech. In exchange, the family allowed Hurdle to read and

write. Being a house slave, Hurdle did not suffer the beatings wielded upon those forced to work in the fields. Yet, this changed when he came face to face with an overseer determined to whip him. On that fateful day, the 16 year old became a runaway slave.

70. After spending days hiding in swamps, hungry for food and freedom, he happened upon a Union Army camp. There he was given a blue coat, food and a job tending the soldiers' horses until the civil war was over. After he returned to the community, he fled to find his sweetheart, Viney Sanders, whom he married.

71. Hurdle had 17 children with Sanders. After her death, he married Jessie Catherine Bailey. At the time of their marriage, she was 25, Hurdle was 65. Through this union, he had eight more children. Described as a "God-fearing" man, Hurdle spent the rest of his life supporting his family. He worked several jobs and was able to send all of his children to college. He purchased 500 acres of land, more that 10 times the 40 acres promised by the government but never provided, which was enough to divide among his offspring.

72. Ms. Hurdle-Toomey is an ordained minister and former African Missionary.

### Marcelle Besteda Porter – Class Representative

73. Plaintiff Marcelle Besteda Porter is a native 72-year Chicagoan whose ancestors were enslaved. She is a registered nurse and was a representative at the Annual Conference of the United Nations Human Rights Commission in Geneva Switzerland, and at the World Conference Against Racism in Durban in September 2001. She is an advocate of reparations at home and abroad.

### Julie Mae Wyatt-Kervin – Class Representative

74. Plaintiff Julie Mae Wyatt-Kervin was born on May 5, 1903. She is the daughter of enslaved Africans, Jake Wyatt and Louise Wyatt. Both Jake and Louise Wyatt were slaves in Wharton County, as were their parents before them. In or about 1860, Wharton County had the distinction of having one of the highest slave populations in all of Texas. When Ms. Wyatt-Kervin's parents were freed from slavery on June 19, 1865, they became sharecroppers.

### Emma Marie Clark – Class Representative

75. EMMA MARIE CLARK is a resident of Texas. On information and belief, she was enslaved in the agriculture industry in Louisiana from about 1927 through 1934. She does not know her precise age, but has been told she was born in

Louisiana between 1904 and 1908. She was one of 10 children born to Mary Elizabeth Clark a Choctaw/Comanche Indian and William M. Clark, an African-American. Her mother took her and abandoned the other children and husband, who had become abusive. They sought refuge in the woods for several years. They lived with a family with a farm where they worked in exchange for housing and food. After an altercation with a member of the family, her mother abandoned her and the family. After the husband of that family died, the wife agreed to let her stay with a couple that operated a nearby dairy farm. That couple told her that they bought her and she was their slave. She was about 20-years-old at that time. Along with two other Black young women, she was forced to work 16 hours days in the dairy, doing housework, and looking after guests in a boardinghouse on the farm. She was never paid for her services and was severely beaten if the couple was not satisfied with her work. She was forced to have sexual relations with men. As a result of this, she got pregnant on two occasions and gave birth to two sons. One of those sons was forced to live amongst the farm animals while she worked during the day. The other son was taken from her at birth. A Dallas couple stayed at the boardinghouse. The wife wanted to give her a tip, but she

refused, explaining that she does not get paid for her services. Shortly after that day, the FBI visited the farm to do an investigation and found her and the two other women being held as slaves. They were later released from the farm. She was subsequently reunited with her son who was taken from her at birth.[54] Ms. Lewis in her own words describes her life as a slave:

> When I got to the Darby's, Maggie or Old Miss they called her, hit me with a pipe and pulled out her pearl handled gun. She took me out behind the barn and showed me some ground. She said if I ever tried to run away from her she would find me, kill me and bury me there. I was about 20 years old. Maggie was a 375 pound white woman. She wore white linen princess style dresses starched so stiff a fly would break his neck landing on them. Everybody was afraid of her.

> Maggie took me into the den. She picked up the phone like she was talking to somebody. She held up a piece of paper that I couldn't read and said I was her new slave. She said that the piece of paper said she owned me. She had two other girls she held for slaves too--Lillie Mae and Maggie Lee. All of us were forced to run their family dairy, boarding house and do household chores. Lillie Mae had been a nurse for Ole Miss' niece and came to live there when the child's father died. Her mother reclaimed the child, after stories of abuse of the child reached her. But Lillie Mae, by then, was convinced that she too was a slave.

> The Darby's had three children, James, Lily and Grace. Ms. Darby built a Methodist church and made her son James the pastor. She was some kind of missionary and

---

traveled all over the States for conferences.  I saw
Bruce and Maggie put on the black clothes of the big
leaders of the local KKK. Most others wore white, when
they met out at the farm. Just top folks wore
black.  They stored the coal oil and containers of tar
for their activities out in the barn.  We stayed in
our quarters.

We weren't allowed to go to our church.  Ole Miss took
us to her church so we wouldn't get wrong ideas from
other Negroes.  She had a special thing on her big car
that held the car door open, but wouldn't let us get
out.  She could see us in the car parked right in
front of the church. She bragged to everybody that she
took her Negroes to church.  We couldn't hear or see
nothing, but it was a break from the farm.

Ole Miss dressed us in mattress ticking striped
coveralls with the arms cut out and the legs cut above
our knees.  We had to keep our hair tied up in rags
and had flour sack cotton gowns to sleep in.  We had
no shoes, but had rubber boots to wear in the winter.
I would put my feet into the boots and
then dip them in a pan of hot water to warm up my
feet.  By the time I reached the barn, there would be
ice between my toes. Maggie said it took too long to
comb our hair, so except for one time when she cut
four strips across the top of our heads with the
clippers, like railroad tracks, we never combed our
hair.  My long hair got more matted with each passing
year.

When I was set free, a lady broke three forks trying
to comb out my hair.


### Bill Gene McGee - Class Representative

76.  Mr. Billy Gene McGee resides in Dallas, Texas and is

the guardian ad litem of his aunt, Ms. Julie Mae Wyatt-Kervin

and brings this case as her representative.

### Ina Bell Daniels Hurdle McGee - Class Representative

77. Plaintiff Ina Bell Daniels Hurdle McGee is a 69 year-old retired school teacher, who taught in the public school system in Dallas for 43 years. She resides in Dallas, Texas and is the great grand-daughter of Andrew Jackson Hurdle, an enslaved African. Her grandmother's name is Laura Elizabeth Hurdle and her father's name is Clarence Hurdle. See, the description of Andrew Jackson Hurdle provided under Hannah Jane Hurdle-Toomey.

### C. Doe - Class Representative

89. "C. DOE"[55] is a resident of Louisiana. Upon information and belief, he was enslaved through the 1960's. His grandfather and father were also former slaves. His seven living children are former slaves. He never completed beyond a third grade education because he was subjected to forced labor without compensation. He and his family were forced to live on the slave quarters of a plantation that grew numerous agricultural crops such as cotton and rice. His trips with the master took him to drop off bales of cotton, next to train tracks that ran through Mississippi, and/or Louisiana. He dropped bales of cotton off at the cotton mills. The slave hut

---

[55] Name withheld for safety reasons.

had no electricity and no running water. C. Doe, nor his children, were ever paid for their labor. In fact one of C. Doe daughters tells of the family being handed to slop bucket of left-over dinner scraps from the master's table. C. Doe experienced the horrors of slave life first-hand including, but not limited to, the murder of a relative by the slave master; physical beatings and physical intimidation purposely designed to prevent him from running away or reporting the criminal incidents to society C. Doe did not run away as he was afraid of the master beating on him.

90. Upon information and belief, during a portion of the time that C. Doe was enslaved namely in or about the 1920's-1930's some/or all of Defendants corporate entities doing business in Mississippi or Louisiana had reason to know of the construction of forms of slavery yet failed to take steps to eliminate same, while they continue to inure benefits form the illegal, but sanctioned system of servitude Post-Emancipation.

### Class Representatives

C. Doe Jr., M.L. Doe, E.H. Doe, A.L. Doe, A. Doe, I. Doe, C.W. Doe.

91. C. Doe, Jr., M.L. Doe, E.H. Doe, A.L. Doe, A. Doe, I.Doe, C.W. Doe are all children of C. Doe, whose names are being withheld for security and safety reasons. All are

residents of Louisiana, and all were formally enslaved. All endured the tragedy of slavery in that they were each forced to work for no pay. They were all intimidated through violence and through threats of same. One of the family members was repeatedly raped by her slave master resulting in permanent injury. They were slaves for the benefit of the cotton industry, sugar industry and rice industry to name of few. There father and grandfather were slaves and they were born into slavery.

### Antoinette Harrell Miller - Class Representative

92. Antoinette Harrell Miller was born in New Orleans, Louisiana on October 28, 1960. She is the daughter of Ms. Isabel Harrell Cook. She is the descendant of former slave, Carrie Richardson (great-great-great-great grandmother) and Thomas Richardson, her son. She spent ten years doing her genealogical research linking or tracing her ancestors to their former slave masters. She has lived in New Orleans for the past twenty-seven years.

### GENERAL DESCRIPTIONS APPLICABLE TO ALL PLAINTIFFS

93. Plaintiffs are presently consumers of defendants. Due to unconscionable, fraudulent and deceptive public

communications made by defendants, plaintiffs suffered the harm of being misled, confused, and deceived about the roles the defendants played in the enslavement of African people. Defendants are able to benefit from these communications by continuing business relationships with plaintiff customers and earning profits from these communications by continuing business relationships with plaintiff customers and earning profits they had told the truth about their connection to slavery.

