# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7764 | **DATE** | 1/26/2004 |
| **CASE TITLE** | In Re: African-American Slave Decendants Litigation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> MDL 1491
> Defendants' Joint Motion to Dismiss

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Before the court is Defendants' Joint Motion to Dismiss. Defendants' joint motion is granted without prejudice. It is so ordered. (See attached order).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | 1/26/04 | **137** |
| | Notified counsel by telephone. | | | date docketed | |
| ✔ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| | courtroom deputy's initials | CLERK U.S. DISTRICT COURT ON JAN 26 PM 3:21 FILED-ED 10 | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

DOCKETED

JAN 2 6 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE AFRICAN-AMERICAN SLAVE | ) | MDL No. 1491 |
| DESCENDANTS LITIGATION | ) | Lead Case No. 02 C 7764 |
| | ) | Honorable Charles R. Norgle |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge:

Before the court is Defendants' Joint Motion to Dismiss. For the following reasons, the motion is granted.

## I. INTRODUCTION

This case arises out of the institution of human chattel slavery as it existed in the North American colonies and the latter-formed United States of America. The allegations in Plaintiffs' First Amended and Consolidated Complaint ("FACC" or "Complaint") retell the generally acknowledged horrors of the institution of slavery, and the malignant actions of the sovereigns, entities and individuals that supported that institution. Plaintiffs' Complaint asks the courts to reexamine a tragic period in our Nation's history and to hold various corporate defendants liable for the commercial activities of their alleged predecessors before, during and after the Civil War in America. Defendants acknowledge that slavery marked a deplorable period in our Nation's history. However, they assert that Plaintiffs' claims, which arise from that period, cannot be heard in 2004 in a court of law.

## II. HISTORICAL OVERVIEW OF SLAVERY IN AMERICA

In essence, Plaintiffs' Complaint is a claim for reparations rooted in the historic injustices and the immorality of the institution of human chattel slavery in the United States. To elucidate the nature of this institution, the court undertakes an analysis, necessarily brief, of the historical

137

events surrounding slavery, including the monumental event that ended the institution of slavery in the United States, the Civil War.

## A. A Definition of Slavery

In January of 1865, General William Tecumseh Sherman of the Union forces, along with Secretary of War Edwin Stanton, met with former slaves. Ira Berlin, <u>Generations of Captivity: A History of African-American Slaves</u> 2 (2003). The conversation focused on two questions: from the point of view of the freed slave, what was the nature of slavery, and what was the nature of freedom? <u>Id.</u> Garrison Frazier, a sixty-seven year old former slave, explained that "[s]lavery . . . is receiving by the *irresistible power* the work of another man, and not by his *consent.*" <u>Id.</u> Freedom, Frazier indicated, "is taking us from the yoke of bondage, and placing us where we could reap the fruits of our own labor, take care of ourselves and assist the Government in maintaining our freedom." <u>Id.</u> Frazier's definition reminds us of the essential unfairness of slavery: the slaveowner takes, by sheer violence and force, the slave's freedom and labor in order to place himself at the top of a society's economic hierarchy. <u>Id.</u> at 3.

## B. A Brief History of Slavery in the New World

While slavery seems to have been a part of human history since the "dawn of civilization," African slave trafficking in the New World began in the year 1502. Robert William Fogel, <u>Without Consent or Contract: The Rise and Fall of American Slavery</u> 17-18 (1991). Europeans were historically drawn to Africa for two reasons: gold and slaves. Edward Reynolds, <u>Stand the Storm, A History of the Atlantic Slave Trade</u> 28 (1985). Those who journeyed to Africa seeking slaves for the New World sometimes simply kidnapped individuals who appeared before them by happenstance. Herbert S. Klein, <u>The Atlantic Slave Trade</u> 103 (1999). However, historical evidence indicates that a great deal (perhaps even the majority) of the slave trade was

made possible by African leaders who sold African slaves to European slave traders. Id.; see also Reynolds, supra at 33-46 (providing a detailed explanation of the African slave market, and the economic mechanisms used to facilitate the sale of slaves from local African chiefs to slave traders). Local African leaders acquired these slaves in several different ways: captives were taken in local wars or raids, those imprisoned for crimes or indebtedness were often forced into slavery, and large states would exact slaves as "tribute" from smaller tribes under their control. See Klein, supra at 117.

Upon their sale to slave traders, slaves were shipped to the New World in what became known as the "Middle Passage." Slaves' heads were shaved, their bodies were branded and stripped naked, and their ankles were shackled. See Reynolds, supra at 47. They were then led into the holds of slave ships, where they were laid down alongside each other for the journey to the New World. Id. at 48. The prevalence of disease, lack of sufficient food and water, and constant confinement took its toll, with up to one-quarter of the slaves on any given ship dying during the "Middle Passage." Id. at 48-53.

African slaves in the New World were initially sold into small sugar production operations in Brazil, Mexico, Peru, Cuba, Haiti, Jamaica, the British West Indies, and Dutch Guyana. Id. at 20-21. Other African slaves were set to work producing such crops as cocoa, coffee, hemp, tobacco and rice. Id. at 21. By the 1680s, the small farm with its traditional methods of operation had given way to more efficient means of production, and the concept of the large "plantation" was born. Id. at 23. Inefficient methods of farming had been "replaced by large gangs of slaves, working in lock step, and moving methodically across vast fields." Id. With this change came an increase in the size of slave operations. By the early part of the 1800s,

many plantations in Jamaica and the West Indies contained up to two hundred and fifty slaves. Id.

Slavery in North America began more slowly than slavery in South America and the Caribbean. In 1680, there were 7,000 slaves in the British North American colonies. Id. at 29. Slavery as an economic institution in North America, however, rapidly gained momentum over the next fifty years. By the 1730s, roughly 120,000 slaves had been brought to the colonies and forced to work in such industries as farming, tobacco production and domestic service. Id. By the middle of the 1700s, the institution of slavery in the United States began to concentrate in the Southern states. It was in these states that plantations emerged, ready to take advantage of the inexpensive labor slaves provided in the production of such crops as tobacco, rice, sugar and cotton. Id. at 31.

During the years 1780 to 1810, the rapid expansion of these industries was accompanied by a significant increase in the number of slaves imported from Africa. Id. at 32. The increase in the importation of slaves, along with the natural increase in the slave population, soon gave the United States a dubious distinction. By 1825, the population of slaves in the United States was roughly 1,750,000, making the United States the "leading user of slave labor in the new world." Id. at 33. Slavery had become the dominant economic force in the Southern United States. Historians cite numerous factors for this development, but it seems that two factors are the most significant. First, slave labor was inexpensive compared to other sources of labor. Id. at 34. Second, slave masters in the Southern states were willing to expend an "enormous, almost unconstrained degree of force . . . to transform ancient modes of labor into a new industrial discipline." Id. This "new industrial discipline" was based on a division of labor scheme, enforced by brutality, and legally sanctioned.

## C. Slavery and American Law

This violent and oppressive system was supported by the United States legal system for a long period of time. Thus slavery was historically more than simply a social and economic institution. It was also an established legal institution.[1] For instance, Article I, Section 9 of the United States Constitution has been traditionally understood to limit Congress' power to regulate slavery.[2] It is thought that this Article meant that Congress was denied the power to regulate the "internal slave trade, leaving only importation from Africa to be prohibited after 1808." Walter Berns, The Constitution and the Migration of Slaves, 78 Yale L.J. 198 (1968). Also, in 1850, Congress passed a statute supporting the rights of slaveowners to capture escaped slaves. The Fugitive Slave Act provided that:

> [W]hen a person held to service or labor in any State or Territory of the United States, has heretofore or shall hereafter escape into another State or Territory of the United States, the person or persons to whom such labor or service shall be due . . . may pursue and reclaim such fugitive person . . . [and may] take and remove such fugitive person back to the State or Territory whence he or she may have escaped as aforesaid.

The Fugitive Slave Act, ch. 60, 9 Stat. 462 (1850). This Act also provided for fines and/or imprisonment for those who aided escaped slaves, and stipulated that both law enforcement personnel and ordinary citizens were bound by law to aid in the capture of escaped slaves. Id. Finally, in the infamous case of Dred Scott v. Sandford, Scott, a slave, brought suit to gain his freedom. 60 U.S. 393 (1856). The Supreme Court of the United States held that since Scott was a "negro, whose ancestors were imported into this country, and sold as slaves," he could not be a

---

[1] Some Northern state statutes, however, stood firmly in opposition to slavery. See infra Part II.E (discussing the Personal Liberty Laws enacted in Northern States).

[2] "The migration or Importation of Such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person." U.S. Const. art I, § 9, cl. 1.

citizen of the United States, and hence had no standing to bring suit in a United States court. Id. at 403-04.

## D. Slavery and Morality

The immorality of the institution of slavery is obvious. However, scholars have attempted to explain exactly what it is about this institution that offends moral sensibilities. Two moral indictments of the institution are significant. First, "slavery permitted one group of people to exercise unrestrained personal domination over another group of people." Fogel, supra at 394. The slave was subject to abject cruelty, both physical and psychological, by his or her masters in order for the master to maintain domination. Id. In one sense, "[t]he extreme degree of domination required by this system . . . is the essential crime." Id. Second, the slave was denied the fruits of his or her labor. Id. at 395. Slaves were forced to work physically grueling tasks for very long hours without pay, thus it was impossible for the slave to improve his or her economic position within society. Id. The slave simply had no resources or "opportunity . . . to rise on the economic ladder by acquiring land, labor skills, and other forms of capital." Id.

## E. Slavery as a Cause of the Civil War

Historians have long debated whether slavery was the single driving force behind the regional tensions in the United States that eventually led to the Civil War. "Although some scholars have held that slavery was *the* cause [of the Civil War], others have developed complex analyses that draw distinctions between immediate and ultimate causes and that explore a variety of ways other than war that could have settled or at least contained the issue of slavery." Id. at 411. This much, however, is clear: by 1861, tensions had escalated to the extent that maintaining peace would have required that the Northern states allow the permanent "existence of an independent confederacy dedicated to the promotion of slavery." Id. at 413. In other words, by

1861, tensions between the North and the South had increased to such a pitch that the only way slavery would be abolished throughout the entire nation was through armed conflict.

A great deal of the tension between the North and the South had to do with the Northern states' promulgation of Personal Liberty Laws. "In his annual message to Congress of December 3, 1860, James Buchanan warned that the South 'would be justified in revolutionary resistance to the Government of the Union' if northern states did not repeal their Personal Liberty Laws." Thomas D. Morris, <u>Free Men All: The Personal Liberty Laws of the North 1780-1861</u> 202 (1974). These laws were devised and implemented by many Northern states to make it very difficult for slave owners to capture escaped slaves who had taken up residence in those states.

The court does not claim objective knowledge of the ultimate cause of the Civil War. Certainly, however, tensions marked by the North's moral outrage at the institution of chattel slavery, and the South's indignation at the North's promulgation of Personal Liberty Laws, contributed significantly to the advent of war.

**F. The Civil War**

Fort Sumter, located in the Charleston harbor, South Carolina, was one of just four Federal fortifications left in Confederate territory. Shelby Foote, <u>The Civil War, A Narrative:</u> <u>Fort Sumter to Perryville</u> 44 (Vintage Books 1986) (1958). In 1861, the government of South Carolina made protests to Washington regarding the presence of a Federal fortification within its borders, but those protests were ignored. <u>Id.</u> Instead, Washington decided to reinforce Fort Sumter with men and supplies. <u>Id.</u> However, when local gunmen opened fire on a Union steamer attempting to bring these reinforcements to Fort Sumter, the steamer was forced to turn away. <u>Id.</u> By March of 1861, Fort Sumter was surrounded by Confederate forces, and was cut off from fresh supplies. <u>Id.</u> By April of that year, the Federal forces inside Fort Sumter were in

danger of starving to death. Id. at 48. The time had come for Washington to make a decision—abandon Fort Sumter or again attempt to resupply it. Washington was aware that another attempt to bring supplies to Fort Sumter might well provoke an attack on the fort itself. Id. at 47. This time, however, the attack would not come from local gunmen, but from Confederate forces. Id. Washington decided not to cave in to Confederate pressures, and to attempt to bring fresh provisions and reinforcements to the fort. Id. at 47. On the morning of April 12, 1861, with Union supply ships within sight of Fort Sumter, the Confederacy fired the first shot of the Civil War. Id. at 49.

The four-year Civil War was fought by means of a series of pitched battles, each one seemingly more horrific than the last. The first true battle of the war, the battle of Bull Run, resulted in the deaths of roughly 2,700 Union soldiers and 2,000 Confederate soldiers. *The Price in Blood, Casualties in the Civil War, at* http://www.civilwarhome.com/casualties.htm. Other battles, at places like Wilson's Creek, Spotslyvania, Cold Harbor, and Franklin, Tennessee took the lives of tens of thousands of Union and Confederate soldiers. Id. The final campaign of the war, fought in the vicinity of Appomattox, Virginia, resulted in a combined 17,500 battle deaths. Id.

Following the Appomattox campaign, on April 9, 1865, Union General Ulysses S. Grant received Confederate General Robert E. Lee at Appomattox Courthouse, where the two generals agreed upon the terms of Lee's surrender. Shelby Foote, The Civil War, A Narrative: Red River to Appomattox 945-51 (Vintage Books 1986) (1974). Shortly thereafter, Grant rode out towards his headquarters, where Union batteries were firing in celebration. Id. at 950-51. Grant insisted the batteries stop firing, worried that the noise might spark a skirmish between his troops and the nearby, and still armed, Confederate soldiers. Id. at 951. There was, however, another more

important reason Grant considered it "unfitting" for his troops to be firing their weapons at that point: "'The war is over,' he told his staff. 'The rebels are our countrymen again.'" Id.

All in all, approximately 620,000 Americans died in the Civil War; Union forces fighting to end slavery suffered 360,000 of these deaths. James M. McPherson, Battle Cry of Freedom: The Civil War Era 854 (Oxford University Press 1988). There were 178,975 African-American Union troops that fought in the Civil War, and 36,000 of those troops died during the war. *The Price in Blood, Casualties in the Civil War, at* http://www.civilwarhome.com/casualties.htm. An analysis as brief as this cannot do justice to the tremendous sacrifices made by both Union and Confederate soldiers in this war. Since the Civil War, America has been involved in a number of armed conflicts, but the casualties America suffered in the Civil War exceeds the total number of casualties America has suffered in all its other wars. Id. The Civil War, the war that ended the institution of chattel slavery in the United States, was truly America's bloodiest war.

## G. The Abolishment of Slavery

On January 1, 1863, in the midst of the Civil War, President Abraham Lincoln issued the Emancipation Proclamation. That document reads in part: "I do order and declare that all persons held as slaves within the designated States . . . are, and henceforward shall be free. . . ." Abraham Lincoln, The Emancipation Proclamation, Exec. Proclamation No. 17 (Jan. 1, 1863), reprinted in 12 Stat. 1268 (1963).

Following the war, Congress acted to formally abolish slavery by proposing the Thirteenth Amendment to the United States Constitution. That Amendment was ratified on December 6, 1865. Section 1 of that Amendment reads: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall

exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

Also, the Fourteenth Amendment to the United States Constitution was ratified on July 9, 1868. Section 1 of that Amendment reads: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State in which they reside." U.S. Const. amend. XIV, § 1. In effect, the Fourteenth Amendment overruled the Dred Scott decision, making freed slaves citizens of the United States.

