UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
APR - 6 2004

**FILED**

| | |
|---|---|
| IN RE: | ) |
| | ) Civil Action No. 02-7764 (CRN) |
| AFRICAN-AMERICAN SLAVE | ) |
| DESCENDANTS LITIGATION | ) MDL Docket No. 1491 |
| | ) |
| | ) This document relates to all cases |

### NOTICE OF FILING

TO:     See the attached Service List

PLEASE TAKE NOTICE that I filed the enclosed **Second Consolidated and Amended Complaint** with the above referred court on this April 5, 2004.

_____
Attorney

### Proof of Service

The undersigned certified under penalty of perjury that a copy of the foregoing instrument and the accompanying documents were served upon the attorneys of record for the Defendants in the above cause by enclosing same in an envelope addressed to such attorneys at their last known address as disclosed by the pleading or record herein, with postage fully prepaid, and by depositing said envelope in a U.S. Post Office Mail Box in Chicago, Illinois on April 5, 2004.

_____
Benjamin Nwoye, Esq.

Benjamin Nwoye, Esq.
MENDOZA & NWOYE, P.C.
180 North Michigan Ave.
Suite 1900
Chicago, Illinois 60601
(312) 658-1660

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

APR - 6 2004

-----------------------------------------------X

In Re: AFRICAN AMERICAN
**DESCENDANTS' SLAVE LITIGATION**      :    **MDL No. 1491 (CRN)**

-----------------------------------------------X

This Pleading Relates to:      :
-----------------------------------------------X

**United States District Court**      :
**Eastern District of New York**

     :    02 CV 1862(CRN)

DEADRIA FARMER-PAELLMANN **FILED**
   On behalf of herself and as
   representative of her enslaved
   ancestors and all other persons    APR 0 5 2004
   similarly situated

     Plaintiff,    MICHAEL W. DOBBINS
     CLERK, U.S. DISTRICT COURT

     : **SECOND CONSOLIDATED AND**
     vs.    : **AMENDED COMPLAINT AND**
     : **JURY DEMAND**

FLEETBOSTON FINANCIAL CORPORATION,    :
AETNA INC., CSX, and
their predecessors, successors    :
and/or assigns,    :    **Class Action**
     Defendants.

-----------------------------------------------X

**United States District Court**      :
**Eastern District of New York**

     :    02 CV 1864 (CRN)

MARY LACEY MADISON,      :
   On behalf of herself and as
   representatives of her enslaved    :
   ancestors and all other persons
   similarly situated    :

     Plaintiff,      :

     :

     vs.      :

     :

_157_

1

FLEETBOSTON FINANCIAL CORPORATION,            :
AETNA CASUALTY, CSX, R.J. REYNOLDS Co.,       :
 BROWN AND WILLIAMSON CORP.,                  :
  and their predecessors,                    :
   successors and/or assigns,                :
                                             :
                    Defendants.              :
------------------------------------------------X
**United States District Court**             :
**Eastern District of New York**             :
                                             :    02 CV 1863 (CRN)
ANDRÉ CARRINGTON,                            :
  On behalf of himself and as               :
  Representative of his enslaved            :
  Ancestors and all other persons          :
  Similarly situated,                       :
                    Plaintiff,              :
                                             :
          vs.                                :
                                             :
FLEETBOSTON FINANCIAL CORPORATION,           :
AETNA INC., CSX, R.J. REYNOLDS CO., BROWN    :
 WILLIAMSON and their predecessors,          :
  successors and/or assigns,                 :
                                             :
                    Defendants.              :
------------------------------------------------X
**United States District Court**             :
**Southern District of New York**            :
                                             :    02 CV 6961 (CRN)
JOHN BANKHEAD, as the Special Administrator  :
of the Estate of EDDLEE BANKHEAD and on      :
and all others  similarly situated,          :
                    Plaintiff,              :
                                             :
          vs.                                :
                                             :

SOCIETY OF LLOYD'S, LEHMAN          :
BROTHERS MORFOLK SOUTHERN,          :
R.J. REYNOLDS                       :
TOBACCO CO., BROWN & WILLIAMSON,    :
LIGGETT GROUP, INC., LOEWS CORP.    :
and their Predecessors, successors  :
and/or Assigns,                     :
          Defendants.    :
------------------------------------------------------------X

**United States District Court**
**District of New Jersey**                :
                                         :    02 CV 2084 (CRN)
RICHARD E. BARBER, SR.,                  :
  On behalf of himself and as           :
  representative of his enslaved         :
  ancestors and all persons             :
  similarly situated,                   :
          Plaintiff,      :
                                         :
                                         :
    vs.                              :
                                         :
NEW YORK LIFE INSURANCE, BROWN           :
BROTHERS HARRIMAN & COMPANY,             :
NORFOLK SOUTHERN,                        :
  and their predecessors,               :
  successors and/or assigns              :
                                         :
         Defendants.     :
------------------------------------------------------------X

**United States District Court**
**Northern District of Illinois**         :
**Eastern Division**                      :
                                         :    02 CV 6180 (CRN)
HANNAH JANE HURDLE-TOOMEY, as the        :
Special Administrator of the Estate of ANDREW :
JACSON HURDLE, and MARCELLE PORTER,      :
as the Special Administrator of the Estate :
of HETTIE PIERCE                         :
                                         :
        Plaintiffs,     :
                                         :
                                         :
    vs.                              :

3

SOCIETY OF LLOYD'S, LEHMAN           :
BROTHERS, UNION PACIFIC, and their   :
predecessors, successors and/or      :
assigns,                             :
                                     :
      Defendants.                    :
-----------------------------------------------------------------X

**United States District Court**    :
**Southern District of Texas**      :
                                    :
                                    :        03 CV 036 (CRN)
JULIE MAE WYATT-KERVIN, an          :
incompetent, by her guardian;       :
BILLY GENE MCGEE; EMMA              :
MARIE CLARK, and INA HURDLE MCGEE,  :
        Plaintiffs,  :
                                    :
     vs.                     :
                                    :
JP MORGAN CHASE, UNION PACIFIC, AIG :
and their predecessors              :
successors and/or                   :
assigns,                            :
        Defendants.  :
-----------------------------------------------------------------X

**United States District Court**    :
**Eastern District of Louisiana**   :
                                    :
Cain Wall, Sr.                      :
Cain Wall, Jr., Mae Louis Miller,   :
Ernestine Hill, Annie L. Miller,    :
Arthur Wall, Idell Wall, C.W. Wall, :
On behalf of themselves and others similarly   situated, :
                                    :
                                    :        02 CV 2712 (CRN)
ANTOINETTE MILLER,                  :
  On behalf of herself and as      :
  representative of their          :
  enslaved ancestors and all       :
  persons similarly situated,      :
        Plaintiffs,  :
     vs.                     :
                                    :
AETNA INC., SOCIETY OF LLOYD'S,     :
BROWN BROTHERS HARRIMAN,            :

4

R.J. REYNOLDS TOBACCO                              :
CO., BROWN AND WILLIAMSON TOBACCO      :
CORP, LIGGETT GROUP INC., LOEWS            :
CORPORATION, CSX CORPORATION,              :
NORFOLK SOUTHERN RAILROAD, UNION        :
PACIFIC RAILROAD, CANADIAN                    :
NATIONAL RAILWAY CO., and their              :
SOUTHERN MUTUAL INSURANCE CO.            :
predecessors, successors and/or                    :
assigns,                                                  :
                          Defendants.                    :
----------------------------------------------------------------X

  Plaintiffs, on behalf of themselves, their enslaved ancestors, and all other persons

similarly situated, by and through their attorneys, complaining against the Defendants as follows:

## OVERVIEW

1. The plaintiffs and plaintiff class are formerly enslaved African-Americans or descendants

of enslaved African-Americans who were forced into slavery from which the defendants unjustly

profited.

2. The plaintiffs have alleged in nine (9) separate complaints filed in seven (7) jurisdictions

nationwide that among other things:

  a) Defendants and/or their predecessors in interest are corporations in the textile,
transportation, financial, insurance, tobacco and many other industries, who were unjustly
enriched through the profits they earned either directly or indirectly from the Trans-
Atlantic Slave Trade and slavery. This enrichment was to the detriment of the plaintiff
class. All profits have continued to compound over time to serve as a basis of tremendous
current wealth[1] of many defendants.
  b) Defendants and/or their predecessors in interest, individually and/or collectively,
profited from the knowing and willful violation of all applicable prohibitions related to the
Trans-Atlantic Slave Trade.
  c) Defendants and their predecessors in interest engaged in human rights violations,
international norms, and crimes against humanity against plaintiffs and/or plaintiffs'
ancestors that included direct or third-party liability for conspiring with slave traders, with
each other and other entities and institutions, all of whom are not yet known, to ship
Africans from Africa to America, even after the slave trade was declared illegal here, to
enslave Africans in America, to separate families, to intentionally inflict emotion distress
upon Africans and African Americans, to dehumanize Africans, and through other acts.

3. The plaintiffs demand, among other things, that defendants:

a) provide a full accounting of their actions, including, but not limited to, turning over all documents in their possession related in any way to the slave trade and slavery;

b) equitably disgorge all illicit profits;

c) be subject to and comply with an independent historical commission designed to fully examine their actions;

d) be subject to the imposition of a constructive trust;

e) pay restitution in the amount equivalent to the present value of the stolen labor from the ancestors of the plaintiffs' class members that was wrongfully earned, retained and has yet to be accounted for; and

f) pay compensatory, exemplary and punitive damages and other relief.

## HISTORICAL BACKGROUND

4. The transatlantic slave trade resulted in the deaths of millions and eviscerated culture, language, and customs of the enslaved.

5. Millions of Africans and their descendants were enslaved in America from 1619 to 1865. Estimates range from 8,000,000 to over 100,000,000. The practice of slavery constituted an immoral and inhumane deprivation of African life, liberty, human rights and cultural heritage. Furthermore, it deprived them of the fruits of their own labor. The institution of slavery in the United States and its predecessor colonies consisted of the involuntary, lifelong hereditary system of chattel servitude.

6. The institution of slavery in the United States and its predecessor colonies consisted of the involuntary, lifelong hereditary system of chattel servitude.

7. The Dutch slave ship that sailed into Jamestown Harbor in Virginia colony in 1619 contained only 27 captive Africans, but by the end of the Trans-Atlantic Slave Trade, more than two and a half centuries later, somewhere between 8 million and 50 million Africans had arrived in America in chains.

8.    Historians estimate that one slave perished for every one who survived capture in the African interior and made it alive to the New World, meaning as many as 12 million perished along the way.

9.    Not only did the institution of slavery result in the deaths of millions of Africans, it eviscerated whole cultures: languages, religions, mores, and customs. It psychologically destroyed its victims. It wrenched from them their history, their memories, their names and their families on a scale never previously, nor since, witnessed.

10.    The institution of slavery expanded from Jamestown Harbor to twelve (12) more colonies. When these colonies secured their independence and established their own governments, they began to develop an elaborate set of repressive statutes to regulate the relationship between slaveholder and slave. These statutes were called "Slave Codes".

A.    **State Slave Codes Sought to Legitimize Abuse, Subordinating and Exploiting Enslaved Persons, and Denying All Natural Liberties of Humankind.**

11.    States continued to regulate the relationship between slave and slaveholder by passing increasingly elaborate and abusive Slave Codes which covered every aspect of life of the enslaved African. Although the laws varied from one state to another, they all agreed on some general principles:

> enslaved Africans are not people but property; laws should protect the ownership of such property and should protect white people against any dangers that might arise from being near large numbers of enslaved Africans; enslaved Africans must be maintained in a state of subordination in order that the optimum discipline and work could be achieved.

12.    For instance, South Carolina Law set forth that enslaved Africans:

> shall be deemed, held, taken, reputed, and adjudged in law to be chattels personal in the hands of their owners and possessors, and their executors, administrators, and assigns, to all intents, constructions, and purposes whatsoever.

13.   Enslaved Africans could not: testify in court against a white person, make contracts, leave the plantation without permission, strike a white person (even in self-defense), buy and sell goods, own firearms, gather without a white person present, possess any anti-slavery literature, or visit the homes of whites or free blacks.

14.   The killing of an enslaved person was almost never regarded as murder, and the rape of enslaved women was treated as a form of trespassing rather than a capital crime.

> Enslaved African women had to endure sexual exploitation, often bearing the children of their masters and overseers. Enslaved Africans were disciplined by whipping, imprisonment, torture, and mutilation – sometimes leading to death – and being sold off.

**B)   Enslaved Africans Built Our Nation, Yet All Were Denied the Basic Fruits of their Labor.**

15.   Although, it is a common perception that the South alone received the enslaved Africans, many of them arrived in ports throughout the North, including, the Dutch colony of New Amsterdam that later became New York City and parts of New Jersey.  Integral to the colony from the start, slaves helped build Trinity Church, the streets of the city, including Broadway, and the wall, from which Wall Street takes its name, that protected the colony from military strikes.

16.   Enslaved Africans in New York lived in attics, hallways and beneath porches, cheek to jowl with their master and mistresses.  In death, many of these same Africans were banished to a separate burial ground, which lay a mile outside the contemporary city limits and contained thousands of bodies heaped one on top of another with little regard for the sanctity of their lives, even in death.

8

17.    Research conducted by Howard University of 400 skeletons of buried slaves revealed that a significant portion were children under the age of 15 and the most common cause of death was malnutrition. The skeletons of the children revealed they had rickets, scurvy, anemia or related diseases. The adult skeletons show that many were simply worked to death. The highest mortality rate is found among women ages 15 to 20. Investigators have concluded that many slaves died of illnesses acquired in the holds of slave ships, from exposure to the cold, and from the trauma of being torn from their families and shipped in chains halfway around the globe. Researchers also concluded that defendants worked their slaves to death and then simply went out and bought new slaves with the proceeds from the insurance companies named herein.