94.     Plaintiffs have suffered the harm of being unconscionably denied the benefits of a competitive market for the goods and services they purchase from defendants.   Such products and services are produced today through the unconscionable and unfair trade act and practice of investing assets earned from the forced, uncompensated labor of enslaved people.

95. Plaintiffs have suffered segregation, lost opportunity, diminished self-worth and value, loss of property rights, loss of derivative property rights, and psychological harm from having witnessed the degradation of their ancestors and relatives.

96. Plaintiff C. Doe and other formerly-enslaved plaintiff class members experienced physical abuse, coercion, involuntary

confinement, and severe emotional distress and the failure to be paid for his labor. His harm continues to this day based upon the deprivation of job opportunities, psychic harm, inability to inherit his father's and grandfather's wealth and other harms. Plaintiffs, formerly enslaved, have been directly affected by slavery.

97. Plaintiff African-American slave descendents have suffered, grieved, and were otherwise significantly effected by their ancestors who were unpaid for their labor and by those who were forced to endure by seeking out a meager existence as sharecroppers, peons or even slaves to support their families.

98. All plaintiffs suffered the harm of separate, but not equal, schools often characterized by torn books, dilapidated buildings and insufficient funding. Plaintiffs suffered lost opportunity by not being able to attend the universities that contemporary white students could attend.

99. Plaintiffs suffered by not being able to eat in the same restaurants or go to the same hotels, motels or lodging places as whites.

100. Plaintiffs were denied the economic wealth of their ancestors' labor.

101. They have a derivative and inherited property right in their ancestors' lost pay, and this right has never been rescinded, voided, altered or satisfied.

102. Plaintiffs' harm is not limited to the past, but continues on a daily basis. They still endure daily indignities from the legacy of slavery, including, but not limited to, racial profiling, racial slurs, and improper and hurtful assumptions regarding their overall status. Plaintiffs are also likely to encounter future harm, as they are more likely to have a shorter life expectancy; more likely go to jail; and are more likely to be murdered, than their white counterparts.

## FACTS RELATED TO NEW JERSEY STATE CLAIMS

103. The State of New Jersey had numerous ports whose major commodity was enslaved Africans.

104. These ports included Camden, Elizabeth, Perth Amboy, Bayonne and Newark. Phillip Carteret, New Jersey's first Governor, encouraged the institution of slavery in New Jersey in that in 1665, additional grants of land were awarded to his fellow voyagers from England, if they arrived with slaves and indentured servants.[56]

---

[56] Clement Price, *Freedom Not Far Distant* (1980). [Need Pg. Citation here]

105. In 1674, the area that is now New Jersey was divided into two colonies, East and West. East Jersey consisted of the counties now known as Bergen Essex, Middlesex and Monmouth. East New Jersey's financial base came primarily from the trade of enslaved Africans.

106. Moreover, like New York, enslaved Africans' labor built East Jersey. It was rare for white people living in East Jersey to be without enslaved Africans. Colonial New Jersey earned the notorious distinction of importing larger numbers of enslaved Africans than any other northern colony and for its harsher treatment of enslaved Africans than any other colony.

107. On the eve of the Revolution, enslaved Africans were estimated to be 10-12 per cent of East Jersey's population.

108. In fact, New Jersey was the last Northern state to abolish slavery in 1828, years after its other Northern counterparts.[57]

## FACTS RELATED TO ILLINOIS STATE CLAIMS

109. Illinois significantly supported the institution of slavery. The first African arrived there in 1720 when Illinois was part of the French colony of Louisiana (Illinois would not

---

[57] *Id.*

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 51*

become a state until 1818). A Frenchman, Phillipe Renault, put enslaved Africans to work in saline (salt) mines near the French-built Fort de Charles in Randolf Country. These mines were unsuccessful and Renault sold his slaves to settlers in the area. By 1763, when the French surrendered control of Illinois to the British, the population of enslaved Africans was nearly six hundred.

110. Illinois was first claimed by the American government in 1778 and nine years later, was declared by the Northwest Ordinance to be part of the Northwest Territory. The Northwest Ordinance prohibited slavery, but allowed slave owners from other areas to reclaim escaped slaves from the Territory.

111. The Ordinance was unpopular to some slave-owning settlers who believed they would be forced to give up their slaves. However, their concerns were soon assuaged by the Territorial Governor, Arthur St. Clair, who interpreted the Ordinance to mean no new slaves could be brought in to the territory, but those there could legally remain enslaved.

112. In 1800, Illinois became part of the Indiana Territory, created from the former Northwest Territory. The territorial government enacted a "Black Code" that effectually

barred enslaved Africans from gaining their freedom by permitting lengthy terms of "indentured servitude," which bound workers to a particular person for a period of time in exchange for shelter and food. Indentured servitude allowed landowners to utilize unpaid labor, despite the prohibition against slavery in the Territory.

113. The institution of slavery was still supported when Illinois entered into the Union as a state in 1818. Although admitted as a free state, the Constitution of 1818 allowed for limited slavery in the salt mines and allowed current slave owners to retain their slaves. Additionally, the General Assembly passed legislation that severely curtailed the rights of free blacks residing within the state and discouraged the migration of free blacks. If a black person was unable to present proof of their freedom, they could be fined $50.00 or sold by the Sheriff to the highest bidder. Not long after the passage of the Constitution, the state's general assembly adopted a pro-slavery resolution that announced its approval of slavery in slave-holding states and at the same time, it condemned the formation of abolition societies within Illinois boundaries.

114. Although, Illinois is largely hailed as a stop along the Underground Railroad, the path from slavery to freedom, little is written about the reverse Underground Railroad, the path from freedom to slavery, whereby free blacks were kidnapped and sold into slavery. The kidnapping of free blacks was a prevalent problem as articulated in the Complete History of Illinois, published in 1876:

> … the crime of seizing free blacks, running them south and selling them into slavery from this state was quite common…. [P]ortions of Southern Illinois for many years afforded a safe retreat to those kidnapping outlaws. We cannot count the numerous cases of kidnapping.

115. Although, the Black Code of 1819, allowed for a fine of $1,000 to be levied on behalf of the victim, it did not provide for criminal conviction. As black people could not testify in court against a white person, the law was virtually useless. The practice of kidnapping continued until after the Civil War.

116. Despite Illinois' repeal of the "Black Codes" in 1865, racial tension and discrimination continued. In 1908, a riot broke out in Springfield, Illinois that lead to the lynching of two black men. As a result, the African-American section of Springfield was demolished by fires and vandalism.

### FACTS RELATED TO TEXAS STATE CLAIMS

117. Texas was the last frontier of slavery in the United States. Slavery began as an institution in Texas in or about 1824 when Moses Austin of Tennessee, a slave-holding state, received a grant from Spain to settle there with 300 families. Later that year when Moses died, his son Stephen was recognized as the heir to his father's contract; it was agreed that settlers could receive eighty acres of land for each bondman brought to Texas.[58] Many of Stephen Austin's original 300 families brought slaves with them. A census of his colony in 1825 showed 443 slaves in a population of 1800. Several years later, in or about 1828-1829, Mexico declared independence and proclaimed the deliverance of every captive on her soil. This act of the Mexican government was resisted at once by the slave-holding settlers of Texas, despite their agreement to submit to the laws of Mexico. The resisters argued that their slaves were "too ignorant and degraded to be emancipated".[59] The Mexican government consented that the Texan slaves should only be

---

[58] Randolf B. Cambell, *The Handbook of Texas Online*, The Texas State Historical Association 1997-2001.

[59] Frederick Douglas, *Texas Slavery, and American Prosperity: An Address Delivered in Belfast Ireland on January 2, 1846.* Belfast News Letter, January 6, 1846. (et. al., eds.), cited in John Blassingame, The Frederick Douglas Papers: Series One-Speeches, Debates, and Interviews, at 118. (New Haven: Yale University Press, 1979. Vol. I, p. 118).

gradually emancipated under a system of indentured apprenticeship. However, Texans evaded the spirit of the agreement by holding indentures binding for some 99 years.

118. The Texas Revolution assured slaveholders of the future of their institution. The Constitution of the Republic of Texas provided that slaves would remain the property of their owners; that the Texas Congress could not prohibit the immigration of slaveholders bringing their property and; that slaves could be imported from the US (although not from Africa).

119. With these protections, slavery expanded rapidly so that by 1845, when Texas joined the United States, the state was home to at least 30,000 bondsmen.

120. After statehood, slavery grew spectacularly. The census of 1856 reported 58,161 slaves or 27.4 percent of the Texas population.

121. By 1860, enslaved Africans constituted 30.2 percent of the total population. Slaves were increasing more rapidly than the population as a whole.

122. Although New Orleans was often considered as the center of the slave trade in the Deep South, there were dealers in Galveston and Houston. As many as 2,000 enslaved Africans came to Texas through the illegal African trade from 1835-1865.

> Slavery promoted development of the
> agricultural economy in Texas in that it
> provided the labor for a 600 percent
> increase in the cotton production during the
> 1850's. Bondmen in Texas, like elsewhere
> had the legal status of personal property.
> They could be sold, mortgaged and hired out.
> They had no legally prescribed way to gain
> freedom. Blacks could not testify against
> whites in court, severely hampering their
> access to the communities… they must
> themselves swing the pick, and they won't
> swing it by the side of Negro slave. That
> is the upshot of the whole business.