Following the Civil War, the South was bankrupt, and an estimated four million African-Americans assumed the responsibility of freedom as nationalism emerged. These lingering effects led to the Reconstruction era, a significant period in our Nation's history, which addressed the numerous issues raised by the abolition of slavery and the war fought to achieve that end.

### III. OVERVIEW OF THE PROCEEDINGS

#### A. Parties

##### 1. *Plaintiffs*

Beginning in 2002, a number of lawsuits were filed by descendants of slaves seeking reparations from private corporations, which were alleged to have unjustly profited from the institution of slavery. On October 25, 2002, the Judicial Panel on Multidistrict Litigation transferred these actions to this court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. See In re African-American Slave Descendants Litigation, No. 1491, 231 F.Supp. 2d 1357 (Jud. Pan. Mult. Lit., Oct. 25, 2002). This litigation presently

consists of nine individual lawsuits, and these individual plaintiffs have filed a consolidated

complaint. See Pls.' First Amended Consolidated Complaint.[3]

The plaintiffs in these cases include the following: Deadria Farmer-Paellmann,[4] Mary

Lacey Madison,[5] Andre Carrington,[6] Richard Barber, Sr.,[7] Hannah Jane Hurdle-Toomey,[8]

Marcelle Besteda Porter,[9] Julie Mae Wyatt-Kervin,[10] Emma Marie Clark,[11] Ina Bell Daniels

Hurdle McGee,[12] C. Doe,[13] Antoinette Harrell Miller,[14] as well as a group of seven anonymous

---

[3]The citations in this opinion are to the paragraphs as styled in Plaintiffs' Complaint; however, in certain instances the numbering of paragraphs does not proceed in chronological order.

[4]Farmer-Paellmann alleges that she is the "great-great-granddaughter of Clara and Abel Hinds, Africans who were enslaved on a South Carolina sea island rice plantation." See FACC ¶ 63.

[5]Madison alleges that her "ancestors were slaves in the agricultural industry in Virginia and North Carolina." See FACC ¶ 64.

[6]Carrington alleges that his maternal and paternal ancestors "were slaves in North Carolina . . . . were involved in the cotton and tobacco industries." See FACC ¶ 66.

[7]Barber alleges that his ancestors were enslaved in the agricultural industry and other industries. See FACC ¶ 67.

[8]Hurdle-Toomey alleges that her father, Andrew Jackson Hurdle, was a slave who was sold to a Texas family when he was ten years old. See FACC ¶ 69. The Texas family is not an identified defendant.

[9]Porter alleges that her ancestors were slaves. See FACC ¶ 73.

[10]Wyatt-Kervin alleges that she is the daughter of former slaves, Jake and Louise Wyatt. See FACC ¶ 74. Bill Gene McGee alleges that he is the guardian ad litem of Wyatt-Kervin, and brings this case as her representative. See id. ¶ 76.

[11]Clark alleges that "she was enslaved in the agricultural industry in Louisiana from about 1927 through 1934," and further alleges that "a couple that operated a dairy farm . . . told her that they bought her and she was their slave." See FACC ¶ 75. The couple is not an identified defendant.

[12]McGee alleges that she is the "great grand-daughter of Andrew Jackson Hurdle, an enslaved African." See FACC ¶ 77.

[13]C. Doe alleges that he was a slave through the 1960s, and "he and his family were forced to live on the slave quarters of a plantation that grew numerous agricultural crops such as cotton and rice." See FACC ¶ 89. C. Doe further alleges that "[u]pon information and belief, . . . some or all of Defendants corporate entities doing business in Mississippi or Louisiana had reason to know of the construction of forms of slavery yet failed to take steps to eliminate same, while they continue to inure benefits form [sic.] the illegal, but sanctioned system of servitude Post-Emancipation." See id. ¶ 90.

[14]Miller alleges that she is a descendant of a former slave, Carrie Richardson. See FACC ¶ 92.

plaintiffs.[15] The named plaintiffs (hereinafter collectively referred to as "Plaintiffs"), on behalf of themselves and the classes they seek to represent,[16] seek reparations on behalf of all "descendants of formerly enslaved Africans" and all living "formerly enslaved African-Americans." See FACC ¶ 60. Specifically, Plaintiffs seek an accounting, constructive trust, restitution, disgorgement, compensatory and punitive damages arising out of the named defendants' alleged past and continued wrongful conduct relating to the institution of slavery. See id. ¶ 55.

### 2. *Defendants*

The named defendants (hereinafter collectively referred to as "Defendants") are eighteen present-day companies whose predecessors are alleged to have been unjustly enriched through profits earned either directly or indirectly from the Trans-Atlantic Slave Trade and slavery between 1619 and 1865, as well as post-Emancipation slavery through the 1960s.

Defendants include the following companies: FleetBoston Financial Corporation, CSX Corporation, Aetna Inc., Brown Brothers Harriman, New York Life Insurance Company, Norfolk Southern Corporation, Lehman Brothers, Lloyd's of London, Union Pacific Railroad, JP Morgan Chase Manhattan Bank, Westpoint Stevens Inc., RJ Reynolds Tobacco Company, Brown and Williamson, Liggett Group Inc., Loews Corporation, Canadian National Railway, Southern Mutual Insurance Company, and American International Group ("AIG").[17]

Plaintiffs allege that FleetBoston, through its predecessor bank, made loans to slave traders and also collected custom duties and fees on ships engaged in the slave trade. See id. ¶¶

---

[15]The group of seven unnamed plaintiffs include: C. Doe, Jr., M.L. Doe, E.H. Doe, A.L. Doe, A. Doe I. Doe and C.W. Doe, who are all alleged to have been enslaved "for the benefit of the cotton industry, sugar industry and rice industry to name of [sic.] few." See FACC ¶ 91.

[16] Plaintiffs refer to numerous classes of plaintiffs, but have not filed any motion for class certification pursuant to the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23.

[17]In addition to joining in the present motion to dismiss, both Defendants Loews Corporation and Canadian National Railway have filed separate motions to dismiss, based on grounds unique to them, pending with the court.

125-27. Plaintiffs further allege that "FleetBoston engaged in a self-concealed business enterprise so that the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise," and, in more recent times, "made various misleading statements to the Press from March 2000 to February 2002, attempting to disassociate its predecessor company from its current company." Id. ¶¶ 129-30.

Plaintiffs allege that CSX "is a successor-in-interest to numerous predecessor railroad lines that were constructed or run, at least in part, by slave labor." Id. ¶ 131. Plaintiffs further allege that "CSX engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement to the Press regarding their participation in and profiting from slavery." Id. ¶¶ 132-33.

Plaintiffs allege that "Aetna's predecessors in interest, actually insured slave owners against the loss of their human chattel . . . [and] therefore unjustly profited from the institution of slavery." Id. ¶ 134. Plaintiffs further allege that "Aetna engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement regarding their participation in and profiting from slavery." Id. ¶¶ 135-36.

Plaintiffs allege that Brown Brothers Harriman is the successor corporation to Brown Brothers & Co., which "loaned millions directly to planters, merchants and cotton brokers throughout the South, . . . [and] records also reveal that Brown Brothers loaned to plantation owners who told the firm that they needed the cash to buy slaves." Id. ¶ 137. Plaintiffs also allege that "Louisiana court records dating back to the 1840's . . . reveal the firm's ownership of at least two cotton plantations totaling 4,614 acres and the plantations' 346 slaves." Id. ¶ 138. Plaintiffs further allege that "Brown Brothers Harriman engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement

based on press reports after the filing, trying to disassociate . . . from its predecessor's business." Id. ¶¶ 140-41.

Plaintiffs allege that "New York Life's predecessor-in-interest, Nautilus Insurance, earned premiums from its sale of life insurance to slave owners." Id. ¶ 142. Plaintiffs further allege that "New York Life engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made misleading statements regarding their participation in and profiting from slavery." Id. ¶¶ 143, 145.

Plaintiffs allege that Norfolk Southern "is a successor-in-interest to numerous railroad lines that were constructed or run, in part, by slave labor." Id. ¶ 147.

Plaintiffs allege that the founder of Lehman Brothers, Henry Lehman, and his brothers "grew rich as middlemen in the slave-grown cotton trade." Id. ¶ 148.

Plaintiffs allege that Lloyd's of London "was involved in the insuring of ships utilized for the Trans-Atlantic slave trade." Id. ¶ 149. Plaintiffs further allege that "Lloyd's engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise." Id. ¶ 150.

Plaintiffs allege that Union Pacific "is a successor-in-interest to numerous predecessor railroad lines that were constructed or run in part by slave labor." Id. ¶ 152. Plaintiffs further allege that "Union Pacific engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement regarding their participation in profiting from slavery." Id. ¶¶ 153-54.

Plaintiffs allege that two of the predecessor banks that merged to create J.P. Morgan Chase "were behind a consortium to raise money to insure slavery." Id. ¶ 155. Plaintiffs further

allege that "J.P. Morgan Chase engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement regarding their participation in and profiting from slavery." Id. ¶¶ 156-57.

Plaintiffs allege that Westpoint Stevens "is a successor-in-interest to Pepperell Manufacturing which utilized cotton from Southern planters farmed by enslaved Africans." Id. ¶ 160.

Plaintiffs allege that R.J. Reynolds Tobacco Company, Brown & Williamson, Liggett Group and Lowes Corporation (parent company of Lorillard Tobacco Company), which were all once part of the American Tobacco Company, are the "beneficiar[ies] of assets acquired through the forced uncompensated labors of enslaved African-Americans." Id. ¶¶ 161, 165, 166, and 168.

Plaintiffs allege that Canadian National Railway "is the successor-in-interest to seven predecessor railroad lines that were constructed or run in part by slave labor." Id. ¶ 169. Plaintiffs further allege that "Canadian National engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise." Id. ¶ 171.

Plaintiffs allege that Southern Mutual Insurance "issued policies on the lives of slaves in Louisiana." Id. ¶ 172.

Plaintiffs allege that "AIG is successor-in-interest to the United States Life Insurance Company . . ., which earned premiums from its sale of life insurance on the lives of enslaved Africans with slave owners as the beneficiaries." Id. ¶ 173.

As evidenced by Plaintiffs' allegations, and as the court shall further discuss, their Complaint is devoid of any allegations that connect the specifically named Defendants or their predecessors and any of the Plaintiffs or their ancestors.

## B. Pleadings

### 1. Factual Allegations of Plaintiffs' First Amended and Consolidated Complaint

Plaintiffs' Complaint begins with a narration of the historical background of the Transatlantic Slave Trade in America. The Complaint proceeds to describe the Slave Codes, which various States enacted in order to perpetuate the institution of slavery. The Complaint also chronicles how the forced labor of enslaved Africans helped to build our Nation and enrich early American industry, while simultaneously dismantling a culture and impoverishing a race of fellow men and women.

The Complaint then outlines the beginnings of laws that outlawed the trafficking and trade of slaves, which progressed into a body of law that found the institution of slavery to be contrary to the Natural Law of Man. The Complaint proceeds to show that despite this body of law that found the institution of slavery to be contrary to the Natural Law of Man, the vestiges of slavery, in the form of racism, have resulted in modern-day disparities between descendants of slaves and the remainder of our society.

Ultimately, the Complaint alleges that "Defendants, through their predecessors in interest, conspired and/or aided and abetted with slave traders, with each other and other entities and institutions . . . and other unnamed entities and/or financial institutions to commit and/or knowingly facilitate crimes against humanity, and to further illicitly profit from slave labor." See id. ¶ 53.

## 2. Counts of Plaintiffs' First Amended and Consolidated Complaint

Count I of Plaintiffs' First Amended and Consolidated Complaint is styled: "Conspiracy." Plaintiffs allege that "[e]ach of the defendants acted individually and in concert with their industry group and with each other, either expressly or tacitly, to participate in a plan that was designed in part to commit the tortious acts referred to herein." Id. ¶ 216.

Count II is styled: "Demand for an Accounting." Plaintiffs allege that "Defendants knew or should have known of the existence of corporate records that indicate their profiting from slave labor[, and] Plaintiffs and the public have demanded that the defendants reveal their complete corporate records regarding same and that a just and fair accounting be made for profits derived from the slave trade." Id. ¶ 219. Plaintiffs further allege that "[t]here is a fiduciary relationship that arose between the litigant classes and defendants by virtue of defendants' superior position, maintenance of those positions and, their holding in constructive trust, the proceeds of the unpaid labor of the plaintiffs and / or their ancestors." Id. ¶ 222. Plaintiffs argue that the production of such corporate records is essential in order to help Plaintiffs to: "heal the continuing psychic harm associated with slavery, trace ancestral records, provide a public and historical record of the violent force necessary to maintain a hierarchy to support slavery, provide evidence of past and subsequently established discrimination, provide a historical record of the economic benefits that accrued to the defendant private institutions as a result of slavery to more fully describe and document the connection between the institution of slavery and racist/discriminatory policies that still exist today, and assist in stemming racial discrimination through the knowledge of the role slavery played in its root causes." Id. ¶ 221(a-f). Plaintiffs' prayer for relief under Count II seeks, among other things, "the appointment of an independent historic commission to serve as a depository for corporate records related to slavery." Id. ¶ 223.

Count III is styled: "Crime Against Humanity." Plaintiffs allege that "[s]lavery is and has always been a crime against humanity." Id. ¶ 224.

Count IV is styled: "Piracy." Plaintiffs allege that "Defendants, upon information and belief[,] committed the crime against humanity by their actions either directly or indirectly in support for the continuation of the smuggling of Africans." Id. ¶ 230. Plaintiffs' prayer for relief under Count IV seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages. See id. ¶ 231.

Count V is styled: "Intentional Infliction of Emotional Distress: Rape, Breeding, Torture, Abuse and the Spread of Racist Beliefs." Plaintiffs allege that "Defendants' predecessor companies aided or abetted, or under other theories of third party liability . . ., participated in, allowed, or implicitly or recklessly, sanctioned, and/or benefitted from an institution that relied in [sic.] the sexual exploitation, violent abuse and rape to achieve its goals of a malleable and unpaid work force." Id. ¶ 233. Plaintiffs further allege that "Defendants' predecessor companies aided or abetted, or under other theories of third party liability . . ., participated in, allowed implicitly or recklessly and / or unjustly benefitted from" the spread of racist ideology concerning the inferiority of the African race. Id. ¶ 236. Plaintiffs' prayer for relief under Count V seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages. Id. ¶ 238.

Count VI is styled: "Conversion." Plaintiffs allege that "[a]s a result of defendants' failure and refusal to account for, acknowledge and return to plaintiffs and the plaintiff class, the value of their ancestors' slave labor, defendants have wilfully and wrongfully misappropriated and converted the value of that labor and its derivative profits into defendant's own property."

Id. ¶ 240. Plaintiffs' prayer for relief under Count VI seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages. See id. ¶ 242.

Count VII is styled: "Unjust Enrichment." Plaintiffs allege that "Defendants' failure to pay for the labor provided by the slaves without receiving any compensation, has allowed defendants to retain a benefit at the expense of the plaintiffs' and their ancestors." Id. ¶ 247. Plaintiffs' prayer for relief under Count VII seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages. See id. ¶ 253.