18.    On a more national scale, recent research has revealed that many of our esteemed and celebrated institutions of learning had their origins in the profits derived from the slave trade. For instance, money from the slave trade financed Yale University's first endowed professorship, its first endowed scholarships and its first endowed library fund. Moreover, in the 1830's, Yale officials led the opposition that prevented the building of the first African-American college, on the grounds that such an institution would have been "incompatible with the existence of Yale". Nicholas and John Brown, two of the founders of what became Brown University were slave traders. Likewise, Harvard Law School was endowed by money its founder earned selling slaves in Antigua's cane fields.

19.    Most early American industries were based on the cotton, sugar, rice, tobacco, and other products African labor produced. Railroads and shipping companies, the banking industry and many other businesses made huge profits from the commerce generated by the output of enslaved labor. The Defendants named herein profited monumentally as well from slavery and the slave trade.

20.     Enslaved Africans built the U.S. Capitol, cast and hoisted the statue of freedom on top of its dome, and cleared the forest between the Capitol and the White House.

21.     Slavery fueled the prosperity of young nation. From 1790 to 1860 alone, the U.S. economy and corporate America reaped the benefits of as much as $40 million in unpaid labor.  Some estimate the current value of this unpaid labor at 1.4 trillion dollars.

**C.     State and Federal Government Outlaw the Trade from 1807-Forward**

22.     As early as 1799, many individual states outlawed the slave trade, years before the federal government abolished it.

23.     In 1794, the Third U.S. Congress enacted a law barring the building or equipping of vessels fitted for the "carrying on of the slave trade."  As part of that law, Congress required forfeiture and payment of $20,000 by "all and every person, so building, fitting out, equipping, loading, or otherwise preparing, or sending away, any ship or vessel, knowing or intending that the same shall be employed in such trade or business . . .or any ways aiding or abetting therein."

24.     In 1800, the US Congress made it unlawful for any U.S. citizen or resident "directly or indirectly: to have any interest in a slave-trade vessel, and granted jurisdiction to the federal courts to handle violations of the law."

25.     In 1807, the United States enacted a law prohibiting the importation of slaves and required forfeiture and payment of $20,000 by persons who aided or abetted in the "building, fitting out, equipping, loading, or otherwise preparing or sending away" of vessels intended for the importation of slaves.

26.     In 1820, Congress determined that the slave trade was so repugnant that perpetrators as well as their aiders and abettors should be subject to the death penalty and the slave trade should be formally equated to the international crime of piracy. Although, the slave trade was formally

10

abolished by England in 1807 and by the United States in 1808, individuals, industries and the government, wholly dependent upon the economic benefits derived from the use of unpaid labor, continued to keep the trade alive by aiding and abetting in the illegal smuggling of enslaved Africans and by aiding and abetting in the institution of "breeding" enslaved Africans. Breeding continued since every child born enslaved, bore a capital value to its owner that far exceeded the cost to raise the enslaved child.

**D.**     **A Body of Law Develops Finding Slavery a Breach of Established and Fundamental Natural Law of Man.**

27.    As states abolished the slave trade before the federal government did, so too, did both state and federal courts create a body of common law finding slavery a violation of the natural law of man. As early as 1781, in one of the famous Quark Walker cases, Commonwealth v. Jennison, Chief Justice William Cushing of the Supreme Judicial Court of Massachusetts charged his jury as to the natural law against slavery:

> whatever usage formally prevailed or slid in upon as by the examples of others on the subject, they can no longer exist... sentiments more favorable to the natural rights of mankind, and to that innate desire for liberty which heaven, without regard to complexion or shape, has planted in the human breast - - have prevailed since the glorious struggle for our rights [the Revolution] began ... slavery is in my judgment as effectively abolished as it can be by the granting of rights and privileges wholly incompatible and repugnant to its existence. (emphasis added).

28.    Several years later in 1789 in a First Circuit case, Justice Joseph Story in the La Jeune Eugenie case, concluded that the international slave trade violated the natural law of man in that it was:

> repugnant to the great principles of Christian duty, the dictates of natural religion, the obligation of good faith and morality, and the eternal maxims of social justice [and]... was inconsistent with any system of law that purports to rest on the authority of reason or revelation. And it is sufficient to stamp any

11

> trade as interdicted by public law, when it can be justly affirmed that it is
> repugnant to the general principles of justice and humanity.

29.    Moreover, in <u>Anderson v. Poindexter</u>, 6 Ohio St. 623 (1857), the Ohio Supreme Court held

that a slave coming into a free jurisdiction (with the consent of the master) for a temporary

sojourn was automatically freed because slavery was repugnant to reason and the principles of

natural law.

30.    In fact, current-day legal scholars continue to write extensively about slavery always

having been contrary to fundamental laws of our nation and the world.  One Justice of the

Supreme Court, Clarence Thomas, wrote in 1987 about a "higher law" that condemns inequality

and hence, slavery.  Thomas argues the "original intent" of the Constitution must follow the

ideals of the Declaration of Independence, which should be read as hostile to slavery in order to

conform with the "higher" principals of our nation that rest on natural law:

> Paine captured well the revolutionary meaning of basing a particular nation on
> a universal truth, the truth of human equality.  Edwin S. Corwin described this
> many years ago as the 'higher law background' of the Constitution.  And
> Martin Luther King, Jr. brought out the contemporary significance of 'higher
> law' well in his famous letter from a Birmingham Jail.  Paraphrasing St.
> Thomas Aquinas, King declared, 'A just law is a man-made code that squares
> with the moral law or the law of God ...  An unjust law is a human law that is
> not rooted in eternal law and natural law.'

31.    Like Justice Thomas' argument, that slavery has to be legally interpreted as against the

specific intent of the Founding Fathers, Professor Hylton asserts, in 2003, that slavery cannot be

viewed as an institution sanctioned by law, but rather, "as a corruption or displacement of law":

> We have to reject the notion that anything we would wish to call law would
> ever sanction such an institution.  For the institution is founded on the absence
> of law.
> Law and slavery are, in essence, 'universal complements,' in the sense that one
> can exist in the space where the other is absent.  Hence, the only morally
> consistent position that a state can take with respect to slavery is that it never
> cohabited with the institution.

32.    Although the institution of slavery in the United States was officially outlawed in 1865, the smuggling of enslaved African slaves continued, de facto, beyond the 1950's. National archive records reveal that in the 1920's and 1930's, the NAACP received letters from African-Americans claiming to still be on plantations and forced to work without pay. Several claims were investigated and were found to be legitimate. Moreover, as late as 1954, the Justice Department prosecuted the Dial brothers in Sumpter County, Alabama because they held blacks in involuntary servitude. A vivid example of this phenomenon is presented in greater detail herein with the 104 year old Louisiana plaintiff, Cain Wall, who was a former slave who did not learn of his emancipation until years afterwards and was subjected to horrendous abuse, intentionally designed to intimidate him from exercising his rights as a free man.

33.    Measures called "Black Codes" guaranteed continued control of Blacks by white employers. As John Hope Franklin noted in *From Slavery to Freedom*:

> the control of blacks by white employers was about as great as that which slaveholders had exercised. Blacks who quit their job could be arrested and imprisoned for breach of contract. They were not allowed to testify in court except in cases involving members of their own race; numerous fines were imposed for seditious speeches, insulting gestures or acts, absence from work, violating curfews and the possession of firearms. There was of course no enfranchisement of blacks and no indication that in the future they could look forward to full citizenship and participation in democracy.

34.    Ten of eleven former confederate states instituted these "Black Codes" which were nothing more than a thinly veiled attempt to circumvent emancipation. Illegal contracts for labor were signed by the uneducated formerly enslaved with unconscionable provisions purposely designed to continue a system of unpaid servitude. The Codes, and other practices that developed that were specifically designed to subvert emancipation, were the result of a callous and intentional collaboration between the landed elite, the police (state) and commercial merchants in order to perpetuate a ready pool of landless, impoverished, and dependent workers.

35.    The post-Reconstruction practices of peonage and sharecropping which continued well into the twentieth century were direct outgrowths of slavery that continued a system of complete control by the dominant culture.  Peonage was a complex system where a black man would be arrested for "vagrancy", ordered to pay a fine that he could not afford, and then incarcerated.  A plantation owner or other white citizen or business owner would pay the fine and then hire the indebted prisoner until he could afford to pay off the fine.  The peon was forced to work, locked up at night and if he escaped, was chased by bloodhounds until recaptured.

36.    Likewise, from 1865 through the period well into early mid-1900's, African-Americans became sharecroppers on land leased from whites whose grandparents had owned their ancestors.  These African-Americans were not allowed to vote, and were socially and economically relegated to the leftovers in education, earnings, and freedoms.

37.    The commercial industries continued to knowingly benefit from these illegally constituted, but state-sanctioned, forms of slavery.

38.    In fact, the long and continued resistance of the South to emancipation led to the stubborn and entrenched belief that white Southerners did not have to pay African-Americans for their labor.  This led to a "dual ethic", a code of treating white people according to a different standard as compared to black people.

39.    Thus, even after Emancipation, the lives of African-Americans remained locked in quasi-servitude, due to legal, economic and psychological restraints that effectively blocked their economic, political and social advancement.

40.    Also, during this period, terror was used as a tool to keep African-Americans tied to their former masters. The wholesale murder and terrorization of African-Americans continued with the rise of the Ku Klux Klan and other like organizations.  Over 3,400 African-Americans were

14

lynched between 1882 and 1930. During this period and beyond, Plaintiffs were prevented from accessing the courts to seek relief committed against them.

**E.** **Legacy of Slavery: Racism and Traceable Disparities in Education Health Care, Housing, Economic Net Worth, Infant Mortality Rate, Literacy, Etc.**

41. When the actual institution of slavery was finally formally ended years of Defendants physically, psychologically, culturally and economically harming the African slaves, the Defendants continued to harm the Plaintiffs by continuing to withhold the fruits of the labor, the property of the slaves and prevented same from passing down to Plaintiffs, thus impoverishing them. Defendants continued to deprived Plaintiffs access to work on the basis of race. Defendants actions caused Plaintiffs economic losses and cultural psychic scars and heretofore without remedy.[1] It left all Americans with ingrained beliefs of the superiority of the Caucasian population which insured that inequality would continue as it has through to the present day in the form of racism.

42. Slavery is and has always been by definition a crime against humanity. There has never been a legitimate justification for the economic and social subjugation of one person to another.

---

[1] More recently, a 1998 census report shows that twenty-six (26) percent of African-Americans in the United States live in poverty compared to eight (8) percent of whites. The 1998 Census Report also showed that 14.7 percent of African-Americans have four-year college degrees, compared with 25 percent of whites. The same year, African-American infant-mortality rates were more than twice as high as those among whites. Federal figures also show that a black person born in 1996 can expect to live, on average, 6.6 fewer years than a white person born the same year.

African-Americans are more likely to go to jail, to be there longer and if their crime is eligible, to receive the death penalty. They lag behind whites according to every social yardstick: literacy, life expectancy, income and education. They are more likely to be murdered and less likely to have a father at home.

The economic deprivation resulting from slavery can be gleaned from discrepancies in earnings between whites and blacks. Black families earn only $580 for every $1,000 earned by white families. Only 3.4% of all black men earned $50,000 or more compared to 12.1% of white men. Additionally, 44.8% of black children live below the poverty line, compared to 15.9% of white children.

Documented discrepancies in net worth are a direct outgrowth of slavery and the lost inheritance from slave ancestors to their descendents. A comparison of income, net worth and net financial assets for black and white, middle-class families shows that, although blacks in the sample earned 70-85% of the income that whites earned, their net worth was only 16-18% of whites' net worth, and their net financial assets were zero. Another study showed that a typical white family enjoys a net worth that is more than eight times that of its black counterpart. This inequity is partly a result of the head start whites enjoy in accumulating and passing on assets. Some economists estimate that 80% of lifetime wealth accumulation results from gifts from earlier generations.

43.    Defendants enslavement of Plaintiffs' ancestors in the United States was the most obscene and extreme example of the practice of slavery given that the economically interdependent conspiracy was so complete that these unjust profits were garnered at every level of the market. The defendants in this case and/or their predecessors in interest knowingly participated, profited and/or aided and abetted in the institution of slavery through any number of mechanisms as more fully alleged within this Complaint.

44.    While it is clear that the Africans and African-Americans who were enslaved were enslaved against their will and robbed of all their rights to include their "life, liberty and the pursuit of happiness," these individuals were not privy to every legal harm they suffered, nor the causes and extent of those harms.

45.    It is equally clear that the plaintiffs were in large part uneducated, unsophisticated and in most cases subjected to extraordinary circumstances at all times from their forced capture in Africa through until their deaths whether they occurred in captivity in Africa, on the perilous voyage to the U.S. or in captivity in the U.S. This period of extraordinary circumstances began with the beginning of the institution of slavery in the U.S., through the official period of government condoned slavery, after the passage of the 13th Amendment to the U.S. Constitution ostensibly abolishing slavery through to the present day as African-Americans continually suffer social and financial deprivation as a direct result of the entrenched social disparity of treatment for African-Americans established in slavery which existed almost twice as long as it has been officially outlawed.

46.    The extraordinary circumstances include but are not limited to the following: continued slavery after 1865 through to the 1960's, "separate but equal", Jim Crow, KKK, peonage and the consistently demonstrated disparity of the African-American experience under any of the social

16

and financial measures. The great majority, if not all slaves, former slaves and descendants of slaves, who had and have been subjugated for centuries and for many generations, had no knowledge, or ability to obtain knowledge, of the harms caused by the defendants' actions alleged in this complaint. The plaintiffs and their ancestors had no, and should not be held to have, omniscient knowledge of their rights, the violations they suffered, those that were the cause of and those that illegally profited from those violations.

47.     The information related to the extent, nature and cause of the harms alleged within this complaint was and is uniquely within the possession and control of the named defendants in this case or their predecessors and other privately held corporations and businesses. This information includes, but is not limited to, business relationships, contracts for goods and services, manifests, business ventures, annual reports, slave holdings, shipping records, etc. The vast majority of this information and documentation has never been available to or accessible by the public. With the recent advent of the Internet and other research tools, a few talented or privileged individuals have accessed some of the documentation leading to information about the extent, nature and cause of the harms suffered.