*Id.*

## FACTS RELATED TO THE LOUISIANA STATE CLAIMS

123. In the state of Louisiana, slave labor was used to pick cotton, cut sugar cane, and perform countless more free labor. Even family units of the enslaved were not respected by the slavist society. Husbands, wives and children were routinely sold without regard to breaking up the family. Mothers crying for their children fell on uncaring ears.

124. Louisiana was formally identified as a slave state during the time of slavery in the United States. The City of New Orleans was a main port of importation of enslaved Africans and was a center of slavery business for named and unnamed defendants herein because at this filing many defendant corporations and companies that profited from doing slavery

related business in New Orleans and throughout the State of Louisiana are unknown. According to the Civil Code of Louisiana:

> A slave is one who is in the power of a master to whom he belongs. The master may sell him, dispose of his person, his industry, and his labor. He can do nothing, possess nothing, nor acquire anything, but what must belong to his master.[60]

## GENERAL DESCRIPTION OF DEFENDANTS

125. Defendant FLEETBOSTON is a Delaware corporation with its principal place of business located at 100 Federal Street, Boston, Massachusetts 02110. It does continuous and systematic business in all the jurisdictions named in the lawsuits. FLEETBOSTON is the successor in interest to Providence Bank which was founded by Rhode Island businessman John Brown. Brown owned ships that embarked on several slaving voyages and Brown was prosecuted in federal court for participating in the international slave trade after it had become illegal under federal law. Upon information and belief, Providence Bank lent substantial sums to Brown, thus financing and profiting from the founder's illegal slave trading.

---

[60] *The Barbarism of Slavery*, by Charles Sumner, LL.D., in the Senate, 36th Congress, 1st Session, Pp. 2590-2603, CONGRESSIONAL GLOBE, citing to Louisiana Civil Code, Art. 35.

126. Upon information and belief, FLEETBOSTON, through its predecessor bank, also collected custom fees due from ships transporting slaves, thus, further profiting from the slave trade. Upon information and belief, FLEETBOSTON, through its predecessor bank, also collected custom duties and fees due on ships transporting enslaved Africans in violation of Rhode Island and federal law, thus profiting from the illegal slave trade.

127. Upon information and belief, over 41,369 Africans were enslaved during the time that FLEETBOSTON, through its predecessor bank, collected customs duties and fees on ships engaged in the illegal slave trade.[61] Providing loans to slave traders to engage in illegal slave trading, and the regular collection of duties and fees, earned in the illegal enslavement of Africans constituted aiding and abetting in the illegal slave trade. Such business practices were unlawful, and unfair business.

128. Upon information and belief, FLEETBOSTON was approached by various members of the general public to verify its historical connection to slavery. Its responses were either evasive, unclear, or denials, thereby constituting fraudulent

business acts. Defendant withheld information or made misleading statements regarding their participation in and profiting from slavery.

129. FLEETBOSTON made various misleading statements to the Press from March 2000 to February 2002, attempting to disassociate its predecessor company from its current company.

130. Defendant FLEETBOSTON engaged in a self-concealed business enterprise so that the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature of participation and profit the defendant derived from slavery.

131. Defendant CSX is a Virginia corporation with its principal place of business located at 901 E. Cary Street, Richmond, VA 23219. It is a successor-in-interest to numerous predecessor railroad lines that were constructed or run, at least in part, by slave labor.[61] Upon information and belief, it does continuous and systematic business in New York, Illinois, California, Texas, and Louisiana.

---

[61] Jay Coughtry, *The Notorious Triangle: Rhode Island and the African Slave Trade 1700 to 1807*, at 267-285.

[62] Jim Cox, *Rail Networks Own Lines Bult with Slave Labor* USA TODAY, Feb. 21, 2002.

132. Defendant CSX withheld information or made a misleading statement to the Press regarding their participation in and profiting from slavery.

133. Defendant CSX engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

134. Defendant AETNA INC. ("AETNA") is a corporation with its principal place of business located at 151 Farmington Avenue, Hartford, Connecticut 06156. Upon information and belief, AETNA's predecessor in interest, actually insured slave owners against the loss of their human chattel. AETNA knew the horrors of slave life as is evident in a rider through which the company declined to pay the premiums for slaves who were lynched or worked to death or who committed suicide. Additionally, AETNA insured enslaved Africans who worked in the agricultural industry of which many plaintiffs and plaintiffs' ancestors were enslaved. The writing of such policies constituted unfair business acts designed to help finance the immoral practices of domestic slavery as set forth by the cruel and inhumane Slave Codes created and enforced by states. AETNA, therefore, unjustly

profited from the institution of slavery. Upon information and belief, it does continuous and systematic business in New York, Illinois, and New Jersey.

135. Defendant AETNA withheld information or made a misleading statement regarding their participation in and profiting from slavery.

136. Defendant AETNA engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

137. Defendant BROWN BROTHERS HARRIMAN & COMPANY ("BROWN BROTHERS HARRIMAN") is a corporation with its principal place of business located at 59 Wall Street, New York, New York. It is the successor corporation to Brown Brothers & Co. The bank founders, James and William Brown, built their merchant bank by lending to Southern planters, brokering slave-grown cotton and acting as a clearinghouse for the South's complex financial system. The firm earned commissions arranging cotton shipments from Southern ports to mills in New England and Britain. It also loaned millions directly to planters, merchants and cotton brokers throughout the South. Company records also reveal that

BROWN BROTHERS loaned to plantation owners who told the firm that they needed the cash to buy slaves. When those planters or their banks failed, it used its local agents to run repossessed plantations and manage the enslaved Africans working there.[63]

138. Additionally, BROWN BROTHERS' enrichment from slave labor is further evidenced by Louisiana court records dating back to the 1840's that reveal the firm's ownership of at least two cotton plantations totaling 4,614 acres and the plantations' 346 slaves, each named in court records. Brown Brothers & Company merged with two other firms in 1931 to create BROWN BROTHERS HARRIMAN.[64]

139. Additionally, Brown Brothers built their merchant bank by lending to Louisiana planters, brokering slave grown cotton, sugar cane and acting as a clearinghouse for the New Orleans based slavery business. Company records also reveal that Brown Brothers loaned money to New Orleans slaveholders who told the firm that they needed the cash to buy slaves. When those banks failed, Brown Brothers used New Orleans courts to seize slaveholders' slaves and then managed the slaves from slave

---

[63] James Cox, *Brown Bros., Loans Gave Planters Cash To Buy Slaves.* USA TODAY (02/21/02).

[64] *Id.*

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 68*

owners who defaulted on debts. It does continuous and systematic business in New York.

140. Defendant BROWN BROTHERS HARRIMAN withheld information or made a misleading statement based upon press reports after the filing, trying to disassociate defendant from its predecessor's business.

141. Defendant BROWN BROTHERS HARRIMAN engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

142. Defendant NEW YORK LIFE INSURANCE COMPANY ("NEW YORK LIFE") is a corporation with its general office located at 2 New York Plaza, 7th Floor, New York, New York 10004. NEW YORK LIFE's predecessor-in-interest, Nautilus Insurance, earned premiums from its sale of life insurance to slave owners. One third of its first 1,000 policies were to insure the lives of slaves. It insured slaves in the agricultural industry of which some of the plaintiffs' ancestors were a part. The writing of such policies also constitute unfair business acts designed to help finance the immoral practices of domestic slavery as set forth

by the cruel and inhumane Slave Codes created and enforced by states. It does continuous and systematic business in New York, New Jersey, Texas, Illinois, and Louisiana.

143. Defendant NEW YORK LIFE withheld information or made misleading statements regarding their participation in and profiting from slavery.

144. Defendant NY LIFE withheld information or it did not report its slavery policies until it was legally required to do so under California law.

145. Defendant NEW YORK LIFE engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

146. Moreover, NEW YORK LIFE's predecessor company Nautilus, issued polices on the lives of slaves some 20 years after slavery had been abolished in New York.[65]

147. Defendant NORFOLK SOUTHERN is a corporation with its principal place of business located at Three Commercial Place, Norfolk Virginia 23410-9227. It does continuous and systematic

---

[65] Brent Staples, *Slaves in the Family: One Generation's Shame Is Another's Revelation.*, June 16, 2003 at OP.ED.
*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 65*

business in many states, including New Jersey. It is a successor-in-interest to numerous railroad lines that were constructed or run, in part, by slave labor.

148. Defendant LEHMAN BROTHERS is a corporation with its principal business at c/o King and Spalding, 1185 Avenue of the Americas, 30th Floor, New York, NY 10036. LEHMAN BROTHERS founder Henry Lehman began as a peddler in 1844, but shortly thereafter when his two brothers, Mayer and Emanuel joined him, they soon grew rich as middlemen in the slave-grown cotton trade. After Henry Lehman's death in 1856 and after the war, the remaining two brothers moved north and continued trading in cotton, oil, sugar and coffee, and then took a seat on the New York Stock Exchange in 1887. It does continuous and systematic business in New York, Illinois, Texas and New Jersey.

149. Defendant SOCIETY OF LLYOD'S, aka LLOYD'S OF LONDON, is an underwriting company with its principal places of business located at 1 Lime Street, London EC3M 7HA and at 590 5th Avenue, 17th Floor, New York, New York 10036. It was involved in insuring of ships utilized for the Trans-Atlantic slave trade. The writing of such policies was an unfair business designed to help finance the international slave trade, to provide states with human chattel who were subjected to the immoral practices

of slavery as set forth by the cruel and inhumane Slave Codes created and enforced by states. LLOYD'S does systematic and continuous business in New York.