Count VIII is styled: "42 U.S.C. § 1982." Plaintiffs allege that as a result of the Defendants' conduct that denied slaves of the value of their labor, and the Defendants' conduct in restricting access to corporate records regarding participation in slavery, the Plaintiffs' ancestors', and their descendants', rights to inherit and convey property have been violated in contravention of 42 U.S.C. § 1982. See id. ¶¶ 255-56.

Count IX, which is pled in the alternative, is styled: "Alien Torts Claims Act." Plaintiffs posit that, as "[m]any of the torts set out in the instant complaint occurred prior to the formal end of chattel slavery in the United States of America," id. ¶ 237, Plaintiffs' ancestors were not citizens of the United States at such a time. See id. ¶ 238.[18] Plaintiffs further allege that slavery and international slave trafficking violated international law, and that since their ancestors were non-citizens, the Alien Torts Claims Act provides a source to relief for those violations of international law. See id. ¶¶ 237-43.

---

[18]See supra footnote 3 (indicating that citations in this opinion are to the paragraphs as styled in Plaintiffs' Complaint, and in certain instances, do not proceed chronologically).

Lastly, Counts X through XIV of the Plaintiffs' Complaint allege that the factual allegations constitute violations of various state consumer protection laws. Specifically, Count X alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq. (2003); Count XI alleges a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401 et seq. (2003); Count XII alleges a violation of the New Jersey Unfair Trade Practice Law, N.J. Stat. Ann. § 56:8-1 (2003); Count XIII alleges a violation of the New York Consumer Protection From Deceptive Acts and Practices Law, NY Gen. Bus. Law §§ 349-350 (2003); and Count XIV alleges a violation of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. and Com. Code Ann. § 17.41 (2002). See FACC ¶¶ 244-253.

In essence, the Plaintiffs seek reparations from Defendants for their alleged roles in the institution of human chattel slavery as it existed in the United States from 1619 through 1865, to date.

### 3. Defendants' Joint Motion to Dismiss

Defendants have responded to Plaintiffs' Complaint with the present Motion to Dismiss, brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[19] See Defs.' Joint Mot. to Dismiss, at 1. Defendants allege four separate grounds which warrant dismissal: (1) Plaintiffs' claims fall short of both constitutional and prudential standing requirements; (2) Plaintiffs' claims present a non-justiciable political question; (3) Plaintiffs' claims fail to state any cognizable claim; and (4) all of Plaintiffs' claims are time-barred. See id., at 4-5. Defendants' motion is fully briefed and now before the court.

---

[19] All named Defendants have joined in the present motion to dismiss. Certain individual defendants have filed separate motions to dismiss on grounds unique to them.

# IV. DISCUSSION

## A. Justiciability Doctrines

Article III, § 2 of the United States Constitution provides that federal courts have jurisdiction only if presented with a "Case" or "Controversy." The requirement of a case or controversy imposes a "dual limitation" upon the federal courts. See Flast v. Cohen, 392 U.S. 83, 94 (1968). First, the requirement of a case or controversy serves to "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." Id. Second, the requirement of a case or controversy serves to "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." Id. This "dual limitation" found in the requirement of a case or controversy is enforced by what have been termed the justiciability doctrines of Article III, which state the fundamental limits on federal judicial power in our system of government. See Allen v. Wright, 468 U.S. 737, 750 (1984). "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." Renne v. Geary, 501 U.S. 312, 316 (1991). The justiciability doctrines include principles such as the prohibition against advisory opinions, standing, ripeness, mootness, and the political question doctrine. See generally Erwin Chemerinsky, Constitutional Law: Principles and Policies 46 (Aspen Law & Business 1997). "The Article III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines." Allen, 468 U.S. at 750.

### 1. Standing

The doctrine of standing ensures that a litigant is the proper party to bring a matter before a federal court for adjudication, by asking if that specific litigant has a sufficient stake in the

matter to invoke the federal judicial process. As the United States Supreme Court recently reiterated: "We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." Raines v. Byrd, 521 U.S. 811, 819 (1997).

### a. Historical Overview of the Doctrine of Standing

The requirement that a litigant demonstrate standing – a personal stake in an alleged dispute – to bring a matter before a court for adjudication has been a bedrock principle in our system of law, as well as the common law system from which our system of law developed. The standing doctrine comes from the well-known common law doctrine of *locus standi*, which translated from Latin means "place of standing." In essence, the doctrine of *locus standi* concerns whether an individual has the legal capacity to institute proceedings. See, e.g., S. M. Thio, Locus Standi and Judicial Review 13-14, 235-36 (1971) (analyzing the doctrines of standing in the United States and in other common law countries). The concept of standing, or *locus standi*, was well known to the early federal courts. See, e.g., Southern Exp. Co. v. Western N.C.R. Co., 99 U.S. 191, 201 (1878) (holding that since appellant had no legally cognizable interest in the suit, appellant "can, therefore, have no *locus standi* in a court of equity").

The standing doctrine serves to reinforce that "[t]he province of the court is, solely, to decide on the rights of individuals . . . ." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803). As stated in an authoritative nineteenth century treatise: "The general rule is that the action should be brought in the name of the party whose legal right has been affected, against the party who committed or caused the injury, or by or against his personal representative." Joseph Chitty, A Treatise on Pleading and Parties to Actions 1 (G. & C. Merriam 1867). In specific reference to tort actions, that treatise provides:

> The action for a tort must in general be brought in the name of the person whose *legal* right has been affected, and who was *legally* interested in the property at the time the injury thereto was committed; for he is impliedly the party injured by the tort, and whoever has sustained the loss is the proper person to call for compensation from the wrongdoer.

Id. at 59 (emphasis in original and footnotes omitted). This treatise was relied upon by the United States Supreme Court in Tyler v. Judges of Court of Registration, 179 U.S. 405, 407 (1900), in which the Supreme Court discussed the proper parties to litigation. In elucidating the standing doctrine's focus on the rights of individuals, the Tyler Court stated:

> The prime object of all litigation is to establish a right asserted by the plaintiff or to sustain a defense set up by the party pursued. Save in a few instances where, by statute or the settled practice of the courts, the plaintiff is permitted to sue for the benefit of another, he is bound to show an interest in the suit personal to himself, and even in a proceeding which he prosecutes for the benefit of the public, as, for example, in cases of nuisance, he must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens.

Id. at 406. In Tyler, the Court reiterated that the doctrine of standing "has been announced in so many cases in this court that it may not be considered an open question." Id.

This core aspect of the doctrine of standing – that a litigant demonstrate a personal stake in an alleged dispute – has remained unchanged as the Supreme Court has elucidated the modern formulation and rationale for the doctrine.

### b. *Modern Formulation of the Doctrine of Standing*

The standing doctrine involves both constitutional limitations on federal courts, based on Article III, and prudential limitations on the exercise of federal court jurisdiction. See, e.g., Warth v. Seldin, 422 U.S. 490, 498 (1975). The modern formulation of the constitutional limitations of the standing doctrine was elucidated in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), where the Supreme Court stated:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560 - 61 (citations and internal quotations omitted). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." Steel Co. v. Citizens For a Better Environment, 523 U.S. 83, 103-04 (1998). These constitutional limitations on standing "are not confined to the facts of any particular case, but are broadly relevant to standing in any Article III controversy." Plotkin v. Ryan, 239 F.3d 882, 884 (7th Cir. 2001).

The party seeking to invoke federal court jurisdiction has the burden of establishing the elements of standing. See Lujan, 504 U.S. at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. The present motion is a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b), and in this posture "we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations." Citizens For a Better Environment, 523 U.S. at 104. "However, [w]here standing is challenged as a factual matter, the plaintiff bears the burden of supporting the allegations necessary for standing with competent proof." Perry v. Village of Arlington Heights, 186 F.3d 826, 829 (7th Cir. 1999) (quoting Retired Chicago Police Ass'n. v. City of Chicago, 76 F.3d 856, 862 (7th Cir. 1996))

(internal quotations omitted); see also McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936) (indicating that the party invoking federal court jurisdiction must "allege in his pleading the facts essential to show jurisdiction [and] [i]f he fails to make the necessary allegations he has no standing"). "'Competent proof' requires a showing by a preponderance of the evidence that standing exists." Id. (quoting NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 237 (7th Cir. 1995)); see also McNutt, 298 U.S. at 189 (stating that when "allegations of jurisdictional facts are challenged . . . in any appropriate manner, [the party alleging jurisdiction] must support them by competent proof;" and if unchallenged, the federal courts "may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence").

### c. Plaintiffs' Allegations in Support of their Standing to Maintain this Suit

In general, Plaintiffs claim that the source of their injury is the institution of slavery. Plaintiffs point to three distinct injuries which they allege are sufficient to confer them standing to maintain this suit. First, "the complaint alleges that enslaved African-Americans suffered concrete injury to their property and tort rights and that their descendants suffer derivative harm today." Pls.' Resp. to Defs.' Mot. to Dismiss, at 3. Specifically, Plaintiffs allege injury through being "denied the economic wealth of their ancestors' labor," which they refer to as a "derivative and inherited property right in their ancestors' lost pay." FACC ¶¶ 100-01. Second, Plaintiffs allege that they are injured on a continuing basis. Specifically, Plaintiffs allege that "[t]hey still endure daily indignities from the legacy of slavery, including, but not limited to, racial profiling, racial slurs, and improper and hurtful assumptions regarding their overall status." Id. ¶ 102. Further, Plaintiffs allege that they "are also likely to encounter future harm, as they are more likely to have a shorter life expectancy; more likely [to] go to jail; and are more likely to be

murdered, than their white counterparts." Id. Third, Plaintiffs' allege that they are "[p]resently consumers of Defendants" and have been injured by certain communications made by the Defendants concerning their respective roles in the institution of slavery. See id. ¶ 93. Specifically, Plaintiffs allege that "[d]ue to unconscionable, fraudulent and deceptive public communications made by defendants, plaintiffs suffered the harm of being misled, confused, and deceived about the roles the defendants played in the enslavement of African peoples." Id. Further, Plaintiffs allege injury through the Defendants' refusal to provide documentation that relates to any profits made as a result of the institution of slavery. See Pls.' Resp. to Defs.' Mot. to Dismiss, at 12.

### *(1). Constitutional Limitations on Standing*

### *(a). Derivative Harm*

It is well-established that a plaintiff must "'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 454, 472 (1982) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)). Plaintiffs cannot establish a personal injury by merely identifying tort victims and alleging a genealogical relationship. The illegal conduct at issue here, the institution of slavery, is alleged to have directly affected Plaintiffs' ancestors. Plaintiffs now, more than a century later, point to that horrific institution as the source of their derivative injury.[20] However, Plaintiffs' own choice of words, *derivative*, should be sufficient to signify the standing problem in this case. See FACC ¶¶ 100-01; see also Pls.' Resp. to Defs.' Mot. to Dismiss, at 3. Plaintiffs fail to allege that they

---

[20] Nine of the named Plaintiffs allege to have been slaves during the twentieth century, but also fail to establish standing to sue Defendants for their alleged injuries. See discussion infra at 27.

have personally suffered a concrete and particularized injury as a result of Defendants' putatively illegal conduct; rather, Plaintiffs' alleged injury is derivative of the injury inflicted upon enslaved African-Americans over a century ago. This is insufficient to establish standing, and contrary to centuries of well-settled legal principles requiring that a litigant demonstrate a personal stake in an alleged dispute. See, e.g., Tyler, 179 U.S. at 406-07 (stating that a plaintiff must "aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens"); Lujan, 504 U.S. at 560 (stating that a "plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is . . . concrete and particularized"); Raines, 521 U.S. at 819 (stating that "a plaintiff's complaint must establish that he had a 'personal stake' in the alleged dispute, and that the alleged injury is particularized as to him"). To recognize Plaintiffs' standing in such a situation "would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" Allen, 468 U.S. at 756 (citing United States v. SCRAP, 412 U.S. 669, 687 (1973)).

In addition, the injury alleged cannot be "conjectural or hypothetical." Lujan, 504 U.S. at 560. Plaintiffs allege injury through being "denied the economic wealth of their ancestors' labor," which they refer to as a "derivative and inherited property right in their ancestors' lost pay." FACC ¶¶ 100-01. However, Plaintiffs' claim to the economic wealth of their ancestors' labor is conjectural. While most would like to assume that they will be the beneficiaries of their ancestors' wealth upon their demise, this is a mere assumption. Plaintiffs can only speculate that their ancestors' estates would have been passed on to them, and cannot say that they would have inherited their ancestors' lost pay. This is insufficient to show a personal injury to Plaintiffs.

Further, the Plaintiffs must allege a "causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560. "[T]he injury has to be fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some third party not before the court . . . ." Id. The allegations of Plaintiffs' Complaint do not link these Defendants to the alleged harm. Plaintiffs fail to allege any facts in their Complaint that link the specifically named Defendants to the alleged injuries suffered by the Plaintiffs; nor does the Plaintiffs' Complaint allege a connection between any of the named Defendants and any of the Plaintiffs' ancestors. The named Plaintiffs who allege that they are descendants of enslaved African-Americans fail to allege that their ancestors were enslaved by any of the eighteen specifically named Defendants. Likewise, the named Plaintiffs who allege that they were slaves fail to allege that they were enslaved by any of the eighteen specifically named Defendants. Plaintiffs' only response to this fundamental defect is to allege that Defendants were engaged in "co-dependent" industries and therefore vicariously liable for the institution of slavery. However, Plaintiffs fail to allege how these named Defendants were involved in these "co-dependent" industries. Plaintiffs offer no allegations that Defendants had any relationships with specific entities that enslaved Plaintiffs or their ancestors. More than "unadorned speculation" is required to establish standing. See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43-44 (1976).

### (b). Continuing Injury

Plaintiffs' allegations that they suffer injury on a continuing basis also fail to establish the requisite standing. Plaintiffs claim a continuing injury through the allegation that "[t]hey still endure daily indignities from the legacy of slavery, including, but not limited to, racial profiling, racial slurs, and improper and hurtful assumptions regarding their overall status." FACC ¶ 102. Further, Plaintiffs allege that they "are also likely to encounter future harm, as they are more likely to have a shorter life expectancy; more likely [to] go to jail; and are more likely to be

murdered, than their white counterparts." Id.

Plaintiffs' allegations of continuing harm are no different than the allegations of continuing harm made by the plaintiffs in Cato v. United States, 70 F.3d 1103 (9th Cir. 1995), and other similar cases. In Cato, descendants of enslaved African-Americans filed a complaint against the United States government seeking damages due to the enslavement of, and subsequent discrimination against, African-Americans. Cato, 70 F.3d at 1105. The plaintiffs in Cato alleged injuries based on "disparities in employment, income, and education" between African-Americans and other racial groups. Id. at 1109. The Cato court found that such allegations were insufficient to establish an injury personal to the plaintiffs so as to establish the plaintiffs' standing; rather, such injuries were "a generalized, class-based grievance . . . ." Id. Other courts faced with similar complaints have also found that those plaintiffs had failed to establish their standing to litigate claims based on continuing injuries alleged to be the result of slavery. See, e.g., Bell v. United States, No. Civ. A. 301CV0338D, 2001 WL 1041792, at *2 (N.D. Tex. Aug. 31, 2001) (plaintiff lacked standing to file suit against United States government seeking damages for the enslavement of African-Americans); Bey v. United States Department of Justice, No. 95 CIV 10401, 1996 WL 413684, at *1 (S.D.N.Y. July 24, 1996) (same); Langley v. United States, No. C 95-4227, 1995 WL 714378, at *2 (N.D. Cal. Nov. 30, 1995) (same); Himiya v. United States, No. 94 C 4065, 1994 WL 376850, *2 (N.D. Ill. July 15, 1994) ("Although it is extremely regrettable that this country's history, as well as the history of many other countries, includes a significant history of slavery, the plaintiff does not have proper standing under the law to recover damages for this reprehensible time period."). Like the plaintiffs' allegations in Cato and the other slavery reparations cases decided after Cato, Plaintiffs' allegations of continuing harm in this case do not establish a concrete and

particularized injury-in-fact, as these allegations are too speculative and generalized. See Lujan 504 U.S. at 560-61.