48.     As an example of the difficulty of gaining access to the documentation and cooperation from the corporations, efforts merely toward the gathering and study of information related to slavery and its effects for African-Americans and American society in Congress have been thwarted for years. Specifically, Representative John Conyers from Michigan has for the last 12 years proposed Resolution No. 40 seeking to set aside $8 million dollars to study the effects of slavery and come up with a formula for reparations. His resolution has died in committee for each of these past eleven years. The opposition to this effort is at least in part clearly from corporate America as there has been no corporation, to include the named defendants in this

17

action, which have gone on record as either supporting Rep. Conyers's resolution or voluntarily disclosing their documentation and knowledge of their connections with slavery.

49.    The period following slavery rather than being a period of flourishing for Africans and African-Americans was simply another period of subjugation with Jim Crow laws and other forms of segregation. This period made it all the more difficult, unlikely, if not impossible for the plaintiffs to gain access to information, which would have put them on notice, inquiry or otherwise, of the violations of their rights as asserted within this Complaint.

50.    The named defendants and/or their predecessor entities engaged in one or more of the following actions against the interests of the plaintiffs and their ancestors: slave business dealings which were self-concealing, denials of any profits from slavery and/or denials to the public for access to, or accountings of, documented slavery dealings and profits from same.

51.    The nature of the complained of business dealings by the defendants, as discussed in more detail in those portions of this Complaint, establishes that they were self-concealing from the enslaved African and African-Americans and by direct extension their descendents. For example, there is no reason for the slaves to know or be aware that their lives were insured; that financing deals controlled their lives; or that profits far a field from their miserable daily, if not hourly, existence occurred.

52.    A number of the defendants have also over the years specifically and falsely denied having any connection to slavery.

53.    The defendants have also fraudulently concealed the facts supporting the plaintiffs' plead causes of action within this complaint from the heirs or the estates of the slaves and former slaves harmed by the defendants' participation in slavery. No defendant had disclosed any facts

18

before two years prior to the filing of these suits which would provide the plaintiffs with notice of any facts of the cause of action as plead within this complaint.

54.    Despite efforts, the plaintiffs have been unable to secure records from a number of the defendants with regards to their ancestors due to the failure of most, if not all, to be able to reliably access documents establishing business relationships, ventures and dealings, contracts, shipping manifests, human cargo lists that may directly connect the plaintiffs with their slave ancestors and their free ancestors. The lists should provide more connections than not having this information, obviously. However, even this information will not provide an easy answer as further efforts were employed to destroy access to information and causation such as the changing of names at most, if not all, stages of the slave trade to include the original kidnapping and Trans-Atlantic journey, all sales and resales, sales of children and their children's children thus making it nearly impossible to accurately trace records.

56.    Recent advances in Internet and computer databases have made some of these records more accessible.

57.    Likewise, corporate histories and records have also been extremely difficult and inaccessible to most people. Hence, research tracing the monetary benefit derived by a few American corporations from the slave trade has only been partially accessible and discussed by prominent researchers within the last year.

58.    The defendants have failed to provide an accounting to the plaintiffs generally at any time in the past and specifically, in the last two years prior to the filing of these suits when requests for such information were made to a number of the defendants.

59.    The Defendants were unjustly enriched by the labor of plaintiffs' ancestors and the defendants actively concealed evidence of this participation in slavery and their conduct was

instrumental in keeping plaintiffs from obtaining the knowledge necessary to be aware of or on notice of the harms they suffered as a direct result of defendants' conduct.

## JURISDICTION AND VENUE

43.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) since the amount in controversy exceeds $75,000 per plaintiff exclusive of interests and costs and there is diversity of citizenship.

44.    Jurisdiction may also be predicated upon 28 U.S.C. § 1331 due to the claims made within this complaint based on the Civil Rights Act of 1866, codified as 42.U.S.C.§ 1982.

45.    The Court has personal jurisdiction over the parties in that the defendants conduct systematic and continuous business within the various states and districts in which the original and/or underlying complaints were filed.

46.    Venue is proper in this Court since the defendants do business and may be found in the District within the meaning of 28 U.S.C. §1391(a), as well as, 28 U.S.C. §1350.

47.    The Court also has supplemental jurisdiction over the following state-law claims pursuant to 28 U.S.C. § 1367(a)claims: California's Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200 et seq.; Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/1 et seq.; Louisiana's Unfair Trade Practices and Consumer Protection Law, La R.S. 51:1401 et seq.; New Jersey's Unfair Trade Practice Law, N.J. Stat. § 56:8-1; New York's Consumer Protection From Deceptive Acts and Practices Laws, NY CLS Gen Bus § 349 and § 350; and Texas' Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. and Com. Code § 17.41. This Court has jurisdiction over these claims pursuant to diversity jurisdiction, 28 USC §1332(a).

## THE CLASS

48. The proposed class composed of formerly enslaved Africans and their descendants, former enslaved African-Americans and their decedents and deceased formerly enslaved Africans and African-Americans.

## CLASS ALLEGATIONS

49. This action is brought and may properly be maintained as a class action pursuant to the provision of the Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). Plaintiffs seek certification of the following class and subclasses:

a) formerly enslaved plaintiffs who where enslaved post-emancipation- all living African-Americans who were enslaved in the United States post-emancipation as a result of the lingering effects of the institution of slavery in this country.

b) Direct descendants of slavery whose parents were enslaved in the United States and who can identify an industry identified in the complaint;

c) Direct descendants of slavery whose parent(s) were enslaved by Defendants or Defendants' predecessor who utilized plaintiffs' ancestor's labor or received a profit directly as a result of the parent's particular connection to that defendant;

d) Second generation descendants of slavery whose grandparents were enslaved by Defendants or Defendants predecessors or who profited from their enslavement;

e) Second generation descendants of slavery whose grandparents were enslaved were enslaved by Defendants or Defendants predecessors or who profited from their enslavement;

f) All other subsequent generations of descendants of enslaved Africans who were enslaved by Defendants or Defendants predecessors or who profited from their enslavement;

g) All other subsequent generations of descendants of enslaved Africans who were enslaved by Defendants or Defendants predecessors or who profited from their enslavement;

h) Third generation descendants of slavery whose great grandparents were enslaved were enslaved by Defendants or Defendants predecessors or who profited from their enslavement;

i) All descendants of enslaved Africans who purchased product from the defendant corporations and who would not have done so had defendants' accurately described their involvement in the Trans-Atlantic slave trade.

50. The exact number of plaintiff class members is not known. Plaintiffs estimate that the class includes millions of African-American descendants of enslaved Africans and the plaintiffs estimate that the combined number of persons in each subclass is so numerous that joiners of

21

individual members is impracticable. The number and identities of the class members can only

be ascertained through appropriate investigation and discovery.

51.     There are questions of fact and law are common to the class including one or more of the

following which predominate over any questions affecting only class members:

> a)     Whether defendants knowingly, intentionally and systematically benefited from the use of enslaved laborers;
> b)     Whether defendants wrongly converted to their own use and for their own benefit, the slave labor and services of the plaintiffs' ancestors, as well as, the products and profits from such slave labor;
> c)     Whether the defendants knew or should have known that they were assisting and acting as accomplices in immoral and inhuman deprivation of life and liberty;
> d)     Whether defendants have been unjustly enriched by their wrongful conduct;
> e)     Whether, as a result of this horrific and wrongful conduct by the defendants, the plaintiff class is entitled to restitution or other equitable relief, or to compensatory or punitive damages.
> f)     Whether plaintiff should be allowed to receive documents as a separate claim in instant action;
> g)     Whether or not defendants' actions constituted a crime against humanity for which plaintiffs are entitled to judgment in accordance with Secondary Liability issues;
> h)     Whether the defendants' acts constituted a violation of 42 U.S.C.S. Section 1982;
> i)     Whether the defendants' acts through theories of Second Party Liability constitute a violation of numerous torts;
> j)     Whether the defendants engaged in unfair deceptive, fraudulent or unconscionable business or trade practices, acts, or omissions; and
> k)     Whether the defendants engaged in unconscionable or unfair methods of competition.
> l)     Whether the Defendants took the property of the formerly enslaved Plaintiffs, the enslaved parents of the Plaintiffs, the enslaved great-grand parents of the Plaintiff and other enslaved fore parents of the Plaintiffs without having title to such property, thus, diminishing the amount of money or property the Plaintiffs are otherwise heir to and entitled to.

52.     Because of the number of the claimants, the relatively small amount of each individual's

claim, when measured against the total amount due the class, a class action is the appropriate

method for the fair and efficient adjudication of this controversy in order to avoid a multiplicity

of suits and possible inconsistent results.

53.     The claims of the individually named Plaintiffs are typical of the claims of the plaintiff

class members. Plaintiffs and all members of the plaintiff class have been similarly affected by

the defendants common course of conduct and the members of each class have similar claims against the defendants. The claims of all class members depend on a showing of the defendants' common course of conduct, as described herein, which gives plaintiffs, individually and as class representatives, the right to the relief sought herein.

54. There is no conflict as between plaintiffs and the other members of the class with respect to this action or the claims for relief. Plaintiffs know and understand their asserted rights and their role as class representatives.

55. Plaintiffs and their attorneys are able to and will fairly, and adequately, protect the interest of the Class. Several of plaintiffs' attorneys are experienced class action litigators who are or will be able to conduct the proposed litigation. Plaintiffs' attorneys can vigorously prosecute the rights of the proposed class members.

56. Prosecution of separate actions by individual plaintiffs will create the risk of inconsistent and varying adjudications and will establish incompatible standards of conduct for defendants in that different Courts may order defendants to provide different types of accounting or take other inconsistent actions.

57. Prosecutions of separate actions by individual plaintiffs of other proposed class members not party to the adjudications will substantially impair or impede their ability to protect their interest in that, for example, defendants may exhaust their available funds in satisfying the claims of earlier plaintiffs to the detriment of later plaintiffs.

58. Defendants have acted and/or refused to act on grounds generally applicable to the proposed class, making final injunctive relief and correspondent declaratory relief appropriate with respect to the class as a whole in that defendants have been unjustly enriched by participation in acts that were known to be immoral and inhumane, and defendants: (a) prevented

23

and or refused restitution to the proposed class members, (b) prevented and/or refused to disgorge wrongfully gained and/or earned profits and benefits, or (c) refused to provide a full and complete accounting and disclosure of the extent of their aforesaid actions and refused to return the property taken without title to the Plaintiffs, the rightful heirs of the original owners entitled to possession of such property.

59. Common questions of law and fact predominate in the claims of all class members, including the named plaintiffs. These claims depend on proving defendants are liable for their acts and/or omissions based, in part, on evidence of a common scheme. Plaintiffs' and the plaintiff class members' proposed evidentiary showings would be based on the same documents and testimony concerning the defendants' actions.

60. A class action is superior to the other available methods for the fair, just and efficient adjudication of the controversy. Plaintiffs and the plaintiff class members have no interest in individually controlling the prosecution of separate actions and, instead are on the whole incapable as practical matter of pursuing individual claims. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expenses to all parties in that the Court system of resolving the controversies engendered by defendants/individual and/or common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy and the fair and equitable handling of all plaintiffs' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and reserves the rights of each class member. Furthermore, for most class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice. A large concentration

of proposed class members is estimated to reside in this District and nearby states. The management of the litigation as a class would pose few problems for this Court.

61.     Certification of the plaintiff class is appropriate under Fed. R. Civ. P. 23(a) and also under 23(b)(2), 23(b)(3).

62.     The named Plaintiffs will fairly and adequately protect the interests of the class members in that their interests are in accordance with and not antagonistic to other members of the class and they have retained competent attorneys to prosecute this claim.

63.     A number of the plaintiffs have begun the application process to be named as the administrator of their enslaved ancestors' estates for the purpose of representing those enslaved ancestors in this action.

### Deadria Farmer-Paellmann – Class Representative

64.     Plaintiff DEADRIA FARMER-PAELLMANN, a New York resident and lead plaintiff in these consolidated actions, submits this complaint on behalf of all Africans enslaved in the United States, and to honor the memory of the many pioneers in the struggle for slavery reparations. Of particular note is the seminal work done by the pioneer Queen Mother Audley E. Moore.[2]

65.     She is the great-great-granddaughter of Clara and Abel Hinds, Africans who were enslaved on a South Carolina sea island rice plantation. On the eve of the Civil War, Clara and Abel Hinds ran away from their slave master. For two weeks they hid in swamps as they crept toward freedom. They later settled in Georgetown, South Carolina where three generations of their progeny were born, including Farmer-Paellmann's: great-grandmother, Alice Hinds-Capers;

---

[2]Alan Fuer, *Harlem's Queen Mother, by Acclaim: Honorary Mayor Traded Convent for Life of Street Charity*, NY TIMES, P.B1, (5/20/2003).

grandfather, Willie Capers; mother, Wilhelmina Capers-Farmer; and her maternal aunt Rosa

Capers-Jones.

66.     Clara Hinds and Abel Hinds ran away from their slave master. For two weeks they hid in

swamps as they crept toward freedom. They later settled in Georgetown, South Carolina where

three generations of their progeny were born, including Farmer-Paellmann's: great-grandmother,

Alice Hinds-Capers; who are now deceased.

67.     Clara Hind, Abel Hinds were victimized by the atrocities of the institution of slavery

instigated, supported and financed by one or more of the defendants, especially Fleetboston

Financial Corporation, Aetna Inc., CSX and their predecessors. Plaintiff as well was

impoverished by Defendants taking the property of her great-grand parents  preventing her from

inheriting such property.