150. Defendant LLOYD'S engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

151. LLOYD'S withheld information in that failed to report any documents to the California registry as required, claiming a fire destroyed its documents.

152. Defendant UNION PACIFIC is a corporation with its principal place of business located at 1416 Dodge Street, Omaha, Nebraska 68179. It is a successor-in-interest to numerous predecessor railroad lines that were constructed or run in part by slave labor. It does continuous and systematic business in California, Texas, Illinois and Louisiana.

153. In or about, defendant UNION PACIFIC withheld information or made a misleading statement regarding their participation in profiting from slavery.

154. Defendant UNION PACIFIC engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs'

ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

155. Defendant JP MORGAN CHASE is a corporation with its principal place of business at One Chase Manhattan Plaza, New York, New York. Two of its predecessor banks that merged to become JP Morgan Chase were behind a consortium to raise money to insure slavery. It does continuous and systematic business in New York, Texas and New Jersey.

156. Defendant JP MORGAN CHASE withheld information or made a misleading statement regarding their participation in and profiting from slavery.

157. Defendant JP MORGAN CHASE engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

158. Defendant JP MORGAN CHASE attempted to deny its association with slavery in the Press in or about January 2003 after other evidence, including a circular shows otherwise.

159. Moreover, JP MORGAN operated with the clear intent of taking in slave-related business after the abolition of slavery in the North. Manhattan Life, one of JP MORGAN's predecessors quoted a speech by a former President discussing what he believed to be one of the first group policies ever issued by an American insurance company that insured indentured workers. *Id.*

160. Defendant WESTPOINT STEVENS is a corporation with its principal place of business located at 1185 Avenue of Americas, New York, New York 10036. It is a successor-in-interest to Pepperell Manufacturing which utilized cotton from Southern planters farmed by enslaved Africans. Such use of enslaved Africans was an unfair business practice set forth by the cruel and inhumane Slave Codes created and enforced by states. Planters in turn purchased the finished product, a cheap, coarse cloth called "Negro cloth," to clothe their human chattel. The fabric served as a reminder to enslaved Africans of their inferior status in life.[66] It does continuous and systematic business in New York and Texas. Upon information and belief, it does continuous and systematic business in the other jurisdictions named in the lawsuit through their distribution of products to these jurisdictions.

161.   Defendant, R.J. REYNOLDS TOBACCO COMPANY is a corporation with its principal place of business located at 401 North Main Street, Winston-Salem, North Carolina 27102.   Upon information and belief, it does continuous and systematic business in all jurisdictions in which these lawsuits have been filed.   R.J. REYNOLDS TOBACCO COMPANY is the beneficiary of assets acquired through the forced uncompensated labors of enslaved African-Americans.   Such use of enslaved Africans was an unfair business practice set forth by the cruel and inhumane Slave Codes created and enforced by states.   Hardin Reynolds, father of R.J. Reynolds owned and operated a tobacco factory at the plantation called "Rock Spring Plantation" – the present day Reynolds Homestead in Critz, Virginia.[67]   Just before the Civil War, Hardin Reynolds owned at least 88 slaves who provided labor on the plantation, including in the Rock Spring tobacco factory.[68]   Operating information on the Rock Spring factory shows that slave labor was used to produce tobacco and other goods for the tobacco factory.[69]   Hardin Reynolds continued

---

[66]   Jim Cox, *Textile Firm Linked to 'Negro Cloth' for slaves*, USA TODAY, Feb. 21, 2002.

[67]   Nannie M. Tilley, *The RJ Reynolds Tobacco Company*, at 8.

[68]   *Id.* at 9.

[69]   *Id.* at 13.

operation of his tobacco factory during and after the Civil war, and was not broken by the war.[70]  Amongst other enterprises, he often engaged in business partnerships with his children.[71] Hardin Reynolds' son, Richard Joshua Reynolds, founder of R. J. Reynolds Tobacco Company, worked at the Rock Spring tobacco factory[72] after the Civil War, and later formed a business partnership with his father at the factory.  The partnership was called "Hardin Reynolds and Son."[73]  In the fall of 1874, R.J. Reynolds sold his interest in the Rock Spring Factory[74] and purchased land in North Carolina in October 1874 upon which he built an R.J. Reynolds Tobacco Company factory.[75]  Records indicate that R. J. took half of two year's profit from the Rock Spring factory to found his new company R.J. Reynolds Tobacco Company.[76]

---

[70]  *Id.* at 27.  Hardin Reynolds was able to raise money to pay taxes in the late 1860s and the 1870s, an indication that he was relatively well off even after the Civil War. *The Reynolds Homestead* by Nannie M. Tilley, 17-18.

[71]  *The RJ Reynolds Tobacco Company* at 14.

[72]  *Id.* at 21.

[73]  *Id.* at 24.

[74]  *Id.* at 26.

[75]  *Id.* at 31.

[76]  *Id.* at 48.

162.   On April 4, 1899, R. J. Reynolds Tobacco company became a subsidiary of the American Tobacco Company[77] through its relationship with the Continental Tobacco Company,[78] a holding company of the American Tobacco Company.[79]  The American Tobacco Company owned controlling shares of stock in R.J. Reynolds Tobacco Company thereby benefiting from and aiding in its already profitable operations.[80]  This relationship existed until 1911, when the U.S. Supreme Court issued a ruling that broke the old American Tobacco Company into several large competing companies.[81]  Upon information and belief, R.J. Reynolds Tobacco Company does continuous and systematic business in every jurisdiction in which the suits have been filed.

163.   Currently existing companies, once part of the American Tobacco Company, and therefore beneficiaries of the slave labor include: R. J. Reynolds Tobacco Company, Brown & Williamson (formerly The American Tobacco Company via ownership

---

[77] This "Tobacco Combination" or trust formed by James Buchanan Duke was wholly owned by Continental Tobacco Company.

[78] *Id.* at 104.

[79] *Id.* at 95

[80] *Id.* at 101.

[81] http://www.bw.com/Index_sub2.cfm?ID=10

of its predecessor by R.J. Reynolds Tobacco Company),[82] Liggett Group Inc. (formerly Liggett & Myers Tobacco Company), and Lorillard Tobacco Company a subsidiary of Loews Corporation.[83] All do continuous and systematic business in all the jurisdictions in which the cases have been filed.

164. It attempted to minimize its involvement in statements to the Press claiming its company was not founded until after slavery was abolished, misleading plaintiffs into believing that the company itself was not founded on the profits of slave labor.

165. Defendant BROWN AND WILLIAMSON TOBACCO CORP. ("BROWN & WILLIAMSON") is a corporation with its principal place of business located at 200 Brown & Williamson Tower, Louisville, Kentucky 40202. Upon information and belief, it does continuous and systematic business in all jurisdictions where these actions have been filed. BROWN AND WILLIAMSON is a successor in interest to The American Tobacco Company. BROWN AND WILLIAMSON benefited from slave labor because it was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco Company from the uncompensated labor of

---

[82] Nanny M. Tilley. The RJ Reynolds Tobacco Company, at 546.

[83] http://www.bw.com/Index_sub2.cfm?ID=10

enslaved Africans. Such use of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states. It does continuous and systematic business in all the jurisdictions in which the cases have been filed.

166. Defendant LIGGETT GROUP INC. is a corporation with its principal place of business located at 100 Maple Lane, Mebane, North Carolina. It does continuous and systematic business in California. LIGGETT GROUP INC. is a successor in interest to the American Tobacco Company. LIGGETT GROUP INC. benefited from slave labor because it was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco Company from the uncompensated labor of enslaved Africans. Such use of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states.

167. Defendant R.J. REYNOLDS engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

168. Defendant LOEWS CORPORATION is the parent corporation of Lorillard Tobacco Company with its principal place of business located at 667 Madison Avenue, New York, New York 10021. Upon information and belief, it does continuous and systematic business in all the jurisdictions in which it is sued. LOEWS CORPORATION is a successor in interest to the American Tobacco Company due to its ownership of Lorillard Tobacco Company. LOEWS CORPORATION benefited from slave labor because its subsidiary was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco Company from the uncompensated labor of enslaved Africans. Such use of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states.

169. Defendant CANADIAN NATIONAL RAILWAY CO. is a corporation with its principal place of business located at 935 de La Gauchetiere St. West, Montreal, QU H3B 2, Canada. It does continuous and systematic business in New York. It is the successor-in-interest to seven predecessor railroad lines, that were constructed and/or run in part by slave labor.[84] Such use

---

[84] Jim Cox, *USA TODAY*, Feb. 21, 2002, citing Canadian National's ownership of seven rail lines built and/or operated by enslaved Africans including Mobile & Ohio which valued slaves lost to emancipation at $199,691 in 1865 (valued today at $2.2 million).

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 75*

of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states.

170. Furthermore, upon information and belief, CANADIAN NATIONAL was approached by members of the general public to verify their historical connection to slavery. They denied any connection thereto.

171. Defendant CANADIAN NATIONAL engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

172. SOUTHERN MUTUAL INSURANCE CO. is a corporation with its principal place of business in Georgia. Upon information and belief it issued policies on the lives of slaves in Louisiana. Upon information and belief, it does systematic and continuous business in Louisiana.