Plaintiffs argue that the other lawsuits seeking reparations for acts related to the institution of slavery are distinguishable on the grounds that those cases were brought by *pro se* plaintiffs, acting without the guidance of counsel, and against the United States Government, protected from suit by the doctrine of sovereign immunity. These are distinctions without a difference. Those *pro se* plaintiffs could have been represented by attorneys and the result would not have changed.[21] Furthermore, the doctrine of sovereign immunity was only one of many jurisdictional bars to suit in those cases, including standing. The constitutional limitations on standing, including an injury-in-fact, "are not confined to the facts of any particular case, but are broadly relevant to standing in any Article III controversy." Plotkin, 239 F.3d at 884. Like the plaintiffs in those cases, Plaintiffs fail to allege any concrete and particular injury-in-fact that they have suffered apart from their race generally.

Further, Plaintiffs complaint is devoid of any allegations that any specific conduct of the Defendants was a cause of the continuing injuries of which Plaintiffs complain. Such wide-ranging social ills are not even alleged "to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560. Plaintiffs' allegations of abstract stigmatic injury are not cognizable absent specific allegations of conduct on behalf of the Defendants that has been directed at Plaintiffs or their ancestors. Cf. Allen, 468 U.S. at 755-56.

---

[21] In fact, courts give special treatment to *pro se* litigation. See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that allegations of *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers"); see also Castro v. United States, –U.S. –, 124 S.Ct. 786, 791-92 (Dec. 15, 2003) (indicating that while holding *pro se* complaints to less stringent standards, courts may recharacterize such motions in order to avoid unnecessary dismissal or inappropriately stringent application of formal labeling requirements).

### (c). *Miscellaneous Injury*

Lastly, Plaintiffs allege injury, in their status as consumers of the Defendants, through being misled, confused and deceived about the roles the Defendants played in the enslavement of African peoples, as a result of Defendants' public communications. See FACC ¶ 93. Plaintiffs also allege a separate harm through the Defendants not turning over documents that relate to their involvement in securing profits from slavery. See id. ¶¶ 218-23. These alleged injuries relate to causes of action plead in Plaintiffs' Complaint as violations of various state consumer protection laws. See id., Counts X-XIV. Plaintiffs argue that their allegations that Defendants have violated these State consumer protection laws are sufficient to confer them standing to pursue these, and all other, claims. See Pls.' Resp. to Defs.' Mot. to Dismiss, at 11. Further, Plaintiffs argue that some of these statutes do not even require that an injury be alleged, and therefore their standing to pursue all claims is a given. See id.

This argument misses the mark. The fact that a state statute dispenses with the requirement that an injury be alleged does not, and cannot, abrogate constitutional limitations imposed by Article III that a personal injury-in-fact is a prerequisite for standing to sue in a federal court. See, e.g., Burford v. Sun Oil Co., 319 U.S. 315, 317 (1943) (holding that state legislatures may not expand the jurisdiction of the federal district courts); see also Rifkin v. Bear Stearns & Co., Inc., 248 F.3d 628, 631 (7th Cir. 2001) (same). These constitutional limitations on standing cannot be altered by either state or federal law. See Gladstone, Realtors, 441 U.S. at 100 (holding that Congress may not abrogate the constitutional limitations on standing); Watson v. Tarpley, 59 U.S. 517, 520 (1855) (holding that "[state] laws cannot affect, either by enlargement or diminution, the jurisdiction of the courts of the United States as vested and prescribed by the constitution and laws of the United States"); see also U.S. Const. art. VI, cl. 2

(Supremacy Clause). Further, Plaintiffs cannot use their standing to pursue one type of claim in a State court in order to establish their standing to pursue all of the claims asserted in the present case in a federal court. "The plaintiffs must establish the district court's jurisdiction over each of their claims independently; they are not permitted to use one count of their complaint to establish federal subject matter jurisdiction and a separate count to establish standing." Rifkin, 248 F.3d at 634.

Moreover, these injuries alleged in Plaintiffs' status as consumers of Defendants do not establish a legally cognizable injury. Aside from alleging a general state of confusion, the Plaintiffs fail to allege any injury-in-fact that has come about as a result of that confusion. "The injury alleged must be . . . distinct and palpable, and not abstract or conjectural or hypothetical." See Allen, 468 U.S. at 751 (citations omitted). Additionally, "in ruling on standing, it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Flast, 392 U.S. at 102. "Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power." Id. Plaintiffs fail to allege that Defendants have any duty to turn over any such documentation. Plaintiffs allege that "[t]here is a fiduciary relationship that arose between the litigant classes and defendants by virtue of defendants' superior position, maintenance of those positions and, their holding in constructive trust, the proceeds of the unpaid labor of the plaintiffs and/or their ancestors." FACC ¶ 222. However, Plaintiffs make this conclusory statement without any specific factual allegations in support of it. Plaintiffs offer unsupported conclusions wrapped in legally significant terms, such as fiduciary duty and constructive trust, which are insufficient to establish standing. "The requirements of Article III

32

are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process." Valley Forge, 454 U.S. at 471. Again, more than "unadorned speculation" and conclusory allegations are required to establish standing. See Simon, 426 U.S. at 43-44.

### (d). Conclusion

In response to all these deficiencies, Plaintiffs argue that "'[s]tanding can be supported by a very slender reed of injury.'" Pls.' Resp. to Defs.' Mot. to Dismiss, at 4 (citing 13 Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.4 (2d ed. 1984)). Plaintiffs are correct that standing can be supported by a very slender reed of injury, as the cases which they cite provide. Yet, this "slender reed" must still have its roots in the soil of an injury personal to the Plaintiffs, not a "derivative harm" uprooted from the soil of another's injury.

Plaintiffs wish to litigate the issue of slavery without establishing that they have suffered some concrete and particularized injury as a result of the putatively illegal conduct of the Defendants. See Valley Forge, 454 U.S. at 472; Lujan 504 U.S. at 560. However, "[t]he fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast, 392 U.S. at 99. "In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." Id. at 99-100. Plaintiffs cannot satisfy the first and most basic requirement of constitutional standing – a concrete and particularized personal injury. See Lujan, 504 U.S. at 560. Plaintiffs cannot establish a personal injury sufficient to confer standing

by merely alleging some genealogical relationship to African-Americans held in slavery over one-hundred, two-hundred, or three-hundred years ago. In attempting to litigate the unopposed issue of slavery rather than their personal injuries, Plaintiffs also cannot satisfy the second requirement of constitutional standing – injury that is fairly traceable to the conduct of the defendants. See id. Plaintiffs do not allege that they had any present property interest that was injured as a result of the Defendants' actions, nor that any action of the Defendants wronged them in any way that would be cognizable under tort theory. Plaintiffs fail to allege any conduct by the eighteen specifically named Defendants that individually affected any of the Plaintiffs.

In sum, the allegations of Plaintiffs' Complaint fail to support their standing to maintain this suit, as required by Article III of the United States Constitution.

### *(2). Prudential Limitations on the Standing Doctrine*

Beyond the constitutional limitations on the standing doctrine, there are prudential limitations on the exercise of federal court jurisdiction. See, e.g., Warth, 422 U.S. at 498. These additional prudential limitations on standing may exist even though the Article III requirements are met because "the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors, 441 U.S. at 99-100. Like the constitutional limitations on the standing doctrine, these prudential limitations ensure that federal courts adhere to the separation of powers concept and are "founded in concern about the proper, and properly limited, role of the courts in a democratic society." Warth, 422 U.S. at 498. However, "unlike their constitutional counterparts, they can be modified or abrogated by Congress." Bennett v. Spear, 520 U.S. 154, 162 (1997).

One of these prudential limits on standing is that a litigant must normally assert his own legal interests rather than those of third parties. See Singleton v. Wulff, 428 U.S. 106, 113-14 (1976); Warth, 422 U.S. at 499. Another is that the federal courts should "refrain[] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475 (citing Warth, 422 U.S. at 499-500).

### (a). Plaintiffs Impermissibly Attempt to Assert the Legal Rights of Absent Third Parties

As a general rule, a litigant must assert his own legal rights and cannot assert the legal rights of a third-party. See, e.g., Powers v. Ohio, 499 U.S. 400, 410 (1991); Singleton, 428 U.S. at 113-14. However, a litigant may assert the rights of absent third-parties in certain limited situations. In determining whether a litigant who seeks standing to assert the legal rights of a third-party may do so, a two-part inquiry is involved. See Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 623 n.3 (1989). First, the litigant must have personally suffered some injury-in-fact adequate to satisfy Article III's case or controversy requirement. See id.; see also Singleton, 428 U.S. at 112. Second, certain prudential considerations must point in favor of permitting the litigant to assert the third-party's legal rights. See id. Among the prudential considerations to consider are the requirements that the litigant must have a legally sufficient relation to the third-party, see Powers, 499 U.S. at 411; see also Craig v. Boren, 429 U.S. 190, 196 (1976), and there must exist some hindrance to the third-party's ability to protect his or her own rights, see Powers, 499 U.S. at 411; see also Singleton, 428 U.S. at 115-116.

To the extent that Plaintiffs are attempting to assert the legal rights of their ancestors, Plaintiffs cannot do so because they themselves have failed to establish that they have personally

suffered some injury-in-fact adequate to satisfy Article III's case-or-controversy requirement. See Singleton, 428 U.S. at 112. In addition, prudential considerations militate against allowing such claims. First, Plaintiffs have not alleged a legally sufficient relation to their ancestors. All that Plaintiffs allege is a genealogical relationship, and more is required under the law in order to confer third-party standing. Cf. Gilmore v. Utah, 429 U.S. 1012, 1016-17 (1976) (indicating that a mother had no standing to contest her son's execution). Plaintiffs make no allegations of any relationship sufficient, whether by common law or statute, to confer them standing to pursue the claims of their deceased ancestors. Cf. Whitmore v. Arkansas, 495 U.S. 149, 163 (1990) (recognizing a next-friend's standing to sue in certain situations); United Food & Comm. Workers Union Local 751 v. Brown Group, 517 U.S. 544, 558 (1996) (recognizing that the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*, grants unions standing to sue on behalf of its members). Furthermore, Plaintiffs do not allege that they are assignees of a legally cognizable claim against the named Defendants. Second, Plaintiffs have not alleged that any hindrance existed to their ancestors' ability to have protected their own rights over the last century. Cf. Johnson v. McAdoo, 45 App. D.C. 440, 441 (D.C. 1916), aff'd, 244 U.S. 643 (1917) (evidencing a claim for slavery-based reparations nearly a century ago).

In sum, Plaintiffs have not established third-party standing to assert the legal rights of their ancestors.

### (b). Plaintiffs Impermissibly Attempt to Litigate a Generalized Grievance Which is Best Addressed in the Representative Branches

As currently framed, Plaintiffs' Complaint seeks to litigate a generalized grievance over one of the most horrific chapters of our Nation's history rather than a personal dispute, which the federal courts are able to adjudicate. For the reasons stated in the following section, such an "abstract question[] of wide public significance" should be left to the representative branches of

36

our system of government. See Valley Forge, 454 U.S. at 475.

### 2. The Political Question Doctrine

Defendants also argue that the court should dismiss Plaintiffs' Complaint because the issue of reparations to former slaves presents a non-justiciable political question. See Defs.' Joint Mot. to Dismiss, at 26-38. Although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, with an abundance of caution, the court will next determine whether the political question doctrine provides an independent basis for dismissal.

### a. Overview of the Political Question Doctrine

It is well-established that the federal courts will not adjudicate questions that fall within the purview of the political question doctrine. See Baker v. Carr, 369 U.S. 186, 210 (1962). Like standing, mootness and ripeness, the political question doctrine is a justiciability limitation with its prudential roots dating back to the 18th century. See, e.g., Hayburn's Case, 2 U.S. (2 Dall.) 408, 410 (1792) (invalidating a statute authorizing the Executive branch to accept or reject federal court determinations of pension eligibility for Revolutionary War veterans); Marbury, 5 U.S. (1 Cranch) at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). The political question doctrine restricts judicial review that might interfere with other branches of the federal government. See McIntyre v. Fallahay, 766 F.2d 1078, 1081 (7th Cir. 1985). Even in cases where the federal court has subject matter jurisdiction, it could choose not to exercise its jurisdiction to avoid interfering with decisions previously made by the Executive or Legislative branches (hereinafter the "Representative Branches"). See United States v. Munoz-Flores, 495 U.S. 385, 393-94 (1990). When the court reaches this conclusion, the question becomes non-

justiciable – meaning not appropriate for judicial review. The non-justiciability of a political question is based primarily on the constitutional principle of separation of powers inherent in the text of the Constitution and the policy of judicial self-restraint. See Baker, 369 U.S. at 210; see also Kashani v. Nelson, 793 F.2d 818, 827 (7th Cir. 1986); Flynn v. Shultz, 748 F.2d 1186, 1189 (7th Cir. 1984); Calvin v. Conlisk, 520 F.2d 1, 5 (7th Cir. 1975). Although the political question doctrine is just one aspect of a broader justiciability issue, it has been "applied in cases involving extremely diverse issues." Flynn, 748 F.2d at 1189; see also Baker, 369 U.S. at 211-18.

However, not all issues having political implications or significant political overtones are non-justiciable under the political question doctrine. See Japan Whaling Ass'n. v. American Cetacean Soc., 478 U.S. 221, 229-30 (1986); see also I.N.S. v. Chadha, 462 U.S. 919, 921 (1983). Rather the Supreme Court has said that "'[i]n determining whether a question falls within (the political question) category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations.'" Baker, 369 U.S. at 210 (quoting Coleman v. Miller, 307 U.S. 433, 454-55 (1939)). To further frame the issue, the Supreme Court has identified at least six factors ("Baker factors") the court should consider to determine whether a matter raises a non-justiciable political question, including:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217; see also Kashani, 793 F.2d at 827. When any one of the foregoing Baker factors is implicated, the court should refrain from adjudicating the issue to prevent unwarranted interference with decisions properly made by the Representative Branches of the federal government. See Munoz-Flores, 495 U.S. at 393-94; Baker, 369 U.S. at 217.