### Mary Lacey Madison – Class Representative

68.     Plaintiff MARY LACEY MADISON is a New York resident, born in Norfolk, Virginia in

1910, to James and Martha Doles Lacey whose ancestors were slaves in the agricultural, cotton

and tobacco industry in Virginia and North Carolina. Mary's maternal grandfather was, as a

child, given to his last owner as a Christmas present.

69.     Mary's great grandfather was victimized by the atrocities of the institution of slavery

instigated, supported and financed by one or more of the defendant, in particular by R.J.

Reynolds Tobacco Co., Brown and Williamson Tobacco Corp., Fleetboston Financial

Corporation, Aetna Casualty, CZX and/or their predecessors. Plaintiff as well was impoverished

by Defendants taking the property of her great-grand parents  preventing her from inheriting such

property.

70.

### André Carrington – Class Representative

71.    Plaintiff ANDRÉ CARRINGTON is a Bronx, New York resident whose ancestors on both his mother and father's side, were slaves in North Carolina, and upon information and belief, were involved in the cotton and tobacco industries.

72.    Andre Carrington is 46 years old. His great-great grandfather, Charlie Wright Williams, was a slave in Dublin County, North Carolina. The town is Wallace North Carolina.  Charlie Wright was a slave until the age of 12. He was married to Phyllis Murry Williams. Charlie's mother, Martha Katherine was born a slave in 1835 and married Charlie's father, a slave named James Williams. They were victimized by the atrocities of the institution of slavery instigated, supported and financed by one or more of the defendants, in particular by R.J. Reynolds Tobacco Co., Brown and Williamson Tobacco Corp., Fleetboston Financial Corporation, Aetna Casualty, CZX and/or their predecessors.   Plaintiff as well was impoverished by Defendants taking the property of her great-grand parents  preventing her from inheriting such property.

73.

### Estate of Edlee  Bankhead – Class Representative

74.    Plaintiff, who passed since the suit was filed and is now represented by his son John Bankhead, was a Corinth, Mississippi resident whose father and mother, Elex Bankhead and Liza Jane (Moore) Bankhead were enslaved in the agricultural industry in Mississippi.

75.    Plaintiff Edlee Bankhead was born on March 12, 1883, saw a life of hard, physical labor, as he worked at farming, logging and picking cotton.  Bankhead was born only 20 years after the Emancipation Proclamation went into effect, and only six years after the post Civil War reconstruction. Bankhead spoke of slavery:  Back then, black folks was no more than animals.

27

They were just bought and sold. Bankhead described sharecropping where each family under the

boss or landowner, was given a pack of meal and a pound of meat per week. He further added:

> We worked. Harvest time come and then we didn't have nothing. They [The
> land-owners] would take everything. Many of them got rich doing that....

Plaintiff's ancestors were harmed by the defendants, especially Society of Lloyd's, Lehman

Brothers, Union Pacific. Plaintiff as well was impoverished by Defendants taking the property

of his parents, grand parents, and great-grand parents preventing him from inheriting such

property.

### Richard E. Barber, Sr. ("Barber")– Class Representative

76. Plaintiff RICHARD E. BARBER, SR. was victimized by the atrocities of the institution of

slavery instigated, supported and financed by one or more of the defendant.

77. Plaintiff Richard E. Barber, Sr. is a New Jersey resident whose ancestors were enslaved in

the agricultural industry and other industries.

78. Plaintiff is a resident of Somerset, New Jersey.

79. Mr. Barber is the grandson and great-grandson of enslaved Africans. His great-

grandfather, Peter Barber, was born into slavery in 1820 in Trenton, North Carolina. His

grandfather, William Mae Barber, was likewise born into slavery in 1840, along with his three

sisters, Anna, Hula, and Julia and his two brothers, John and Seth. Peter Barber was a farmer

and William Mae, was a master carpenter. William Mae Barber built many of the stately homes

that still stand along Route 58 South in Trenton, North Carolina.

The plaintiff, Richard Barber, recalls delivering newspapers, cutting lawns and raking leaves of

many of the residents of the homes his grandfather built. Richard Barber's father, John, was a

sharecropper. Plaintiff is victimized by Defendants, especially New York Life Insurance, Brown

Brothers Harriman & Co., Norfolk Southern who have taken the property of his enslaved fore parents and failed to return same to him.

### Hannah Hurdle-Toomey and The Estate of Andrew Jackson Hurdle – Class Representative

80.     Plaintiff Hurdle-Toomey lives in Belleview, Illinois. She is the youngest surviving daughter of Andrew Jackson Hurdle, a former slave, now deceased.

81.     Andrew Jackson Hurdle was born on 12/25/1845 and died on 11/27/1935. Mr. Hurdle was 10 years old when he was sold away from his family and brought into slavery.

82.     He eventually ran away from slavery at 16 years old. He had suffered family separation, physical and psychological abuse and deprivation of basic human rights.

83.     Plaintiff Hannah Hurdle Toomey has petitioned the Circuit Court of Cook County Illinois to be appointed as the Independent administrator of her father's estate.

Andrew Jackson hurdle was victimized by the atrocities of the institution of slavery instigated, supported and financed by one or more of the defendants.   Plaintiff as well was impoverished by Defendants taking the property of her parents  preventing her from inheriting such property.

### Marcelle Porter and The Estate of Hettie Pierce – Class Representative

84.     Plaintiff Marcelle Besteda Porter is 72 years old.  She is a native of Chicago.  Her great grand-mother, Hettie Pierce was enslaved in North Carolina.  Marcelle Porter has petitioned the Court to open an estate on behalf of her great grand mother and to be appointed as the Independent administrator of her great grand mother's estate.  She brings this lawsuit on behalf of herself and her great grandmother's estate and all others similarly situated.  Plaintiff and Hettie Pierce were victimized by the atrocities of the institution of slavery instigated, supported and financed by one or more of the defendant.  Plaintiff as well was impoverished by Defendants taking the property of his parents, grand parents, and great-grand parents  preventing him from

29

inheriting such property. She has petitioned the Circuit Court of Cook County to be appointed as the Independent administrator of her grand-mother's estate. Marcelle Porter is a customer of Defendant, JP Morgan Chase. But for this Defendant's deception, she would not have been its customer.

### Julie Mae Wyatt-Kervin ("Mae Wyatt-Kervin– Class Representative

85.     Plaintiff Mae Wyatt-Kervin was born on May 5, 1903. She is the daughter of enslaved Africans, Jake Wyatt and Louise Wyatt. Both Jake and Louise Wyatt were slaves in Wharton County, Taxes. Both Jake and Louise Wyatt were victimized by the atrocities of the institution of slavery instigated, supported and financed by one or more of the defendant. Plaintiff as well was impoverished by Defendants taking the property of her parents, grand parents, and great-grand parents  preventing her from inheriting such property.

### The Estate of Emma Marie Clark – Class Representative

86.     EMMA MARIE CLARK was, until her death on July 4th 2003, a resident of Texas. On information and belief, she was enslaved in the agriculture industry in Louisiana from about 1927 through 1934. She does not know her precise age, but has been told she was born in Louisiana between 1904 and 1908.

87.     Emma Clark was forced to work 18 to 21 hour days in the dairy, doing housework, and looking after guests in a boardinghouse on the farm. She was never paid for her services and was severely beaten if the couple was not satisfied with her work. She was forced to have sexual relations with men for the purpose of breading more slaves. As a result of this, she got pregnant on two occasions and gave birth to two sons. Her estate is represented by her son, Clio Clark of Dallas, Texas.

### Julie Mae Wyatt-Kervin – Class Representative

88.     Plaintiff Julie Mae Wyatt-Kervin was born on May 5, 1903. She is the daughter of

enslaved Africans, Jake Wyatt and Louise Wyatt. Both Jake and Louise Wyatt were slaves in

Wharton County, as were their parents before them. In or about 1860, Wharton County had the

distinction of having one of the highest slave populations in all of Texas. When Ms. Wyatt-

Kervin's parents were freed from slavery on June 19, 1865, they became sharecroppers.

### Ina Bell Daniels Hurdle McGee ("Hurdle McGee")– Class Representative

89.     Plaintiff Ina Bell Daniels Hurdle McGee is 69 years of age. She resides in Dallas, Texas.

90.     Hurdle McGee is the great grand-daughter of Andrew Jackson Hurdle, an enslaved

African. Her grandmother's name is Laura Elizabeth Hurdle and her father's name is Clarence

Hurdle. Ina is a customer of Defendant, Aetna Insurance Company. But for Aetna's deception,

Ina would not have been a customer of Aetna.

91.     Hurdle McGee and her deceased ancestors were victimized and they endured the hardship

and atrocities associated with the institution of slavery which was supported, sponsored and

financed by one of more of the defendants.

### Cain Wall, Sr. – Class Representative

92.     Cain Wall, Sr. is a resident of Louisiana. Upon information and belief, he was enslaved

through the 1960's. His grandfather and father were also former slaves. His seven living

children are former slaves. He was subjected to forced labor without compensation.

93.     Plaintiff Cain Wall, Sr. and his family were forced to live on the slave quarters of a

plantation that grew numerous agricultural crops such as cotton and rice. His trips with the

master took him to drop off bales of cotton, next to train tracks that ran through Mississippi,

and/or Louisiana. He dropped bales of cotton off at the cotton mills.

94.     His children were never paid for their labor.

95.     Cain Wall experienced the horrors of slave life first-hand including, but not limited to, the murder of a relative by the slave master; physical beatings and physical intimidation purposely designed to prevent him from running away or reporting the criminal incidents to society Cain Wall did not run away as he was afraid of the master beating on him.

96.     Upon information and belief, during a portion of the time that Plaintiff Cain Wall was enslaved namely in or about the 1920's-1930's, one or more of the Defendants were doing business in Mississippi or Louisiana.

97.     These defendants had reason to know that their enslavement of Cain Wall was illegal and yet failed to take steps to eliminate same, while they continue to inure benefits form the illegal, but sanctioned system of servitude Post-Emancipation.

98.     Plaintiff Cain Wall and his family members were victimized and they endured the hardship and atrocities associated with the institution of slavery which was supported, sponsored and financed by one of more of the defendants.

### Class Representatives:  Cain Wall, Jr., Mae Louis Miller, Ernestine Hill Annie L. Miller, Arthur Wall, Idell Wall, C.W. Wall

99.     Plaintiffs, Cain Wall, Jr., Mae Louis Miller, Ernestine Hill Annie L. Miller, Arthur Wall, Idell Wall, C.W. Wall are residents of  Louisiana, and all were formally enslaved.  All endured the tragedy of slavery in that they were each forced to work for no pay.

100.    These Plaintiffs were intimidated through violence and through threats of same.  One of the family members was repeatedly raped by her slave master resulting in permanent injury. They were slaves for the benefit of the cotton industry, sugar industry and rice industry to name of few.  Their father and grandfather were slaves and they were born into slavery.

32

101.    These Plaintiff were victimized and they endured the hardship and atrocities associated with the institution of slavery which was supported, sponsored and financed by one of more of the defendants.

### Antoinette Harrell Miller ("Miller")– Class Representative

102.    Miller was born in New Orleans, Louisiana on October 28, 1960. She is the great-great grand daughter of a former slave, Carrie Richardson and the great grand daughter of a former slave, Thomas Richardson.

103.    Miller and her enslaved ancestors were victimized and they endured the hardship and atrocities associated with the institution of slavery which was supported, sponsored and financed by one of more of the defendants. Plaintiff is victimized by Defendants, especially New York Life Insurance, Brown Brothers Harriman & Co., Norfolk Southern who have taken the property of her enslaved fore parents and failed to return same to him.

### GENERAL DESCRIPTIONS APPLICABLE TO ALL PLAINTIFFS

104.    Some or all the Plaintiffs are presently consumers of defendants. Due to unconscionable, fraudulent and deceptive public communications made by defendants, plaintiffs suffered the harm of being misled, confused, and deceived about the roles the defendants played in the enslavement of African people.

105.    Defendants are benefiting from these communications by continuing business relationships with plaintiff customers.

106.    Some or all the Plaintiffs have suffered the harm of being unconscionably denied the benefits of a competitive market for the goods and services they purchase from defendants.

107.    It is believed that such products and services are produced today through the unconscionable and unfair trade act and practice of investing assets earned from the forced, uncompensated labor of enslaved people.

108.    Each plaintiff has suffered segregation, lost opportunity, diminished self-worth and value, loss of property rights, loss of derivative property rights, and psychological harm from having witnessed the degradation of their ancestors and relatives.

109.    Each Plaintiff and other formerly-enslaved plaintiff class members experienced physical abuse, coercion, involuntary confinement, and severe emotional distress and the failure to be paid for his labor.

110.    Each Plaintiff continues to be harmed to the present day, in that each and others similarly situated are deprived job opportunities, caused psychic harm, denied ability to inherit his or her fore-parents wealth.

111.    Each Plaintiff African-American slave descendent has suffered by the Defendants failure to pay their ancestors for their labor as slaves or as sharecroppers, peons or even slaves.

112.    Each Plaintiff suffered the harm of being denied the wealth of their ancestors by the Defendants and thus being unable to purchase goods and services such as quality education at the elementary, secondary and university levels.

113.    Each Plaintiff was denied the economic wealth of his or her ancestors' labor.

114.    Each Plaintiff African-American slave descendant has derivative and inherited property rights in their ancestors' lost pay, and this right has never been rescinded, voided, altered or satisfied.

115.    Each Plaintiff African-American descendants' harm is not limited to the past, but continues on a daily basis.  They still endure daily indignities from the legacy of slavery,

34

including, but not limited to, racial profiling, racial slurs, and improper and hurtful assumptions regarding their overall status.

## DEFENDANTS

116. **Defendant FLEETBOSTON** is a Delaware corporation with its principal place of business located at 100 Federal Street, Boston, Massachusetts 02110.

117. It engaged in business that affects interstate commerce including the jurisdictions named in the lawsuits.

118. FLEETBOSTON is the successor in interest to Providence Bank which was founded by Rhode Island businessman John Brown.