173. Defendant AMERICAN INTERNATIONAL GROUP INC. ("AIG") is a corporation with its principal place of business at 70 Pine Street, New York, New York, 10270. AIG is successor-in-interest to the United States Life Insurance Company in the City of New

York, which earned premiums from its sale of life insurance on the lives of enslaved Africans with slave owners as the beneficiaries. In the California Department of Insurance's May 2002 Slavery Era Insurance Registry approximately 200 slaveholders' policies are associated with AIG's predecessor United States Life Insurance Company in the City of New York. (U.S.Life).

(See, http://www.insurance.ca.gov/SEIR/Slaveholder.htm)

## GENERAL DEFENDANTS' DESCRIPTION

174. Defendants and the other known and unknown defendants used and/or profited from slave labor and have retained the benefits and use of those profits and products derived from that slave labor. Defendants knew that the plaintiff class was subject to physical and mental abuse and inhuman treatment at the time they earned those profits and since.

175. Defendants conspired with each other with intentions to violate plaintiffs' ancestors' basic human rights and by so doing, to profit from these violations.

## MISCELLANEOUS UNIDENTIFIED DEFENDANTS

176. Defendants CORPORATE DOES NOS. 1-100 are other companies, industrial, manufacturing, financial and other

enterprises that, like the named defendants, its/their predecessors, affiliates and/or assigns unjustly profited from slave labor. The designation CORPORATE DOES NOS. # 1-100 is used until such time as the specific identity of such additional companies, as they relate to this action, is ascertained through discovery and/or other means.

### CLASS ALLEGATIONS

177. This action is brought and may properly be maintained as a class action pursuant to the provision of the Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). Plaintiffs seek certification of the following class and subclasses:

a) formerly enslaved plaintiffs who where enslaved post-emancipation- all living African-Americans who were enslaved in the United States post-emancipation as a result of the lingering effects of the institution of slavery in this country.

b) Direct descendants of slavery whose parents were enslaved in the United States and who can identify an industry identified in the complaint;

c) Direct descendants of slavery whose parent(s) were enslaved in the United States and who can name a direct defendant who utilized plaintiffs' ancestor's labor or received

a profit directly as a result of the parent's particular connection to that defendant;

d) Second generation descendants of slavery whose grandparents were enslaved in the United States and who can name an industry identified in the complaint;

e) Second generation descendants of slavery whose grandparents were enslaved in the United States and who can name a direct defendant who utilized plaintiffs' ancestor's labor or received a profit directly as a result of the grandparent's particular connection to that defendant;

f) All other subsequent generations of descendants of enslaved Africans who can identify the industry group in which their ancestor labored;

g) All other subsequent generations of descendants of enslaved Africans who can identify the specific defendant for whom the plaintiffs' ancestors provided services or whom a specific defendant profited from;

h) Third generation descendants of slavery whose great grandparents were enslaved in the United States and who can name a particular defendant;

i) All descendants of enslaved Africans who purchased product from the defendant corporations and who would not have

done so had defendants' accurately described their involvement in the Trans-Atlantic slave trade.

178. The exact number of plaintiff class members is not known. Plaintiffs estimate that the class includes millions of African-American descendants of enslaved Africans and the plaintiffs estimate that the combined number of persons in each subclass is so numerous that joiners of individual members is impracticable. The number and identities of the class members can only be ascertained through appropriate investigation and discovery.

179. Questions of fact and law are common with respect to each class member. Common questions of fact and law include:

a) Whether defendants knowingly, intentionally and systematically benefited from the use of enslaved laborers;

b) Whether defendants wrongly converted to their own use and for their own benefit, the slave labor and services of the plaintiffs' ancestors, as well as, the products and profits from such slave labor;

c) Whether the defendants knew or should have known that they were assisting and acting as accomplices in immoral and inhuman deprivation of life and liberty;

d)    Whether defendants have been unjustly enriched by their wrongful conduct;

e)    Whether, as a result of this horrific and wrongful conduct by the defendants, the plaintiff class is entitled to restitution or other equitable relief, or to compensatory or punitive damages.

f)    Whether plaintiff should be allowed to receive documents as a separate claim in instant action;

g)    Whether or not defendants' actions constituted a crime against humanity for which plaintiffs is entitled to judgment in accordance with Third Party Liability issues;

h)    Whether the defendants' acts constituted a violation of 42 U.S.C.S. Section 1982;

i)    Whether the defendants' acts through theories of Third Party Liability constitute a violation of numerous torts;

j)    Whether defendants' actions violate the Alien Tort Claim Act.

k)    Whether the defendants engaged in unfair deceptive, fraudulent or unconscionable business or trade practices, acts, or omissions; and

l)    Whether the defendants engaged in unconscionable or unfair methods of competition.

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 81*

180. The claims of the individually named Plaintiffs are typical of the claims of the Plaintiff Class Members. Plaintiffs and all members of the Plaintiff Class have been similarly affected by the defendants common course of conduct and the members of each class have similar claims against the defendants. The claims of all class members depend on a showing of the defendants' common course of conduct, as described herein, which gives plaintiffs, individually and as class representatives, the right to the relief sought herein.

181. There is no conflict as between plaintiffs and the other members of the class with respect to this action or the claims for relief. Plaintiffs know and understand their asserted rights and his role as class representatives.

182. Plaintiffs and their attorneys are able to and will fairly, and adequately, protect the interest of the Class. Several of plaintiffs' attorneys are experienced class action litigators who are or will be able to conduct the proposed litigation. Plaintiffs' attorneys can vigorously prosecute the rights of the proposed class members.

183. Prosecution of separate actions by individual plaintiffs will create the risk of inconsistent and varying

adjudications and will establish incompatible standards of conduct for defendants in that different Courts may order defendants to provide different types of accounting or take other inconsistent actions.

184.    Prosecutions of separate actions by individual plaintiffs of other proposed class members not party to the adjudications will substantially impair or impede their ability to protect their interest in that, for example, defendants may exhaust their available funds in satisfying the claims of earlier plaintiffs to the detriment of later plaintiffs.

185.    Defendants have acted and/or refused to act on grounds generally applicable to the proposed class, making final injunctive relief and correspondent declaratory relief appropriate with respect to the class as a whole in that defendants have been unjustly enriched by participation in acts that were known to be immoral and inhumane, and defendants: (a) prevented and or refused restitution to the proposed class members, (b) prevented and/or refused to disgorge wrongfully gained and/or earned profits and benefits, or (c) refused to provide a full and complete accounting and disclosure of the extent of their aforesaid actions.

186.   Common questions of law and fact predominate in the claims of all class members, including the named plaintiffs. These claims depend on proving defendants are liable for their acts and/or omissions based, in part, on evidence of a common scheme.   Plaintiffs' and the plaintiff class members' proposed evidentiary showings would be based on the same documents and testimony concerning the defendants' actions.

187.   A class action is superior to the other available methods for the fair, just and efficient adjudication of the controversy.  Plaintiffs and the plaintiff class members have no interest in individually controlling the prosecution of separate actions and, instead are on the whole incapable as practical matter of pursuing individual claims.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expenses to all parties in that the Court system of resolving the controversies engendered by defendants/individual and/or common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy and the fair and equitable handling of all plaintiffs' claims in a single forum.  The conduct of this

action as a class action conserves the resources of the parties and of the judicial system, and reserves the rights of each class member. Furthermore, for most class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice. A large concentration of proposed class members is estimated to reside in this District and nearby states. The management of the litigation as a class would pose few problems for this Court.

188. Certification of the plaintiff class is appropriate under Fed. R. Civ. P. 23(a) and also under 23(b)(2), 23(b)(3).

## STATUTE OF LIMITATIONS TOLLED

189. The statute of limitations for the causes of action brought in this Complaint are tolled via one or more of the following doctrines, theories or rules: crimes against humanity, Federal Accrual/Discovery Rule, Equitable Tolling and Continuing Violation.

### Crimes Against Humanity

190. Just as there is no statute of limitation for murder in any State in the Union, there is no statute of limitation for crimes against humanity.[85]   Slavery is and has always been by

---

[85]   Article 29 of the International Criminal Court at the Hague codified the Practice of International Law, i.e., the crimes within the jurisdiction of the court shall not be subject to any statute of limitations; see also, Convention on the Non-Applicability of Statutory Limitations to War Crimes

definition a crime against humanity. There has never been a legitimate justification for the economic and social subjugation of one person to another.

191. The institution of slavery in the United States was the most obscene and extreme example of the practice of slavery given that the economically interdependent conspiracy was so complete that these unjust profits were garnered at every level of the market. Therefore any profits from such a heinous activity are not, nor should they be, sheltered by a statute of limitation.

## Federal Accrual/Discovery Rule

192. While it is clear that the Africans and African-Americans who were enslaved were enslaved against their will and robbed of all their rights to include their "life, liberty and the pursuit of happiness," these individuals were not privy to the causes and extent of the harms they suffered. Without this information, the claim does not accrue.

193. It is equally clear that the plaintiffs were in large part uneducated, unsophisticated and in most cases in extremely difficult circumstances after the passage of the 13th Amendment to the U.S. Constitution ostensibly abolishing slavery. In

---

*and Crimes Against Humanity*, General Assembly Resolution 2391 (XXIII) of 26

fact, as with the slave population of Texas and elsewhere, the mere knowledge of "emancipation" was difficult to obtain having been delayed for years and, for some, decades.[86] To impute to these individuals who have been subjugated for over a century, and for some for generations, what amounts to an omniscient knowledge of their rights, the violations they suffered, those that were the cause of and those that illegally profited from those violations is an incredible fiction.