### b. Application of the Political Question Doctrine

Before determining whether any of the Baker factors require dismissal under the political question doctrine, the court must first decide the applicability of the political question doctrine based on the nature of Plaintiffs' claims. Plaintiffs argue that the political question doctrine is inapplicable here because their claims are *private*, not *political*. See Pls.' Resp. to Defs.' Mot. to Dismiss, at 25 (emphasis added). Specifically, Plaintiffs assert that the doctrine does not apply because their "claims are brought by private individuals against private corporations for tort and property harms that were occasioned by defendants' particular acts of years past, as well as their acts of today."[22] Id. The court rejects Plaintiffs' argument for two reasons. First, there are numerous cases where the federal courts have dismissed claims by private plaintiffs against private defendants on the basis of the political question doctrine. The majority of these cases arise in the context of reparations claims arising out of World War II. See, e.g., Kelberine v.

_____

[22]In support is their position, Plaintiffs rely on Kadic v. Karadzic, 70 F.3d 232 (2nd Cir. 1995), a case which is clearly distinguishable from the present case. In Kadic, the Second Circuit declined to dismiss the plaintiffs' claims under the Alien Tort Claims Act alleging gross human rights abuses against a Bosnian Serb leader on the basis of the political question doctrine. 70 F.3d at 250. The Kadic court cautioned that "judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions . . ." and added that "[a]lthough these cases present issues that arise in a politically charged context, that does not transform them into cases involving non-justiciable political questions." Id. at 249. However, in reaching its decision, the Kadic court stated that it did not have to decide the issue of whether judicial involvement would interfere with actions of other branches of the federal government because the court obtained a "'Statement of Interest'" signed by both the Solicitor General and the State Department's Legal Advisor expressly disclaiming any concern that the political question doctrine should be invoked. Id. at 250. No such "Statement of Interest" has been or could be sought in the present case.

Societe Internationale, 363 F.2d 989, 995 (D.C. Cir. 1966); In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d 370, 382 (D.N.J. 2001); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 489 (D.N.J. 1999); Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248, 282-85 (D.N.J. 1999).

Second, although Plaintiffs couch their claims as *tort* or *property* claims for acts committed by *private* corporate defendants, this alone does not preclude the application of the political question doctrine. The Supreme Court has stated that the identity of the litigants is immaterial to the questions raised by the political question doctrine. See Munoz-Flores, 495 U.S. at 394. Additionally, when determining whether the political question doctrine applies, the court must look to the nature of the underlying litigation, not the specific claims enumerated in the complaint. See Renne, 501 U.S. at 316 (to determine justiciability, the court must examine the "pleadings and record to determine the nature of the dispute and the interests of the parties in having [the issue] resolved"); see also Baker, 369 U.S. at 217 (indicating the need for a "discriminating inquiry into the precise facts and posture of the particular case" when distinguishing between "political questions" and "political cases"). Thus, the issue becomes whether Plaintiffs' claims are the type of claims that have been committed to the Representative Branches for resolution. See In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d at 378.

Plaintiffs' Complaint establishes that the underlying nature of their lawsuit seeks reparations for Defendants' participation in slavery dating back as far as the year 1691. See FACC ¶ 9. Although Plaintiffs request both equitable and legal relief, the bulk of this relief centers on Plaintiffs' claim for restitution. For example, Plaintiffs seek, among other things, the following remedies: (1) an accounting containing all records Defendants possess related to the

slave trade and slavery; (2) equitable disgorgement of all illicit profits Defendants gained from slavery; (3) the appointment of an independent historic commission designed to fully examine Defendants' actions; (4) a constructive trust imposed on all profits Defendants gained from slavery; and (5) restitution in the value of Plaintiffs' ancestors' slave labor and Defendants' corresponding unjust enrichment. See id. ¶¶ 3, 116. These remedies collectively provide the basis for calculating and distributing the amount of restitution sought, that is the amount in which Plaintiffs claim that Defendants wrongfully benefitted from Plaintiffs' ancestors' unpaid slave labor. See United States v. Shepard, 269 F.3d 884, 885 (7th Cir. 2001) (defining restitution as usually meaning the return of ill-gotten gains to which the holder is not legally entitled). Courts have consistently held that claims seeking restitution for forced labor are claims for reparations. See Iwanowa, 67 F. Supp. 2d at 485 n.84; see also Burger-Fischer, 65 F. Supp. 2d at 281-82. Such claims clearly raise a question as to whether the Judicial branch of the federal government is best suited to resolve the issue. See Cato, 70 F.3d at 1110 (holding that plaintiffs' claims for slavery reparations presented a non-justiciable political question); see also Kelberine, 363 F.2d at 995 (concluding that plaintiffs' claims for reparations against private corporate defendant for its involvement in a "Nazi Conspiracy" during World War II were barred by political question doctrine).

To further support this conclusion, in a recent action seeking relief from a German company and its American subsidiaries for damages resulting from the plaintiffs' forced labor in Nazi Germany during World War II, the District Court for the District of New Jersey rejected the very same argument that Plaintiffs raise here. See In re Nazi Era Cases Against German Defendants Litig. 129 F. Supp. 2d at 375 (rejecting the plaintiffs' argument that the political question doctrine cannot preclude a claim for reparations brought by an individual against a

private company when the underlying abuse alleged was "fundamentally interrelated with the Nazi war effort").

As a result, the fact that Plaintiffs refer to their claims as *private* rather than *political* does not, in and of itself, preclude the court from inquiring into the existence of a non-justiciable political question. Further, based on the nature of Plaintiffs' claims, an analysis of the political question doctrine is necessary. Having reached this conclusion, a review of Plaintiffs' Complaint reveals that all of the Baker factors are present in the underlying litigation.

### (1). A Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department

The Constitution commits to the Representative Branches of the United States Government the authority to resolve the issue of reparations to former slaves resulting from the Nation's role in the institution of slavery. As stated above, historians have long debated whether the issue of slavery was the actual cause of the Civil War. See supra, Part II.E. However, regardless of what actually caused the Civil War, it is clear that the abolition of slavery as an institution was a fundamental concern of the Representative Branches both during and after the war. See, e.g., Donald G. Nieman, Promises to Keep: African-Americans and the Constitutional Order, 1776 to the Present 54 (Oxford University Press 1991). Under the Constitution, the war powers are reserved to the Representative Branches of the federal government. See U.S. Const. art. I, § 8; U.S. Const. art. II, § 2; see also Doe v. Bush, 323 F.3d 133, 137 (1st Cir. 2003). These powers not only include the power to declare and prosecute war, but also extend to the power to ensure a just and lasting peace following the conclusion of a war. See Ladue & Co. v. Brownell, 220 F.2d 468, 472 (7th Cir. 1955) (holding that Congress may reserve the power to seize property following a formal declaration of peace). By exclusively entrusting such powers to the

Representative Branches, the Constitution restricts judicial review or interference on many war-related decisions made by Congress and the President both during and after a war. <u>See</u> <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 589-90 (1952).

In this case, there is a strong historical record indicating that the relief sought, reparations to former slaves following the Civil War, was considered and rejected by the Representative Branches in lieu of other forms of relief. This relief came in many forms, including wartime and post-war legislation, civil rights legislation, and constitutional amendments – all intended to ensure the liberty of the newly freed slaves and benefit them generally.

For example, prior to the end of the Civil War, Congress passed the Federal Confiscation Acts designed to punish those who participated in the rebellion by confiscating their property. <u>See</u> An Act to Confiscate Property Used for Insurrectionary Purposes, ch. 60, 12 Stat. 319 (Aug. 6, 1861), as amended by, An Act to Suppress Insurrection, to Punish Treason and Rebellion, to Seize and Confiscate the Property of Rebels, and for Other Purposes, ch. 195, 12 Stat. 589 (July 17, 1862). The Confiscation Acts also freed tens of thousands of slaves who had fled to Union forces by the summer of 1862. <u>See id.</u> Shortly thereafter, following a series of Union victories, President Lincoln, using his constitutional authority as Commander-in-Chief, issued the Emancipation Proclamation on January 1, 1863. <u>See</u> Abraham Lincoln, The Emancipation Proclamation, Exec. Proclamation No. 17 (Jan. 1, 1863), reprinted in 12 Stat. 1268 (1863). The Emancipation Proclamation freed all slaves in the states under Confederate control. <u>Id.</u>

Other wartime efforts to ensure the well-being of the newly freed slaves included Congress' creation of the Freedman's Bureau in March 1865. <u>See</u> An Act to Establish a Bureau for the Relief of Freedmen and Refugees, ch. 90, 13 Stat. 507 (March 3, 1865). Congress created the Freedman's Bureau pursuant to the war powers to provide former slaves food, clothing,

supplies, job placement, educational facilities and homestead land. Id.; see also Albert P. Blaustein and Robert L. Zangrando, Civil Rights and the American Negro: A Documentary History 210 (Washington Square Press, Inc., New York 1968). The Bureau had the authority to rent or sell to freed slaves land abandoned or confiscated in the Confederacy. Id. Although Congress initially intended for the Bureau's authority to expire one-year after the completion of the Civil War, Congress voted to extend the Bureau's powers over President Johnson's veto. See An Act to Continue in Force and to Amend An Act to Establish a Bureau for the Relief of Freedmen and Refugees, and for Other Purposes, ch. 200, 14 Stat. 173 (July 16, 1866); An Act to Continue the Bureau for the Relief of Freedmen and Refugees, and for Other Purposes, ch. 135, 15 Stat. 83 (July 6, 1868); see also George R. Bentley, A History of the Freedmen's Bureau 133 (Octagon Books 1970) (1955).

Congress also passed numerous Civil Rights Acts between the period of 1866-1875. Specifically, the Civil Rights Acts of 1866, 1870, 1871 and 1875 were enacted to secure civil rights for the newly freed slaves. Most notably, the Civil Rights Act of 1866 declared "[a]ll persons" to be citizens of the United States and guaranteed them legal equality throughout the nation.[23] See Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (April 6, 1866). The Act provided that "[a]ll persons . . . shall have the same right in every State . . . as is enjoyed by white citizens." Id. § 1 (currently codified, as amended, at 42 U.S.C. § 1981 (2003)).

Additionally, Congress ratified three constitutional amendments (hereinafter collectively referred to as the "Civil War Amendments") between the period of 1865 to 1870 to ensure the liberty of the newly freed slaves. The Thirteenth Amendment, ratified on December 6, 1865,

---

[23] Because there were questions as to whether the Thirteenth Amendment authorized the Civil Rights Act of 1866, Congress ratified the Fourteenth Amendment on July 9, 1868, rendering the issue moot. See U.S. Const. amend XIV.

provides, in part: "Neither slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. This amendment formally abolished slavery within the United States by prohibiting individual states from enacting legislation authorizing the use of slavery within their borders. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439 (1968) (noting that the Thirteenth Amendment effectively abolished slavery and gave Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States") (internal quotations omitted). Congress then ratified the Fourteenth Amendment on July 9, 1868, declaring among other things, that all persons born or naturalized in the United States were United States citizens and citizens in the state in which they resided. See U.S. Const. amend. XIV, § 1. Section 1 of this Amendment effectively overruled the Supreme Court's Dred Scott[24] decision, ultimately making freed slaves citizens of the United States. Finally, on February 3, 1870, Congress ratified the Fifteenth Amendment with the intention of granting African-Americans the right of suffrage.[25] The Fifteenth Amendment provides, in part: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on the account of race, color, or previous condition of servitude." U.S. Const. amend XV, § 1. Concerned with the possibility that individual states

---

[24]In Dred Scott v. Sanford, the Supreme Court declared the Missouri Compromise unconstitutional and broadly held that slaves were property, not citizens. 60 U.S. 393 (1865). The Court's ruling established that slaves were not entitled to all of the rights, privileges and immunities guaranteed to all citizens under the Constitution. Id. at 404-405.

[25]The court notes that although Congress intended to give African-Americans the right to vote by ratifying the Fifteenth Amendment, the Amendment itself did not guarantee such a result. State and local laws requiring poll taxes, literary tests, residence and registration requirements, and "grandfather clauses" acted as impediments to this right. See Blaustein and Zangrando, supra at 245-46. Many of these issues were not resolved until decades later when the United States Supreme Court became involved in the issue and Congress passed the Voting Acts Rights Act of 1965. Id. However, to help illustrate the seriousness of Congress' efforts to assimilate the newly freed slaves into society, the court notes that the African-American male was given the right to vote fifty years prior to Congress' ratification of the Nineteenth Amendment, which gave women the right to vote. See U.S. Const. amend. XIX.

may attempt to circumvent the purpose behind the Civil War Amendments, Congress included an enabling clause in all three of the Civil War Amendments – giving it the exclusive power to enforce the Amendments with appropriate legislation. See U.S. Const. amend XIII, § 2; see also U.S. Const. amend XIV, § 5; U.S. Const. amend XV, § 2.

More directly on point, the Representative Branches considered the issue of reparations to freed slaves for harms suffered as a result of the institution of slavery.[26] Congressman Thaddeus Stevens proposed a bill that would have utilized the Confiscation Acts to seize public and private real property within the former Confederate States. See H.R. 29, 40th Cong. § 1, 2 (1867). The confiscated property would have been distributed to freed slaves. See id. § 4. Specifically, the text of that bill provided, *inter alia*:

> That out of the lands thus seized and confiscated the slaves who have been liberated by the operations of the war and the amendment to the Constitution or otherwise, who reside in said "confederate States" on the 4th day of March, A.D. 1861, or since, shall have distributed to them as follows, namely: to each male person who is the head of a family, forty acres; to each adult male, whether the head of a family or not, forty acres; to each widow who is the head of a family, forty acres – to be held by them in fee-simple, but to be inalienable for the next ten years after they come seized thereof.

Id. In addition, each freed slave would have also been entitled to a monetary grant for the purpose erecting buildings on these distributed lands. See id. § 5.

---

[26]In fact the Representative Branches continue to consider the issue of reparations to descendants of slaves. In 1989, and in each successive year, Congressman John Conyers has introduced a Reparations Study Bill, commonly referred to as H.R. 40. See, e.g., Commission to Study Reparations Proposals for African Americans Act, H.R. 3745, 101st Cong. (1989); Commission to Study Reparation Proposals for African-Americans Act, H.R. 40, 108th Cong. (2003). This Reparations Study Bill provides, *inter alia*, for the formation of a commission to study human chattel slavery and its continuing impact on African descendants in the United States today. See, e.g., H.R. 3745, § 2(b)(1)-(3), 101st Cong. (1989). The bill also calls for the commission to recommend the form that reparations should take if it indeed finds there to be continuing injuries to African descendants. See id. at § 2(b)(5).

Stevens passionately advocated for passage of this bill. Stevens indicated that H.R. 29 was designed to help several classes of persons, including freed slaves, stating:

> [H.R. 29] is important to four millions of injured, oppressed, and helpless men, whose ancestors for two centuries have been held in bondage and compelled to earn the very property a small portion of which we propose to restore to them, and who are now destitute, helpless, and exposed to want and starvation under the deliberate cruelty of their former masters . . . . The cause of the war was slavery. We have liberated the slaves. It is our duty to protect them and provide for them while they are unable to provide for themselves. Have we not a right, in the language of Vattel, 'to do ourselves justice respecting the object which has caused the war,' by taking lands for homesteads for these 'objects' of the war?

Cong. Globe, 40th Cong., 1st Sess. 204 (1867) (statement of Congressman Stevens). According to Stevens, passage of H.R. 29 would have served two objectives. First, the bill would have served to punish the Confederate States for their treasonous war. As Stevens stated: "You hold at your feet a conquered foe, an atrocious enemy. Tell him on what terms he may arise and depart or remain loyal. But do not embrace him too hastily. Be sure first that there is no dagger in his girdle." Id. at 205. Second, the bill would have served to place freed slaves on the path to economic independence. As Stevens stated:

> Four million people have just been freed from a condition of dependence, wholly unacquainted with business transactions, kept systematically in ignorance of all their rights and of the common elements of education, without which none of any race are competent to earn an honest living, to guard against the frauds which will always be practiced on the ignorant, or to judge of the most judicious manner of applying their labor.