119. John Brown owned ships that embarked on several slaving voyages and Brown was prosecuted in federal court for participating in the international slave trade after it had become illegal under federal law.

120. Upon information and belief, FLEETBOSTON knew that Brown and others similarly situated intended to inflict emotional distress upon the enslaved Africans.

121. Upon information and belief, Providence Bank, aware of the borrower's intent, lent substantial sums to Brown, thus financing and profiting from the founder's illegal slave trading and in his intentional infliction of emotional distress upon enslaved Africans.

122. Upon information and belief, John Brown, the predecessor of FLEETBOSTON, provided one or more instrumentalities of slavery. Such instrumentalities included but were not limited to finance and other supports which encouraged slave masters to continue their tortious conduct.

123. FLEETBOSTON, profited and has continued to profit from illegal slave trading in that it failed to disgorge the ill-gotten wealth it inherited from it predecessor, John Brown.

124.    Upon information and belief, FLEETBOSTON, through its predecessor(s), also collected custom fees due from ships transporting slaves, thus, further knowingly and intentionally profiting from the slave trade and its practice of intentionally inflicting emotional distress upon enslaved Africans.

125.    Upon information and belief, FLEETBOSTON, through its predecessor(s), also collected custom duties and fees due on ships transporting enslaved Africans in violation of Rhode Island and federal law, thus profiting from the illegal slave trade.

125.    Upon information and belief, over 41,369 Africans were enslaved during the time that FLEETBOSTON, through its predecessor(s), encouraged the continuation of slavery because it profited from the customs duties and fees it collected from ships that engaged in the illegal slave trade.  Intentionally and knowingly providing loans to slave traders to engage in illegal slave trading, and the regular collection of duties and fees, earned in the illegal enslavement of Africans constituted aiding and abetting in the intentional infliction of emotional distress upon those enslaved Africans.  Such business practices were unlawful, and unfair business.

126.    FLEETBOSTON, also participated in the torture and enslavement of Africans in that it provided loans to slave traders which encouraged slave traders to engage in illegal slave trading.  Such business practices were unlawful, and unfair business.

127.    Upon information and belief, FLEETBOSTON was approached by various members of the general public to verify its historical connection to slavery.  Its responses were either evasive, unclear, or denials, thereby constituting fraudulent business acts.  FLEETBOSTON withheld information or made misleading statements regarding their participation in and profiting from slavery.

128.    FLEETBOSTON made various misleading statements to the Press from March 2000

to February 2002, attempting to disassociate its predecessor company from its current company. FLEETBOSTON engaged in a self-concealed business enterprise so that the Plaintiffs and others similarly situated would not be aware of the existence of this enterprise without a specific disclosure as to the nature of participation and profit it derived from slave trade and unpaid slave labor.

129. **Defendant CSX ("CSX")** is a Virginia corporation with its principal place of business Richmond, Virginia. It is a successor-in-interest to numerous predecessor railroad lines that were constructed or run, at least in part, by slave labor.[3]

130. CSX is a railroad transportation company. It engaged in the business that affects interstate commerce. It provided the instrumentality of slavery by transporting enslaved Africans to and from various parts of the United States. It is believed that Defendant CSX leased enslaved Africans and maintained ownership and control of enslaved Africans.

131. CSX withheld information or made a misleading statement to the Press regarding their participation in and profiting from slavery.

132. Upon information and belief, its predecessor rail lines: i) knew or should have known that the businesses with which they contracted and/or for whom they provided transportation participated in the slave trade and slavery; that key to the success of those endeavors was the intentional infliction of emotional distress upon the enslaved Africans ii) intended to help these businesses to continue in this wrongful practice; and iii) took steps to do so.

133. CSX engaged in a self-concealed business enterprise as the plaintiffs and others similarly situated would not be aware of the existence of this enterprise without a specific disclosure as to the nature and level of participation and profit the defendant derived from slavery.

---

[3] Jim Cox, *Rail Networks Own Lines Bult with Slave Labor* USA TODAY, Feb. 21, 2002.

134.    Upon information and belief, it does continuous and systematic business in New York, Illinois, California, Texas, and Louisiana.

135.    **Defendant AETNA INC. ("AETNA")** is an insurance corporation with its principal place of business located in Hartford, Connecticut.

136.    Upon information and belief, AETNA's predecessor in interest, provided the instrumentality of slavery by underwriting insurance policies for slave owners against the loss of their African slaves which made the lives of the enslaved Africans easily dispensable at no cost to the slave traders.

137.    AETNA knew the horrors of slave life as is evident in a rider through which the company declined to pay the premiums for slaves who were lynched or worked to death or who committed suicide.

138.    Upon information and belief, AETNA knew or should have known that an essential element to the maintenance of slavery was the intentional infliction of emotional distress.

139.    AETNA insured enslaved Africans who worked in the agricultural industry of which many plaintiffs and plaintiffs' ancestors were enslaved.

The writing of such insurance policies constituted unfair business acts designed to support the immoral practices of domestic slavery as set forth by the cruel and inhumane Slave.

140.    Upon information and belief, AETNA, unjustly profited from the institution of slavery.

141.    Upon information and belief, AETNA: i) knew or should have known that the persons/businesses for whom they provided insurance did intentionally inflict emotional distress upon enslaved Africans; ii) intended to further that practice; and iii) by providing insurance policies did so. AETNA aided and abetted those who engaged in the maintenance of slavery.

142.     AETNA withheld information or made a misleading statement regarding their participation in and profiting from slavery.

143.     AETNA engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure as to the nature and level of participation and profit AETNA derived from slavery.

144.     Upon information and belief, it does continuous and systematic business in New York, Illinois, and New Jersey.

145.     **Defendant BROWN BROTHERS HARRIMAN & COMPANY ("BROWN BROTHERS HARRIMAN")** is a financial institution with its principal place of business in New York, New York. It is the successor corporation to Brown Brothers & Co.

146.     The founders, James and William Brown, built their merchant bank by lending to Southern planters, brokering slave-grown cotton and acting as a clearinghouse for the South's complex financial system. BROWN BROTHERS earned commissions arranging cotton shipments from Southern ports to mills in New England and Britain. It also loaned millions directly to planters, merchants and cotton brokers throughout the South.

147.     When those planters or their banks failed, BROWN BROTHERS used its local agents to run repossessed plantations and manage the enslaved Africans working there.[4]

148.     BROWN BROTHERS' enrichment from slave labor is further evidenced by Louisiana court records dating back to the 1840's that reveal the firm's ownership of at least two cotton plantations totaling 4,614 acres and the plantations' 346 slaves, each named in court records. BROWN BROTHERS & COMPANY merged with two other firms in 1931 to create BROWN BROTHERS HARRIMAN.[5]

---

[4] James Cox, *Brown Bros., Loans Gave Planters Cash To Buy Slaves*. USA TODAY (02/21/02).
[5] *Id.*

149.    BROWN BRTOHERS built their merchant bank by lending to Louisiana planters,

brokering slave grown cotton, sugar cane and acting as a clearinghouse for the New Orleans

based slavery business.

150.    When those banks failed, BROWN BROTHERS seized the slaveholders' slaves and then

managed the slaves from slave owners who defaulted on debts.

151.    BROWN BROTHERS withheld information or made a misleading statement based upon

press reports in an attempt to disassociate itself from its predecessor's business.

152.    Defendant BROWN BROTHERS HARRIMAN engaged in a self-concealed business

enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of

this enterprise without a specific disclosure as to the nature and level of its participation and

profit it derived from slavery.

153.    Upon information and belief, BROWN BROTHERS: i) was aware of the horrors of

slavery and its maintenance through the intentional infliction of emotional distress; ii) despite

that knowledge, intended to further this practice through its financing of slave owners and the

business of slavery; and iii) did provide such financing.

154.    **Defendant NEW YORK LIFE INSURANCE COMPANY ("NEW YORK LIFE") is**

an insurance corporation with its general office located in New York, New York.

155.    NEW YORK LIFE's predecessor-in-interest, Nautilus Insurance, earned premiums from

its sale of life insurance to slave owners. One third of its first 1,000 policies were to insure the

lives of slaves.

156.    It insured slaves in the agricultural industry of which some or all of the plaintiffs and/or

their ancestors were a part.

157.    Upon information and belief, NEW YORK LIFE knew that an essential element to the maintenance of slavery was the intentional infliction of emotional distress.

158.    The writing of the above mentioned insurance policies also constitute unfair business acts designed to help finance the immoral practices of slavery.  NEW YORK LIFE engaged in business that affects interstate commerce.

159.    NEW YORK LIFE withheld information or made misleading statements regarding their participation in and profiting from slavery.

160.    NEW YORK LIFE withheld information or it did not report its slavery policies until it was compelled to do so under California law.

161.    Upon information and belief, NEW YORK LIFE: i) knew that the persons/businesses for whom they provided insurance did intentionally inflict emotional distress upon enslaved Africans; ii) intended to further that practice; and iii) by providing insurance policies did so. NEW YORK LIFE aided and abetted those who engaged in the maintenance of slavery.

162.    NEW YORK LIFE engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure as to the nature and level of participation and profit it derived from slavery.

163.    NEW YORK LIFE's predecessor, company Nautilus, continued to provide the instrumentalities and support for slavery after slavery had been abolished.  It issued polices on the lives of slaves after slavery had been abolished in New York.[6]

162.    **Defendant NORFOLK SOUTHERN** ("NORFOLK") is a corporation with its principal place of business located Norfolk, Virginia.   It engages in business that affects interstate commerce.  Defendant NORFOLK also provided the instrumentality necessary for the enslavement of Africans.

---

[6] Brent Staples, *Slaves in the Family:  One Generation's Shame Is Another's Revelation.*, June 16, 2003 at OP.ED.

163.    NORFOLK is a successor-in-interest to numerous railroad lines that were constructed or run, in part, by slave labor.

164.    Upon information and belief, its predecessor rail lines: i) knew that the businesses with which they contracted and/or for whom they provided transportation participated in the slave trade and slavery; that key to the success of those endeavors was the intentional infliction of emotional distress upon the enslaved Africans ii) intended to help these businesses to continue in this wrongful practice; and iii) took steps to do so.

165.    NORFOLK participated in the institution of slavery in that it derived the benefits of unpaid slave labor and it provided financial supports to slave owners and slave traders.

167.    **Defendant LEHMAN BROTHERS** is a corporation with its principal business located in New York, New York.

168.    LEHMAN BROTHERS founder Henry Lehman began as a peddler in 1844, but shortly thereafter when his two brothers, Mayer and Emanuel joined him, they soon grew rich as middlemen in the slave-grown cotton trade.

169.    Upon information and belief, the Lehman Brothers knew that that the intentional infliction of emotional distress upon enslaved Africans was key to the cotton trade. Upon information and belief, Lehman Brothers: i) knew that the businesses with which they contracted intended to inflict emotional distress upon enslaved Africans; ii) intended to help perpetuate this practice; and iii) took steps to do so through its business interactions with the producers of cotton.

170.    After Henry Lehman's death in 1856 and after the war, the remaining two brothers moved north and continued trading in cotton, oil, sugar and coffee, and then took a seat on the New York Stock Exchange in 1887.

171.    LEHMAN BROTHERS participated in the institution of slavery by providing financial supports to slave traders and slave masters who used unpaid slave labor to supply the business enterprise of LEHMAN BROTHERS.  Furthermore, Defendant LEARMAN BROTHERS also owned slaves.

172.    **Defendant SOCIETY OF LLYOD'S**, aka LLOYD'S OF LONDON, ("LLOYD") is a foreign entity. It is an underwriting insurance company with its principal place in London, U.K.

173.    LLOYD provided one or more of instrumentalities of slavery in that it insured ships utilized for the Trans-Atlantic slave trade.

172.    The writing of such policies was an unfair business designed to help finance the international slave trade, to provide other corporations that profited from slave trade with human chattel.  Furthermore, by writing such insurance policies, Defendant LLYOD provided the instrumentality of slavery.

173.    LLOYD'S engages in business that affects interstate commerce.

174.    Defendant LLOYD'S engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific as to the nature and level of its participation and profit it derived from slavery.

175.    LLOYD'S withheld information in that it failed to report any documents to the California registry as required, claiming a fire destroyed its documents.

176.    Upon information and belief, Society of Lloyds was aware that essential to the practice of the international slave trade was the intentional infliction of emotional distress upon the enslaved Africans. Upon information and belief, the SOCIETY OF LLOYDS:  i) knew or should have known that the parties for whom they wrote insurance intended to continue the intentional

43

infliction of emotional distress upon the enslaved Africans; ii) intended to perpetuate this practice; and iii) did so perpetuate it through the insurance policies it underwrote.

177.    **Defendant UNION PACIFIC** is a railroad transportation corporation with its principal place of business in Omaha, Nebraska. It is a successor-in—interest to numerous predecessor railroad lines that were constructed or run in part by slave labor. It engages in business that affects interstate commerce. This defendant by and through the conducts of its predecessors provided the instrumentality of slavery that resulted to the more or more of the harms alleged herein.

178.    UNION PACIFIC withheld information or made a misleading statement regarding their participation in profiting from slavery.

179.    Defendant UNION PACIFIC engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure as to the nature and level of participation and profit it derived from slavery.

180.    Upon information and belief, its predecessor rail lines: i) knew or should have known that the businesses with which they contracted and/or for whom they provided transportation participated in the slave trade and slavery; that key to the success of those endeavors was the intentional infliction of emotional distress upon the enslaved Africans ii) intended to help these businesses to continue in this wrongful practice; and iii) took steps to do so.

181.    **Defendant JP MORGAN CHASE** ("MORGAN CHASE") is a banking corporation with its principal place of business in New York, New York. Two of its predecessor banks that merged to become JP Morgan Chase were behind a consortium to raise money to insure slavery. It engages in business that affects interstate commerce. This Defendant by and through its

predecessors provided the instrumentality of slavery that resulted to one or more of the harm alleged herein.