194. The information related to the extent, nature and cause of the harms was and is uniquely within the possession and control of the named defendants in this case or their predecessors and other privately held corporations and businesses. This information includes, but is not limited to, business relationships, contracts for goods and services, manifests, business ventures, annual reports, slave holdings, shipping records, etc. The vast majority of this information and documentation has never been available to or accessible by the public. With the recent advent of the Internet and other research tools recently, a few talented or privileged individuals have accessed some of the documentation leading to

_____

November 1968.

information about the extent, nature and cause of the harms suffered.

195. As an example of the difficulty of gaining access to the documentation and cooperation from the corporations, efforts merely toward the gathering and study of information related to slavery and its effects for African-Americans and American society in Congress have been thwarted for years. Specifically, Representative John Conyers from Michigan has for the last 11 years proposed Resolution No. 40 seeking to set aside $8 million dollars to study the effects of slavery and come up with a formula for reparations. His resolution has died in committee for each of these past eleven years. The opposition to this effort is at least in part clearly from corporate America as there has been no corporation, to include the named defendants in this action, which have gone on record as either supporting Rep. Conyers's resolution or voluntarily disclosing their documentation and knowledge of their connections with slavery.

196. The period following slavery rather than being a period of flourishing for Africans and African-Americans was simply another period of subjugation with Jim Crow laws and other forms of segregation. This period made it all the more

---

[86] Reference to Plaintiff's motion to depose C. Doe from Louisiana, who is a

difficult for the plaintiffs to gain access to information which would have put them on notice of the violations of their rights as asserted within this Complaint.

### Equitable Tolling

197. The named defendants and/or their predecessor entities engaged in one or more of the following: slave business dealings which were self-concealing, denials of any profits from slavery and/or denials to the public for access to or accountings of documented slavery dealings and profits from same.

198. The nature of the complained of business dealings by the defendants, as discussed in more detail in those portions of this Complaint, establishes that they were self-concealing from the enslaved African and African-Americans. For example, there is no reason for the slaves to know or be aware that their lives were insured; that financing deals controlled their lives; or that profits far a field from their miserable existence occurred.

199. A number of the defendants have also over the years specifically and falsely denied having any connection to slavery.

---

104 year old man who was enslaved despite the adoption of the 13th Amendment to the Constitution.
*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 89*

200. Despite efforts, the plaintiffs have been unable to secure records from a number of the defendants with regards to their ancestors due to the failure of most, if not all, to be able to reliably access documents establishing business relationships, ventures and dealings, contracts, shipping manifests, human cargo lists that may directly connect the plaintiffs with their slave ancestors and their free ancestors. The lists should provide more connections than not having this information, obviously. However, even this information will not provide an easy answer as further efforts were employed to destroy access to information and causation such as the changing of names at most, if not all, stages of the slave trade to include the original kidnapping and Trans-Atlantic journey, all sales and resales, sales of children and their children's children thus making it nearly impossible to accurately trace records.

201. Recent advances in Internet and computer databases have made these records more accessible.

202. Likewise, corporate histories and records have also been extremely difficult and inaccessible to most people. Hence, research tracing the monetary benefit derived by American

corporations from the slave trade has only been accessible and discussed by prominent researchers within the last year.

203. Plaintiffs incorporate by reference, as if fully set forth herein, the paragraphs from the preceding Federal Accrual/Discovery Rule section related to the defendants' efforts to withhold documentation and information.

### Continuing Violation

204. Finally, the action of each of the defendants by their failure to provide an accounting to the plaintiffs constitutes a continuing violation that tolls the statute.

### THIRD PARTY LIABILITY

a)    Aiding and Abetting Liability.

205.   Both customary international law and domestic law specifically recognize the liability of principals who commit a tortious act.   Both customary international law and domestic law also recognize the liability of those who aid and abet or otherwise participate in that wrongful act.

206.   Defendants aided and abetted others in the furtherance of the commission of the crimes of forced labor, extrajudicial killing, torture, cruel, inhuman and degrading treatment.

207. The principal of secondary liability of aiders and abettors to crimes against humanity date back to the 1700's.

b) **Criminal Enterprise Liability.**

208. International law and domestic law impose liability for participation in a criminal enterprise where, *inter alia*, a party acted in furtherance of a particular system in which the crime is committed by reason of the accused's function and with knowledge of the nature of that system and intent to further that system. Liability is imposed on all persons who had: the intention to take part in a joint criminal enterprise and to further-individually and jointly-the criminal purposes of that enterprise and where it is foreseeable that crimes will be committed by other members of the enterprise.

c) **Other Standards of Liability.**

209. In addition to and independent of aiding and abetting liability, domestic law imposes liability on third parties for the wrongful acts of another where the is, a joint venture, an agency relationship, negligence or reckless disregard.

210. "Reckless disregard" encompasses "objective recklessness" and "subjective recklessness" and imposes liability when one party acts with reckless disregard for the welfare of another.

211. "Objective Recklessness" imposes liability on a person who acts in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.

212. "Subjective Recklessness" imposes liability on a person who knows a substantial risk that was subsequently disregarded.

213. Recklessness does not require proof of intent, but only that a party acted in conscious disregard of known dangers.

214. Third party liability is also imposed when a third party acts with deliberate indifference to a substantial risk of harm to another.

## COUNT I - CONSPIRACY

215. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

216. Each of the defendants acted individually and in concert with their industry group and with each other, either expressly or tacitly, to participate in a plan that was designed in part to commit the tortious acts referred to herein.

217. For instance, each industry group was co-dependent on the others and operated as a joint enterprise, designed in part,

to maintain and continue a system of inhumane servitude. The shipping and railroad industry benefited and profited from the transportation of the slaves. The railroad industry utilized slave labor in the construction of rail lines. These transportation industries were dependent upon the manufacturing and raw materials industries to utilize the slaves they shipped and provide them further profits from shipping the produced raw and manufactured items to the various markets. The cotton, tobacco, rice and sugar industries thrived on profits generated from their use of slave labor, and relied upon financial and insurance industries to finance and insure the slaves that they utilized and owned. All industries: raw market, retail, financial, insurance, and transportation, benefited from the reduced costs of slave-produced goods.

## COUNT II- DEMAND FOR AN ACCOUNTING

218. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

219. Defendants knew or should have known of the existence of corporate records that indicate their profiting from slave labor. Plaintiffs and the public have demanded that the

defendants reveal their complete corporate records regarding same and that a just and fair accounting be made for profits derived from the slave trade.

220. There is no adequate remedy at law for the harm arising from the failure to provide corporate documentation related to slavery.

221. The tangible production of this documentation is essential to the victim classes:

a) to heal the continuing psychic harm associated with slavery;

b) to trace ancestral records;

c) to provide a public and historical record of the violent force necessary to maintain a hierarchy to support slavery[87];

d) to provide evidence of past and subsequently established discrimination;

e) to provide a historical record of the economic benefits that accrued to the defendant private institutions as a result of slavery to more fully describe and document the connection between the institution of slavery and racist/discriminatory policies that still exist today.

f)   to assist in stemming racial discrimination through the knowledge of the role slavery played in its root causes.

222. There is a fiduciary relationship that arose between the litigant classes and defendants by virtue of defendants' superior position, maintenance of those positions and, their holding in constructive trust, the proceeds of the unpaid labor of the plaintiffs and/or their ancestors.

223.  Defendants have failed to provide said records and have failed to comply with plaintiffs' demands for same.

WHEREFORE, plaintiffs demand judgment requiring: (a) defendants make a full disclosure of all of their corporate records that reveal any evidence of slave labor or their profiting from same; (2) seeking the appointment of an independent historic commission to serve as a depository for corporate records related to slavery and; (3) directing defendants to account to plaintiffs for any profits they derived from slavery.

---

[87] Keith M. Hylton – *Slavery and Tort Law*, Working Paper Series, Public Law & Legal Theory, Working Paper No. 03-02 (discussing advantages of an accounting claim in slavery reparations lawsuit at 151-53, 1/3/03.

## COUNT III – CRIME AGAINST HUMANITY

224.    Slavery is and has always been a crime against humanity.[88]

225. The Trans-Atlantic Slave trade and the slavery carried out in the Americas are internationally recognized as crimes against humanity.

226. "Slavery is completely banned in all forms under international law: 1948 Universal Declaration of Human Rights; 1966 International Covenant on Civil and Political Rights; European Convention for the Protection of Human Rights and Fundamental Freedoms; American Convention on Human Rights; African Charter on Human and Peoples' Rights; the Slavery Convention; Restatement of the Foreign Relations Law of the United States" [89], [90]

---

[88] "For the purpose of this Statute: 'crime against humanity' means any of the following acts: ... (c) Enslavement," The Rome Statute establishing the International Criminal Court, effective date, July 1, 2002.