Id.

In the Senate, Senator Charles Sumner also championed this vision of land distribution as a form of reparations to freed slaves. See Cong. Globe, 40th Cong., 1st Sess. 15, 49-56, 79, 114, 147, 203-08, 304-08, 463 (1867) (statements of Senator Sumner). According to Sumner, "all who are now familiar with the process of reconstruction have felt that our work would be

incomplete unless in some way or another we secured to the freedmen a piece of land." Cong. Globe, 40th Cong., 1st Sess. 50 (1867) (statement of Senator Sumner). One particular proposed resolution of Sumner's provided, *inter alia*: "Not less important than education is the homestead, which must be secured to the freedmen, so that at least every head of a family may have a piece of land." Id. (reading text of proposed resolution, Miscellaneous Document No. 1, § 5).

The idea of land distribution was also a plan of the Bureau of Refugees, Freedmen, and Abandoned Land. See generally Bentley, supra at 49. However, the idea of land distribution was ultimately abandoned, with President Andrew Johnson pursuing a plan to pardon Confederate sympathizers and restore their property rights. See Claude F. Oubre, Forty Acres and a Mule: The Freedmen's Bureau and Black Land Ownership 61 – 71 (1978).

The words of Senator Sumner, lamenting the decision not to extend monetary or property reparations to freed slaves, is hauntingly prophetic of the continued post-Emancipation reparations movement: "I do not like to play the part of Cassandra;[27] but I cannot forbear declaring my conviction that we shall regret hereafter that we have not done more." Cong. Globe, 40th Cong., 1st Sess. 165 (1867) (statement of Senator Sumner). Yet, that does not change the fact that the Representative Branches considered the issue of reparations to former slaves, and the chosen vessels of reparations came in the form of constitutional and legislative enactments guaranteeing equality under the law and freedom from discrimination. It is the political question doctrine that militates that this court attribute finality to those decisions, and not posit itself as the ultimate authority on the issue by second guessing those decisions. See Baker, 369 U.S. at 210. It is not the province of this court to say that more could have been done

---

[27] In Greek mythology, Cassandra was a figure endowed with the gift of prophecy but fated never to be believed.

in the past; as such decisions are in the nature of political questions committed to the Representative Branches.

In conclusion, based on the historical record presented here, it is clear that both during and after the Civil War the issue of reparations to former slaves was one committed to the Representative Branches of the federal government. It was the President and Congress who prosecuted the military and political aspects of the Civil War, ultimately leading to the conclusion of the war. With a goal of preserving the Union and securing an acceptable and lasting peace, it again was the President and Congress who chose to amend the Constitution and enact civil rights legislation in an effort to provide legal equality to the newly freed slaves. Although the Representative Branches decided to take this particular course of conduct in lieu of providing reparations to former slaves, the historical record clearly demonstrates that the Constitution commits this decision to the Representative Branches. See Alperin v. Vatican Bank, 242 F. Supp. 2d 686, 692 (N.D. Cal. 2003) (noting that "a court must consider the totality of the circumstances in determining whether a claim is one committed to the political branches for resolution"). By requiring the court to second-guess the decisions of the Representative Branches made more than a century ago, Plaintiffs' Complaint presents a non-justiciable political question. See Cato, 70 F.3d at 1110 (affirming the dismissal of plaintiffs' slavery reparations complaint on political question grounds based on Congress' desire "to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort") (internal quotations and citations omitted).

### (2). Judicially Discoverable and Manageable Standards

There also exists a lack of "judicially discoverable and manageable standards" for resolving Plaintiffs' claims in this case. Baker, 369 U.S. at 217. Defendants argue, and the court

agrees, that the historical issues raised in Plaintiffs' Complaint "involve too broad a span of conduct over too broad an expanse of time to be susceptible to any manageable judicial standards for resolution." See Defs.' Joint Mot. to Dismiss, at 35. As stated in the Complaint, the relevant events took place as far back as the year 1619. See FACC ¶ 9. Absent a political framework, the court is ill-equipped to determine many issues posed in a dispute covering a period of almost 400 years. This includes, for example, determining such issues as consanguinity and apportionment of liability given the multiple generations associated with the litigation. See, e.g., Eric A. Posner and Adrian Vermeule, Reparations For Slavery and Other Historical Injustices, 103 Colum. L. Rev. 689, 702 (2003) (discussing the limited effect of the restitutionary theory of reparations where the claim is made several generations removed from the actual wrongdoing).

In support of their claims, Plaintiffs rely on In re Holocaust Victim Asset Litig., 105 F. Supp. 2d 139 (E.D.N.Y. 2000), to support their assertion that this type of case is "extremely well suited to judicial resolutions." See Pls.' Resp. to Def.'s Mot. to Dismiss, at 30 n.47; see also Pls.' Sur-reply Br., at 6 n.20. In the Holocaust Victim case, the district court approved a class action settlement between Holocaust victims and two leading Swiss banks after the plaintiffs brought suit alleging, among other things, that the defendants "collaborated with and aided the Nazi regime in furtherance of war crimes, crimes against humanity, crimes against peace, slave labor and genocide." 105 F. Supp. 2d at 141. However, the Holocaust Victim case is clearly distinguishable from the present action because in its opinion, the court noted that because the settlement was reached while the defendants' motions to dismiss were pending, the court did not have to decide the issues raised in the motions. Id. at 142. Thus, the Holocaust Victim court never considered whether the issues raised in the plaintiffs' complaint implicated a non-justiciable political question.

Moreover, although it can be argued that in certain cases such issues similar to those presented in Plaintiffs' Complaint are not entirely inappropriate for judicial resolution, this case is not one of them. Because the events surrounding the institution of slavery and the Civil War are so deeply rooted in our Nation's history, the issues that may appear to be capable of judicial resolution in an ordinary case move beyond the province of this court given the magnitude of the events that preceded them. Cf. Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d at 389 (stating that the magnitude of World War II has placed Plaintiffs' claims for reparations beyond the province of judicial determination and "into the political realm").

Ultimately, the court is persuaded by the reasoning adopted by other courts that have considered the issue in the context of reparations for forced labor during World War II and have held that such claims are not suitable for judicial resolution. See, e.g., Kelberine, 363 F.2d at 995; Iwanowa, 67 F. Supp. 2d at 489; Burger-Fischer, 65 F. Supp. 2d at 283-84; Alperin, 242 F. Supp. 2d at 695; Anderman v. Federal Republic of Austria, 256 F. Supp. 2d 1098, 1115 (C.D. Cal. 2003). In Kelebrine, while discussing whether a private corporation should be liable for its involvement in the Nazi conspiracy of 1933-45, the Appeals Court for the D.C. Circuit stated:

> We are of the opinion the thesis is not presently susceptible of judicial implementation. It may be that the Congress might enact a program and a procedure by which the objectives prayed for could be achieved. But we think the courts alone cannot do it. As presently framed, the problem is not within the established scope of judicial authority . . . . The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought — adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power – is too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed. . . . The events, the witnesses, the guilty tortfeasors, their membership in the conspiracy are all so potentially vague at this point as to pose an insoluble problem if undertaken by the courts without legislative or executive guidance, authorization or support. The whole concept is

too uncertain of legal validity to sustain the self-establishment of the proceedings by a court in the absence of specific legislative or executive formulation.

Id.

The issues raised by the Kelebrine court, particularly those relating to the impracticality of judicially resolving disputes covering vast time periods and containing numerous unidentifiable tortfeasors, are clearly present in the underlying litigation. Although Plaintiffs attempt to distinguish the World War II reparation cases from their case, many of the issues raised in Kelebrine and its progeny are plentiful in the underlying litigation. As such, the second Baker factor also requires dismissal of Plaintiffs' Complaint.

### (3). Remaining *Baker* Factors

As stated above, the issues raised in Plaintiffs' Complaint involve events that have had a significant impact on our Nation's historical development. See supra Part IV.A.2.b.(1). Both during and after the Civil War, the Representative Branches implemented various policies aimed at resolving the problems and challenges stemming from the abolition of slavery within the United States. These policies included, among others, the enactment of several Civil Rights Acts and the ratification of the Civil War Amendments – all of which were intended to provide legal equality to the newly freed slaves. Even throughout the twentieth century, the Representative Branches continued to establish these policies by enacting further civil rights legislation and by implementing various relief programs intended to benefit minorities – many of whom are descendants of former slaves.

By bringing their claims for slavery reparations before the court, Plaintiffs require the court to criticize or question actions or decisions or policies made by the Representative Branches over a period spanning more than a century. Given our constitutional structure, policy

determinations of this type are for elected officials, not the courts. Moreover, during and after the bloodiest war in this country's history, the Representative Branches grappled with these issues while simultaneously trying to conclude the war and ensure lasting peace. Allowing Plaintiffs, through private litigation, to seek reparations for wrongs committed prior to and during the Civil War clearly expresses a lack of respect for the Representative Branches and their attempted resolution of such issues over the past century and one-half.[28] Although Plaintiffs question the choices made by the Representative Branches and the effectiveness of these decisions in providing equality to descendants of former slaves, the fact remains that these are political questions which the court must decline to determine. Cf. Burger-Fischer, 65 F. Supp. 2d at 282 (concluding that courts cannot re-examine the adequacy of reparation agreements between the United States and other World War II combatants because doing so implicates a political question in which the court must decline to determine).

### c. Conclusion

In sum, the issues raised in Plaintiffs' Complaint implicate all of the factors established by the Supreme Court identifying a non-justiciable political question. See Baker, 369 U.S. at 217. As such, each Baker factor provides a separate and independent basis for the court to dismiss Plaintiffs' Complaint under the well-settled political question doctrine. See id.

---

[28]Plaintiffs argue that President Bush recently gave "implicit support" for their claims in a major policy speech given on Goree Island in Senegal on July 8, 2003, where he declared slavery as "one of the greatest crimes in history." See Pls.' Resp. to Defs.' Mot. to Dismiss, at 31. Plaintiffs fail to develop this argument or support it in any way. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) (stating that courts should not consider undeveloped or unsupported arguments). In any event, Plaintiffs' use of the President's speech is not persuasive because such statements may support the proposition that the Representative branches of our government should continue their historical efforts to advance civil rights for all citizens.

## B. Failure to State a Claim Upon Which Relief Can be Granted

As discussed supra, one of the fundamental defects of Plaintiffs' Complaint is lack of standing, as the Complaint fails to allege any constitutionally cognizable injury that is fairly traceable to Defendants. As an additional argument in support of dismissal, Defendants argue that Plaintiffs' Complaint fails to state a claim upon which relief can be granted. Although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, and that these claims present a non-justiciable political question, with an abundance of caution, the court will next determine whether the Complaint fails to state a claim upon which relief can be granted as an independent basis for dismissal.

The sufficiency of a complaint may be tested in a number of ways pursuant to Federal Rule of Civil Procedure 12: a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6); a motion for a more definite statements of a vague or ambiguous complaint pursuant to Rule 12(e); or a motion to strike redundant, immaterial, impertinent or scandalous matter in a complaint pursuant to Rule 12(f). In this matter, Defendants have elected to proceed pursuant to Rule 12(b)(6), challenging whether Plaintiffs' Complaint states a claim upon which relief can be granted.

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2); see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 162, 168 (1993) (discussing "notice pleading" standards under the Federal Rules of Civil Procedure). Under this liberal notice pleading standard, "'[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be

proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)).

The main function to be performed by the complaint is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). "While federal notice-pleading allows for a generous reading of a complaint, in order to resist a motion to dismiss, the complaint must at least set out facts sufficient to 'outline or adumbrate' the basis of the claim." Panaras v. Liquid Carbonic Industries Corp., 74 F.3d 786, 792 (7th Cir. 1996). The Federal Rules of Civil Procedure require the plaintiff to disclose adequate information regarding the basis of the claim for relief as distinguished from a bare averment that the plaintiff wants relief and is simply entitled to it. See 5 Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1202 (2d ed. 1990). A complaint contains adequate information regarding the basis of the claim for relief if it contains even "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002). To provide a defendant with fair notice, "a complaint must allege facts bearing on all material elements necessary to sustain a recovery under some viable legal theory." Looper Maintenance Service, Inc. v. City of Indianapolis, 197 F.3d 908, 911 (7th Cir. 1999) (citation omitted).

Plaintiffs claim that Defendants illegally profited from slavery without identifying the act or acts claimed to support this broad charge. This is insufficient to state a claim even under liberal notice-pleading standards. See Higgs, 286 F.3d at 439. As already indicated, Plaintiffs' Complaint fails to connect any alleged injury of any one of the Plaintiffs or their ancestors to alleged conduct by any one of the Defendants or their predecessors. Rather, Plaintiffs seek to hold Defendants liable for an entire era of history simply because their alleged predecessors were

purportedly doing business in nineteenth century America. Plaintiffs' Complaint can be reduced to the following syllogism: Defendants or their predecessors allegedly profited from the unpaid labor of former slaves, and Plaintiffs are descendants of former slaves, therefore, Plaintiffs are entitled to some of Defendants' profits. However, the allegations in a complaint must be those relating to the plaintiff, not those of someone else. See Kyle v. Morton High School, 144 F.3d 448, 455 (7th Cir. 1998). The broad allegations of Plaintiffs' Complaint fail to give Defendants fair notice of what conduct is alleged to have injured which persons, in what manner, and when over the past four centuries covered in the Complaint.

In light of this omission failing to link any alleged conduct of Defendants or their alleged predecessors to Plaintiffs or their ancestors, Plaintiffs' Complaint relies on a conspiracy theory. Plaintiffs' Complaint alleges that Defendants or their alleged predecessors conspired with certain unnamed malefactors to violate the legal rights of certain unnamed victims – presumably all persons held in slavery – and thus are somehow liable based on a theory of third-party liability. However, Plaintiffs' Complaint fails to allege even the faintest outline of this conspiracy, let alone its members and Defendants', or their predecessors', alleged roles in that conspiracy. Even under liberal notice pleading standards, the pleading of a conspiracy requires a plaintiff to "indicate the parties, general purposes, and approximate date, so that the defendant has notice of what he is charged with." Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002). Plaintiffs' conspiracy theory is similar to that in Albiero v. City of Kankakee, 122 F.3d 417, 420-21 (7th Cir. 1997), where the plaintiffs alleged a conspiracy, but did not elaborate or provide any other allegations to support the conspiracy.

Plaintiffs' Complaint fails to meet the notice pleading requirements set forth in the Federal Rules of Civil Procedure. "This is not a case where the plaintiff has been tripped up by

'mere technicalities,' but rather, the plaintiff has omitted the gravamen of his complaint." Kyle, 144 F.3d at 457. Plaintiffs' Complaint is a pastiche of the generally acknowledged horrors of slavery, totally devoid of allegations of injury to the Plaintiffs or corresponding conduct committed by Defendants. "This glaring gap in the complaint leaves total speculation as the only alternative for the court to come up with any set of facts justifying relief." Id. at 454. Defendants cannot be deemed to have fair notice of Plaintiffs' claims when they are based solely on speculation. Further, the court cannot indulge this speculation and attempt to determine whether Plaintiffs' Complaint could set forth any set of facts justifying relief, as "[t]hat is not the court's job." Id. In short, Plaintiffs fail to present a well-pleaded complaint that can withstand scrutiny under Rule 12(b)(6), even under liberal notice pleading standards.