182. MORGAN CHASE withheld information or made a misleading statement regarding their participation in and profiting from slavery.

182. MORGAN CHASE engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure as to the nature and level of participation and profit it derived from slavery.

181. MORGAN CHASE attempted to deny its association with slavery in the Press in or about January 2003 after other evidence, including a circular shows otherwise.

182. MORGAN CHASE operated with the clear intent of taking in slave-related business after the abolition of slavery in the North.

183. Upon information and belief, J.P. MORGAN CHASE predecessor banks: i) knew or should have known that the persons/businesses for whom they provided insurance did intentionally inflict emotional distress upon enslaved Africans; ii) intended to further that practice; and iii) by providing insurance policies did so. These predecessors aided and abetted those who engaged in the maintenance of slavery through the intentional infliction of emotional distress.

184. **Defendant, R.J. REYNOLDS TOBACCO COMPANY** ("REYNOLDS") is a corporation with its principal place of business located in Winston-Salem, North Carolina. It engages in business that affects interstate commerce.

185. REYNOLDS TOBACCO is the beneficiary of assets acquired through the forced uncompensated labors of enslaved African-Americans.

186. Hardin Reynolds, father of R.J. Reynolds owned and operated a tobacco factory at

the plantation called "Rock Spring Plantation" – the present day Reynolds Homestead in Critz, Virginia.

187.    Before the Civil War, Hardin Reynolds owned at least 88 slaves who provided labor on the plantation, including in the Rock Spring tobacco factory.

188.    The operating information on the Rock Spring factory shows that slave labor was used to produce tobacco and other goods for the tobacco factory.

189.    Hardin Reynolds continued operation of his tobacco factory during and after the Civil war, and was not broken by the war.

190.    Amongst other enterprises, Hardin engaged in business partnerships with his children. Hardin Reynolds' son, Richard Joshua Reynolds, founder of R. J. Reynolds Tobacco Company, worked at the Rock Spring tobacco factory[7] after the Civil War, and later formed a business partnership with his father at the factory.

191.    The partnership was called "Hardin Reynolds and Son." In the fall of 1874, R.J. Reynolds sold his interest in the Rock Spring Factory and purchased land in North Carolina in October 1874 upon which he built an R.J. Reynolds Tobacco Company factory.

192.    Records indicate that R. J. took half of two year's profit from the Rock Spring factory to found his new company R.J. Reynolds Tobacco Company.[8]

193.    On April 4, 1899, R. J. Reynolds Tobacco Company became a subsidiary of the American Tobacco Company[9] through its relationship with the Continental Tobacco Company, a holding company of the American Tobacco Company.

---

[7] *Id.* at 21.

[8] *Id.* at 48.

[9] This "Tobacco Combination" or trust formed by James Buchanan Duke was wholly owned by Continental Tobacco Company.

194. The American Tobacco Company owned controlling shares of stock in R.J. Reynolds Tobacco Company thereby benefiting from and aiding in its already profitable operations.[10]

195. This relationship existed until 1911, when the U.S. Supreme Court issued a ruling that broke the old American Tobacco Company into several large competing companies.

196. Upon information and belief, R.J. Reynolds Tobacco Company does continuous and systematic business in every jurisdiction in which the suits have been filed.

197. Currently existing companies, once part of the American Tobacco Company, and therefore beneficiaries of the slave labor include: R. J. Reynolds Tobacco Company, Brown & Williamson (formerly The American Tobacco Company via ownership of its predecessor by R.J. Reynolds Tobacco Company), Liggett Group Inc. (formerly Liggett & Myers Tobacco Company), and Lorillard Tobacco Company a subsidiary of Loews Corporation. All do continuous and systematic business in all the jurisdictions in which the cases have been filed.

198. It attempted to minimize its involvement in statements to the Press claiming its company was not founded until after slavery was abolished, misleading plaintiffs into believing that the company itself was not founded on the profits of slave labor.

199. **Defendant BROWN AND WILLIAMSON TOBACCO CORP. ("BROWN & WILLIAMSON")** is a corporation with its principal place of business in Louisville, Kentucky. It engages in business that affects interstate commerce.

200. BROWN AND WILLIAMSON is a successor in interest to The American Tobacco Company.

201. BROWN AND WILLIAMSON benefited from slave labor because it was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco

---

[10] *Id.* at 101.

Company from the uncompensated labor of enslaved Africans. Such use of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states.

202.    It does continuous and systematic business in all the jurisdictions in which the cases have been filed.

203.    **Defendant LIGGETT GROUP INC.**("LIGGETT")is a corporation with its principal place of business located at 100 Maple Lane, Mebane, North Carolina. It does continuous and systematic business in California.

204.    LIGGETT is a successor in interest to the American Tobacco Company. LIGGETT GROUP INC. benefited from slave labor because it was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco Company from the uncompensated labor of enslaved Africans.

205.    Such use of enslaved Africans was an unfair business practice set forth by Slave Codes created and enforced by states.

206.    LIGGETT engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

207.    Defendant LOEWS CORPORATION is the parent corporation of Lorillard Tobacco Company with its principal place of business in New York, New York.

208.    Upon information and belief, it does continuous and systematic business in all the jurisdictions in which it is sued.

209.    LOEWS CORPORATION is a successor in interest to the American Tobacco Company due to its ownership of Lorillard Tobacco Company.

210.     LOEWS CORPORATION benefited from slave labor because its subsidiary was formed out of the American Tobacco Company that benefited from assets acquired by R. J. Reynolds Tobacco Company from the uncompensated labor of enslaved Africans.

211.     Such use of enslaved Africans was an unfair business practice.

212.     **Defendant CANADIAN NATIONAL RAILWAY CO.("CANADIAN NATIONAL")**is a corporation with its principal place business in Montreal, Canada.

213.     It engages in business that affects interstate commerce.  It is the successor-in—interest to seven predecessor railroad lines, that were constructed and/or run in part by slave labor.[11]

214.     Furthermore, upon information and belief, CANADIAN NATIONAL was approached by members of the general public to verify their historical connection to slavery.  They denied any connection thereto.

215.     CANADIAN NATIONAL engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise without a specific disclosure by the plaintiffs as to the nature and level of participation and profit the defendant derived from slavery.

216.     Upon information and belief, its predecessor rail lines: i) knew or should have known that the businesses with which they contracted and/or for whom they provided transportation participated in the slave trade and slavery; that key to the success of those endeavors was the intentional infliction of emotional distress upon the enslaved Africans ii) intended to help these businesses to continue in this wrongful practice; and iii) took steps to do so.

---

[11] Jim Cox, *USA TODAY,* Feb. 21, 2002, citing Canadian National's ownership of seven rail lines built and/or operated by enslaved Africans including Mobile & Ohio which valued slaves lost to emancipation at $199,691 in 1865 (valued today at $2.2 million).

217.    **Defendant SOUTHERN MUTUAL INSURANCE CO.**("SOUTHERN MUTUAL") is

an insurance corporation with its principal place of business in Georgia. It engages in business

that affects interstate commerce.

218.    Upon information and belief, SOUTHERN MUTUAL INSURANCE: i) knew or should

have known that the persons/businesses for whom they provided insurance did intentionally

inflict emotional distress upon enslaved Africans; ii) intended to further that practice; and iii) by

providing insurance policies did so. SOUTHERN MUTUAL INSURANCE aided and abetted

those who engaged in the maintenance of slavery through the intentional infliction of emotional

distress.

219.    Upon information and belief it issued policies on the lives of slaves in Louisiana.  Upon

information and belief, it does systematic and continuous business in Louisiana.

220.    **Defendant AMERICAN INTERNATIONAL GROUP INC.** ("AIG") is a corporation

with its principal place of business located in New York, New York.

221.    AIG is successor-in-interest provided instrumentalities of slavery by selling insurance

policy to cover the lives of enslaved Africans with slave owners as the beneficiaries.

223.    Upon information and belief, AIG'S predecessor in interest: i) knew or should have

known that the persons/businesses for whom they provided insurance did intentionally inflict

emotional distress upon enslaved Africans; ii) intended to further that practice; and iii) by

providing insurance policies did so. These predecessors aided and abetted those who engaged in

the maintenance of slavery.

224.    In the California Department of Insurance's May 2002 Slavery Era Insurance Registry

approximately 200 slaveholders' policies are associated with AIG's predecessor United States

Life Insurance Company in the City of New York. (U.S. Life). (See,

http://www.insurance.ca.gov/SEIR/Slaveholder.htm)

## GENERAL DEFENDANTS' DESCRIPTION

225.    Defendants and the other known and unknown defendants used and/or profited from

slave labor and have retained the benefits and use of those profits and products derived from that

slave labor. Defendants knew that the plaintiff class was subject to physical and mental abuse

and inhuman treatment at the time they earned those profits and since.

226.    Defendants conspired with each other with intentions to violate plaintiffs' ancestors'

basic human rights and by so doing, to profit from these violations.

## CONTINUED INTENTIONAL MISREPRESENTATIONS

227.    Not only have defendants hidden their complicity in slavery for years, they continue to

do so today. Solely to promote their business interests in maintaining customer goodwill and

increasing their profits, defendants are engaging in continued intentional misrepresentations and

deceptive statements to the consuming public about their roles in the enslavement of Africans.

They are unjustly enriched by these commercial acts and omissions, which are communicated

through defendants' corporate websites, print and online press, and radio interviews, in the

traditional manner in which corporations engage in promotional activities.

228.    Defendants' continued misrepresentations include but are not limited to:

### AETNA

229.    Aetna has long ago acknowledged that for several years shortly after its founding in

1853, the company may have insured the lives of slaves. Despite limited and incomplete

information in our archives on the extent of our participation, we express our deep regret over

51

any participation at all in this deplorable practice. *AETNA STATEMENT ON PRE-CIVIL WAR INSURANCE POLICIES* www.aetna.com/news/2000/pr_200000310.htm posted until late 2001.

230.     Two years ago, Aetna expressed regret for 'any involvement' it 'may have' had in insuring slaves.  Today it stands by that statement and says it has been able to find only seven policies insuring 18 slaves.  'We stood up; we apologized; we tried to do the right thing.' Says Aetna spokesman Fred Laberge. *Insurance Firms Issued Slave Policies*, by James Cox, USA Today, February 21, 2002

231.     "I believe that I could not say with certainty that we wrote these policies," said Thomas Strohmenger, Aetna vice president and counsel, who conducted the research.  Kenneth R. Gosselin, *Profits Made At The Cost Of Freedom; Beyond Aetna, Others Reaped Benefits From Slavery In U.S.,* Hartford Courant (March 10, 2000).

## CSX

232.     "The claimants named CSX because slave labor was used to construct portions of some U.S. rail lines under the political and legal system in place more than a century before CSX was formed in 1980. Courtrooms are the wrong setting for this issue." *CSX TRANSPORTATION STATEMENT IN RESPONSE TO LAWSUIT FILED SEEKING FINANCIAL REPARATIONS,* http://web.archive.org/web/20020617141431/www.csx.com/aboutus/news/press/pressview.cfm?ID=9149, (March 26, 2002).

233.     While abhorring slavery, Richmond, Virginia-based CSX offered an online statement that noted the lawsuit filed against it and "other corporations demanding financial reparations is wholly without merit and should be dismissed. The claimants named CSX because slave labor was used to construct portions of some U.S. rail lines under the political and legal system in place more than a century before CSX was formed in 1980. Courtrooms are the wrong setting for

this issue." Myra A. Thomas *Reparations Lawsuits: The Target Companies And Why They Were Chosen: Aetna, CSX and FleetBoston Financial Named In Lawsuits* NorthStar Network (September 30, 2002).

234.    CSX, based in Richmond, Va., says the allegations that its railroad lines were built by slave labor lack merit, and the suit should be dismissed. Ira J. Hadnot *Slave descendants bound and determined to be 'made whole again,* The Dallas Morning News (September 5, 2002).

### JP MORGAN CHASE

235.    "We have examined our archives and had them examined by an outside, independent archival expert to look for any evidence to support these allegations," Chase spokesman Tom Johnson said. "We've found nothing to indicate that we were involved in any of the (slave) transactions that are being quoted in articles about the lawsuit." Kevin Moran *Chase Denies Slave-Trade Link,* HoustonChronicle.com (January 21, 2003).

236.    J.P. Morgan spokesman Thomas Johnson said the "allegations are without merit" and that the company's archives don't support the claims in the litigation. David Voreacos *R.J. Reynolds, J.P. Morgan Among 12 Sued in African Slave Cases,* Bloomberg (September 4, 2002).

237.    Two of the many banks that merged and are part of what is today the USA's second-largest bank are listed in an 1852 circular as the banks behind a London-based consortium raising money to insure slaves. James Cox *Insurance Firms Issued Slave Policies,* USA Today (February 21, 2002).

238.    J.P. Morgan Chase says a "thorough and extensive" search of internal and external archives turned up no evidence its predecessor banks ever did business with the consortium or that the consortium ever actually issued policies on slaves. James Cox *Insurance Firms Issued Slave Policies,* USA Today (February 21, 2002).

## CANADIAN NATIONAL

239.     CN's Chicago-based spokesperson, Jack Burke, denies up and down that the company, or

any of its predecessors, profited from slave labor. Sigcino Moyo, *Blood On the Tracks: CN Rail*

*Named in U.S. Suit Seeking Slave Reparations,* TorontoNow.com (February 2003).

240.     "We have been presented with no documentation showing that we profited, that there was

any profit from slave labor," he says. "If there was a predecessor railroad called the Mobile &

Ohio, I'm not aware of it." Sigcino Moyo, *Blood On the Tracks: CN Rail Named in U.S. Suit*

*Seeking Slave Reparations,* TorontoNow.com (February 2003).

241.     "Any reparations suit against CN is wholly without merit and CN will defend itself

vigorously," spokesman Jack Burke said. "Neither CN nor Illinois Central, which was acquired

by CN in 1999, ever employed slave labor." Brett Martel, *Slave Descendants File Lawsuits*

Associated Press (September 4 2002).