[89] Jon M. Van Dyke, "Reparations for the Descendants of American Slaves Under International Law," pp 5-6, Williams S. Richardson School of Law, University of Hawai'i at Nanoa

[90] Sec. 13, "Durban Declaration and Plan of Action," "*We acknowledge that slavery and the slave trade, including the transatlantic slave trade, were appalling tragedies in the history of humanity not only because of their abhorrent barbarism but also in terms of their magnitude, organized nature and especially their negation of the essence of the victims, and further acknowledge that slavery and the slave trade are a crime against humanity and should always have been so, especially the transatlantic slave trade and are among the major sources and manifestations of racism, racial discrimination, xenophobia and related intolerance, and that Africans and people of African descent, Asians and people of Asian descent and indigenous peoples were*

227. Prior to and during the era of chattel slavery in North America, Customary International Law did not recognize the legality of slavery.[91]

---

*victims of these acts and continue to be victims of their consequences "* United Nations World Conference Against Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance," adopted in Durban, South Africa 9/8/01. Emphasis added

[91] Louis de Jaocourt, *"This purchase is a business which violates religion, morality, natural law, and all human rights. There is not one of those unfortunate souls who does not have the right to be declared free, since in truth he has never lost his freedom; and he could not lose it, since it was impossible for him to lose it; and neither his prince, nor his father, nor anyone else had the right to dispose of it."* Contribution to Diderot's *Encyclopedie*, 1765; Lieber's Code, *"Slavery, complicating and confounding the ideas of property (that is, of a thing) and of personality (that is, of humanity) , exists according to municipal or local law only. The law of nature and nations has never acknowledged it. The digest of the Roman law enacts the early dictum of the pagan jurist, that 'so far as the law of nature is concerned, all men are equal.' Fugitives escaping from a country in which they were slaves, villeins or serfs, into another country, have, for centuries past, been held free and acknowledged free by judicial decisionss of European countries, even though the municipal law of the country n which the slave had taken refuge acknowledged slavery within its own dominions"* General Orders no. 100, Instructions for the Government of Armiesof the United States in the Field, Section I, para. 42 issued by President Abraham Lincoln,, 24th of April 1863; Wiecek, William, M. *"The [Siete] Partidas [1265] stated that slavery was contra razon de natura, and the Cuban [Slave] code ... declared slavery to be 'the most evil and the most despicable things which can be found among men.'"* Somerset: Lord Mansfield and the Legitmacy of Slavery in the Anglo-American World, 42 U. of Chi. L.R. 86, f.n.70 at 107 (1974); Geraldine Van Bueren, *"Britain is legally bound, despite current denials, to pay reparations for the slave trade. Long forgotten documents show Britain knew that the slave trade was illegal, even while Britons continued to trade in slaves. It is assumed, wrongly, that there were no international laws [that] prohibited the slave trade at the time of the African slave trade ... The General Act of the Berlin Conference 1885 declared that 'trading in slaves is forbidden in conformity with the principles of international law.' Britain was one of the 15 signatory powers. The Act was not a treaty establishing rules for future behaviour, but was declaratory of existing genera; 'principles of international law.' By signing [it], Britain was acknowledging that the slave trade was illegal under international law prior to 1885,"* It's Britain's Guilty Secret, THE GUARDIAN, London, 25 May, 2001.

## COUNT IV – PIRACY

228.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

229.    In 1820, Congress determined that the slave trade was so repugnant that perpetrators as well as their aiders and abettors should be subject to the death penalty and the slave trade should be formally equated to the international crime of piracy.[92]

230. Defendants, upon information and belief committed the crime against humanity by their actions either directly or indirectly in support for the continuation of the smuggling of Africans.

231. As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or

---

[92] [16th Congress. Session 1, Ch. 113, May 15, 1820].

benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein, together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

## COUNT V - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS[93]: RAPE, BREEDING, TORTURE, ABUSE AND THE SPREAD OF RACIST BELIEFS.

232. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs.

### Sexual Exploitation/Breeding

233. Defendants' predecessor companies aided or abetted, or under other theories of third party liability as have been

---

[93] Dean M. Richardson, a professor of Law, states that [a]lthough the applicability of the tort of outrage to racial discrimination seems clear, Plaintiffs rarely have employed this theory of action to combat racism (the infrequent use of this theory was due to the fact that a proof of assault or battery was required to show harm). The tort of outrage has three components: the defendant's state of mind, the Plaintiff's severe emotional distress, and the egregiousness of the defendant's conduct.

described more fully herein, participated in, allowed, or implicitly or recklessly, sanctioned, and/or benefited from an institution that relied in the sexual exploitation, violent abuse and rape to achieve its goals of a malleable and unpaid work force. The violence and crimes against the enslaved group were done with the calculated intent of demeaning, subjugating, and controlling the enslaved population for purposes of exploitation for profit and for the direct benefit of commercial industries. This wholesale sexual exploitation resulted in the birth of countless racially mixed children who remained unclaimed by their fathers. It further resulted in and was intended to result in the creation of a belief structure founded on racial ideology based upon inequality.

234. Likewise, the defendants' predecessor companies aided or abetted or, under other theories of third party liability, as have been described more fully herein, participated in, allowed, implicitly or recklessly, and/or benefited unjustly from human breeding whereby slave owners forced plaintiffs and plaintiff's ancestors to have sex with multiple individuals in order to create a stronger, bigger and healthier enslaved person for

exploitation for profit[94]. The result of this was to demean and diminish the humanity of plaintiffs. African-Americans are still subject to the false legacies and harmful myths that grew out of this inhumane practice.

235. Defendants' predecessor companies aided or abetted, or under other theories of third party liability, as have been described more fully herein, participated in, allowed, implicitly and/or recklessly sanctioned, and/or unjustly benefited from the wholesale torture of enslaved people. Abuse was used as mechanism to intimidate, control, and terrorize plaintiffs in order to prevent any resistance. Such torture also served to ingrain in the minds of plaintiff and plaintiffs' ancestors the belief of the omnipotence of the slave master. The torture was intended to have a long lasting impact on plaintiff, plaintiffs' ancestors and the rest of society. Acts of torture were usually public and intended to inflict significant fear among the enslaved and confidence by those in power that such treatment was legitimate.

<u>Intentional Promotion of Racism.</u>

236. Defendants' predecessor companies, aided or abetted, or under other theories of third party liability as have been

---

[94]  See footnote 16 at 20 herein, for a complete citation of authorities

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 102*

described more fully herein, participated in, allowed implicitly or recklessly and/or unjustly benefited from the intentional efforts to weaken the spirit and well-being of the plaintiff class by the publication of statements and messages designed to demean and demoralize the plaintiff and plaintiffs' ancestors by alleging that plaintiffs' ancestors were inferior, destined by God to be slaves to defendants and other self-defeating messages. That defendants made such repetitive statements and took actions to reinforce these beliefs resulted in severe physic scarring. The perpetuation of these false beliefs were done with the purpose to enslave plaintiffs and plaintiffs ancestors for profits; in order to force the social death of plaintiff and plaintiffs' ancestors; in order to transform plaintiffs and plaintiffs' ancestors into a commodity to be worked, sold, and discarded without resistance with the intent to cause or with reckless disregard of a substantial probability of causing severe emotional harm and distress of such intensity that no person could be expected to endure.

237. This behavior resulted also in **contagion and mass belief**[95] that plaintiffs and plaintiffs' ancestors were beasts,

supporting "breeding".
[95] Aaron Lynch, *Thought Contagion and Mass Belief*, by Aaron Lynch, is an article how beliefs are spread and how the Nazis intentionally infected the Germany population with false racist beliefs about the Jews that took on a

marginal, of inferior intellect, incapable of reason and logic, diseased, inhuman, unequal to whites, descendants of the devil, destined by God to be slaves to defendants and, incapable of being civilized. The result of this initial effort caused severe emotional harm and distress.

238. As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein,

---

life of its own in the society at that time harming the Jewish population of Germany. (www.thoughtcatagion.com/ecamb.htm) (September 19, 1997).

together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

## COUNT VI - CONVERSION

239. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

240. As a result of defendants' failure and refusal to account for, acknowledge and return to plaintiffs and the plaintiff class, the value of their ancestors' slave labor, defendants have willfully and wrongfully misappropriated and converted the value of that labor and its derivative profits into defendants' own property.

241. Defendants have never accounted for or returned the value of plaintiffs' ancestors' slave labor and the profits defendants derived from said slave labor.

242. As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies,

profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein, together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

### COUNT VII - UNJUST ENRICHMENT

243. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

244. Defendants have improperly benefited from the immoral and inhumane institution of slavery in the United States.

245. Defendants have failed to account for and or return to plaintiffs and the plaintiff class the value of their ancestors' slave labor and/or the profits and benefits the defendants

derived therefrom and defendants have concealed the nature and scope of their participation in the institution of slavery.

246. The actions of the defendants in relation to the enslavement of plaintiff ancestors has resulted in an impoverishment to the plaintiff and the class of persons seeking relief and their ancestors, to the unjust enrichment of the defendants.

247. Defendant's failure to pay for the labor provided by the slaves without receiving any compensation, has allowed defendants to retain a benefit at the expense of the plaintiffs' and their ancestors.

248. There is an absence of legal or moral justification for the enrichment of the defendants and the impoverishment of the plaintiffs.

249. Plaintiffs and the class of persons sought to be represented are entitled to restitution for the unjust enrichment of the defendants.[96]

250. The defendants and their past and present stakeholders were and are still being unjustly enriched via the conversion of the slaves' work without just compensation or consideration. Additionally, the prior slaves and the

plaintiffs named herein were deprived of their moral and legal rights to seek and secure basic education, economic independence and the utilization of the natural law of self-preservation and human dignity. Accordingly, the defendants' actions were in violation of recognized common law.

251. The defendants named herein were unjustly enriched as a result of their participation in slavery. Defendants should not be allowed to continue to benefit from their improper actions.[97]

252. Compensation, reduction of future misfortune and expression of moral judgment are the three goals of a compensation system.[98] Absent equitable relief under the theory of unjust enrichment or another theory contained herein, plaintiffs will be left without remedy.