## C. Statutes of Limitation

As an additional argument in support of dismissal, Defendants argue that Plaintiffs' claims are time-barred by operation of various statutes of limitation. Once again, although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, that these claims present a non-justiciable political question, and fail to state a claim upon which relief can be granted, with an abundance of caution, the court will also determine whether statute of limitations defenses would also constitute an independent basis for dismissal.

### 1. Overview of Statutes of Limitation

The concept of limitations periods to the bringing of legal action has been well-established in the law for centuries. Limitations on actions can be traced back to early Roman law. See Developments in the Law: Statutes of Limitations 63 Harv. L. Rev. 1177 (1950) (citing Sohm, The Institutes of Roman Law 318-22 (Ledlie's trans., 3d ed. 1907)). As part of our Anglo-American common law system of law, statutes of limitations can be traced as far back as

1189 for actions concerning property right disputes.  See Thomas E. Atkinson, Some Procedural Aspects of the Statute of Limitations, 27 Colum. L. Rev. 157, 162 (1927) (chronicling the history of statutes of limitations).  While the concept of statute of limitations has evolved over the centuries well beyond the realm of property law, the general principles behind them remain the same.

One principle behind statutes of limitations is the promotion of justice.  In his work The Path of the Law, Oliver Wendell Holmes reflected on statutes of limitations, asking: "What is the justification for depriving a man of his rights, a pure evil as far as it goes, in consequence of the lapse of time?"  Oliver W. Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 476 (1897).[29]  To answer Holmes' question, the justification is fairness to litigants.  This fairness is achieved through two goals of statutes of limitations: first, to provide the defendant notice of the plaintiff's claims; and second, to provide repose to the defendant.  "Statutes of limitations . . . in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses disappeared."  Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348-49 (1944).  Statutes of limitations are based on "[t]he theory that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."  Id. at 349.

The Supreme Court has further elucidated on that point, stating that:

Statutes of limitations find their justification in necessity and convenience rather than in logic.  They represent expedients, rather than principles.  They are

---

[29]Also reflecting on the purposes served by statutes of limitation, the Supreme Court once stated: "Statutes of limitations always have vexed the philosophical mind for it is difficult to fit them into a completely logical and symmetrical system of law."  Donaldson, 325 U.S. at 313.

practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. [citation omitted] They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what is now called a 'fundamental' right or what used to be called a 'natural' right of the individual. [Plaintiffs] may, of course, have the protection of the policy while it exists, but the history of pleas of limitations shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314 (1945).

The procedural requirements established by various legislatures for gaining access to the courts are not to be disregarded out of a vague sympathy for particular litigants. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 2071 (2002) (citing Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984)). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application." Cada v. Baxter HealthCare Corp., 920 F.2d 446, 453 (7th Cir. 1990). Statutes of limitations are regulations set by the legislature, designed to set a time period in which to file an action. "They protect important social interests in certainty, accuracy, and repose." Id. "Though rarely the subject of sustained scholarly attention, the law concerning statute of limitations fairly bristles with subtle, intricate, and often misunderstood issues . . . ." Wolin v. Smith Barney Inc., 83 F.3d 847, 849 (7th Cir. 1996).

Two important concepts when dealing with statutes of limitation are accrual and tolling. Accrual denotes the point in time when an action can be maintained. "A cause of action 'accrues' when a suit may be maintained thereon, and the law in this regard differs from state-to-state and by nature of action." Deluxe Black's Law Dictionary, 6th edition at 21 (1990). The

proverbial clock starts to run when the action accrues. It is not the date on which the wrong that injures the plaintiff occurs, but the date – often the same, but sometimes later – on which the plaintiff discovers that he has been injured. While discovery of the injury in some cases may be complex, in others it would be immediately obvious, as in the case of the brutal application of the lash, the turning of the screw, or the tightening of the leg chains nightly to a post. In a complement to accrual, tolling is a concept which suspends the running of a limitations period to an accrued action. The proverbial clock is stopped when the action is tolled.

### 2. *Statutes of Limitations as Applied to Plaintiffs' Claims*

Since statutes of limitations are defenses to claims, a plaintiff ordinarily need not anticipate or attempt to defuse these defenses in a complaint. See Gomez v. Toledo, 446 U.S. 635, 640 (1980). However, "[a] litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense . . . ." United States Gypsum Co. v. Indiana Gas Co., Inc., 350 F.3d 623, 626 (7th Cir. 2003) (citation omitted); see also Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998) ("Litigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail."); Soo Line R.R. Co. v. St. Louis S.W. Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997) (indicating that a "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts").

The allegations of Plaintiffs' Complaint do allege the ingredients of a statute of limitations defense. Plaintiffs allege that their claims arise out of the institution of human chattel slavery as it existed in America, and admit that "[m]any of the torts set out in the instant complaint occurred prior to the formal end of chattel slavery in the United States of America," which occurred in 1865. FACC ¶ 237. Plaintiffs also claim that these injuries are recurring as long as Defendants do not provide a proper accounting of the profits allegedly gained by them or

their predecessors throughout the years from commercial activities relating to the institution of slavery.

Plaintiffs' claims fall into three groups: common law claims, state statutory claims, and federal statutory claims.[30] Plaintiffs' common law claims include: Count I, conspiracy; Count II, accounting; Count V, intentional infliction of emotional distress, Count VI, conversion; and Count VII, unjust enrichment. Plaintiffs' state statutory claims, included in Counts X through XIV, allege a violation of consumer protection laws for Illinois, Louisiana, Texas, New Jersey, and New York.

In the Motion to Dismiss, Defendants point to the law of Illinois as an example to show that Plaintiffs' state common claims are time-barred by many years, and extrapolate that Plaintiffs' claims would also be time-barred under any conceivable choice of law analysis using the law of any given state. Plaintiffs fail to object to Defendants' argument, and do not argue that there is any material conflict among the various state choice of law principles that could be applied in this case. Therefore the statute of limitations for Plaintiffs' other claims are as follows:

- **Conspiracy – three years.** See, e.g., Peoples v. Peebles, 457 N.E.2d 1318, 1322 (Ill.App. Ct. 1983); 720 Ill. Comp. Stat. 5/3-4 (2003).

- **Accounting – five years.** See, e.g., Schlossberg v. Corrington, 400 N.E.2d 73, 76 (Ill.App. Ct. 1980); 735 Ill. Comp. Stat. 5/13-205 (2003).

---

[30]The court notes that neither Plaintiffs nor Defendants engage in a choice of law analysis. As to Plaintiffs' state law claims, the court normally would apply the choice of law principles of the state in which each transferor court sits. See Ferens v. John Deere Co., 494 U.S. 516, 518-19 (1990) (indicating that in actions transferred pursuant to 28 U.S.C. § 1407(a), the transferee court applies the choice of law principles of the state where the transferor court sits for an analysis of state law claims). The court notes that the vagueness of Plaintiffs' Complaint prevents a thorough choice of law analysis.

- **Intentional Infliction of Emotional Distress – two years.** See, e.g., <u>Dahl v. Fed. Land Bank Ass'n. of W. Ill.</u>, 572 N.E.2d 311, 314 (Ill.App. Ct. 1991).

- **Conversion – five years.** See, e.g., <u>Bontkowski v. Smith</u>, 305 F.3d 757, 763 (7th Cir. 2002); 735 Ill. Comp. Stat. 5/13/205 (2003).

- **Unjust Enrichment – five years.** See, e.g., <u>Burns Philp Foods, inc. v. Cavalea Cont'l Freight, Inc.</u>, 135 F.3d 526, 527 (7th Cir. 1998); 735 Ill. Comp. Stat. 5/13-205 (2003).

- **Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41** (2002) -- **two years.** See Tex. Bus. & Com. Code Ann. § 17.565 (2002).

- **Illinois Consumer Fraud and Deceptive Business Act, 815 Ill. Comp. Stat. 505/1** (2003) **– three years.** See, e.g., 815 Ill. Comp. Stat. 505/10a(3) (2003); <u>Dreisilker Elec. Motors, Inc. v. Rainbow Elec. Co.</u>, 562 N.E.2d 970, 972-3 (Ill.App. Ct. 1990).

- **New York Consumer Protection from Deceptive Acts and Practices Laws, N.Y. Gen. Bus. Law §§ 348, 350 – three years.** See, e.g., <u>Soskel v. Handler</u>, 736 N.Y.S.2d 853, 855 (N.Y. Sup. Ct. 2001).

- **New Jersey Unfair Trade Practice Law, N.J. Stat. Ann. § 56:8-1** (2003) **– six years.** See, e.g., <u>Mirra v. Holland Am. Line</u>, 751 A.2d 138, 140 (N.J. Super. Ct. App. Div. 2000).

- **Louisiana Unfair Trade Practices and Consumer Protection Law, La Rev. Stat. Ann. § 51:1401** (2003) **– one year.** See La. Rev. Stat. Ann. § 51:1409(e) (2003).

Plaintiffs' federal statutory claims include: Count IV, piracy; and Count VIII, 42 U.S.C. §

1982. Although there is a five year statute of limitation on Plaintiff's piracy claim, see 18 U.S.C.

§ 3282 (2000), Plaintiffs' claim for piracy does not provide a private right of action, and need not

be considered further.[31] The statute of limitations for violations of 42 U.S.C. § 1982 is two years. See Honorable v. Easy Life Real Estate Sys., Inc., 182 F.R.D. 553, 563 (N.D. Ill. 1998).

Plaintiffs argue that their remaining claims: Count III, crimes against humanity, and Count IX, the Alien Torts Claims Act ("ATCA"), which is plead in the alternative, do not have statutes of limitation. As for Plaintiffs' claim for crimes against humanity, the court need not address the issue of the statute of limitations regarding it because it is presented as merely a mélange in which Plaintiffs fail to identify a claim which is actionable.[32] As for the ATCA, it does not contain a statute of limitations. "Although the ATCA itself does not contain a statute of limitations, when a cause of action under federal civil law does not have a directly applicable limitations period, the Supreme Court has instructed that the court should not assume that no time limit for the cause of action was intended." In re World War II Era Japanese Forced Labor Litig., 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001) (citing DelCostello v International Bhd of Teamsters, 462 U.S. 151, 158 (1983)).

Generally, in such situations, the court should apply the "most closely analogous statute of limitations under state law." DelCostello, 462 U.S. at 152; Reed v. United Transp. Union, 488

---

[31]Although Plaintiffs attempt to assert a claim for piracy, there is no private right of action for this claim, only criminal. See 18 U.S.C. § 1585; see also Karahalios v. National Federation of Federal Employees, Local 1263, 489 U.S. 527, 532-33 (1989) (citing Transamerica Mort. Advisers, Inc. v. Lewis, 444 U.S. 11, 19 (1979)) (indicating that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies).

[32]Plaintiffs attempt to assert a private right of action against Defendants for slavery, as a crime against humanity, based on the doctrine of *jus cogens*. Plaintiffs contend that since slavery has been deemed a crime against humanity according to international law, the doctrine of *jus cogens* applies, making this claim enforceable against parties in the United States. There are only two bases for establishing a private right of action based on international law: (1) self-executing treaties and (2) express statutory grants. See, e.g., Dreyfus v. Von Finck, 534 F.2d 24, 29-31 (2d Cir. 1976). First, the United States is not a signatory to any international treaty declaring slavery a crime against humanity. Second, there is no United States statute establishing a private right of action for claims based upon slavery as a crime against humanity. Therefore, Plaintiffs cannot a assert a private claim for crimes against humanity.

U.S. 319, 323-24 (1989); see also Jones v. R.R. Donnelley & Sons Co., 305 F.3d 717, 723 (7th Cir. 2002). However, as a narrow exception to the general rule, the court should apply the limitations period provided by an analogous federal law when it determines that either: (1) a rule from elsewhere in federal law provides a closer analogy than available state law; or (2) the application of the state limitations period "would frustrate or interfere with the implementation of national policies." North Star Steel Co. v. Thomas, 515 U.S. 29, 34 (1995) (citations and internal quotations omitted); see also Papa v. United States, 281 F.3d 1004, 1011-12 (9th Cir. 2002). Some federal courts that have considered the issue have held that the Torture Victim Protection Act of 1991 ("TVPA"), which contains a limitations period of ten years, provides the most analogous statute to the ATCA. See, e.g., Deutsch, 324 F.3d at 717; Iwanowa, 67 F. Supp. 2d at 462; Cabiri v. Assasie-Gyimah, 921 F. Supp. 1189, 1195-96 (S.D.N.Y. 1996). Under this theory, the ATCA limitations period is also ten years. See 28 U.S.C. § 1350, note § 2(c). In this case, the court need not determine whether a state or federal law provides a more closely analogous statute to the ATCA. Plaintiffs have not provided, nor can the court find an analogous state tort statute with a limitations period longer than the ten years provided under the TVPA. Assuming that the limitations period is ten years, Plaintiffs contention that they (or their ancestors) were aliens of the United States prior to the ratification of the Fourteenth Amendment, which occurred on July 9, 1868, see FACC ¶¶ 237-39, takes their claims back over a century.

Conceding that "[m]any of the torts set out in the instant complaint occurred prior to the formal end of chattel slavery in the United States of America," Pls.' FACC, ¶ 237, these claims would have accrued by 1865 at the latest. The longest limitations period for any of Plaintiffs' claims is ten years, which would have run well over a century prior to the filing of the instant Complaint. If cognizable claims ever existed, those claims were owned by former slaves

themselves, and became time-barred when the statutes of limitations expired in the nineteenth century. As such, Plaintiffs' century-old claims are barred by the statutes of limitation in every jurisdiction.

### 3. Doctrines to Extend Statute of Limitations Periods

Plaintiffs attempt to avoid having their claims deemed time-barred by arguing a number of doctrines. Specifically, Plaintiffs contend that all of the respective statute of limitations should be tolled based on either the discovery rule, the continuing violation doctrine, equitable estoppel, or equitable tolling. These four principles, in one way or another, allow a plaintiff to bring a claim that on its face falls outside the statute of limitations. Both the discovery rule and the continuing violations doctrine deal with when the accrual of a claim is established. In contrast, the doctrines of equitable estoppel and equitable tolling allow a plaintiff to assert a claim after it has accrued by tolling the respective statutes of limitation. However, as the court will discuss below, these doctrines cannot revive claims already barred by the statute of limitations.

#### a. Discovery Rule

The discovery rule postpones the beginning of a limitations period until such time as the plaintiff discovers the injury, or through reasonable diligence should have discovered the injury. See Cada, 920 F.2d at 450. The discovery rule keeps a claim from accruing until the plaintiff knows or through reasonable diligence should have known of the injury. See TRW Inc. v. Andrews, 534 U.S. 19, 27 (2001).