## FLEETBOSTON

242.     "The bank was one of hundreds that created Fleet," said Fleet spokesman James

Mahoney. "The link between Fleet and Brown is extremely remote." Tom Walsh, *Reparations*

*group eyes Fleet; Lawyers readying case,* The Boston Herald (February 22, 2002).

243.     A FleetBoston spokesman said it appears there is no connection to Brown's bank, though

FleetBoston doesn't have records that date back 200 years. Kenneth R. Gosselin, *Profits Made at*

*the Cost of Freedom; Beyond Aetna, Others Reaped Benefits From Slavery In U.S.,* Hartford

Courant (March 10, 2000).

244.     "And the connection between the original bank and our bank is a very distant one," said

FleetBoston spokesman James E. Mahoney." Kenneth R. Gosselin, *Profits Made at the Cost of*

*Freedom; Beyond Aetna, Others Reaped Benefits From Slavery In U.S.,* Hartford Courant
(March 10, 2000).

## RJ REYNOLDS

245.    R.J. Reynolds spokeswoman Maura Payne said the allegations are "completely without
merit" because the company was founded in 1876, a decade after slavery was abolished." David
Voreacos, *R.J. Reynolds, J.P. Morgan Among 12 Sued in African Slave Cases,* Bloomberg
(September 4, 2002).

246.    "All of our employees since the company has existed have been paid for their work
time," Payne said. David Voreacos, *R.J. Reynolds, J.P. Morgan Among 12 Sued in African Slave
Cases,* Bloomberg (September 4, 2002).

247.    R.J. Reynolds spokeswoman Maura Payne said the allegations are "completely without
merit" because the company was founded in 1876, a decade after slavery was abolished."
*Another Group Files Slave Suit,* The New York Post (September 5, 2002).

## BROWN BROTHER'S HARRIMAN

248.    An emailed statement to NorthStar by Donald Murphy, a partner at Brown Brothers
Harriman in New York City, noted,... "Today's firm has no capital or earnings connection with
the Browns of the nineteenth century." Myra A. Thomas, *Reparations Lawsuits: The Target
Companies And Why They Were Chosen: Aetna, CSX and FleetBoston Financial Named In
Lawsuits* NorthStar Network (September 30, 2002).

249.    Donald Murphy, a partner, says the investment bank has no pre-Civil War records and
sees no need to go through its records. James Cox, *Brown Bros: Loans Gave Planters Cash to
Buy Slaves.*

250.    The named defendants and/or their predecessor entities engaged in one or more of the following: slave business dealings which were self-concealing, denials of any profits from slavery and/or denials to the public for access to or accountings of documented slavery dealings and profits from same.

251.    The nature of the complained of business dealings by the defendants, as discussed in more detail in those portions of this Complaint, establishes that they were self-concealing from the enslaved African and African-Americans.  For example, there is no reason for the slaves to know or be aware that their lives were insured; that financing deals controlled their lives; or that profits far a field from their miserable existence occurred.

252.    A number of the defendants have also over the years specifically and falsely denied having any connection to slavery.

253.    Despite efforts, the plaintiffs have been unable to secure records from a number of the defendants with regards to their ancestors due to the failure of most, if not all, to be able to reliably access documents establishing business relationships, ventures and dealings, contracts, shipping manifests, human cargo lists that may directly connect the plaintiffs with their slave ancestors and their free ancestors.  The lists should provide more connections than not having this information, obviously.  However, even this information will not provide an easy answer as further efforts were employed to destroy access to information and causation such as the changing of names at most, if not all, stages of the slave trade to include the original kidnapping and Trans-Atlantic journey, all sales and resales, sales of children and their children's children thus making it nearly impossible to accurately trace records.

254.    Recent advances in Internet and computer databases have made these records more accessible.

255.     Likewise, corporate histories and records have also been extremely difficult and inaccessible to most people.  Hence, research tracing the monetary benefit derived by American corporations from the slave trade has only been accessible and discussed by prominent researchers within the last year.

256.     Plaintiffs incorporate by reference, as if fully set forth herein, the paragraphs from the preceding Federal Accrual/Discovery Rule section related to the defendants' efforts to withhold documentation and information.

### COUNT I – CONSPIRACY

257.     Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding.

258.     Each of the defendants acted individually and in concert with their industry group and with each other, either expressly or tacitly, to participate in a plan that was designed in part to commit the tortious acts referred to herein.

259.     For instance, each industry group was co-dependent on the others and operated as a joint enterprise, designed in part, to maintain and continue a system of inhumane servitude.

260.     The shipping and railroad industry benefited and profited from the transportation of the slaves.  The railroad industry utilized slave labor in the construction of rail lines.

261.     These transportation industries were dependent upon the manufacturing and raw materials industries to utilize the slaves they shipped and provide them further profits from shipping the produced raw and manufactured items to the various markets.

262. The cotton, tobacco, rice and sugar industries thrived on profits generated from their use of slave labor, and relied upon financial and insurance industries to finance and insure the slaves that they utilized and owned.

263. All the industries: raw market, retail, financial, insurance, and transportation, benefited from the reduced costs of slave-produced goods.

264. Each of the defendants, acting individually and in concert with their industry group and with each other, agreed, expressly or tacitly, to participate in a plan to establish and maintain the illegal institution of slavery for their own individual and mutual profit and benefit.

265. Each of the defendants agreed, either expressly or tacitly, to participate in the above-cited plan knowing that it would include the following illegal means - kidnapping, forcible transfer of population, torture, murder, rape, imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law, enforced pregnancy, intentional infliction of emotional distress, assault and battery.

266. Each of the defendants committed one or more of the following overt acts in furtherance of the plan: Direct and indirect management of plantations; issuing policies insuring the enslaved Africans for the benefit of their owners; direct use of enslaved Africans; leasing of enslaved Africans; providing the necessary financing agreements, which were used to further the scheme; providing the necessities, e.g. clothing, required to maintain enslaved Africans.

267. Plaintiff class and their ancestors were injured by the overt acts as cited above.

## COUNT II – CONVERSION

268. The allegations within this complaint are incorporated by reference as though fully set forth herein.

269.    Under most manifestations of slavery, the enslaved was considered personal property, chattel or commodity.

270.    The enslaved Africans had a property right in themselves.

271.    This property right was wrongfully and illegally taken.

272.    Defendants aided and abetted, conspired or otherwise acted jointly with others to deny this right.

273.    Defendants converted this property into proceeds for which they have become the constructive trustee.

274.    The proceeds are quantifiable and should be segregated and held in a separate fund for the behalf of the beneficiaries, the enslaved descendants' heirs.

275.    Plaintiffs as the equitable and legal beneficiaries are entitled to the value of this converted property.

276.    Plaintiffs have demanded an accounting of these proceeds and the defendants have refused.

277.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

278.    As a result of defendants' failure and refusal to account for, acknowledge and return to plaintiffs and the plaintiff class, the value of their ancestors' slave labor, defendants have willfully and wrongfully misappropriated and converted the value of that labor and its derivative profits into defendants' own property.

279.    Defendants have never accounted for or returned the value of plaintiffs' ancestors' slave labor and the profits defendants derived from said slave labor.

280.    As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all  monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein, together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

### COUNT III - UNJUST ENRICHMENT

281.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

282.    Defendants have improperly benefited from the immoral and inhumane institution of slavery in the United States.

283.    Defendants have failed to account for and or return to plaintiffs and the plaintiff class the value of their ancestors' slave labor and/or the profits and benefits the defendants derived therefrom and defendants have concealed the nature and scope of their participation in the institution of slavery.

282.    The actions of the defendants in relation to the enslavement of plaintiff ancestors has resulted in an impoverishment to the plaintiff and the class of persons seeking relief and their ancestors, to the unjust enrichment of the defendants.

284. Defendant's failure to pay for the labor provided by the slaves without receiving any compensation, has allowed defendants to retain a benefit at the expense of the plaintiffs' and their ancestors.

285. There is an absence of legal or moral justification for the enrichment of the defendants and the impoverishment of the plaintiffs.

285. Plaintiffs and the class of persons sought to be represented are entitled to restitution for the unjust enrichment of the defendants.

285. The defendants and their past and present stakeholders were and are still being unjustly enriched via the conversion of the slaves' work without just compensation or consideration.

285. Additionally, the former slaves and the plaintiffs named herein were deprived of their moral and legal rights to seek and secure basic education, economic independence and the utilization of the natural law of self-preservation and human dignity. Accordingly, the defendants' actions were in violation of recognized common law.

286. The defendants named herein were unjustly enriched as a result of their participation in slavery. Defendants should not be allowed to continue to benefit from their improper actions.

287. Absent equitable relief under the theory of unjust enrichment or another theory contained herein, plaintiffs will be left without remedy.

288. As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d)

equitable disgorgement of all said monies, profits, and/or benefits derived by defendants'

exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional

limits of this Court and to be determined at the trial herein, together with interest, exemplary or

punitive damages, attorneys' fees and costs of this action.

## COUNT IV- REPLEVIN

289.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are

similarly situated, re-allege as if fully set forth, each and every allegation contained in the

preceding paragraphs.

290.    The defendants hold personal property that was never properly vested in them.

291.    Title to the property never vested in the defendants because the enslaved person's work

was unpaid, stolen and forcibly held.

292.    The plaintiffs hold a superior right of possession of the property.

293.    Defendants aided and abetted, conspired or otherwise acted jointly with others to deny

this right.

294.    The defendants are liable to the plaintiffs under the common law theory of replevin.

295.    The plaintiffs have demanded a return of the property and the defendants have refused.

296.    These parties fraudulently concealed the cause of action from the heirs or the estates, so

that the statute of limitations does not begin to accrue until the full facts of the cause of action

are reveled to the heirs and the estate, which will require disclosure by and discovery against

defendants, pursuant to Illinois Statute 13-215 (IL ST CH 110 Section 13-215 "Fraudulent

Concealment. If a person liable to an action fraudulently conceals the cause of such action from

the knowledge of the person entitled thereto, the action may be commenced at any time within 5

years after the person entitled to bring the same discovers that he or she has such cause of action,

and not afterwards.")

297.    Plaintiffs as the equitable and legal beneficiaries are entitled to the value of this property.

298.    As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand judgment against the defendants jointly, severally and/or in the alternative on this cause of action for, amongst other things: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court and to be determined at the trial herein, together with interest, exemplary or punitive damages, attorneys' fees and costs of this action.

## COUNT IV - 42 U.S.C. § 1982

299.    Plaintiffs incorporate all allegations contained elsewhere in this complaint within this section as if fully set forth herein.

300.    In conjunction with defendants' conduct as alleged elsewhere in this complaint that directly denied slaves of the fruits of their labor or otherwise resulted in defendants' profits directly related to slavery and the lives of slaves, the defendants' continuing conduct in restricting access to the defendants' records related to their activities and profits related and derived from slavery, the plaintiffs', their ancestors' and their descendants' rights to inherit and convey property under 42 U.S.C. § 1982 have been and continue to be violated.

301.    Specifically, 42 U.S.C. § 1982. Property Rights of Citizens, Civil Rights Act of 1866, provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

302. Defendants have engaged in conduct with the clear intent to deprive the plaintiffs, their ancestors and their descendants from having access to what is rightfully theirs which in turn denies them, in accordance with the defendants' clear intent, the opportunity to inherit and convey personal and real property representing their families' combined and accumulated wealth as do and have the white citizens of this country.

303. No non-slave or non-slave family has suffered the same or similar denial of wealth at the hands of the defendants' illegal profiting from slavery and continued pattern and practice of retaining this ill-gotten wealth by restricting from all members of the public access to information related to the defendants' activities and profits from slavery, as well as continued profits with this enormous and incomparable source of wealth.

## COUNT V - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

304. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs.

305. Defendants' predecessor companies aided or abetted, or under other theories of secondary liability as have been described more fully herein, participated in, allowed, or implicitly or recklessly, sanctioned, and/or benefited from an institution that relied in the sexual exploitation, violent abuse and rape to achieve its goals of a malleable and unpaid work force. The violence and crimes against the enslaved group were done with the calculated intent of demeaning, subjugating, and controlling the enslaved population for purposes of exploitation for profit and for the direct benefit of commercial industries. This wholesale sexual exploitation

resulted in the birth of countless racially mixed children who remained unclaimed by their fathers. It further resulted in and was intended to result in the creation of a belief structure founded on racial ideology based upon inequality.

306. Likewise, the defendants' predecessor companies aided or abetted or, under other theories of secondary liability, as have been described more fully herein, participated in, allowed, implicitly or recklessly, and/or benefited unjustly from human breeding whereby slave owners forced plaintiffs and plaintiffs' ancestors to have sex with multiple individuals in order to create a stronger, bigger and healthier enslaved person for exploitation for profit. The result of this was to demean and diminish the humanity of plaintiffs. African-Americans are still subject to the false legacies and harmful myths that grew out of this inhumane practice.

307. Defendants' predecessor companies aided or abetted, participated in, allowed, implicitly and/or recklessly sanctioned, and/or unjustly benefited from the wholesale torture of enslaved people. Abuse was used as mechanism to intimidate, control, and terrorize plaintiffs in order to prevent any resistance. Such torture also served to ingrain in the minds of plaintiff and plaintiffs' ancestors the belief of the omnipotence of the slave master. The torture was intended to have a long lasting impact on plaintiff, plaintiffs' ancestors and the rest of society. Acts of torture were usually public and intended to inflict significant fear among the enslaved and confidence by those in power that such treatment was legitimate.

308. The perpetuation of these false beliefs were done with the purpose to enslave plaintiffs and plaintiffs' ancestors for profits; in order to force the social death of plaintiff and plaintiffs' ancestors; in order to transform plaintiffs and plaintiffs' ancestors into a commodity to be worked, sold, and discarded without resistance with the intent to cause or with reckless disregard

of a substantial probability of causing severe emotional harm and distress of such intensity that no person could be expected to endure.