---

[96] See, John Hope Franklin and Scott Ellsworth's publication "History Knows No Fences: An Overview"; published with the Oklahoma History Commission Report, pgs. 21, 26, 27 and 28 (2001).
[97] See, cf. U.C.C. ss 2-403, 3-302 (1978), nor can the beneficiary of goods and services keep the benefits without paying restitution: see, e.g. Small v. Badenhop, 67 Hasrv. 628. 701 p. 2d 647 (1985).

[98] See, Abel, Pounds of Cure, Ounces of Prevention, 73 Calif. L. Rev. 1003 (1985). Cf. Note, Victim Restitution in the Criminal Process: A Procedural Analysis, 97 Harv. L. Rev. 4 (1984) identifying the multidimensional goals of restitution in the criminal law, including deterrence, compensation, retribution and rehabilitation; Fletcher, Punishment and Compensation, 14 Creighton L. Rev. 691 (1981) which discuss the philosophical basis for compensation systems].

253. As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein, together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

## COUNT VIII - 42 U.S.C. § 1982

254. Plaintiffs incorporate all allegations contained elsewhere in this complaint within this section as if fully set forth herein.

255. In conjunction with defendants' conduct as alleged elsewhere in this complaint that directly denied slaves of the

fruits of their labor or otherwise resulted in defendants' profits directly related to slavery and the lives of slaves, the defendants' continuing conduct in restricting access to the defendants' records related to their activities and profits related and derived from slavery, the plaintiffs', their ancestors' and their descendants' rights to inherit and convey property under 42 U.S.C. § 1982 have been and continue to be violated.

256. Specifically, 42 U.S.C. § 1982. Property Rights of Citizens, Civil Rights Act of 1866, provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

257. Defendants have engaged in conduct with the clear intent to deprive the plaintiffs, their ancestors and their descendants from having access to what is rightfully theirs which in turn denies them, in accordance with the defendants' clear intent, the opportunity to inherit and convey personal and real property representing their families' combined and accumulated wealth as do and have the white citizens of this country.

258. No non-slave or non-slave family has suffered the same or similar denial of wealth at the hands of the defendants' illegal profiting from slavery and continued pattern and practice of retaining this ill-gotten wealth by restricting from all members of the public access to information related to the defendants' activities and profits from slavery, as well as continued profits with this enormous and incomparable source of wealth.

259. It was not until 1968 that 42 U.S.C. § 1982 was even held by the United States Supreme Court, *Jones v. Mayer Co.*, 392 U.S. 409 (1968), to even apply to private discrimination as opposed to discrimination only under color of state law. That is, 102 years of dormant, not lost, statutory effect.

260. Without information within the knowledge of the plaintiffs, their ancestors and descendants of the part played by defendants in their loss of wealth the plaintiffs', their ancestors' and their descendants' rights related to inheritance and conveyance of their families' accumulated yet stolen wealth were directly violated.


### COUNT IX - ALIEN TORTS CLAIMS ACT
### (Pled In The Alternative)

236. Plaintiffs on behalf of themselves, their ancestors

and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

237. Many of the torts set out in the instant complaint occurred prior to the formal end of chattel slavery in the United States of America (passage of the 13th Amendment to the Constitution of the United States 1865).

238. Enslaved Africans were aliens, i.e. not considered citizens of the United States, until the passage of the Fourteenth Amendment to the Constitution of the United States.

239. Plaintiffs are descendants of these alien, non-citizen Africans who were the victims of the Trans-Atlantic slave trade and slavery in North America and in the United States of America.

240. Trafficking in the international slave trade was prohibited under Federal law after 1808. (See, supra, paras. 31-34.)

241. Slavery and international slave trafficking violated the law of nations, i.e. international customary law prior to 1865. (see paragraphs 30, 32-36 supra)[99]

---

[99] Conduct violates the "law of nations" if it contravenes "well-established, universally recognized norms of international law." Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir. 1995), cert. denied, 518 U.S. 1005, 135 L. Ed. 2d 1048, 116 S. Ct. 2524 (1996). In United States v. Smith, 18 U.S. (5 Wheat.)

242. The alien victims of the torts set out in this complaint did not have the access to the Court system necessary to utilize the ATCA.

243. As a result of defendants' acts in violation of the laws of nations, plaintiffs and members of the plaintiff class have been injured and are entitled to compensatory and punitive damages against the defendants in an amount to be determined at trial.

## COUNT X - ILLINOIS STATE CLAIM

244. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

245. The aforementioned acts and practices of the defendants are in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCA Sec 505/1 et seq.

## COUNT XI - LOUISIANA STATE CLAIM

246. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege

---

153, 160-61, 5 L. Ed. 57 (1820); " The general rule is that international law only binds state actors. However, courts interpreting the ATCA have found that certain forms of conduct--piracy, the slave trade, slavery and forced labor, aircraft hijacking, genocide, and war crimes--violate the law of nations "whether undertaken by those acting under the auspices of a state or only as private individuals." Kadic, 70 F.3d at 239.

*First Amended and Consolidated Complaint*
*American Slavery Case*
*Page 113*

as if fully set forth, each and every allegation contained in the preceding paragraphs.

247. The aforementioned acts and practices of defendants are in violation of Louisiana's Unfair Trade Practices and Consumer Protection Law, La R.S. 51:1401 et seq.

## COUNT XII - NEW JERSEY CLAIM

248. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

249. The aforementioned acts and practices of defendants are in violation of New Jersey's Unfair Trade Practice Law. N.J.S.A. Sec. 56:8-1.

## COUNT XIII - NEW YORK STATE CLAIM

250. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

251. The aforementioned acts and practices of defendants are in violation of New York's Consumer Protection From

Deceptive Acts and Practices Laws. NY CLS Gen Bus Sec. 349 and Sec. 350.

### COUNT XIV - TEXAS STATE CLAIM

252. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

253. The aforementioned acts and practices of defendants are in violation of Texas' Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. and Com. Code Sec. 17.41.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the plaintiff class demand a jury trial and judgment and damages against the Defendants, jointly, severally, on the basis of market share liability, and/or in the alternative, as follows:

(1)  For an order certifying the plaintiff class alleged herein;

(2)  For an accounting;

(3)  For the appointment of an independent historic commission;

(4)  For the imposition of a constructive trust;

(5)  For restitution of the value of their ancestors' slave labor;

(6)  For restitution of the value of their unjust enrichment based upon slave labor;

(7)  For disgorgement of illicit profits;

(8)  For compensatory damages in an amount to be determined by trial together with interest;

(9)  For exemplary or punitive damages in an amount to be determined at trial;

(10) For attorneys' fees;

(11) For the cost of this action; and

(12)   Such other and further relief justice so requires.

Dated:       June 16, 2003
             Livingston, New Jersey

_____
DIANE E. SAMMONS, ESQ.
**Nagel, Rice & Mazie**
301 South Livingston Avenue, Suite 201
Livingston, New Jersey 07039
973-535-3100

ROGER S. WAREHAM, ESQ. (RW 4751)
JOMO SANGA THOMAS, ESQ. (JT 7544)
**Thomas Wareham & Richards**
527 Flatbush Avenue, Suite 2
Brooklyn, New York 11225
(718) 941-6407

EDWARD D. FAGAN, ESQ. (EF-4125)
**Fagan & Associates**
51 JFK Parkway
1st Floor, West
Short Hills, NJ   07078
(973) 218-2610

LIONEL JEAN-BAPTISTE, ESQ.
**Jean-Baptiste & Associates**
1900 Asbury Avenue
Evanston, Illinois 60201
(847) 424-0400

**GARY L. BLEDSOE, ESQ.**
312 W. 12th Street, Suite 307
Austin, Texas 78701
512-322-9992
Fax 512-322-0840
Texas Bar # 02467500
Attorney of Record

ROBERT NOTZON, ESQ.
509 W. 16th Street
Austin, Texas 78701
512-474-7563
Fax 512-474-9489
Texas Bar # 00797934

MORSE GELLER, ESQ.
116-10 Queens Boulevard
Forest Hills, New York 11375
(718) 520-0300

PIUS A. OBIOHA, ESQ.
1546 North Broad Street
New Orleans, Louisiana 70119
504-944-1049

BRYAN R. WILLIAMS, ESQ.
46 Trinity Place, 4th Floor
New York, New York 10006
(212) 505-1800

DUMISA BUHLE NTSEBEZA, Judge Advocate
718 Hugenot Chambers
40 Queen Victoria Street
8001, Cape Town
Republic of South Africa
(Special Advisor to the Plaintiff Class)

ROLAND W. BURRIS, ESQ.
1130 S. Wabash Avenue, Suite 501
Chicago, IL 60605
Special Advisor to the Plaintiff Class
(312) 566-0202

JOSEPH M. WRIGHT, J.D., Ph.D.
Chief Deputy Court Administrator
   & Associate Judicial Attorney
State of Michigan
36th District Court
421 Madison Avenue
Suite 5028
Detroit, Michigan  48226
(313) 965-2788

HARRY E. CANTRELL JR., ESQ.
The Cantrell Law Firm
309 Baronne Street
Suite 300
New Orleans, Louisiana  70112-1605
(504) 585-7347

LARRY KENNON, ESQ.
205 W. Randolph Street, Suite 1245
Chicago, IL 60606
(312) 263-6611