In support of their argument that the discovery rule should delay accrual of their claims, Plaintiffs argue that "[slaves] were not privy to the causes and extent of the harms they suffered." FACC ¶ 192. Specifically, Plaintiffs argue that "in their miserable condition which was a direct

result of slavery . . ., although intimately familiar with their pitifully horrific condition, [they] were not aware of the nature of the investments, insurance policies, joint ventures and other schemes and conspiracies developed and utilized by these defendants . . . to profit from slavery." Pls.' Resp. to Defs.' Mot. to Dismiss, at 17.

In response, Defendants reiterate that Plaintiffs' Complaint fails to allege any act committed by any specifically named Defendant or their predecessors against any of the Plaintiffs or their ancestors. Further, Defendants argue that since the alleged injuries were known, or knowable, to Plaintiffs' ancestors over a century ago, the discovery rule is simply inapplicable in this case.

Plaintiffs are attempting to recover for injuries incurred by their ancestors over a century ago. Plaintiffs' ancestors knew or should have known that they were being brutalized and wrongfully forced to work for people, plantations, companies and industries without being compensated. If they did not know of their exact injury at the time it occurred, they certainly should have known of it after the Civil War, the passing of the Civil War Amendments, or even the Civil Rights Movement of the 1960s. Furthermore, there is evidence that other former slaves were aware of their injuries and previously have attempted to recover for them well before this action was filed. See, e.g., Johnson, 45 App. D.C. 440, (evidencing a claim for slavery reparations nearly a century ago).

Plaintiffs' contentions would have the Court extend the statute of limitations indefinitely, or at least until all of the discovery Plaintiffs desire is completed. "By tying the start of the limitations period to a plaintiff's reasonable discovery of a pattern rather than to the point of injury or its reasonable discovery the [discovery] rule would extend the potential for most . . . cases well beyond the time when a plaintiff's cause of action is complete." Rotella v. Wood, 528

U.S. 549, 558 (2000). The mere fact that Plaintiffs' ancestors did not know exactly how much profit was made off of their slave labor is not enough to establish the discovery rule. "The federal common law discovery rule does not permit the plaintiff to delay filing its lawsuit until all foreseeable harms arising from the injury are actually experienced, but only until the plaintiff discovers the predicate injury." Brademas v. Indiana Housing Finance Authority, No. 03-2210, – F.3d –, 2004 WL 48163, *5 (7th Cir. Jan. 12, 2004). The predicate injury in this instance was the institution of slavery itself. Plaintiffs make a veiled attempt to tie the beginning of the statute of limitations period to the discovery of the damages that flowed from slavery, rather than the predicate injury itself. Again, the discovery doctrine only extends the statute of limitations until the predicate act is discovered, not until all discovery of its consequences is completed. See Rotella, 528 U.S. at 558. Therefore, the discovery rule, when applied in this instance, does not delay accrual of the claims alleged.

### b. Continuing Violation Doctrine

The continuing violations doctrine, although slightly different from the discovery rule, allows the plaintiff to file an action when there is a continuous series of injuries stemming from the same injury. Under this doctrine, the statue of limitations is not tolled per se, but rather left open until a final injury has accrued. See Heard v. Sheahan, 253 F.3d 316, 319 (7th Cir. 2001). "The continuing violation doctrine allows a complainant to obtain relief for a time-barred act of discrimination by linking it with acts that fall within the statutory limitations period." Filipovic v. K&R Exp. Systems, Inc., 176 F.3d 390, 396 (7th Cir. 1999) (citing Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992)). Courts will then treat the series of acts as one continuous act ending within the limitations period. See id. The continuing violation doctrine is applicable only if it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct.

See id.; see also Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167 (7th Cir. 1996).

As a preliminary matter, Plaintiffs assert that the continuing violation doctrine should be applied solely to their cause of action for an accounting. See Pls' Resp. to Defs.' Joint Mot. to Dismiss, at 22. Plaintiffs assert that they are continually hurt because they have not received an accounting of the monies owed to them and their ancestors for work they did while enslaved, and that Defendants continue to profit from the revenue they earned from the labor of Plaintiffs' ancestors. In support of their argument that the discovery rule should delay accrual of their claims, Plaintiffs argue that Defendants' failure to provide a proper accounting of the profits allegedly gained by them or their predecessors throughout the years from commercial activities relating to the institution of slavery constitute a continuing violation. In response, Defendants argue that Plaintiffs do not allege a continuing violation; rather, they are alleging a single event with purported continuing injuries.

With respect to this claim, the underlying injury concerns the denial of payments for the forced labor of Plaintiffs' ancestors. All of the other ills and consequences that flowed from this injury, no matter how dreadful, do not constitute new or continuing claims. They are merely the alleged effects of an injury that occurred over a century ago, and not a continuing series of acts. See Diliberti v. United States, 817 F.2d 1259, 1264 (7th Cir. 1987) (citing Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981) ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation."); Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C. Cir. 1978) (plaintiff's claim accrues when he is "first harmed")).

Plaintiffs also assert that Defendants' present day failure to produce an accounting of whether they profited from the slave trade constitutes a new and continuing violation. Again,

Plaintiffs' assertions are incorrect. Plaintiffs' assertions are merely a veiled attempt to circumvent the statute of limitations for their underlying claims. Plaintiffs have not alleged any new unlawful conduct by Defendants; but have merely alleged a continuing adverse consequence of prior unlawful conduct. See Diliberti, 817 F.2d at 1264. Therefore, the continuing violation doctrine, when applied in this instance, does not delay accrual of the claims alleged.

### c. Equitable Estoppel

Equitable estoppel allows a plaintiff to bring a cause of action after the statue of limitations has expired when the "'defendant takes active steps to prevent the plaintiff from suing on time.'" Brademas, No. 03-2210, – F.3d –, 2004 WL 48163, *5 (quoting Sharp v. United Airlines, Inc., 236 F.3d 368, 372 (7th Cir. 2001)). The defendant can prevent the plaintiff from filing their claim on time either by telling them that they will not assert the statute of limitations as a defense or by fraudulently concealing the injury after the fact. See Holmberg v. Armbrecht, 327 U.S. 392, 396-97 (1946); Brademas, No. 03-2210, – F.3d –, 2004 WL 48163, *5 (citing Sharp, 236 F.3d at 372). "The 'granting of equitable estoppel should be premised on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon.'" Hentosh v. Herman M. Finch Univ. of Health Sci. / The Chicago Medical School, 167 F.3d 1170, 1174 (1999) (quoting Wheeldon v. Monon Corp., 946 F.2d 533, 537 (7th Cir. 1991)).

Plaintiffs do not assert, nor is there any indication that Plaintiffs failed to file their claims within the appropriate time limitations because Defendants promised not to plead the statute of limitations as a defense. Rather, Plaintiffs assert that they did not properly file their claims within the appropriate time frame because of Defendants' unwillingness to divulge information about their ties to slavery, and that Defendants actively mislead them – i.e., fraudulent concealment. See FACC ¶ 198; Pls.' Resp. to Defs.' Mot. to Dismiss, at 23. Specifically, Plaintiffs assert that:

(1) defendants withheld documents and information related to their illegal profits from slavery and/or lied about their participation in slavery; (2) the fact that the defendants benefitted from concealing the information and that the concealment was so complete, provides a sufficient basis to conclude that they were aware of the concealment; (3) plaintiffs did not know of the defendants conduct or illegal profits and therefore could not have known of the concealment and/or misrepresentation; (4) defendants in concealing the information knew that this concealment would protect them from accountability for their actions; (5) plaintiffs lack of knowledge was reasonable and in good faith given the nature of defendants' conduct and plaintiffs' conditions; and (6) clearly justice would not be served by allowing the defendants to benefit from their concealing behavior as measured against the extreme harm suffered by plaintiffs and their ancestors.

Pls.' Resp. to Defs.' Mot. to Dismiss, at 22. In response, Defendants argue that Plaintiffs fail to plead, let alone particularize, the required elements of equitable estoppel.

Plaintiffs have not asserted any facts alleging that any Defendant concealed information in a way that would have prevented Plaintiffs' ancestors from asserting their claims within the proscribed statute of limitations period. Plaintiffs do not allege that Defendants concealed the injury. In fact, the injury was not concealed, but rather quite obvious when inflicted. Plaintiffs merely make vague generalizations about Defendants and their perceived practices. Plaintiffs vague assertions are not enough to satisfy the requirements for equitable estoppel. See Hentosh, 167 F.3d at 1174; see also Williamson v. Indiana Univ., 345 F.3d 459, 463 (7th Cir. 2003) (denying equitable tolling based on plaintiff's failure to present any evidence that defendant took active steps to prevent her from bringing her charge within the allotted time). Therefore, equitable estoppel, when applied in this instance, does not toll the statue of limitations.

### d. Equitable Tolling

"Equitable tolling applies when a plaintiff, despite due diligence, is unable to obtain enough information to conclude that there is a basis for a claim." Brademas, No. 03-2210, – F.3d –, 2004 WL 48163, *5 (citing Sharp, 236 F.3d at 373). As distinguished from equitable estoppel,

equitable tolling "permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before, even though the defendant took no active steps to prevent him from suing." Singletary v. Continental Ill. Nat'l. Bank & Trust Co., 9 F.3d 1236, 1241 (7th Cir. 1993) (citing Heck v. Humphrey, 997 F.2d 355, 357 (7th Cir. 1993)); see also Cada, 920 F.2d at 451 (indicating that equitable tolling does not require a finding of any conduct on the part of the defendant). "Equitable tolling is frequently confused with both fraudulent concealment [equitable estoppel] on the one hand and with the discovery rule -- governing, as we have seen, accrual -- on the other hand." Cada, 920 F.2d at 451.

Equitable tolling "halts the running of the limitations period so long as the plaintiff uses reasonable care and diligence in attempting to learn the facts that would disclose the defendant's fraud or other misconduct." 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedures § 1056, at 239 (3d. ed. 2002); see also Cada, 920 F.3d at 451. When dealing with equitable tolling between two innocent parties, "the negligence of the party invoking the doctrine can tip the balance against its application . . . ." Jackson v. Rockford Housing Auth., 213 F.3d 389, 397 (7th Cir. 2000) (quoting Cada, 920 F.2d at 453). A plaintiff invoking equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information.

Plaintiffs assert that in this instance the only relevant question as to equitable tolling is "whether the circumstances preventing the plaintiffs from gaining equal access to the justice system over the past decades are sufficiently extraordinary to justify application of the equitable tolling doctrine." Pls' Resp. to Defs.' Mot. to Dismiss, at 19. Plaintiffs base this assertion on the fact that they were only recently able to obtain the necessary information to assert their claims, as

a result of the "uniquely catastrophic historical context from which their class is still seeking to advance and from which the defendants are still profiting." Id. at 20.

It is true that because of the institution of slavery, the Jim Crow laws, and the lingering bigotries and separatist views following the Civil War, African-Americans were obstructed from obtaining necessary information on their claims and in some instances access to the legal system. Nevertheless, Plaintiffs' ancestors knew of their injury at the time that it occurred. They knew, or should have known that they were wrongfully being forced to work without compensation, and that somebody was making a profit from their labor. Yet, neither Plaintiffs nor their ancestors ever asserted these claims in a court of law until now. Plaintiffs have not shown that they acted with all due diligence in attempting to obtain vital information about their claims, and assert them timely.

Plaintiffs' contentions fly in the face of numerous well-settled legal principles and history. African-Americans, as well as various other ethnic groups, have previously brought claims seeking reparations in one form or another, against both public and private entities. See Johnson, 45 App. D.C. 440; see also Deutsch, 317 F.3d at 1028-29 (affirming dismissal of slave labor claims against private corporations as, inter alia, time-barred), amended by 324 F.3d 692; Wolf, 95 F.3d at 544 (dismissing claims against private defendant on standing grounds); Kelberine, 363 F.2d at 992 (dismissing on justiciability and statute of limitations grounds reparations claims for World War II era slave labor against private company); In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d at 389 (dismissing slave and forced labor claims as nonjusticiable); Iwanowa, 67 F. Supp. 2d at 424; Burger-Fischer, 65 F. Supp. 2d at 248. Plaintiffs merely make vague assertions and generalizations as to their claims and the state of the legal system. Plaintiffs' vague assertions and generalizations are not enough to toll

the statue of limitations on their claims. Plaintiffs' Complaint is nothing more than an attempt to by-pass the various statutes of limitation by chronicling the social inequities and injustices that have befallen African-Americans as a result of slavery. But the statutes of limitations "are not to be disregarded by courts out of a vague sympathy for particular litigants." Morgan, 122 S.Ct. at 2071. Therefore, the doctrine of equitable tolling does not apply in this instance.

### *4. Conclusion*

Plaintiffs' attempt to bring claims over a century old are barred by the statute of limitations. Plaintiffs have failed to assert any factual or legal basis for allowing them to proceed with their cause of action in light of when their claims accrued or with due diligence found that they would have accrued. Plaintiffs' attempt to avoid this legal reality by pleading vague factual generalities and chronicling the social and economic injustices that have befallen African Americans due to slavery. However, statutes of limitation serve to promote justice for litigants, see Donaldson, 325 U.S. at 314, which cannot be disregarded out of vague sympathy for Plaintiffs and their claims. See Morgan, 122 S.Ct. at 2071. Therefore, the court finds that Plaintiffs' claims are barred by the statute of limitations.

## V. CONCLUSION

It is beyond debate that slavery has caused tremendous suffering and ineliminable scars throughout our Nation's history. However, Plaintiffs' claims, as alleged in their Complaint, fail based on numerous well-settled legal principles. First, Plaintiffs' claims are beyond the constitutional authority of this court. Without alleging any specific connection between themselves and the named Defendants, Plaintiffs lack essential constitutional standing requirements to bring their claims. Second, prudential limitations prohibit the court from deciding such broad questions of social importance when such claims are brought on behalf of

73

absent third parties, as Plaintiffs attempt here. Third, the long-standing and well-reasoned political question doctrine bars the court from deciding the issue of slavery reparations, an issue that has been historically and constitutionally committed to the Legislative and Executive branches of our government. Fourth, Plaintiffs' claims are untimely. Conceding that many of the torts alleged in the Complaint occurred prior to the formal end of slavery, Plaintiffs fail to show how any of these claims fall within the applicable statutes of limitation. Finally, under the rules of procedure which guide the federal judicial system, Plaintiffs' Complaint fails to state a claim upon which relief can be granted, a serious defect the court cannot overlook regardless how egregious the circumstances giving rise to the claims.

In summary, Plaintiffs' attempt to bring these claims more than a century after the end of the Civil War and the formal abolition of slavery fails; this determination is consistent with the position taken by numerous courts which have considered the issue over the last century. Ultimately, the legal obstacles prohibiting judicial resolution of such claims cannot be circumvented by the courts. Moreover, from the onset of the Civil War until present, the historical record clearly shows that the President and Congress have the constitutional authority to determine the nature and scope of the relief sought in this case, not the courts. This is manifested in the signing of the Emancipation Proclamation; the enactment of the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution; and the promulgation of over a century of civil rights legislation.

Some may view this ruling as a condonation of ancient wrongs. That view is wrong. To suggest that the lions have won again and that the court is impervious to the human suffering at the core of this case would be absurd. The reasonable prudent person will read this opinion with care. We strive, case by case, within an imperfect system of law, through human endeavors, towards the unattainable perfect justice we seek.

For the foregoing reasons, Defendants' Joint Motion to Dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) is granted without prejudice.

IT IS SO ORDERED.

CHARLES RONALD NORGLE, Judge
United States District Court

DATED January 26, 2004