309.    This behavior resulted also in contagion and mass belief that plaintiffs and plaintiffs' ancestors were beasts, marginal, of inferior intellect, incapable of reason and logic, diseased, inhuman, unequal to whites, descendants of the devil, destined by God to be slaves to defendants and, incapable of being civilized. The result of this initial effort caused severe emotional harm and distress.

310.    As a result of defendants' wrongful acts and omissions, plaintiffs and the plaintiff class have been injured and demand monetary judgment against the defendants jointly, severally and/or in the alternative demand: (a) an accounting of the slave labor monies, profits and/or benefits derived by defendants; (b) a constructive trust in the value of said monies, profits and/or benefits derived by defendants' use of slave labor; (c) full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor; (d) equitable disgorgement of all said monies, profits, and/or benefits derived by defendants' exploitation of slave labor; and (e) other damages in an amount in excess of the jurisdictional limits of this Court. Plaintiffs further demand punitive damages to punish these defendants and deter others from committing the types of action herein described.

## COUNT VI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

311.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege, as if fully set forth, each and every allegation contained in the preceding paragraphs.

312.    At all time herein relevant the Defendant directly and through their predecessors had a duty to protect the enslaved Africans from the harms committed against them by the slave traders and others who profited from the enslavement of Africans in the United States.

313.    Notwithstanding its duties, the defendant committed one or more of the following negligent conducts: i) failed to stop the transportation of Africans across State lines for purposes of enslavement; ii) failed to release and free enslaved Africans who were entrusted to their care, custody and control; iii) failed to cease and desist from providing finances necessary for continuation of slave trade after it became illegal to engage in such conduct; iv) failed to prohibit the collection of levies, tax and duties from slave traders who transported Africans across internal waters after slavery had been abolished; v) failed to cease and desist from issuing insurance policies for the lives of enslaved Africans to prevent the heinous act of enslavement of fellow human being; vi) failed to protect enslaved Africans who were placed under their care, custody and control from physical torture, assault, battery, humiliations, rape, murder and other horrendous acts, and committed other negligent acts and omissions.

314.    As a result of one or more of the above listed wrongful acts and omissions, the Plaintiffs' and their deceased enslaved African ancestors suffered suffer emotional distress and mental anguish.

WHEREFORE, the Plaintiffs pray this Honorable Court to award damages in their favor and against the Defendants in an amount sufficient to satisfy the jurisdiction of this court and grant further relief that is just and equitable in this cause.

## COUNT VII – NEW YORK UDAP LAW CLAIM

315.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are

similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

Binning at an exact date unknown to plaintiffs, but at all times relevant herein, defendants have engaged in the practices described above as "Continued Intentional Misrepresentations" in New York.

316. The Continued Intentional Misrepresentations violate New York's UDAP Law, N.Y. GEN. BUS. LAW §§ 349 and 350.

317. Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York are unlawful. New York UDAP § 349.

318. False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in New York is also unlawful. New York UDAP § 350.

320. Any person who has been injured by reason of any violation of the New York UDAP may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or $50.00, whichever is greater, or both. The court may award enhanced damages to an amount not to exceed three times the actual damages up to $1,000.00, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff. New York UDAP § 349(h) and § 350-e(3).

321. The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

322.     Plaintiffs seek all actual damages, all enhanced damages and an injunction prohibiting Defendants from making the Continued Intentional Misrepresentations. Plaintiffs also seek an award of attorneys' fees and costs.

## COUNT IX – TEXAS UDAP LAW CLAIM

323.     Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

324.     Beginning at an exact date unknown to plaintiffs, but at all times relevant herein, defendants have engaged in the practices described above as "Continued Intentional Misrepresentations" in Texas.

325.     The Continued Intentional Misrepresentations violate Texas' UDAP, TEX. BUS. AND COM. CODE § 17.41 et seq.

326.     Plaintiffs and each member of the Class are consumers within the meaning of Texas UDAP § 17.45.

327.     Defendants have engaged in trade or commerce in Texas, both in general and by making the Continued Intentional Misrepresentations.

328.     Texas's UDAP declares that "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Texas UDAP § 17.46.

329.     The Continued Intentional Misrepresentations were likely to and did mislead and deceive reasonable consumers in material ways and respects.

330.     The Continued Intentional Misrepresentations were an "unconscionable actions and/or courses of action" within the meaning of the Texas UDAP because they, to consumers'

detriment, took advantage of the lack of knowledge, ability, experience, or capacity of consumers to a grossly unfair degree.

331.    The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

332.    Plaintiffs seek to have the Continued Intentional Misrepresentations enjoined and declared unlawful and also seek an order of the Court restoring to all class members any money or property that Defendants may have acquired in violation of the Texas UDAP by making the Continued Intentional Misrepresentations. Plaintiffs also seek an award of attorneys' fees, and costs.

## COUNT X – CALIFORNIA UDAP LAW CLAIM

333.    Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

334.    Beginning at an exact date unknown to plaintiffs, but at all times relevant herein, defendants have engaged in the practices described above as "Continued Intentional Misrepresentations" in California.

335.    The Continued Intentional Misrepresentations are acts of unfair competition and thus violate California's UDAP law, CAL. BUS & PROF. CODE § 17200 et seq.

336.    The Continued Intentional Misrepresentations are "unlawful." The Continued Intentional Misrepresentations are "unfair" because the gravity of the harm to the victims of defendants' practices outweighs the utility of the defendants' conduct. Moreover, each of the Continued

Intentional Misrepresentations offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

337.   The Continued Intentional Misrepresentations are "fraudulent" because members of the public are likely to be deceived by them.

338.   The Continued Intentional Misrepresentations present a continuing threat to members of the public in that defendants persist and continue to engage in Continued Intentional Misrepresentations, and will not cease doing so unless and until forced to do so by this Court.

339.   The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

340.   As a result of the Continued Intentional Misrepresentations, defendants have received and continue to wrongfully collect and to hold revenues from their wrongful business practices. Such revenues were obtained by defendants through the use of unlawful, unfair or fraudulent practices and defendant should be ordered to identify and locate all victims of its practices and make restitution to them to the full extent permitted under law. Plaintiffs also seek an award of attorneys' fees, and costs.

## COUNT XI – ILLINOIS UDAP LAW CLAIM

341.   Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

340.    Beginning at an exact date unknown to plaintiffs, but at all times relevant herein,

defendants have engaged in the practices described above as "Continued Intentional

Misrepresentations" in Illinois.

341.    The Continued Intentional Misrepresentations violate Illinois' UDAP law.

342.    Specifically, the Continued Intentional Misrepresentations violate Consumer Fraud Act,

815 ILCA Sec 505/1 et seq., which prohibits unfair methods of competition and unfair or

deceptive acts or practices, including but not limited to the use or employment of any deception

fraud, false pretense, false promise, misrepresentation or the concealment, suppression or

omission of any material fact, with intent that others rely upon the concealment, suppression or

omission of such material fact, or the use or employment of any practice described in Section 2

of the Illinois Uniform Deceptive Trade Practices Act. The Illinois Uniform Deceptive Trade

Practices Act, 815 ILCA § 510/1 et seq., prohibits a variety of deceptive trade practices,

including the Continued Intentional Misrepresentations, which create a likelihood of confusion

or misunderstanding.

343.    Plaintiffs and each member of the Class are consumers within the meaning of Illinois

UDAP § 505/1.

345.    Defendants have engaged in trade or commerce in Illinois, within the meaning of Illinois

UDAP § 505/1, both in general and by making the Continued Intentional Misrepresentations.

346.    Illegal practices in the conduct of trade or commerce are prohibited by the Illinois

Consumer Fraud Act regardless whether any person has in fact been misled, deceived or

damaged. Illinois UDAP § 505/2.

347.    Any person who suffers actual damage as a result of a violation of the Illinois Consumer

Fraud Act committed by any other person may bring an action against such person. The court

may award actual economic damages or any other relief which the court deems proper, including injunctive relief and reasonable attorney's fees and costs. Illinois UDAP § 505/10a. A plaintiff need not prove competition between the parties or actual confusion or misunderstanding. Illinois UDAP § 510/2.

348.     The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

349.     Pursuant to the provisions of Illinois UDAP Law, Plaintiffs seek all actual economic damages and an injunction prohibiting Defendants from making the Continued Intentional Misrepresentations. Plaintiffs also seek an award of attorneys' fees and costs.

## COUNT XII – LOUISIANA UDAP LAW CLAIM

350.     Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

351.     Beginning at an exact date unknown to plaintiffs, but at all times relevant herein, defendants have engaged in the practices described above as "Continued Intentional Misrepresentations" in Louisiana.

352.     The Continued Intentional Misrepresentations violate Louisiana's UDAP Law, LA. R.S. 51:1401 et seq.

353.     Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Louisiana UDAP Law § 51-1405.

354. Plaintiffs and each member of the Class are consumers within the meaning of Louisiana UDAP Law § 51-1402.

355. Defendants have engaged in trade or commerce in Louisiana, both in general and by making the Continued Intentional Misrepresentations.

356. A person who suffers any ascertainable loss of money or movable property may bring an action for damages. Louisiana UDAP Law § 51-1409.

357. The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

358. Plaintiffs seek all actual economic damages and an injunction prohibiting Defendants from making the Continued Intentional Misrepresentations. Plaintiffs also seek an award of attorneys' fees and costs.

## COUNT XIII – NEW JERSEY UDAP LAW CLAIM

359. Plaintiffs on behalf of themselves, their ancestors and all other descendants who are similarly situated, re-allege as if fully set forth, each and every allegation contained in the preceding paragraphs.

360. Beginning at an exact date unknown to plaintiffs, but at all times relevant herein, defendants have engaged in the practices described above as "Continued Intentional in New Jersey.

361. The Continued Intentional Misrepresentations violate New Jersey's UDAP Law. N.J.S.A. § 56:8-1 et seq.

362.    The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate is an unlawful practice. New Jersey UDAP Law § 56:8-2.

363.    The New Jersey UDAP applies whether or not any person has in fact been misled, deceived or damaged by a violation. New Jersey UDAP Law § 56:8-2.

364.    Any person violating the provisions of the New Jersey UDAP Law is liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful. New Jersey UDAP Law § 56:8-2.11. This refund may be recovered in a private action. New Jersey UDAP Law § 56:8-2.12.

365.    The Continued Intentional Misrepresentations were a direct, foreseeable, producing, and proximate cause of monetary and other economic damages to Plaintiffs and the other members of the Class in amounts yet to be determined and, unless enjoined, will continue to cause such damage to Plaintiffs and the other members of the Class.

366.    Plaintiffs seek all actual economic damages and an injunction prohibiting Defendants from making the Continued Intentional Misrepresentations. Plaintiffs also seek an award of attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the plaintiff class demand judgment against the Defendants, jointly and severally, in an amount to satisfy the jurisdictional limitation of this Court. Plaintiffs request the Court to award punitive sufficient to punish these defendants and

deter others from committing similar acts in the future.   Additionally, Plaintiffs request the

Court to grant the following equitable relief:

(1) For an accounting;
(2) For the imposition of a constructive trust;
(3) For restitution of the value of their ancestors' slave labor;
(4) For restitution of the value of Defendants' unjust enrichment based upon slave labor; and
(5) For the cost of this action; and


Dated: April 5, 2004
Chicago, IL


LIONEL JEAN-BAPTISTE, ESQ.
**Jean-Baptiste & Associates**
1900 Asbury Avenue
Evanston, Illinois 60201
(847) 424-0400

ROGER S. WAREHAM, ESQ. (RW 4751)
JOMO SANGA THOMAS, ESQ. (JT 7544)
**Thomas Wareham & Richards**
527 Flatbush Avenue, Suite 2
Brooklyn, New York 11225
(718) 941-6407


EDWARD D. FAGAN, ESQ. (EF-4725)
**Fagan & Associates**
51 JFK Parkway
1st Floor, West
Short Hills, NJ  07078
(973) 218-2610

**GARY L. BLEDSOE, ESQ.**
312 W. 12th Street, Suite 307
Austin, Texas 78701
512-322-9992
Fax 512-322-0840
Texas Bar # 02467500
Attorney of Record

**BENJAMIN NWOYE, ESQ.**
**Mandoza & Nwoye**
180 N. Michigan Ave
Suite 1900
Chicago, IL 60606

**ROBERT NOTZON, ESQ.**
509 W. 16th Street
Austin, Texas 78701
512-474-7563
Fax 512-474-9489
Texas Bar # 00797934

**MORSE GELLER, ESQ.**
116-10 Queens Boulevard
Forest Hills, New York 11375
(718) 520-0300

**PIUS A. OBIOHA, ESQ.**
1546 North Broad Street
New Orleans, Louisiana 70119
504-944-1049

**BRYAN R. WILLIAMS, ESQ.**
46 Trinity Place, 4th Floor
New York, New York 10006
(212) 505-1800

**DUMISA BUHLE NTSEBEZA**, Judge Advocate
718 Hugenot Chambers
40 Queen Victoria Street
8001, Cape Town
Republic of South Africa
(Special Advisor to the Plaintiff Class)

**ROLAND W. BURRIS, ESQ.**
1130 S. Wabash Avenue, Suite 501
Chicago, IL 60605
Special Advisor to the Plaintiff Class
(312) 566-0202

_Joseph M. Wright_

**JOSEPH M. WRIGHT, J.D., Ph.D.**
Chief Deputy Court Administrator
 & Associate Judicial Attorney
State of Michigan
36th District Court
421 Madison Avenue
Suite 5028
Detroit, Michigan  48226
(313) 965-2788


_Harry E. Cantrell_

**HARRY E. CANTRELL JR., ESQ.**
The Cantrell Law Firm
309 Baronne Street
Suite 300
New Orleans, Louisiana  70112-1605
(504) 585-7347


_Larry Kennon_

**LARRY KENNON, ESQ.**
205 W. Randolph Street, Suite 1245
Chicago, IL 60606