## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE AFRICAN-AMERICAN SLAVE | ) | MDL No. 1491 |
| DESCENDANTS LITIGATION | ) | Lead Case No. 02 C 7764 |
| | ) | Honorable Charles R. Norgle |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendants' Joint Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint. For the following reasons, the motion is granted with prejudice.

## I. INTRODUCTION

This case arises out of the institution of human chattel slavery as it existed in the North American colonies and the later formed United States of America. The allegations in Plaintiffs' Second Consolidated and Amended Complaint ("SCAC" or "Complaint") retell the generally acknowledged horrors of the institution of slavery, and the malignant actions of the sovereigns, entities, and individuals, foreign and domestic, that supported that institution. Plaintiffs' Complaint asks the courts to reexamine a tragic period in our Nation's history and to hold various corporate defendants liable for the commercial activities of their alleged predecessors before, during, and after the Civil War in America. Defendants acknowledge that slavery marked a deplorable period in our Nation's history. However, they assert that Plaintiffs' claims, which arise from that period, cannot be heard in 2005 in a court of law.

## II.  HISTORICAL OVERVIEW OF SLAVERY IN AMERICA

In essence, Plaintiffs' Complaint is a claim for reparations rooted in the historic injustices and the immorality of the institution of human chattel slavery in the United States.  To elucidate the nature of this institution, the court undertakes an analysis, necessarily brief, of the historical events surrounding slavery, including the monumental event that ended the institution of slavery in the United States, the Civil War.  The court also undertakes a brief analysis of the present day slave reparations movement, in order to illuminate the larger political context into which this case falls.

### A.  A Definition of Slavery

In January of 1865, General William Tecumseh Sherman of the Union forces, along with Secretary of War Edwin Stanton, met with former slaves.  Ira Berlin, Generations of Captivity: A History of African-American Slaves 2 (2003).  The conversation focused on two questions: from the point of view of the freed slave, what was the nature of slavery, and what was the nature of freedom?  Id.  Garrison Frazier, a sixty-seven year old former slave, explained that "[s]lavery . . . is receiving by the *irresistible power* the work of another man, and not by his *consent*."  Id. Freedom, Frazier indicated, "is taking us from the yoke of bondage, and placing us where we could reap the fruits of our own labor, take care of ourselves and assist the Government in maintaining our freedom."  Id.  Frazier's definition reminds us of the essential unfairness of slavery: the slaveowner takes, by sheer violence and force, the slave's freedom and labor in order to place himself at the top of a society's economic hierarchy.  Id. at 3.

**B. A Brief History of Slavery in the New World**

While slavery seems to have been a part of human history since the "dawn of civilization," African slave trafficking in the New World began in the year 1502. Robert William Fogel, Without Consent or Contract: The Rise and Fall of American Slavery 17-18 (1991). Europeans were historically drawn to Africa for two reasons: gold and slaves. Edward Reynolds, Stand the Storm, A History of the Atlantic Slave Trade 28 (1985). Those who journeyed to Africa seeking slaves for the New World sometimes simply kidnapped individuals who appeared before them by happenstance. Herbert S. Klein, The Atlantic Slave Trade 103 (1999). However, historical evidence indicates that a great deal (perhaps even the majority) of the slave trade was made possible by African leaders who sold African slaves to European slave traders. Id.; see also Reynolds, supra at 33-46 (providing a detailed explanation of the African slave market, and the economic mechanisms used to facilitate the sale of slaves from local African chiefs to slave traders). Local African leaders acquired these slaves in several different ways: captives were taken in local wars or raids, those imprisoned for crimes or indebtedness were often forced into slavery, and large states would exact slaves as "tribute" from smaller tribes under their control. See Klein, supra at 117.

Upon their sale to slave traders, slaves were shipped to the New World in what became known as the "Middle Passage." Slaves' heads were shaved, their bodies were branded and stripped naked, and their ankles were shackled. See Reynolds, supra at 47. They were then led into the holds of slave ships, where they were laid down alongside each other for the journey to the New World. Id. at 48. The prevalence of disease, lack of sufficient food and water, and

3

constant confinement took its toll, with up to one-quarter of the slaves on any given ship dying during the "Middle Passage." Id. at 48-53.

African slaves in the New World were initially sold into small sugar production operations in Brazil, Mexico, Peru, Cuba, Haiti, Jamaica, the British West Indies, and Dutch Guyana. Id. at 20-21. Other African slaves were set to work producing such crops as cocoa, coffee, hemp, tobacco, and rice. Id. at 21. By the 1680s, the small farm with its traditional methods of operation had given way to more efficient means of production, and the concept of the large "plantation" was born. Id. at 23. Inefficient methods of farming had been "replaced by large gangs of slaves, working in lock step, and moving methodically across vast fields." Id. With this change came an increase in the size of slave operations. By the early part of the 1800s, many plantations in Jamaica and the West Indies contained up to two hundred and fifty slaves. Id.

Slavery in North America began more slowly than slavery in South America and the Caribbean. In 1680, there were 7,000 slaves in the British North American colonies. Id. at 29. Slavery as an economic institution in North America, however, rapidly gained momentum over the next fifty years. By the 1730s, roughly 120,000 slaves had been brought to the colonies and forced to work in such industries as farming, tobacco production, and domestic service. Id. By the middle of the 1700s, the institution of slavery in the United States began to concentrate in the Southern colonies. It was in these colonies that plantations emerged, ready to take advantage of the inexpensive labor slaves provided in the production of such crops as tobacco, rice, sugar, and cotton. Id. at 31.

During the years 1780 to 1810, the rapid expansion of these industries was accompanied by a significant increase in the number of slaves imported from Africa. Id. at 32. The increase in the importation of slaves, along with the natural increase in the slave population, soon gave the United States a dubious distinction. By 1825, the population of slaves in the United States was roughly 1,750,000, making the United States the "leading user of slave labor in the new world." Id. at 33. Slavery had become the dominant economic force in the Southern United States. Historians cite numerous factors for this development, but it seems that two factors are the most significant. First, slave labor was inexpensive compared to other sources of labor. Id. at 34. Second, slave masters in the Southern states were willing to expend an "enormous, almost unconstrained degree of force . . . to transform ancient modes of labor into a new industrial discipline." Id. This "new industrial discipline" was based on a division of labor scheme, enforced by brutality, and legally sanctioned.

## C. Slavery and American Law

This violent and oppressive system was supported by the United States legal system for a long period of time. Thus slavery was historically more than simply a social and economic institution. It was also an established legal institution.[1] For instance, Article I, Section 9 of the United States Constitution has been traditionally understood to limit Congress' power to regulate slavery.[2] It is thought that this Article meant that Congress was denied the power to regulate the

---

[1] Some Northern state statutes, however, stood firmly in opposition to slavery. See infra Part II.E (discussing the Personal Liberty Laws enacted in Northern States).

[2] "The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person." U.S. Const. art I, § 9, cl. 1.

"internal slave trade, leaving only importation from Africa to be prohibited after 1808." Walter

Berns, The Constitution and the Migration of Slaves, 78 YALE L.J. 198 (1968). Also, in 1850,

Congress passed a statute supporting the rights of slaveowners to capture escaped slaves. The

Fugitive Slave Act provided that:

> [W]hen a person held to service or labor in any State or Territory of the United
> States, has heretofore or shall hereafter escape into another State or Territory of
> the United States, the person or persons to whom such service or labor may be
> due . . . may pursue and reclaim such fugitive person . . . [and may] take and
> remove such fugitive person back to the State or Territory whence he or she may
> have escaped as aforesaid.

The Fugitive Slave Act, ch. 60, § 6, 9 Stat. 462 (1850). This Act also provided for fines and/or

imprisonment for those who aided escaped slaves, and stipulated that both law enforcement

personnel and ordinary citizens were bound by law to aid in the capture of escaped slaves. Id.

Finally, in the infamous case of Dred Scott v. Sandford, Scott, a slave, brought suit to gain his

freedom. 60 U.S. 393 (1856). The Supreme Court of the United States held that since Scott was

a "negro, whose ancestors were imported into this country, and sold as slaves," he could not be a

citizen of the United States, and hence had no standing to bring suit in a United States court. Id.

at 403-04.

**D. Slavery and Morality**

The immorality of the institution of slavery is obvious. However, scholars have

attempted to explain exactly what it is about this institution that offends moral sensibilities. Two

moral indictments of the institution are significant. First, "slavery permitted one group of people

to exercise unrestrained personal domination over another group of people." Fogel, supra at 394.

6

The slave was subject to abject cruelty, both physical and psychological, by his or her masters in order for the master to maintain domination. Id. In one sense, "[t]he extreme degree of domination required by this system . . . is the essential crime." Id. Second, the slave was denied the fruits of his or her labor. Id. at 395. Slaves were forced to work at physically grueling tasks for very long hours without pay, thus it was impossible for the slave to improve his or her economic position within society. Id. The slave simply had no resources or "opportunity . . . to rise on the economic ladder by acquiring land, labor skills, and other forms of capital." Id.

**E. Slavery as a Cause of the Civil War**

Historians have long debated whether slavery was the single driving force behind the regional tensions in the United States that eventually led to the Civil War. "Although some scholars have held that slavery was *the* cause [of the Civil War], others have developed complex analyses that draw distinctions between immediate and ultimate causes and that explore a variety of ways other than war that could have settled or at least contained the issue of slavery." Id. at 411. This much, however, is clear: by 1861, tensions between the North and the South had escalated to the extent that maintaining peace would have required that the Northern states allow the permanent "existence of an independent confederacy dedicated to the promotion of slavery." Id. at 413. In other words, by 1861, tensions between the North and the South had increased to such a pitch that the only way slavery would be abolished throughout the entire nation was through armed conflict.

A great deal of the tension between the North and the South had to do with the Northern states' promulgation of Personal Liberty Laws. "In his annual message to Congress of

December 3, 1860, [President] James Buchanan warned that the South 'would be justified in revolutionary resistance to the Government of the Union' if northern states did not repeal their Personal Liberty Laws."  Thomas D. Morris, <u>Free Men All:  The Personal Liberty Laws of the North 1780-1861</u> 202 (1974).  These laws were devised and implemented by many Northern states to make it very difficult for slave owners to capture escaped slaves who had taken up residence in those states.

The court does not claim objective knowledge of the ultimate cause of the Civil War.  Certainly, however, tensions marked by the North's moral outrage at the institution of chattel slavery, and the South's indignation at the North's promulgation of Personal Liberty Laws, contributed significantly to the advent of war.

## F.  The Civil War

Fort Sumter, located in the Charleston harbor, South Carolina, was one of just four Federal fortifications left in Confederate territory in 1861.  Shelby Foote, <u>The Civil War, A Narrative:  Fort Sumter to Perryville</u> 44 (Vintage Books 1986) (1958).  The government of South Carolina had made protests to Washington regarding the presence of a Federal fortification within its borders, but those protests were ignored.  <u>Id.</u>  Instead, Washington decided to reinforce Fort Sumter with men and supplies.  <u>Id.</u>  However, when local gunmen opened fire on a Union steamer attempting to bring these reinforcements to Fort Sumter, the steamer was forced to turn away.  <u>Id.</u>  By March of 1861, Fort Sumter was surrounded by Confederate forces, and was cut off from fresh supplies.  <u>Id.</u>  By April of that year, the Federal forces inside Fort Sumter were in danger of starving to death.  <u>Id.</u> at 48.  The time had come for Washington to make a decision—

8

abandon Fort Sumter, or again attempt to resupply it. Washington was aware that another attempt to bring supplies to Fort Sumter might well provoke an attack on the fort itself. Id. at 47. This time, however, the attack would not come from local gunmen, but from Confederate forces. Id. Washington decided not to cave in to Confederate pressures, and attempted to bring fresh provisions and reinforcements to the fort. Id. at 47. On the morning of April 12, 1861, with Union supply ships within sight of Fort Sumter, the Confederacy fired the first shot of the Civil War. Id. at 49.

The four-year Civil War was fought by means of a series of pitched battles, each one seemingly more horrific than the last. The first true battle of the war, the battle of Bull Run, resulted in the deaths of roughly 2,700 Union soldiers and 2,000 Confederate soldiers. *The Price in Blood, Casualties in the Civil War*, *at* http://www.civilwarhome.com/casualties.htm. Other battles, at places like Gettysburg, Antietam, Fredericksburg, Wilson's Creek, Spotslyvania, Cold Harbor, and Franklin took the lives of tens of thousands of Union and Confederate soldiers. Id. The final campaign of the war, fought in the vicinity of Appomattox, Virginia, resulted in a combined 17,500 battle deaths. Id.

Following the Appomattox campaign, on April 9, 1865, Union General Ulysses S. Grant received Confederate General Robert E. Lee at Appomattox Courthouse, where the two generals agreed upon the terms of Lee's surrender. Shelby Foote, The Civil War, A Narrative: Red River to Appomattox 945-51 (Vintage Books 1986) (1974). Shortly thereafter, Grant rode out towards his headquarters, where Union batteries were firing in celebration. Id. at 950-51. Grant insisted the batteries stop firing, worried that the noise might spark a skirmish between his troops and the nearby, and still armed, Confederate soldiers. Id. at 951. There was, however, another more

important reason Grant considered it "unfitting" for his troops to be firing their weapons at that point: "'The war is over,' he told his staff. 'The rebels are our countrymen again.'" Id.

All in all, approximately 620,000 Americans died in the Civil War; Union forces fighting to end slavery suffered 360,000 of these deaths. James M. McPherson, Battle Cry of Freedom: The Civil War Era 854 (Oxford University Press 1988). There were 178,975 African-American Union troops that fought in the Civil War, and 36,000 of those troops died during the war. *The Price in Blood, Casualties in the Civil War*, *at* http://www.civilwarhome.com/casualties.htm. An analysis as brief as this cannot do justice to the tremendous sacrifices made by both Union and Confederate soldiers in this war. Since the Civil War, America has been involved in a number of armed conflicts, but, by some estimates, the fatalities America suffered in the Civil War exceeds the total number of fatalities America has suffered in all its other wars. Id. The Civil War, the war that ended the institution of chattel slavery in the United States, was truly America's bloodiest war.

**G. The Abolishment of Slavery**

On January 1, 1863, in the midst of the Civil War, President Abraham Lincoln issued the Emancipation Proclamation. That document reads in part: "I do order and declare that all persons held as slaves within said designated States . . . are, and henceforward shall be free . . . ." Abraham Lincoln, The Emancipation Proclamation, Exec. Proclamation No. 17 (Jan. 1, 1863), reprinted in 12 Stat. 1268 (1863).

Following the war, Congress acted to formally abolish slavery by proposing the Thirteenth Amendment to the United States Constitution. That Amendment was ratified on

December 6, 1865. Section 1 of that Amendment reads: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

Also, the Fourteenth Amendment to the United States Constitution was ratified on July 9, 1868. Section 1 of that Amendment reads: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. In effect, the Fourteenth Amendment overruled the Dred Scott decision, making freed slaves citizens of the United States.

Following the Civil War, the South was bankrupt, and an estimated four million African-Americans assumed the responsibilities of freedom as nationalism emerged. These lingering effects led to the Reconstruction era, a significant period in our Nation's history, which addressed the numerous issues raised by the abolition of slavery and the war fought to achieve that end.

**H. The Modern Slave Reparations Movement**

Plaintiffs' Second Consolidated and Amended Complaint falls within the broader context of a present and ongoing social and political movement for slave reparations in America. In order to properly place this suit within the context of that movement, the court offers a brief analysis of recent efforts undertaken by various groups to gain reparations for the historic injustices of slavery.

11

### 1.  A Definition of "Reparations"

A complete definition of the term "reparations" will answer, at least, the following questions.  What political, moral, or legal justification is there for the assertion that descendants of slaves are owed some sort of reparations?  What are the arguments against reparations?  Assuming reparations are justified, what form should these reparations take?  Which specific individuals or groups will pay these reparations?  To which specific individuals or groups will these reparations be paid?

In general, reparations advocates argue that reparations are justified because America itself owes a debt to the descendants of slaves.  America owes this debt, advocates assert, simply because the slaves themselves were never paid for their labor.  "[B]lack people worked long, hard, killing days, years, centuries - and they were never *paid* . . . .  There is a debt here." Randall Robinson, <u>The Debt: What America Owes to Blacks</u> 207 (2000).  In other words, the basic moral principle of fairness, and the fundamental legal principle that parties must repay their debts, justifies reparations.  "[B]elief in the fairness of reparations requires at the intellectual level acceptance of the principle that the victims of unjust enrichment should be compensated.  Under reparations, Blacks more readily may position themselves as creditors seeking payment of an overdue debt, rather than as racial supplicants seeking an undeserved preference."  Robert Westley, <u>Many Billions Gone: Is It Time to Reconsider the Case for Black Reparations?</u>, 40 B.C. L. REV. 429, 436 (1998).

Other advocates argue that reparations are justified as a way to "repair a country by creating a sense of mutual, interracial trust, respect, and shared destiny."  Note, <u>Bridging the</u>

Color Line: The Power of African-American Reparations to Redirect America's Future, 115 HARV. L. REV. 1689, 1689-90 (2002) (hereinafter, "Note"). Still others argue that reparations for descendants of slaves are justified because other groups that have suffered historical harms have been able to obtain reparations. See Alfred L. Brophy, Some Conceptual and Legal Problems in Reparations for Slavery, 58 N.Y.U. ANN. SURV. AM. L. 497, 499 (2003) (hereinafter "Conceptual and Legal Problems") (noting that "Native Americans, Holocaust victims, [and] Japanese Americans interned during World War II" have obtained reparations).

However, opponents of slave reparations identify a number of reasons, they assert, that reparations are unjust or unwise. Alfred L. Brophy, The Cultural War over Reparations for Slavery, 53 DEPAUL L. REV. 1181, 1201-02 (2004) (hereinafter "Cultural War"); see also David Horowitz, Uncivil Wars: The Controversy over Reparations for Slavery 12-16 (2002) (identifying ten separate arguments against reparations). The court will briefly summarize what seem to be the most cogent of these arguments. Some assert that there is no genuine moral or legal liability on the part of those who are currently asked to pay the reparations. Cultural War, supra, at 1202-06. This argument focuses on the fundamental notion that "one should be liable only for the harms one causes . . . ." Id. at 1202. Since today's Americans do not hold slaves, the argument goes, today's Americans are not morally or legally liable for the evils of slavery. Id. Others argue that the reparations asked for have, in fact, already been paid.

> Since the passage of the Civil Rights Act and the advent of the Great Society in 1965, trillions of dollars in transfer payments have been made to African-Americans in the form of welfare benefits and racial preferences (in contracts, job placements and educational admissions) . . . . It is said that reparations are necessary to achieve a healing between African-Americans and other Americans.

> If trillion-dollar restitutions and a wholesale rewriting of American law (in order
> to accommodate racial preferences) is not enough to achieve a "healing," what is?

Horowitz, supra, at 14; see also CHICAGO, ILL., ORDINANCE 2-92-420 et seq. (providing that "Minority-owned business[es]," including those businesses owned by African-Americans, are to receive at least twenty-five percent of the dollar value of any contract, purchase order, or agreement awarded by the City of Chicago). Some also argue that the Civil War itself was payment, in blood and human lives, for slavery. Cultural War, supra, at 1208; see also Horowitz, supra, at 15 ("If not for the sacrifices of white soldiers and a white American president who gave his life to sign the Emancipation Proclamation, blacks in America would still be slaves"). Finally, a common argument made against reparations is that reparations talk is divisive, and continues to enmesh African-Americans in a culture of victimhood. Cultural War, supra, at 1209-10 ("[talk of reparations] makes blacks think that whites as a group are their oppressors; it makes whites who have no responsibility for the sins of the past feel like oppressors and plays on feelings of guilt").

Advocates of reparations differ in their assessments of exactly what form reparations ought to take. Some reparations advocates assert that reparations should start with a formal apology from America, as well as the establishment of "truth commissions" to investigate the complicity of various groups or organizations in slavery. Cultural War, supra, at 1185-1189; see also CHICAGO, ILL., ORDINANCE 2-92-585 (requiring parties entering into contracts with the city to search company records, and provide "full and accurate disclosure to the public about any slavery policies sold by any companies, or profits from slavery by other industries (or their predecessors) who are doing business with the city"); S. Res. 39, 109th Cong. (2005) (formally

14

apologizing for the Senate's failure to enact anti-lynching legislation, and expressing sympathy to the descendants of victims of lynching). Apologies, "truth commissions," and local ordinances requiring companies to disclose ties to slavery, are thought by some to be a first step along the road to full reparations. "By preparing people to understand the nature of the harm and why reparations are needed, they are a way of making the claim before the public." Cultural War, supra, at 1188.

Most commonly, however, the term "reparations" simply means some sort of financial compensation for descendants of slaves. Some reparations advocates have proposed that reparations take the form of a "trust . . . established for the benefit of all Black Americans." Westley, supra, at 470; see also Robinson, supra, at 244-45. This trust "should be financed by funds drawn annually from the general revenue of the United States," and the funds would "be expendable on any project or pursuit aimed at the educational and economic empowerment" of African-Americans. Westley, supra, at 470. Specifically, advocates of reparations assert that trust funds should be used to finance the creation of special schools for black children found to be "at risk in unhealthy family and neighborhood environments." Robinson, supra, at 244-45. These funds could also be used to finance the work of black political and advocacy groups. Id. at 245-46. Other reparations advocates propose that reparations take "the form of subsidies to black-owned businesses, investment in education programs and scholarships for black youths, training programs for black workers, affirmative action programs, resources for community-based organizations in predominantly black communities, and development and implementation of programs designed to educate the country about the legacy of slavery." Note, supra, at 1690.

The reparations movement has thus moved towards the notion that reparations should be directed towards certain groups of people, rather than specific individuals. "Pro-reparation positions more readily see harm to entire groups and want to repair that economic and psychological harm." Conceptual and Legal Problems, supra, at 509; see also Robinson, supra, at 244-46 (advocating group reparations). The group entitled to receive reparations would obviously consist of descendants of slaves, and determining exactly who is and is not a member of this group could be done in a number of different ways. See Kevin Hopkins, Forgive U.S. Our Debts? Righting the Wrongs of Slavery, 89 GEO. L.J. 2531, 2542 (2001) (proposing that genealogical research, blood testing, or genetic mapping could be used to determine whether one is a legitimate descendant of slaves).

However, there may well be no perfect method of determining exactly who is a descendant of a slave, and thus a member of the group entitled to receive reparations. See id. at 2542-2547. Genealogical research "often fails to provide significant information about a person's ancestry." Id. at 2543. The blood, or "one-drop," test (whereby anyone with any trace of African ancestry is deemed part of the group entitled to receive reparations) "fails to differentiate between descendants of U.S. slaves and those of other nationalities with African heritage . . . ." Id. at 2544. Genetic mapping, or DNA testing, is more promising than the above two methods, but "alone is insufficient to provide a decisive link to a homeland . . . ." Id. at 2547.

The question of who ought to pay the reparations is also complex. The value of slaves' unpaid labor, reparations advocates argue, was scattered amongst numerous entities: "plantation owners, northern entrepreneurs, state treasuries, the United States government." Robinson, supra,

at 207. In the case presently before the court, the Plaintiffs have chosen to bring suit against private entities, the corporations who allegedly held slaves, and their successors in interest. For example, the first named Defendant is FleetBoston Corporation, which Plaintiffs allege is a successor in interest to Providence Bank, which allegedly financed and profited from the slave trade. SCAC, ¶¶ 116-126. Many reparations advocates, however, focus their attention on the United States government as the proper party to pay reparations. See Note, supra, at 1700 ("Reparations are not intended to hold individual Americans living today morally responsible for the acts of their forefathers, but rather to insist that the country apologize for its wrongful acts and take the necessary steps to bridge the racial divide and to alleviate the economic and social disparities that resulted from those acts."); see also Hopkins, supra, at 2551-52 (advocating that the United States government pay these reparations).

The following general definition of slave "reparations" thus emerges. "[R]eparations mean truth commissions that document the history of racial crimes and the current liability for those crimes, apologies that acknowledge liability, and payments to settle the account." Cultural War, supra, at 1190. These payments may be made in the form of a trust, with the descendants of slaves named as trust beneficiaries, or other forms of subsidies given to the descendants, and could be made by private entities who have allegedly profited from slavery (as the plaintiffs in the instant suit urge). The reparations movement more commonly insists, however, that the United States government should make these payments. Reparations are justified, advocates argue, on several grounds, including that of an alleged moral and legal debt owed to descendants of slaves, and the historical precedents of reparations for the victims of other historical injustices. However, there are a number of cogent arguments against reparations, including the arguments

17

that present day Americans are not morally or legally liable for historical injustices, that the debt to African-Americans has already been paid, and that reparations talk is divisive, immersing African-Americans in a culture of victimhood.

### 2. Previous Attempts at Slave Reparations

Reparations advocates identify five different time periods during which reparations for slavery were seriously discussed in one form or another. See Vincene Verdun, If the Shoe Fits, Wear It: An Analysis of Reparations to African Americans, 67 TUL. L. REV. 597, 600 (1993). First, during and immediately after the Civil War, both Congress and President Lincoln attempted to confiscate property from former slaveowners, and to redistribute that land to former slaves. Id. at 600-01. These attempts ultimately failed in 1865, when President Johnson ordered that lands be returned to their "pre-Civil War owners." Id. at 602.

The second period of attempts at slave reparations, occurring near the turn of the century, included attempts to establish pension funds for former slaves. Id. at 602-03. The third attempt at reparations, occurring during World War II, was not a proposal to pay African-Americans a sum of money; the proposal was rather to "provid[e] for the migration and colonization of negroes to newly acquired territories." Id. at 603. The fourth period of attempts at reparations coincided with the civil rights movement of the 1960's. Id. Various black activists such as James Forman, Audley Moore, and Dr. Martin Luther King, Jr., demanded, or in some cases, hinted at, slave reparations for African-Americans. Id. at 603-05. For example, in his celebrated "I Have a Dream" speech, Dr. King asserted that "America has given the Negro people a bad check, which has come back marked 'insufficient funds.'" Id. at 604.

18

Finally, the fifth, and current period of attempts at slave reparations began with the Civil Liberties Act of 1988.  Id. at 605-06.  This Act provided $20,000, and a formal apology from the United States government to Japanese-Americans who were interned during World War II.  Pub. L. No. 100-383, 102 Stat. 903 (1988); see also Korematsu v. United States, 323 U.S. 214 (1944) (upholding the constitutionality of military and executive orders issued during World War II which excluded individuals of Japanese descent from the West Coast, and provided for the detention of those individuals in "assembly or relocation centers").  Seizing on what appeared to be Congress' willingness to right the wrongs of history, reparations activists began their efforts anew.  Numerous grassroots organizations formed to advocate slave reparations.  Verdun, supra, at 606 nn.26-27.  In 1989, U.S. Representative John Conyers introduced a bill that would have established a commission to study the effects of slavery on present day African-Americans, and to study whether reparations would be appropriate.  H.R. 3745, 101st Cong. (1989).  The preamble to Conyers' proposed legislation stated that its intent was

> to acknowledge the fundamental injustice, cruelty, brutality, and inhumanity of slavery in the United States and the 13 American colonies between 1619 and 1865 and to establish a commission to examine the institution of slavery, subsequent de jure and de facto racial and economic discrimination against African Americans, and the impact of these forces on living African Americans, [and] to make recommendations to the Congress on appropriate remedies, and for other purposes.

Id.  Conyers has introduced similar legislation to each Congress since 1989, but none of these bills has made it out of committee.  See, e.g., H.R. 40, 108th Cong. (2003), H.R. 40, 107th Cong. (2001).

### 3.  *The Legislature as the Proper Forum to Achieve Slave Reparations*

19

Despite Representative Conyers' lack of success before Congress, some reparations activists today still assert that the legislature, rather than the courts, is the best forum in which to introduce their claims.  See, Westley, supra, at 436 ("It is Congress, and perhaps the legislatures of the former slave states, that must be persuaded to enact reparations"); Note, supra, at 1704 ("There are concrete benefits of working in the legislative branch rather than the judicial branch").  Activists acknowledge that there are significant problems involved with bringing the issue of reparations for slavery before a court of law.

The specific problem with bringing this issue before a court is that courts are equipped for, and charged with the responsibility of, "dealing with claims by well-identified victims against well-identified wrongdoers . . . ." See Conceptual and Legal Problems, supra, at 502. Claims asserting harms against groups of long dead victims, perpetrated by groups of long dead wrongdoers, are particularly difficult to bring in modern American courts of law.  "First, the victims are making claims against people who are not themselves wrongdoers.  Furthermore, that defendant class may not have any current benefit from the harm . . . .  Often the perpetrators cannot be identified with specificity or are no longer alive."  Id. at 503.  For these reasons, plaintiffs in reparations suits will inevitably face the conceptual problems of standing and statutes of limitations.  Westley, supra, at 435.  However, reparations advocates who bring their claims before legislatures face no such problems.  "[L]egislatures may hold hearings, make findings, and pass resolutions or laws on any matter affecting the public interest and within the scope of constitutional power.  Substantively, legislatures provide a friendlier forum than courts for racial remedies."  Id.

In addition to reparations offered to Japanese individuals interred during World War II, at least one state legislature has passed a bill authorizing reparations for past racial injustices. See C. Jeanne Bassett, House Bill 591: Florida Compensates Rosewood Victims and Their Families for a Seventy-One-Year-Old Injury, 22 FLA. ST. U. L. REV. 503 (1994). In January 1923, the small town of Rosewood, Florida, inhabited entirely by African-Americans, was burned to the ground by a group of whites after a white woman claimed she had been raped by an African-American man. Id. at 505-07. In addition, at least eight African-Americans were murdered. Id.; see also Martha Minow, Not Only for Myself: Identity, Politics, and Law, 75 OR. L. REV. 647, 679 (1996). In 1994, Florida passed House Bill 591, which authorized compensation for the victims of this massacre, and their direct descendants. Bassett, supra, at 517-18. The compensation included up to $150,000 for each survivor, and college scholarships for their descendants. Id.

Legislatures, both federal and state, are thus sometimes inclined to award compensation to victims of historical injustices. See Pub. L. No. 100-383, 102 Stat. 903 (1988) (awarding compensation to Japanese individuals interred during World War II); see also Bassett, supra, (describing how the Florida legislature awarded compensation to victims and descendants of victims of the 1923 Rosewood, Florida massacre). Courts of law, however, are constrained by judicial doctrine and precedent, including concepts of standing, statutes of limitations, and the political question doctrine. Legislatures, both state and federal, face no such conceptual and doctrinal constraints. For that reason, advocates of slave reparations may resolve to bring their concerns and demands to the legislative and executive branches of the government, rather than the adjudicative and adversarial judicial branch.

### III.  OVERVIEW OF THE PROCEEDINGS

**A.  Parties**

**1.  *Plaintiffs***

Beginning in 2002, a number of lawsuits were filed by descendants of slaves seeking reparations from private corporations that were alleged to have unjustly profited from the institution of slavery.  On October 25, 2002, the Judicial Panel on Multidistrict Litigation transferred these actions to this court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  See In re African-American Slave Descendants Litigation, No. 1491, 231 F. Supp. 2d 1357 (Jud. Pan. Mult. Lit., Oct. 25, 2002).  This litigation then consisted of nine individual lawsuits.  As directed by the court, the individual Plaintiffs filed a consolidated complaint, which, upon later review, the court dismissed without prejudice.  The court held that the Plaintiffs had failed to state a cause of action, had no standing to bring the suit, and that the suit was barred by the political question doctrine and statutes of limitations. See In re African-American Slave Descendants Litigation, No. 1491, 304 F. Supp. 2d 1027 (N.D. Ill. 2004).   The court then granted Plaintiffs leave to file a second amended complaint. Plaintiffs have since filed their Second Consolidated and Amended Complaint, which also consists of nine individual suits.  See SCAC.[3]       The Plaintiffs in the SCAC include the

---

[3]The citations in this Opinion are to the paragraphs as styled in Plaintiffs' Complaint; however, in certain instances the numbering of paragraphs does not proceed in chronological order.

following: Deadria Farmer-Paellmann,[4] Mary Lacey Madison,[5] Andre Carrington,[6] John

Bankhead, as administrator of the Estate of Edlee Bankhead,[7] Richard Barber, Sr.,[8] Hannah

Hurdle-Toomey, as administrator of the Estate of Andrew Jackson Hurdle,[9] Marcelle Porter, as

administrator of the Estate of Hettie Pierce,[10] Julie Mae Wyatt-Kervin,[11] the Estate of Emma

Marie Clark,[12] Ina Bell Daniels Hurdle McGee,[13] Cain Wall Sr., and seven other individuals who

assert they were formerly enslaved,[14] and Antoinette Harrell Miller.[15] These named Plaintiffs

(hereinafter collectively referred to as "Plaintiffs"), on behalf of themselves and the classes they

seek to represent,[16] seek reparations on behalf of all "formerly enslaved Africans and their

---

[4]Farmer-Paellmann alleges that she is the "great-great-granddaughter of Clara and Abel Hinds, Africans who were enslaved on a South Carolina sea island rice plantation." See SCAC, ¶ 65.

[5]Madison alleges that her "ancestors were slaves in the agricultural, cotton, and tobacco industry in Virginia and North Carolina." See SCAC, ¶ 68.

[6]Carrington alleges that his maternal and paternal ancestors "were slaves in North Carolina, and . . . were involved in the cotton and tobacco industries." See SCAC, ¶ 71.

[7]The Estate of Edlee Bankhead alleges that Bankhead's parents were enslaved in Mississippi. See SCAC, ¶ 74.

[8]Barber alleges that his ancestors were born into slavery, and were enslaved in the agricultural industry and other industries. See SCAC, ¶¶ 76-79 .

[9]Hurdle-Toomey alleges that her father, Andrew Jackson Hurdle, was a slave who was sold into slavery when he was ten years old. See SCAC, ¶ 81.

[10]Porter alleges that her great grandmother, Hettie Pierce, was a slave in North Carolina. See SCAC, ¶ 84.

[11]Wyatt-Kervin alleges that she is the daughter of former slaves, Jake and Louise Wyatt. See SCAC, ¶ 85.

[12] Clark's Estate alleges that Clark was a slave in Louisiana from 1927-1934. See SCAC, ¶ 86.

[13]McGee alleges that she is the "great grand-daughter of Andrew Jackson Hurdle, an enslaved African." See SCAC, ¶ 90.

[14]See SCAC, ¶¶ 92-100.

[15]Miller alleges that she is a descendant of a former slave, Carrie Richardson. See SCAC, ¶ 102.

[16] Plaintiffs refer to a proposed class of plaintiffs, and assert that this suit may be brought as a class action under Federal Rule of Civil Procedure 23 (a) and (b). See SCAC, ¶ 49. Plaintiffs have not, however, filed any separate motion for class certification pursuant to the Federal Rules of Civil Procedure.

descendants," and all living "former enslaved African-Americans and their descendants . . . ." See SCAC, ¶ 48. Specifically, Plaintiffs seek an accounting, disgorgement of profits, the creation of an "independent historical commission" to study Defendants' actions, a constructive trust, restitution, and compensatory and punitive damages arising out of the named Defendants' alleged past and continued wrongful conduct relating to the institution of slavery. See id. ¶ 3.

### 2. *Defendants*

The named Defendants (hereinafter collectively referred to as "Defendants") are seventeen present-day companies whose predecessors are alleged to have been unjustly enriched through profits earned either directly or indirectly from the Trans-Atlantic Slave Trade and slavery between 1619 and 1865, as well as post-Emancipation slavery.

Defendants include the following companies: FleetBoston Financial Corporation, CSX Corporation, Aetna Inc., Brown Brothers Harriman & Company, New York Life Insurance Company, Norfolk Southern Corporation, Lehman Brothers Corporation, Lloyd's of London, Union Pacific Railroad, JP Morgan Chase, R.J. Reynolds Tobacco Company, Brown and Williamson, Liggett Group Inc., Canadian National Railway, Southern Mutual Insurance Company, American International Group ("AIG"), and Loews Corporation.[17]

Plaintiffs allege that FleetBoston, through its predecessor bank, made loans to slave traders and also collected custom duties and fees on ships engaged in the slave trade. See id. ¶¶ 125-26. Plaintiffs further allege that "FleetBoston engaged in a self-concealed business enterprise so that the Plaintiffs and others similarly situated would not be aware of the existence of this enterprise," and, in more recent times, "made various misleading statements to the Press

---

[17] Loews Corporation does not join in the present motion to dismiss. Loews has filed a separate motion to dismiss, based on grounds it asserts are unique to it.

24

from March 2000 to February 2002, attempting to disassociate its predecessor company from its current company." Id. ¶ 128.

Plaintiffs allege that CSX "is a successor-in-interest to numerous predecessor railroad lines that were constructed or run, at least in part, by slave labor." Id. ¶ 129. Plaintiffs further allege that "CSX engaged in a self-concealed business enterprise as the plaintiffs and others similarly situated would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement to the Press regarding their participation in and profiting from slavery." Id. ¶¶ 131-33.

Plaintiffs allege that "Aetna's predecessor in interest, provided the instrumentality of slavery by underwriting insurance policies for slave owners against the loss of their African slaves . . . ." Id. ¶ 136. Plaintiffs further allege that "Aetna engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise . . . ." and, in more recent times, "withheld information or made a misleading statement regarding their participation in and profiting from slavery." Id. ¶¶ 142-43.

Plaintiffs allege that Brown Brothers Harriman "is the successor corporation to Brown Brothers & Co.," which "loaned millions directly to planters, merchants and cotton brokers throughout the South." Id. ¶¶ 145-46. Plaintiffs also allege that "Louisiana court records dating back to the 1840's . . . reveal the firm's ownership of at least two cotton plantations totaling 4,614 acres and the plantations' 346 slaves . . . ." Id. ¶ 148. Plaintiffs further allege that "Brown Brothers Harriman engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise . . . ." and, in more recent times, "withheld information or made a misleading statement based on press reports in an attempt to disassociate itself from its predecessor's business." Id. ¶¶ 151-52.

Plaintiffs allege that "New York Life's predecessor-in-interest, Nautilus Insurance, earned premiums from its sale of life insurance to slave owners." Id. ¶ 155. Plaintiffs further

allege that "New York Life engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise . . . ." and, in more recent times, "withheld information or made misleading statements regarding their participation in and profiting from slavery." Id. ¶¶ 159, 162.

Plaintiffs allege that Norfolk Southern "is a successor-in-interest to numerous railroad lines that were constructed or run, in part, by slave labor." Id. ¶ 163. Plaintiffs further allege that Norfolk "participated in the institution of slavery in that it derived the benefits of unpaid slave labor and it provided financial supports to slave owners and slave traders." Id. ¶ 165.

Plaintiffs allege that the founder of Lehman Brothers, Henry Lehman, and his brothers "grew rich as middlemen in the slave-grown cotton trade." Id. ¶ 168. Plaintiffs further allege that Lehman Brothers owned slaves. Id. ¶ 171.

Plaintiffs allege that Lloyd's of London "insured ships utilized for the Trans-Atlantic slave trade." Id. ¶ 173. Plaintiffs further allege that "Lloyd's engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise . . . ." Id. ¶ 174.

Plaintiffs allege that Union Pacific "is a successor-in-interest to numerous predecessor railroad lines that were constructed or run in part by slave labor." Id. ¶ 177. Plaintiffs further allege that "Union Pacific engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise . . . ." and, in more recent times, "withheld information or made a misleading statement regarding their participation in profiting from slavery." Id. ¶¶ 178-79.

Plaintiffs allege that "two of [the] predecessor banks that merged to become J.P. Morgan Chase were behind a consortium to raise money to insure slavery." Id. ¶ 181. Plaintiffs further allege that "J.P. Morgan Chase engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiffs' ancestors would not be aware of the existence of this enterprise," and, in more recent times, "withheld information or made a misleading statement regarding their participation in and profiting from slavery." Id. ¶ 182.

Plaintiffs allege that R.J. Reynolds Tobacco Company, Brown & Williamson, Liggett Group, and Loews Corporation (parent company of Lorillard Tobacco Company) were all once part of the American Tobacco Company. Id. ¶ 197. As parts of this larger enterprise, Plaintiffs assert, these Defendants are "all beneficiar[ies] of assets acquired through the forced and uncompensated labors of enslaved African-Americans." Id. ¶ 185; see also id. ¶¶ 201, 204, and 210.

Plaintiffs allege that Canadian National Railway "is the successor-in-interest to seven predecessor railroad lines, that were constructed and/or run in part by slave labor." Id. ¶ 213. Plaintiffs further allege that "Canadian National engaged in a self-concealed business enterprise as the plaintiff class and/or plaintiff ancestors would not be aware of the existence of this enterprise . . . ." Id. ¶ 215.

Plaintiffs allege that Southern Mutual Insurance "issued policies on the lives of slaves in Louisiana." Id. ¶ 219. Plaintiff further alleges that Southern Mutual "aided and abetted those who engaged in the maintenance of slavery through the intentional infliction of emotional distress." Id. ¶ 218.

Plaintiffs allege that AIG's predecessors "provided instrumentalities of slavery by selling insurance policy [sic] to cover the lives of enslaved Africans with slave owners as beneficiaries." Id. ¶ 221. Plaintiffs further allege that AIG's predecessors "aided and abetted those who engaged in the maintenance of slavery." Id. ¶ 223.

As evidenced by Plaintiffs' allegations, and as the court shall further discuss, their SCAC is devoid of any allegations that connect the specifically named Defendants or their predecessors and any of the Plaintiffs or their ancestors.

**B. Pleadings**

### 1. Factual Allegations of Plaintiffs' Second Consolidated and Amended Complaint

Plaintiffs' SCAC begins with a narration of the historical background of the Transatlantic Slave Trade in America. The Complaint proceeds to describe the Slave Codes, which various States enacted in order to perpetuate the institution of slavery. The Complaint also chronicles how the forced labor of enslaved Africans helped to build our Nation and enrich early American industry, while simultaneously dismantling a culture and impoverishing a race of fellow men and women.

The SCAC then outlines the beginnings of laws that outlawed the trafficking and trade of slaves, which progressed into a body of law that found the institution of slavery to be contrary to the Natural Law of Man. The Complaint proceeds to allege that despite this body of law that found the institution of slavery to be contrary to the Natural Law of Man, the vestiges of slavery, in the form of racism, have resulted in modern-day disparities between descendants of slaves and the remainder of our society.

28

Ultimately, the SCAC alleges that "Defendants' actions caused Plaintiffs economic losses and cultural psychic scars and heretofore without remedy." SCAC, ¶ 41. Plaintiffs allege that the practice of slavery has caused the following specific social inequities:

> twenty-six (26) percent of African-Americans in the United States live in poverty compared to eight (8) percent of whites . . . . 14.7 percent of African-Americans have four-year college degrees, compared with 25 percent of whites . . . . [A] black person born in 1996 can expect to live, on average, 6.6 fewer years than a white person . . . . African-Americans are more likely to go to jail, to be there longer and . . . to receive the death penalty . . . . [African-Americans] lag behind whites according to every social yardstick: literacy, life expectancy, income and education. They are more likely to be murdered and less likely to have a father at home . . . . Black families earn only $580 for every $1000 earned by white families.

Id. ¶ 41 n.1.

### 2. Counts of Plaintiffs' Second Consolidated and Amended Complaint

Count I of Plaintiffs' SCAC is styled: "Conspiracy." Plaintiffs allege that "[e]ach of the defendants acted individually and in concert with their industry group and with each other, either expressly or tacitly, to participate in a plan that was designed in part to commit the tortious acts referred to herein." Id. ¶ 258.

Count II is styled: "Conversion." Plaintiffs allege that "[t]he enslaved Africans had a property right in themselves." Id. ¶ 270. Plaintiffs then allege that "[t]his property right was wrongfully and illegally taken." Id. ¶ 271. Plaintiffs further allege that "defendants have willfully and wrongfully misappropriated and converted the value of [slave] labor and its derivative profits into defendants' own property." Id. ¶ 278. Plaintiffs' prayer for relief under Count II seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages. See id. ¶ 280.

29

Count III is styled: "Unjust Enrichment."  Plaintiffs allege that "[d]efendants' failure to pay for the labor provided by the slaves without receiving any compensation, has allowed defendants to retain a benefit at the expense of plaintiffs and their ancestors."  Id. ¶ 284. Plaintiffs further allege that "[d]efendants have failed to account for and or return to plaintiffs and the plaintiff class the value of their ancestors' slave labor and/or the profits and benefits the defendants derived therefrom . . . ."  Id. ¶ 283.  Plaintiffs' prayer for relief under Count III seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages.  See id. ¶ 288.

Count IV is styled: "Replevin."  Plaintiffs allege that "defendants hold personal property that was never properly vested in them . . . because the enslaved person's work was unpaid, stolen, and forcibly held."  Id. ¶¶ 290-91.  Plaintiffs further allege that defendants "fraudulently concealed the cause of action from the heirs or the estates [of Plaintiffs], so that the statute of limitations does not begin to accrue until the full facts of the cause of action are revealed to the heirs and the estate [of Plaintiffs]."  Id. ¶ 296.  Plaintiffs' prayer for relief under Count IV seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages.  Id. ¶ 298

A second Count IV is styled: "42 U.S.C. § 1982."[18]  Plaintiffs allege that as a result of the Defendants' conduct in denying slaves the value of their labor, and restricting slaves' access to corporate records regarding Defendants' participation in slavery, the Plaintiffs' ancestors' and their descendants' rights to inherit and convey property have been violated in contravention of 42 U.S.C. § 1982.  Id. ¶ 300.

---

[18]Plaintiffs allege Count IV twice.  The first Count IV is styled "Replevin."  The second Count IV is styled "42 U.S.C. § 1982."

30

Count V is styled: "Intentional Infliction of Emotional Distress."  Plaintiffs allege that "Defendants' predecessor companies aided or abetted, or under other theories of secondary liability . . . , participated in, allowed, or implicitly or recklessly, sanctioned, and/or benefitted from an institution that relied on the sexual exploitation, violent abuse and rape to achieve its goals of a malleable and unpaid work force."  Id. ¶ 305.  Plaintiffs further allege that "[t]he violence and crimes against the enslaved group were done with the calculated intent of demeaning, subjugating, and controlling the enslaved population for the purposes of exploitation for profit and for the direct benefit of commercial industries."  Id.  Plaintiffs' prayer for relief under Count V seeks an accounting of profits earned from slave labor, a constructive trust imposed on such profits, restitution, equitable disgorgement, and punitive damages.  Id. ¶ 310.

Count VI is styled "Negligent Infliction of Emotional Distress."  Plaintiffs allege that, as a result of Defendants' negligent conduct and omissions in relation to the slave trade and the slavery industry, "Plaintiffs and their deceased enslaved African ancestors suffered emotional distress and mental anguish."  Id. ¶ 314.

Counts VII - XIII[19] of the Plaintiffs' Complaint allege violations of various state consumer protection laws.  Specifically, Count VII alleges violations of the New York Consumer Protection from Deceptive Acts and Practices Law, NY GEN. BUS. LAW §§ 349-350; Count IX alleges violations of the Texas Deceptive Trade Practices and Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41 et seq.; Count X alleges violations of California's Preservation and Regulation of Competition Law, CAL. BUS. & PROF. CODE § 17200 et seq.; Count XI alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP.

---

[19]Plaintiffs include no Count VIII.

STAT. 505/1 et seq.; Count XII alleges violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, LA. REV. STAT. ANN. § 51:1401 et seq.; Count XIII alleges violations of the New Jersey Unfair Trade Practices Law, N.J. STAT. ANN. § 56:8-1 et seq. See SCAC ¶¶ 315-366.

In essence, the Plaintiffs seek reparations from Defendants for their alleged roles in the institution of human chattel slavery as it existed in the United States from 1619 through 1865, to date.

### 3.  Plaintiffs' Second Consolidated and Amended Complaint is Not Materially Different from Plaintiffs' First Consolidated and Amended Complaint

Plaintiffs' SCAC repeats many of the same factual and legal allegations found in Plaintiffs' First Consolidated and Amended Complaint ("FCAC"). The FCAC and the SCAC both begin with a lengthy allegation of the historical background of the Trans-Atlantic Slave Trade, the institution of slavery in the colonies and the United States, the "state slave codes" which gave legal sanction to slavery, the horrors of slavery, and the eventual abolishment of slavery. Both Complaints then go on to allege that the institution of slavery still negatively impacts African-Americans. The Complaints allege, *inter alia*, that African-Americans receive fewer college degrees than whites, have less income than whites, and are more likely to be incarcerated than whites. The Complaints further allege that Defendants' participation in the slave trade and the institution of slavery is a direct cause of these harms.

Both Complaints include the following Counts: Conspiracy, Intentional Infliction of Emotional Distress, Conversion, Unjust Enrichment, and 42 U.S.C. § 1982. The Conspiracy Counts are generally materially similar, and they are virtually identical in places. Compare

FCAC, ¶¶ 215-17 <u>with</u> SCAC, ¶¶ 257-67.   The Intentional Infliction of Emotional Distress Counts again are generally materially similar, and they are virtually identical in places.  <u>Compare</u> FCAC, ¶¶ 232-35 <u>with</u> SCAC, ¶¶ 304-10.  The Conversion Counts are also generally materially similar, and they are virtually identical in places, although Plaintiffs now allege that the slaves had a property interest in themselves as well as a property interest in their labor.   <u>Compare</u> FCAC, ¶¶ 239-42 <u>with</u> SCAC, ¶¶ 268-80.  The Unjust Enrichment Counts as well are materially similar, and are virtually identical in places.  <u>Compare</u> FCAC, ¶¶ 243-53 <u>with</u> SCAC, ¶¶ 281-88. The 42 U.S.C. § 1982 Count is virtually identical in both Complaints.  <u>Compare</u> FCAC, ¶¶ 254-60 <u>with</u> SCAC, ¶¶ 299-303.  Both Complaints also include numerous Counts alleging violations of various state consumer fraud and fair trade statutes.  <u>Compare</u> FCAC, ¶¶ 244-53 <u>with</u> SCAC, ¶¶ 315-66.  Plaintiffs' allegations in the various SCAC Counts are, in many places, word for word repetitions of allegations made in FCAC Counts.  <u>Compare</u>, <u>e.g.</u>, FCAC, ¶ 255 <u>with</u> SCAC, ¶ 300.

The SCAC adds new Counts of Replevin and Negligent Infliction of Emotional Distress. However, the fundamental problems contained within the FCAC, Plaintiffs' lack of standing, the political question issue, the statutes of limitations, and Plaintiffs' failure to state a claim on which relief can be granted, have not been resolved by the SCAC.  Plaintiffs' SCAC still fails to state a claim upon which relief could be granted, and also fails to allege any facts that would indicate that Plaintiffs have standing, that the issue of slave reparations is not a political question, or that the applicable statutes of limitations have not expired.

### 4. Defendants' Joint Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint

Defendants have responded to Plaintiffs' Second Consolidated and Amended Complaint with the present Joint Motion to Dismiss, brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[20]  See Defs.' Joint Mot. to Dismiss Pls.' Second Consolidated and Amd. Compl., at 1.  Defendants allege four separate grounds which, they assert, warrant dismissal: (1) Plaintiffs' claims fall short of both constitutional and prudential standing requirements; (2) all of Plaintiffs' claims are time-barred; (3) Plaintiffs' claims present a non-justiciable political question; and (4) Plaintiffs fail to state any cognizable claim.  Id. at 1-2.

Defendants' Joint Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint is now fully briefed and before the court.

## IV.  DISCUSSION

### A.  Justiciability Doctrines

Article III, § 2 of the United States Constitution provides that federal courts have jurisdiction only if presented with a "Case" or "Controversy."  The requirement of a case or controversy imposes a "dual limitation" upon the federal courts.  See Flast v. Cohen, 392 U.S. 83, 94 (1968).  First, the requirement of a case or controversy serves to "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."  Id.  Second, the requirement of a case or controversy serves to "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government."  Id.  This "dual limitation" found in the requirement of a case or controversy is

---

[20] Loews Corporation has not joined in the present Motion to Dismiss.  Loews Corporation has filed a separate Motion to Dismiss, to which Plaintiffs have failed to reply.  The court therefore dismisses this action as to Defendant Loews Corporation, pursuant to Local Rule 78.3.

enforced by what have been termed the justiciability doctrines of Article III, which state the fundamental limits on federal judicial power in our system of government.  See Allen v. Wright, 468 U.S. 737, 750 (1984).  "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so."  Renne v. Geary, 501 U.S. 312, 316 (1991).  The justiciability doctrines include principles such as the prohibition against advisory opinions, standing, ripeness, mootness, and the political question doctrine.  See generally Erwin Chemerinsky, Constitutional Law: Principles and Policies 46 (Aspen Law & Business 1997). "The Article III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."  Allen, 468 U.S. at 750.

### 1. Standing

Defendants first assert that Plaintiffs lack standing to bring these claims in a federal court. Mem. in Supp. of Defs.' Joint Mot. to Dismiss Pls.' Second Consolidated Amd. Compl., at 2-3 (hereinafter, "Mem. in Supp. of Defs.' Mot. to Dismiss II").[21]  The doctrine of standing ensures that a litigant is the proper party to bring a matter before a federal court for adjudication, by asking if that specific litigant has a sufficient stake in the matter to invoke the federal judicial process.  This central principle of United States Supreme Court jurisprudence has deep historical roots.  See  Miss. & M.R. Co. v. Ward, 67 U.S. 485, 491 (1863) ("unless he shows that he has sustained, and is still sustaining, individual damage, he cannot be heard").  As the Supreme Court recently reiterated:  "We have consistently stressed that a plaintiff's complaint must

---

[21]  Defendants incorporate by reference their previous Memorandum in Support of Defendants' Joint Motion to Dismiss the Plaintiffs' First Consolidated and Amended Complaint (hereinafter "Mem. in Supp. of Defs.' Mot. to Dismiss I") into their present Memorandum.

establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him."  Raines v. Byrd, 521 U.S. 811, 819 (1997).

### a.  Historical Overview of the Doctrine of Standing

The requirement that a litigant demonstrate standing – a personal stake in an alleged dispute – to bring a matter before a court for adjudication has been a bedrock principle in our system of law, as well as the common law system from which our system of law developed.  The standing doctrine comes from the well-known common law doctrine of *locus standi*, which translated from Latin means "place of standing."   In essence, the doctrine of *locus standi* concerns whether an individual has the legal capacity to institute proceedings.  See, e.g., S. M. Thio, Locus Standi and Judicial Review 13-14, 235-36 (1971) (analyzing the doctrines of standing in the United States and in other common law countries).  The concept of standing, or *locus standi*, was well known to the early federal courts.  See, e.g., Southern Exp. Co. v. Western N.C.R. Co., 99 U.S. 191, 201 (1878) (holding that since appellant had no legally cognizable interest in the suit, appellant "can, therefore, have no *locus standi* in a court of equity").

The standing doctrine serves to reinforce that "[t]he province of the court is, solely, to decide on the rights of individuals . . . ."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803).  As stated in an authoritative nineteenth century treatise: "The general rule is that the action should be brought in the name of the party whose legal right has been affected, against the party who committed or caused the injury, or by or against his personal representative." Joseph Chitty, A Treatise on Pleading and Parties to Actions 1 (G. & C. Merriam 1867).  In specific reference to tort actions, that treatise provides:

> The action for a tort must in general be brought in the name of the person whose *legal* right has been affected, and who was *legally* interested in the property at the time the injury thereto was committed; for he is impliedly the party injured by the tort, and whoever has sustained the loss is the proper person to call for compensation from the wrongdoer.

Id. at 59 (emphasis in original and footnotes omitted).  This treatise was relied upon by the United States Supreme Court in Tyler v. Judges of Court of Registration, 179 U.S. 405, 407 (1900), in which the Supreme Court discussed the proper parties to litigation.  In elucidating the standing doctrine's focus on the rights of individuals, the Tyler Court stated:

> The prime object of all litigation is to establish a right asserted by the plaintiff or to sustain a defense set up by the party pursued.  Save in a few instances where, by statute or the settled practice of the courts, the plaintiff is permitted to sue for the benefit of another, he is bound to show an interest in the suit personal to himself, and even in a proceeding which he prosecutes for the benefit of the public, as, for example, in cases of nuisance, he must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens.

Id. at 406.  In Tyler, the Court reiterated that the doctrine of standing "has been announced in so many cases in this court that it may not be considered an open question."  Id.

This core aspect of the doctrine of standing – that a litigant must demonstrate a personal stake in an alleged dispute – has remained unchanged as the Supreme Court has elucidated the modern formulation and rationale for the doctrine.

### b.  *Modern Formulation of the Doctrine of Standing*

The modern standing doctrine involves both constitutional limitations on federal courts, based on Article III, and prudential limitations on the exercise of federal court jurisdiction.  See, e.g., Warth v. Seldin, 422 U.S. 490, 498 (1975).  "Article III standing . . . enforces the Constitution's case or controversy requirement . . . ."  Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301, 2308 (2004).  The Supreme Court has explained that "prudential standing

encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" Id. at 2309 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Without the doctrine of standing, "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions . . . ." Id.

The modern formulation of the constitutional limitations of the standing doctrine was elucidated in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), where the Supreme Court stated:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560 - 61 (citations and internal quotations omitted). The principle of standing is therefore commonly viewed as requiring a legally sufficient relationship between the parties in a suit. "Under the standing doctrine, the relationship becomes legally important only if the defendant is in some way both directly responsible for causing [plaintiff's] injury, and able to redress it." Eric J. Miller, Representing the Race: Standing to Sue in Reparations Lawsuits, 20 HARV. BLACKLETTER L.J. 91, 93 (2004). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." Steel Co. v.

Citizens For a Better Environment, 523 U.S. 83, 103-04 (1998). These constitutional limitations

on standing "are not confined to the facts of any particular case, but are broadly relevant to

standing in any Article III controversy." Plotkin v. Ryan, 239 F.3d 882, 884 (7th Cir. 2001); see

also Books v. Elkhart County, Ind., 401 F.3d 857, 861 (7th Cir. 2005).

The party seeking to invoke federal court jurisdiction has the burden of establishing the

elements of standing. See Lujan, 504 U.S. at 561. "[S]ince they are not mere pleading

requirements but rather an indispensable part of the plaintiff's case, each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof,

i.e., with the manner and degree of evidence required at the successive stages of the litigation."

Id. The present motion is a motion to dismiss brought pursuant to Federal Rule of Civil

Procedure 12(b), and in this posture "we must presume that the general allegations in the

complaint encompass the specific facts necessary to support those allegations." Citizens For a

Better Environment, 523 U.S. at 104. "However, [w]here standing is challenged as a factual

matter, the plaintiff bears the burden of supporting the allegations necessary for standing with

competent proof." Perry v. Village of Arlington Heights, 186 F.3d 826, 829 (7th Cir. 1999)

(quoting Retired Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 862 (7th Cir. 1996))

(internal quotations omitted); see also McNutt v. General Motors Acceptance Corp. of Indiana,

298 U.S. 178, 189 (1936) (indicating that the party invoking federal court jurisdiction must

"allege in his pleading the facts essential to show jurisdiction [and] [i]f he fails to make the

necessary allegations he has no standing"). "'Competent proof' requires a showing by a

preponderance of the evidence that standing exists." Perry, 186 F.3d at 829 (quoting NLFC, Inc.

v. Devcom Mid-America, Inc., 45 F.3d 231, 237 (7th Cir. 1995)); see also McNutt, 298 U.S. at

39

189  (stating that when "allegations of jurisdictional facts are challenged . . . in any appropriate manner, [the party alleging jurisdiction] must support them by competent proof;" and if unchallenged, the federal courts "may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence").

### c.  *Plaintiffs' Allegations in Support of their Standing to Maintain this Suit*

In general, Plaintiffs claim that the source of their injury is the institution of slavery. Plaintiffs first point to four distinct injuries which they allege are sufficient to confer them standing to maintain this suit.  Plaintiffs allege that they currently suffer concrete, direct harm as descendants of slaves, in that they presently do not have "the same opportunities as [do] their white contemporaries, . . . [do] not have to overcome barriers to their human right to development which their white contemporaries [do] not, . . . suffer irreparable psychological damage from the loss of their history, language and culture," . . . and that they do not "know the actual birth names of . . . their forebearers and, consequently, to this day do not know their own real names."  Pls.' Mem. in Opp. to Defs.' Joint Mot. to Dismiss the Second Amended and Consolidated Compl., at 1-2 (hereinafter "Mem. in Opp. to Defs.' Mot. to Dismiss II").  Next, Plaintiffs allege that particular Plaintiffs, Cain Wall and his children, and Emma Clark, were themselves actually enslaved in the twentieth century.  Id. at 2.[22]  Plaintiffs then allege that, as they have filed or will file the necessary paperwork to become administrators of their ancestor's

---

[22]  Plaintiffs do not, however, allege that these specific Plaintiffs were enslaved by Defendants or any predecessors-in-interest of Defendants.  Even if these allegations were true, any harms suffered by these specific Plaintiffs are not "fairly traceable" to the Defendants.  See Lujan, 504 U.S. at 560 - 61.  Such allegations are therefore insufficient to confer standing on these specific Plaintiffs.  See id.

estates, they have suffered an actual, particularized injury by being denied their rightful inheritances.  Id.

Further, Plaintiffs allege that they have "suffered segregation, lost opportunity, diminished self-worth and value, loss of property rights, loss of derivative property rights, and psychological harm . . . ."  SCAC, ¶ 108.  Plaintiffs also allege that they are "presently consumers of Defendants" and have been injured by certain communications made by the Defendants concerning Defendants' respective roles in the institution of slavery.  See id. ¶ 104.  Specifically, Plaintiffs allege that "[d]ue to unconscionable, fraudulent and deceptive public communications made by defendants, plaintiffs suffered the harm of being misled, confused, and deceived about the roles the defendants played in the enslavement of African people."  Id.  Additionally, Plaintiffs allege injury through the Defendants' alleged continuing violation of state consumer protection laws.  SCAC, Counts VII-XIII; Mem. in Opp. to Defs.' Mot. to Dismiss II, at 9-14.

However, "[e]ven if [Plaintiffs'] claimed injury is sufficiently specific, it is not clear that [Plaintiffs themselves are] harmed.  The fact of having an enslaved ancestor, even one transported, insured, or put to work by the defendants, does not seem sufficient injury without something more."  Miller, supra, at 97 (commenting specifically on the instant case).  "[D]escent from slaves is not of itself an injury, rather the sorts of legally relevant injuries are harms suffered by individuals that are attributable to the ongoing effects of slavery."  Id.  The type of injuries Plaintiffs are alleging in this case therefore cannot be understood as run-of-the-mill, traditional injuries as are commonly found in most tort claims.  Plaintiffs are alleging that injuries to their long-dead ancestors are causing them concrete harm today.  "[P]arties suffering

41

non-traditional injuries must prove, *to a virtual certainty*, the causal link between the action challenged and the claimed injury . . . ."  Laveta Casdorph, <u>The Constitution and Reconstitution of the Standing Doctrine</u>, 30 St. Mary's L.J. 471, 502 (1999) (emphasis added).  Plaintiffs face insurmountable problems in establishing "to a virtual certainty" that they have suffered concrete, individualized harms at the hands of Defendants.  "[A]n essential prerequisite to bringing suit is the plaintiff's ability to establish with precision her relationship to the injury and the defendant."  Miller, <u>supra</u>, at 93.  In terms of slavery reparations, the "'traditional' model . . . seeks suit against a defendant or defendants on behalf of a plaintiff class comprised of descendants of slaves."  <u>Id.</u>  In such situations, plaintiffs "assume[] that a familial relationship between the ancestor victim and the descendant plaintiff– what might be called hereditary or genetic standing– is sufficient to bring suit."  <u>Id.</u>  An assumption such as this is difficult to implement in practice.  "The notion that standing can be inherited (the 'genetic' theory of standing) is . . . legally . . . suspect; and the notion that groups, rather than individuals, have standing to sue, is legally insupportable."  <u>Id.</u> at 94.

### (1). Constitutional Limitations on Standing

#### (a).  Derivative Harm

It is well-established that a plaintiff must "'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"  <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 454, 472 (1982) (quoting <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99 (1979)).  Plaintiffs cannot establish a personal injury by merely identifying tort victims and alleging a genealogical relationship.  The illegal conduct at issue here, the institution of slavery, is alleged

to have directly affected Plaintiffs' ancestors.  Plaintiffs now, more than a century later, point to that horrific institution as the source of their derivative injury.[23]  However, Plaintiffs' own choice of words, *derivative*, should be sufficient to signify the standing problem in this case.  <u>See</u> SCAC, ¶ 114.  Plaintiffs fail to allege that they have personally suffered a concrete and particularized injury as a result of Defendants' putatively illegal conduct; rather, Plaintiffs' alleged injury is derivative of the injury inflicted upon enslaved African-Americans over a century ago.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 111 ("Each Plaintiff African-American slave descendant has suffered by the Defendants' failure to pay their ancestors for their labor as slaves or as sharecroppers, peons or even slaves").  This is insufficient to establish standing, and contrary to centuries of well-settled legal principles requiring that a litigant demonstrate a personal stake in an alleged dispute.  <u>See</u>, <u>e.g.</u>, <u>Tyler</u>, 179 U.S. at 406-07 (stating that a plaintiff must "aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens"); <u>Lujan</u>, 504 U.S. at 560 (stating that a "plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is . . . concrete and particularized"); <u>Raines</u>, 521 U.S. at 819 (stating that "a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him"); <u>see also</u> Antonin Scalia, <u>The Doctrine of Standing as an Essential Element of the Separation of Powers</u>, 17 Suffolk U. L. Rev. 881, 881-82 (1983) ("I suggest that courts need to accord greater weight than they have in recent times to the traditional requirement that the plaintiff's alleged injury be a particularized one . . . .").  To recognize Plaintiffs' standing in this case "would transform the federal courts

---

[23] Several of the named Plaintiffs allege to have been slaves during the twentieth century, but also fail to establish standing to sue Defendants for their alleged injuries.  <u>See</u> discussion <u>infra</u> at n.22, and 44-45.

into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" Allen, 468 U.S. at 756 (citing United States v. SCRAP, 412 U.S. 669, 687 (1973)).

In addition, the injury alleged cannot be "conjectural or hypothetical." Lujan, 504 U.S. at 560. Plaintiffs allege injury through being "denied the economic wealth of his or her ancestors' labor;" Plaintiffs also allege they hold a "derivative and inherited property right in their ancestors' lost pay . . . ." SCAC, ¶¶ 113-14. However, Plaintiffs' claim to the economic wealth of their ancestors' labor is conjectural. While most would like to assume that they will be the beneficiaries of their ancestors' wealth upon their demise, this is a mere assumption. Plaintiffs can only speculate that their ancestors' estates would have been passed on to them, and cannot say that they would have inherited their ancestors' lost pay. This is insufficient to show a personal injury to Plaintiffs.

Further, the Plaintiffs must allege a "causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560. "[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court . . . ." Id. The allegations of Plaintiffs' SCAC do not link these Defendants to the alleged harm. Plaintiffs fail to allege any facts in their Complaint that directly link the specifically named Defendants to the alleged injuries suffered by the Plaintiffs; nor does the Plaintiffs' Complaint allege a direct connection between any of the named Defendants and any of the Plaintiffs' ancestors. The named Plaintiffs who allege that they are descendants of enslaved African-Americans fail to allege that their ancestors were enslaved by any of the seventeen specifically named Defendants. Likewise, the named Plaintiffs who allege that they were slaves fail to allege that they were enslaved by any of the seventeen specifically named

44

Defendants. Plaintiffs' only response to this fundamental defect is to allege that Defendants were engaged in "co-dependent" industries and therefore are generally and vicariously liable for the institution of slavery. However, Plaintiffs fail to allege how their alleged harms are "not the result of the independent action of some third party not before the court . . . ." See Lujan, 504 U.S. at 560. Plaintiffs offer no allegations that Defendants had any relationship with specific entities that enslaved the named Plaintiffs or their ancestors. More than "unadorned speculation" is required to establish standing. See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43-44 (1976).

### (b). Continuing Injury

Plaintiffs' allegations that they suffer injury on a continuing basis also fail to establish the requisite standing. Plaintiffs claim a continuing injury through the allegation that "[t]hey still endure daily indignities from the legacy of slavery, including, but not limited to, racial profiling, racial slurs, and improper and hurtful assumptions regarding their overall status." SCAC, ¶ 115. Further, Plaintiffs allege that they "continue[] to be harmed to the present day, in that each . . . are deprived job opportunities, caused psychic harm, denied ability to inherit his or her fore-parents wealth." Id. ¶ 110

Plaintiffs' allegations of continuing harm are no different than the allegations of continuing harm made by the plaintiffs in Cato v. United States, 70 F.3d 1103 (9th Cir. 1995), and other similar cases. In Cato, descendants of enslaved African-Americans filed a complaint against the United States government seeking damages due to the enslavement of, and subsequent discrimination against, African-Americans. Cato, 70 F.3d at 1105. The plaintiffs in Cato alleged injuries based on "disparities in employment, income, and education" between

African-Americans and other racial groups.  Id. at 1109.  The Cato court found that such allegations were insufficient to establish an injury personal to the plaintiffs so as to establish the plaintiffs' standing; rather, such injuries were "a generalized, class-based grievance . . . ."  Id. Other courts faced with similar complaints have also found that those plaintiffs had failed to establish their standing to litigate claims based on continuing injuries alleged to be the result of slavery.  See, e.g., Bell v. United States, No. CIV. A. 301CV0338D, 2001 WL 1041792, at *2 (N.D. Tex. Aug. 31, 2001) (plaintiff lacked standing to file suit against United States government seeking damages for the enslavement of African-Americans); Bey v. United States Department of Justice, No. 95 CIV 10401, 1996 WL 413684, at *1 (S.D.N.Y. July 24, 1996) (same); Langley v. United States, No. C 95-4227, 1995 WL 714378, at *2 (N.D. Cal. Nov. 30, 1995) (same); Himiya v. United States, No. 94 C 4065, 1994 WL 376850, *2 (N.D. Ill. July 15, 1994) ("Although it is extremely regrettable that this country's history, as well as the history of many other countries, includes a significant history of slavery, the plaintiff does not have proper standing under the law to recover damages for this reprehensible time period").  Like the plaintiffs' allegations in Cato and the other slavery reparations cases decided after Cato, Plaintiffs' allegations of continuing harm in this case do not establish a concrete and particularized injury-in-fact, as these allegations are too speculative and generalized.  See Lujan 504 U.S. at 560-61.

Plaintiffs argue that the other lawsuits seeking reparations for acts related to the institution of slavery are distinguishable on the grounds that those cases were brought by *pro se* plaintiffs, acting without the guidance of counsel, and against the United States Government,

46

protected from suit by the doctrine of sovereign immunity.[24]  These are distinctions without a difference.  Those *pro se* plaintiffs could have been represented by attorneys and the result would not have changed.[25]  Furthermore, the doctrine of sovereign immunity was only one of many jurisdictional bars to suit in those cases, including standing.  The constitutional limitations on standing, including an injury-in-fact, "are not confined to the facts of any particular case, but are broadly relevant to standing in any Article III controversy."  Plotkin, 239 F.3d at 884.  Like the plaintiffs in those cases, Plaintiffs fail to allege any concrete and particular injury-in-fact that they have suffered apart from their race generally.

Further, Plaintiffs' Complaint is devoid of any allegations that any specific conduct of the Defendants was a cause of the continuing injuries of which Plaintiffs complain.  Such wide-ranging social ills are not even alleged "to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  Lujan, 504 U.S. at 560.  Plaintiffs' allegations of abstract stigmatic injury are not cognizable absent specific allegations of conduct on behalf of the Defendants that has been directed at Plaintiffs or their ancestors.  Cf. Allen, 468 U.S. at 755-56.

### (c).  Miscellaneous Injury

---

[24]  Plaintiffs make this argument in their Memorandum in Opposition to Defendants' Joint Motion to Dismiss, 9-10 (hereinafter "Mem. in Opp. to Defs.' Mot. to Dismiss I").  Plaintiffs "incorporate by reference" their Mem. in Opp. to Defs.' Mot. to Dismiss I into their present Mem. in Opp. to Defs.' Mot. to Dismiss II.

[25]  In fact, courts give special treatment to *pro se* litigation.  See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that allegations of *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers"); see also Castro v. United States, 540 U.S. 375, 381-82, 124 S. Ct. 786, 791-92 (2003) (indicating that while holding *pro se* complaints to less stringent standards, courts may recharacterize such motions in order to avoid unnecessary dismissal or inappropriately stringent application of formal labeling requirements).

Lastly, Plaintiffs allege injury, in their status as consumers of the Defendants, through being misled, confused, and deceived about the roles the Defendants played in the enslavement of African peoples, as a result of Defendants' public communications. See SCAC, ¶ 104. Plaintiffs also allege harm through the Defendants' "intentional misrepresentations" relating to their involvement in securing profits from slavery. See id. ¶ 227. These alleged injuries relate to causes of action pled in Plaintiffs' Complaint as violations of various state consumer protection laws. See id. Counts VII-XIII. Plaintiffs argue that their allegations that Defendants have violated these State consumer protection laws are sufficient to confer them standing to pursue these claims. See Mem. in Opp. to Defs.' Mot. to Dismiss II, § IV. Further, Plaintiffs argue that some of these statutes do not even require that an injury be alleged, and therefore their standing to pursue these claims is a given. See Mem. in Opp. to Defs.' Mot. to Dismiss I, at 11.

This argument misses the mark. The assertion that a state statute dispenses with the requirement that an injury be alleged does not, and cannot, abrogate constitutional limitations imposed by Article III that a personal injury-in-fact is a prerequisite for standing to sue in a federal court. See, e.g., Burford v. Sun Oil Co., 319 U.S. 315, 317 (1943) (holding that state legislatures may not expand the jurisdiction of the federal district courts); see also Rifkin v. Bear Stearns & Co., Inc., 248 F.3d 628, 631 (7th Cir. 2001) (same). These constitutional limitations on standing cannot be altered by either state or federal law. See Gladstone, Realtors, 441 U.S. at 100 (holding that Congress may not abrogate the constitutional limitations on standing); Watson v. Tarpley, 59 U.S. 517, 520 (1855) (holding that "[state] laws cannot affect, either by enlargement or diminution, the jurisdiction of the courts of the United States as vested and prescribed by the constitution and laws of the United States"); see also U.S. Const. art. VI, cl. 2

48

(Supremacy Clause).  Further, Plaintiffs cannot use their standing to pursue one type of claim in a State court in order to establish their standing to pursue all of the claims asserted in the present case in a federal court.  "The plaintiffs must establish the district court's jurisdiction over each of their claims independently; they are not permitted to use one count of their complaint to establish federal subject matter jurisdiction and a separate count to establish standing."  Rifkin, 248 F.3d at 634.

Moreover, these injuries alleged in Plaintiffs' status as consumers of Defendants do not establish a legally cognizable injury.  Aside from alleging a general state of confusion, the Plaintiffs fail to allege any injury-in-fact that has come about as a result of that confusion.  "The injury alleged must be . . . distinct and palpable, and not abstract or conjectural or hypothetical."  See Allen, 468 U.S. at 751 (citations omitted).  Additionally, "in ruling on standing, it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated."  Flast, 392 U.S. at 102.  "Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power."  Id.

Plaintiffs allege that "defendants are engaging in continued intentional misrepresentations and deceptive statements to the consuming public about their roles in the enslavement of Africans.  They are unjustly enriched by these commercial acts and omissions . . . ."  SCAC, ¶ 227.  Plaintiffs fail to allege that Defendants have any cognizable duty to reveal any such information, nor do Plaintiffs allege any concomitant right to obtain such information.  Moreover, Plaintiffs make this conclusory statement without any specific factual allegations in

49

support of it.  Plaintiffs offer unsupported conclusions wrapped in legally significant terms, such as "intentional misrepresentation" and "unjust enrichment," which are insufficient to establish standing.  "The requirements of Article III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process."  Valley Forge, 454 U.S. at 471.  Again, more than "unadorned speculation" and conclusory allegations are required to establish standing.  See Simon, 426 U.S. at 43-44.

### (d).  Conclusion

In response to all these deficiencies, Plaintiffs argue that "'[s]tanding can be supported by a very slender reed of injury.'"  Mem. in Opp. to Defs.' Mot. to Dismiss I, at 4 (citing 13 Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.4 (2d ed. 1984)).  Plaintiffs are correct that standing can be supported by a very slender reed of injury, as the cases which they cite provide.  Yet, this "slender reed" must still have its roots in the soil of an injury personal to the Plaintiffs, not a "derivative harm" uprooted from the soil of another's injury.

Plaintiffs wish to litigate the issue of slavery without establishing that they have suffered some concrete and particularized injury as a result of the putatively illegal conduct of the Defendants.  See Valley Forge, 454 U.S. at 472; Lujan 504 U.S. at 560.  However, "[t]he fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated."  Flast, 392 U.S. at 99.  "In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not

50

whether the issue itself is justiciable." Id. at 99-100. Plaintiffs cannot satisfy the first and most basic requirement of constitutional standing – a concrete and particularized personal injury. See Lujan, 504 U.S. at 560. Plaintiffs cannot establish a personal injury sufficient to confer standing by merely alleging some genealogical relationship to African-Americans held in slavery over one-hundred, two-hundred, or three-hundred years ago. In attempting to litigate the unopposed issue of slavery rather than their personal injuries, Plaintiffs also cannot satisfy the second requirement of constitutional standing – injury that is fairly traceable to the conduct of the defendants. See id. Plaintiffs do not allege that they had any present property interest that was injured as a result of these specific Defendants' actions, nor that any action of the Defendants wronged them in any way that would be cognizable under tort theory. Plaintiffs fail to allege any conduct by the seventeen specifically named Defendants that individually affected any of the Plaintiffs.

In sum, the allegations of Plaintiffs' Complaint fail to support their standing to maintain this suit, as required by Article III of the United States Constitution.

### (2). Prudential Limitations on Standing

Beyond the constitutional limitations on the standing doctrine, there are prudential limitations on the exercise of federal court jurisdiction. See, e.g., Warth, 422 U.S. at 498. These additional prudential limitations on standing may exist even though the Article III requirements are met because "the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors, 441 U.S. at 99-100. Like the constitutional limitations on the standing doctrine, these prudential limitations ensure that federal

courts adhere to the separation of powers concept and are "founded in concern about the proper, and properly limited, role of the courts in a democratic society." Warth, 422 U.S. at 498. However, "unlike their constitutional counterparts, they can be modified or abrogated by Congress." Bennett v. Spear, 520 U.S. 154, 162 (1997).

One of these prudential limits on standing is that a litigant must normally assert his own legal interests rather than those of third parties. See Singleton v. Wulff, 428 U.S. 106, 113-14 (1976); Warth, 422 U.S. at 499. Another is that the federal courts should "refrain[] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475 (citing Warth, 422 U.S. at 499-500).

### (a). *Plaintiffs Impermissibly Attempt to Assert the Legal Rights of Absent Third Parties*

As a general rule, a litigant must assert his own legal rights and cannot assert the legal rights of a third-party. See, e.g., Powers v. Ohio, 499 U.S. 400, 410 (1991); Singleton, 428 U.S. at 113-14. However, a litigant may assert the rights of absent third-parties in certain limited situations. In determining whether a litigant who seeks standing to assert the legal rights of a third-party may do so, a two-part inquiry is involved. See Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 623 n.3 (1989). First, the litigant must have personally suffered some injury-in-fact adequate to satisfy Article III's case or controversy requirement. See id.; see also Singleton, 428 U.S. at 112. Second, certain prudential considerations must point in favor of permitting the litigant to assert the third-party's legal rights. See Caplin, 491 U.S. at 623 n.3. Among the prudential considerations to consider are the requirements that the litigant must have

a legally sufficient relation to the third-party, see Powers, 499 U.S. at 411; see also Craig v. Boren, 429 U.S. 190, 196 (1976), and there must exist some hindrance to the third-party's ability to protect his or her own rights.  See Powers, 499 U.S. at 411; see also Singleton, 428 U.S. at 115-116.

To the extent that Plaintiffs are attempting to assert the legal rights of their ancestors, Plaintiffs cannot do so because they themselves have failed to establish that they have personally suffered some injury-in-fact adequate to satisfy Article III's case-or-controversy requirement. See Singleton, 428 U.S. at 112.  In addition, prudential considerations militate against allowing such claims.  First, Plaintiffs have not alleged a legally sufficient relation to their ancestors.  All that Plaintiffs allege is a genealogical relationship, and more is required under the law in order to confer third-party standing.  Cf. Gilmore v. Utah, 429 U.S. 1012, 1016-17 (1976) (indicating that a mother had no standing to contest her son's execution).  Plaintiffs make no allegations of any relationship sufficient, whether by common law or statute, to confer them standing to pursue the claims of their deceased ancestors.  Cf. Whitmore v. Arkansas, 495 U.S. 149, 163 (1990) (recognizing a next-friend's standing to sue in certain situations); United Food & Comm. Workers Union Local 751 v. Brown Group, 517 U.S. 544, 558 (1996) (recognizing that the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq., grants unions standing to sue on behalf of its members).   Furthermore, Plaintiffs do not allege that they are assignees of a legally cognizable claim against the named Defendants.  Second, Plaintiffs have not alleged that any hindrance existed to their ancestors' ability to have protected their own rights over the last century.  Cf. Johnson v. McAdoo, 45 App. D.C. 440, 441 (D.C. 1916), aff'd, 244 U.S. 643 (1917) (evidencing a claim for slavery-based reparations nearly a century ago).

53

In sum, Plaintiffs have not established third-party standing to assert the legal rights of their ancestors.

### (b). Plaintiffs Impermissibly Attempt to Litigate a Generalized Grievance Which is Best Addressed in the Representative Branches

As currently framed, Plaintiffs' Complaint seeks to litigate a generalized grievance over one of the most horrific chapters of our Nation's history rather than a personal dispute, which the federal courts are able to adjudicate. For the reasons stated in the following section, such an "abstract question[] of wide public significance" should be left to the representative branches of our system of government. See Valley Forge, 454 U.S. at 475.

### 2. The Political Question Doctrine

Defendants also argue that the court should dismiss Plaintiffs' Complaint because the issue of reparations to former slaves presents a non-justiciable political question. See Mem. in Supp. of Defs.' Mot. to Dismiss II, at 3. Although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, with an abundance of caution, the court will next determine whether the political question doctrine provides an independent basis for dismissal.

### a. Overview of the Political Question Doctrine

It is well-established that the federal courts will not adjudicate questions that fall within the purview of the political question doctrine. See Baker v. Carr, 369 U.S. 186, 210 (1962). Like standing, mootness and ripeness, the political question doctrine is a justiciability limitation with its prudential roots dating back to the 18th century. See, e.g., Hayburn's Case, 2 U.S. (2 Dall.) 408, 410 (1792) (invalidating a statute authorizing the Executive branch to accept or reject

54

federal court determinations of pension eligibility for Revolutionary War veterans); <u>Marbury</u>, 5 U.S. (1 Cranch) at 170 ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). The political question doctrine restricts judicial review that might interfere with other branches of the federal government. <u>See</u> <u>McIntyre v. Fallahay</u>, 766 F.2d 1078, 1081 (7th Cir. 1985). Even in cases where the federal court has subject matter jurisdiction, it could choose not to exercise its jurisdiction to avoid interfering with decisions previously made by the Executive or Legislative branches (hereinafter the "Representative Branches"). <u>See</u> <u>United States v. Munoz-Flores</u>, 495 U.S. 385, 393-94 (1990). When the court reaches this conclusion, the question becomes non-justiciable – meaning not appropriate for judicial review. The non-justiciability of a political question is based primarily on the constitutional principle of separation of powers inherent in the text of the Constitution and the policy of judicial self-restraint. <u>See</u> <u>Baker</u>, 369 U.S. at 210; <u>see also</u> <u>Kashani v. Nelson</u>, 793 F.2d 818, 827 (7th Cir. 1986); <u>Flynn v. Shultz</u>, 748 F.2d 1186, 1189 (7th Cir. 1984); <u>Calvin v. Conlisk</u>, 520 F.2d 1, 5 (7th Cir. 1975). Although the political question doctrine is just one aspect of a broader justiciability issue, it has been "applied in cases involving extremely diverse issues." <u>Flynn</u>, 748 F.2d at 1189; <u>see also</u> <u>Baker</u>, 369 U.S. at 211-18.

However, not all issues having political implications or significant political overtones are non-justiciable under the political question doctrine. <u>See</u> <u>Japan Whaling Ass'n v. American Cetacean Soc.</u>, 478 U.S. 221, 229-30 (1986); <u>see also</u> <u>I.N.S. v. Chadha</u>, 462 U.S. 919, 921 (1983). Rather the Supreme Court has said that "'[i]n determining whether a question falls within (the political question) category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory

55

criteria for a judicial determination are dominant considerations.'" <u>Baker</u>, 369 U.S. at 210

(quoting <u>Coleman v. Miller</u>, 307 U.S. 433, 454-55 (1939)).  To further frame the issue, the

Supreme Court has identified at least six factors ("<u>Baker</u> factors") the court should consider to

determine whether a matter raises a non-justiciable political question, including:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

<u>Baker</u>, 369 U.S. at 217; <u>see also</u> <u>Kashani</u>, 793 F.2d at 827.  When any one of the foregoing <u>Baker</u>

factors is implicated, the court should refrain from adjudicating the issue to prevent unwarranted

interference with decisions properly made by the Representative Branches of the federal

government.  See <u>Munoz-Flores</u>, 495 U.S. at 393-94; <u>Baker</u>, 369 U.S. at 217.

Following <u>Baker</u>, the Supreme Court "has not retreated from the analytical framework it

established." <u>Alperin v. Vatican Bank</u>, 405 F.3d 727, 739 (9th Cir. 2005) (holding that dismissal

of victims of World War II war crimes Complaint was not warranted because the court could

resolve property claims without expressing lack of respect for federal government's political

branches).  Other recent decisions have elaborated on the <u>Baker</u> criteria.  Last Term, the

Supreme Court revisited the <u>Baker</u> decision, stating that the factors enumerated in that case are

"probably listed in descending order of both importance and certainty." <u>Vieth v. Jubelirer</u>, 541

U.S. 267, 278 (2004) (holding that political gerrymandering claims are nonjusticiable).  After

<u>Vieth</u>, courts have taken a "slightly different approach to interpreting the phrase 'judicially

56

discoverable and manageable standards.'" Alperin, 405 F.3d at 747. "Instead of focusing on the logistical obstacles, we ask whether the courts are capable of granting relief in a reasoned fashion or, on the other hand, whether allowing the . . . [c]laims to go forward would merely provide 'hope' without a substantive legal basis for a ruling." Id. (citing Vieth, 541 U.S. at 304).

### b. Application of the Political Question Doctrine

Before determining whether any of the Baker factors require dismissal under the political question doctrine, the court must first decide the applicability of the political question doctrine based on the nature of Plaintiffs' claims. Plaintiffs argue that the political question doctrine is inapplicable here because their claims are *private*, not *political*. See Mem. in Opp. to Defs.' Mot. to Dismiss I, at 25 (emphasis added); see also Mem. in Opp. to Defs.' Mot. to Dismiss II, at 4. Specifically, Plaintiffs assert that the doctrine does not apply because their "claims are brought by private individuals against private corporations for both tort and property harms that were occasioned by defendants' particular acts of years past, as well as their acts of today."[26] Mem. in Opp. to Defs.'s Mot. to Dismiss I, at 25. The court rejects Plaintiffs' argument for two

---

[26]In support of their position, Plaintiffs rely on Kadic v. Karadzic, 70 F.3d 232 (2nd Cir. 1995), a case which is clearly distinguishable from the present case. In Kadic, the Second Circuit declined to dismiss the plaintiffs' claims under the Alien Tort Claims Act alleging gross human rights abuses against a Bosnian Serb leader on the basis of the political question doctrine. 70 F.3d at 250. The Kadic court cautioned that "judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions . . ." and added that "[a]lthough these cases present issues that arise in a politically charged context, that does not transform them into cases involving non-justiciable political questions." Id. at 249. However, in reaching its decision, the Kadic court stated that it did not have to decide the issue of whether judicial involvement would interfere with actions of other branches of the federal government because the court obtained a "'Statement of Interest'" signed by both the Solicitor General and the State Department's Legal Advisor expressly disclaiming any concern that the political question doctrine should be invoked. Id. at 250. No such "Statement of Interest" has been or could be sought in the present case.

reasons.  First, there are numerous cases where the federal courts have dismissed claims by private plaintiffs against private defendants on the basis of the political question doctrine.  The majority of these cases arise in the context of reparations claims arising out of World War II.  See, e.g., Kelberine v. Societe Internationale, 363 F.2d 989, 995 (D.C. Cir. 1966); In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d 370, 382 (D.N.J. 2001); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 489 (D.N.J. 1999); Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248, 282-85 (D.N.J. 1999).

Second, although Plaintiffs couch their claims as *tort* or *property* claims for acts committed by *private* corporate defendants, this alone does not preclude the application of the political question doctrine.  The Supreme Court has stated that the identity of the litigants is immaterial to the questions raised by the political question doctrine.  See Munoz-Flores, 495 U.S. at 394.  Additionally, when determining whether the political question doctrine applies, the court must look to the nature of the underlying litigation, not the specific claims enumerated in the complaint.  See Renne, 501 U.S. at 316 (to determine justiciability, the court must examine the "pleadings and record to determine the nature of the dispute and the interests of the parties in having [the issue] resolved"); see also Baker, 369 U.S. at 217 (indicating the need for a "discriminating inquiry into the precise facts and posture of the particular case" when distinguishing between "political questions" and "political cases").  Thus, the issue becomes whether Plaintiffs' claims are the type of claims that have been committed to the Representative Branches for resolution.  See In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d at 378.

58

Finally, Plaintiffs assert that the issue of reparations is a distinct and separate issue from issues of "[e]quality under the law and freedom from discrimination." Mem. in Opp. to Defs.' Mot. to Dismiss II, at 4. In other words, Plaintiffs argue that the legislation Congress has passed granting African-Americans full citizenship and equality under the law does not amount to, or serve as a substitute for, legitimate and meaningful reparations for slavery. Id. Plaintiffs therefore argue that the political question doctrine does not apply to the issue of slave reparations. Id. at 4-5. It is clear, however, that Congress has considered the issues of reparations for slavery numerous times, in contexts distinct from that of equal rights under the law. See, e.g., H.R. 40, 108th Cong. (2003) and H.R. 40, 107th Cong. (2001) (proposing a Congressional committee to study the effects of slavery on the present African-American community); An Act to Establish a Bureau for the Relief of Freedmen and Refugees, ch. 90, 13 Stat. 507 (March 3, 1865) (creating the Freedman's Bureau, which was to provide former slaves with, *inter alia*, food, clothing, and job placement); H.R. 29, 40th Cong. § 1, 2 (1867) (proposing that Confederate property be seized and distributed to former slaves).

Plaintiffs' Complaint indicates that the underlying nature of their lawsuit seeks reparations for Defendants' participation in slavery dating back as far as the year 1619. See SCAC, ¶ 5. Although Plaintiffs request both equitable and legal relief, the bulk of this relief centers on Plaintiffs' claim for restitution. For example, Plaintiffs seek, among other things, the following remedies: (1) an accounting of the "monies, profits, and/or benefits derived by defendants" from the slave trade and slavery; (2) "a constructive trust in the value of said monies, profits, and/or benefits," (3) "full restitution in the value of all monies, profits, and/or benefits derived by defendants' use of slave labor," (4) "equitable disgorgement" of these

"monies, profits, and/or benefits," and (5) any other appropriate damages. See id. ¶¶ 288, Prayer for Relief. These remedies collectively provide the basis for calculating and distributing the amount of restitution sought; that is the amount in which Plaintiffs claim that Defendants wrongfully benefitted from Plaintiffs' ancestors' unpaid slave labor. See United States v. Shepard, 269 F.3d 884, 885 (7th Cir. 2001) (defining restitution as usually meaning the return of ill-gotten gains to which the holder is not legally entitled). Courts have consistently held that claims seeking restitution for forced labor are claims for reparations. See Iwanowa, 67 F. Supp. 2d at 485 n.84; see also Burger-Fischer, 65 F. Supp. 2d at 281-82. Such claims clearly raise a question as to whether the Judicial branch of the federal government is best suited to resolve the issue. See Cato, 70 F.3d at 1110 (holding that plaintiffs' claims for slavery reparations presented a non-justiciable political question); see also Kelberine, 363 F.2d at 995 (concluding that plaintiffs' claims for reparations against private corporate defendant for its involvement in a "Nazi Conspiracy" during World War II were barred by political question doctrine).

To further support this conclusion, in a recent action seeking relief from a German company and its American subsidiaries for damages resulting from the plaintiffs' forced labor in Nazi Germany during World War II, the District Court for the District of New Jersey rejected the very same argument that Plaintiffs raise here. See In re Nazi Era Cases Against German Defendants Litig. 129 F. Supp. 2d at 375 (rejecting the plaintiffs' argument that the political question doctrine cannot preclude a claim for reparations brought by an individual against a private company when the underlying abuse alleged was "fundamentally interrelated with the Nazi war effort").

As a result, Plaintiffs' assertions that their claims are *private* rather than *political*, and that the issue of reparations is different from the issue of equal rights under the law, do not preclude the court from inquiring into whether this case presents a non-justiciable political question. Further, given the nature of Plaintiffs' claims, an analysis of the political question doctrine is necessary. Having reached this conclusion, a review of Plaintiffs' Complaint reveals that all of the <u>Baker</u> factors are present in the underlying litigation.

### *(1). A Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department*

The Constitution commits to the Representative Branches of the United States Government the authority to resolve the issue of reparations to former slaves resulting from the Nation's role in the institution of slavery. As stated above, historians have long debated whether the issue of slavery was the actual cause of the Civil War. <u>See</u> <u>infra</u>, Part II.E. However, regardless of what actually caused the Civil War, it is clear that the abolition of slavery as an institution was a fundamental concern of the Representative Branches both during and after the war. <u>See</u>, <u>e.g.</u>, Donald G. Nieman, <u>Promises to Keep: African-Americans and the Constitutional Order, 1776 to the Present</u> 54 (Oxford University Press 1991). Under the Constitution, the war powers are reserved to the Representative Branches of the federal government. <u>See</u> U.S. Const. art. I, § 8; U.S. Const. art. II, § 2; <u>see also</u> <u>Doe v. Bush</u>, 323 F.3d 133, 137 (1st Cir. 2003). These powers not only include the power to declare and prosecute war, but also extend to the power to ensure a just and lasting peace following the conclusion of a war. <u>See</u> <u>Ladue & Co. v. Brownell</u>, 220 F.2d 468, 472 (7th Cir. 1955) (holding that Congress may reserve the power to seize property following a formal declaration of peace). By exclusively entrusting such powers to the

Representative Branches, the Constitution restricts judicial review or interference on many war-related decisions made by Congress and the President both during and after a war.  See Harisiades v. Shaughnessy, 342 U.S. 580, 589-90 (1952).

In this case, there is a strong historical record indicating that the relief sought, reparations to former slaves following the Civil War, was considered and rejected by the Representative Branches in lieu of other forms of relief.  This relief came in many forms, including wartime and post-war legislation, civil rights legislation, and constitutional amendments – all intended to ensure the liberty of the newly freed slaves and benefit them generally.

For example, prior to the end of the Civil War, Congress passed the Federal Confiscation Acts designed to punish those who participated in the rebellion by confiscating their property. See An Act to Confiscate Property Used for Insurrectionary Purposes, ch. 60, 12 Stat. 319 (Aug. 6, 1861), as amended by, An Act to Suppress Insurrection, to Punish Treason and Rebellion, to Seize and Confiscate the Property of Rebels, and for Other Purposes, ch. 195, 12 Stat. 589 (July 17, 1862).  The Confiscation Acts also freed tens of thousands of slaves who had fled to Union forces by the summer of 1862.  See id.  Shortly thereafter, following a series of Union victories, President Lincoln, using his constitutional authority as Commander-in-Chief, issued the Emancipation Proclamation on January 1, 1863.  See Abraham Lincoln, The Emancipation Proclamation, Exec. Proclamation No. 17 (Jan. 1, 1863), reprinted in 12 Stat. 1268 (1863).  The Emancipation Proclamation freed all slaves in the states under Confederate control.  Id.

Other wartime efforts to ensure the well-being of the newly freed slaves included Congress' creation of the Freedman's Bureau in March 1865.  See An Act to Establish a Bureau for the Relief of Freedmen and Refugees, ch. 90, 13 Stat. 507 (March 3, 1865).  Congress created

the Freedman's Bureau pursuant to the war powers to provide former slaves food, clothing, supplies, job placement, educational facilities, and homestead land.  Id.; see also Albert P. Blaustein and Robert L. Zangrando, Civil Rights and the American Negro: A Documentary History 210 (Washington Square Press, Inc., New York 1968).  The Bureau had the authority to rent or sell to freed slaves land abandoned or confiscated in the Confederacy.  Id.  Although Congress initially intended for the Bureau's authority to expire one-year after the completion of the Civil War, Congress voted to extend the Bureau's powers over President Johnson's veto. See An Act to Continue in Force and to Amend An Act to Establish a Bureau for the Relief of Freedmen and Refugees, and for Other Purposes, ch. 200, 14 Stat. 173 (July 16, 1866); An Act to Continue the Bureau for the Relief of Freedmen and Refugees, and for Other Purposes, ch. 135, 15 Stat. 83 (July 6, 1868); see also George R. Bentley, A History of the Freedmen's Bureau 133 (Octagon Books 1970) (1955).

Congress also passed numerous Civil Rights Acts between the period of 1866-1875. Specifically, the Civil Rights Acts of 1866, 1870, 1871, and 1875 were enacted to secure civil rights for the newly freed slaves.  Most notably, the Civil Rights Act of 1866 declared "[a]ll persons" to be citizens of the United States and guaranteed them legal equality throughout the nation.[27]  See Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (April 9, 1866).  The Act provided that "[a]ll persons . . . shall have the same right in every State . . . as is enjoyed by white citizens."  Id. § 1 (currently codified, as amended, at 42 U.S.C. § 1981).

---

[27] Because there were questions as to whether the Thirteenth Amendment authorized the Civil Rights Act of 1866, Congress ratified the Fourteenth Amendment on July 9, 1868, rendering the issue moot.  See U.S. Const. amend XIV.

Additionally, Congress ratified three constitutional amendments (hereinafter collectively referred to as the "Civil War Amendments") between the period of 1865 to 1870 to ensure the liberty of the newly freed slaves. The Thirteenth Amendment, ratified on December 6, 1865, provides, in part: "Neither slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. This amendment formally abolished slavery within the United States by prohibiting individual states from enacting legislation authorizing the use of slavery within their borders. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439 (1968) (noting that the Thirteenth Amendment effectively abolished slavery and gave Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States") (internal quotations omitted). Congress then ratified the Fourteenth Amendment on July 9, 1868, declaring among other things, that all persons born or naturalized in the United States were United States citizens and citizens of the state in which they resided. See U.S. Const. amend. XIV, § 1. Section 1 of this Amendment effectively overruled the Supreme Court's Dred Scott[28] decision, ultimately making freed slaves citizens of the United States. Finally, on February 3, 1870, Congress ratified the Fifteenth Amendment with the intention of granting African-Americans the right of suffrage.[29] The Fifteenth Amendment provides, in part: "The right of citizens of the United

---

[28]In Dred Scott v. Sanford, the Supreme Court declared the Missouri Compromise unconstitutional and broadly held that slaves were property, not citizens. 60 U.S. 393 (1856). The Court's ruling established that slaves were not entitled to all of the rights, privileges and immunities guaranteed to all citizens under the Constitution. Id. at 404-405.

[29]The court notes that although Congress intended to give African-Americans the right to vote by ratifying the Fifteenth Amendment, the Amendment itself did not guarantee such a result. State and local laws requiring poll taxes, literary tests, residence and registration requirements, and "grandfather clauses" acted as impediments to this right. See Blaustein and Zangrando, supra at 245-46. Many of these issues were not resolved until decades later when the

States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend XV, § 1.  Concerned with the possibility that individual states may attempt to circumvent the purpose behind the Civil War Amendments, Congress included an enabling clause in all three of the Civil War Amendments – giving it the exclusive power to enforce the Amendments with appropriate legislation.  See U.S. Const. amend XIII, § 2; see also U.S. Const. amend XIV, § 5; U.S. Const. amend XV, § 2.

More directly on point, the Representative Branches considered the issue of reparations to freed slaves for harms suffered as a result of the institution of slavery.[30]  Congressman Thaddeus Stevens proposed a bill that would have utilized the Confiscation Acts to seize public and private real property within the former Confederate States.  See H.R. 29, 40th Cong. § 1, 2 (1867).  The confiscated property would have been distributed to freed slaves.  See id. § 4. Specifically, the text of that bill provided, *inter alia*:

> That out of the lands thus seized and confiscated the slaves who have been liberated by the operations of the war and the amendment to the Constitution or otherwise, who reside in said "confederate States" on the 4th day of March, A.D. 1861, or since, shall have distributed to them as follows, namely: to each male

United States Supreme Court became involved in the issue and Congress passed the Voting Acts Rights Act of 1965.  Id.  However, to help illustrate the seriousness of Congress' efforts to assimilate the newly freed slaves into society, the court notes that the African-American male was given the right to vote fifty years prior to Congress' ratification of the Nineteenth Amendment, which gave women the right to vote.  See U.S. Const. amend. XIX.

[30]In fact the Representative Branches continue to consider the issue of reparations to descendants of slaves.  In 1989, and in each successive year, Congressman John Conyers has introduced a Reparations Study Bill, commonly referred to as H.R. 40.  See, e.g., Commission to Study Reparations Proposals for African Americans Act, H.R. 3745, 101st Cong. (1989); Commission to Study Reparation Proposals for African-Americans Act, H.R. 40, 108th Cong. (2003).  This Reparations Study Bill provides, *inter alia*, for the formation of a commission to study human chattel slavery and its continuing impact on African descendants in the United States today.  See, e.g., H.R. 3745, § 2(b)(1)-(3), 101st Cong. (1989).  The bill also calls for the commission to recommend the form that reparations should take if it indeed finds there to be continuing injuries to African descendants.  See id. at § 2(b)(5).

> person who is the head of a family, forty acres; to each adult male, whether the head of a family or not, forty acres; to each widow who is the head of a family, forty acres – to be held by them in fee-simple, but to be inalienable for the next ten years after they come seized thereof.

Id.  In addition, each freed slave would have also been entitled to a monetary grant for the purpose of erecting buildings on these distributed lands.  See id. § 5.

Stevens passionately advocated for passage of this bill.  Stevens indicated that H.R. 29 was designed to help several classes of persons, including freed slaves, stating:

> [H.R. 29] is important to four millions of injured, oppressed, and helpless men, whose ancestors for two centuries have been held in bondage and compelled to earn the very property a small portion of which we propose to restore to them, and who are now destitute, helpless, and exposed to want and starvation under the deliberate cruelty of their former masters . . . .  The cause of the war was slavery.  We have liberated the slaves.  It is our duty to protect them and provide for them while they are unable to provide for themselves.  Have we not a right, in the language of Vattel, 'to do ourselves justice respecting the object which has caused the war,' by taking lands for homesteads for these 'objects' of the war?

CONG. GLOBE, 40th Cong., 1st Sess. 204 (1867) (statement of Congressman Stevens).  According to Stevens, passage of H.R. 29 would have served two objectives.  First, the bill would have served to punish the Confederate States for their treasonous war.  As Stevens stated:  "You behold at your feet a conquered foe, an atrocious enemy.  Tell him on what terms he may arise and depart or remain loyal.  But do not embrace him too hastily.  Be sure first that there is no dagger in his girdle."  Id. at 205.  Second, the bill would have served to place freed slaves on the path to economic independence.  As Stevens stated:

> Four million persons have just been freed from a condition of dependence, wholly unacquainted with business transactions, kept systematically in ignorance of all their rights and of the common elements of education, without which none of any race are competent to earn an honest living, to guard against the frauds which will always be practiced on the ignorant, or to judge of the most judicious manner of applying their labor.

66

Id.

In the Senate, Senator Charles Sumner also championed this vision of land distribution as a form of reparations to freed slaves. See CONG. GLOBE, 40th Cong., 1st Sess. 15, 49-56, 79, 114, 147, 203-08, 304-08, 463 (1867) (statements of Senator Sumner). According to Sumner, "all who are now familiar with the process of reconstruction have felt that our work would be incomplete unless in some way or another we secured to the freedmen a piece of land." CONG. GLOBE, 40th Cong., 1st Sess. 50 (1867) (statement of Senator Sumner). One particular proposed resolution of Sumner's provided, *inter alia*: "Not less important than education is the homestead, which must be secured to the freedmen, so that at least every head of a family may have a piece of land." Id. (reading text of proposed resolution, Miscellaneous Document No. 1, § 5).

The idea of land distribution was also a plan of the Bureau of Refugees, Freedmen, and Abandoned Land. See generally Bentley, supra at 49. However, the idea of land distribution was ultimately abandoned, with President Andrew Johnson pursuing a plan to pardon Confederate sympathizers and restore their property rights. See Claude F. Oubre, Forty Acres and a Mule: The Freedmen's Bureau and Black Land Ownership 61 – 71 (1978).

The words of Senator Sumner, lamenting the decision not to extend monetary or property reparations to freed slaves, is hauntingly prophetic of the continued post-Emancipation reparations movement: "I do not like to play the part of Cassandra;[31] but I cannot forbear declaring my conviction that we shall regret hereafter that we have not done more." CONG. GLOBE, 40th Cong., 1st Sess. 165 (1867) (statement of Senator Sumner). Yet, that does not

---

[31] In Greek mythology, Cassandra was a figure endowed with the gift of prophecy but fated never to be believed.

change the fact that the Representative Branches considered the issue of reparations to former slaves, and the chosen vessels of reparations came in the form of constitutional and legislative enactments guaranteeing equality under the law and freedom from discrimination. It is the political question doctrine that militates that this court attribute finality to those decisions, and not posit itself as the ultimate authority on the issue by second guessing those decisions. See Baker, 369 U.S. at 210. It is not the province of this court to say that more could have been done in the past, as such decisions are in the nature of political questions committed to the Representative Branches.

In conclusion, based on the historical record presented here, it is clear that both during and after the Civil War the issue of reparations to former slaves was one committed to the Representative Branches of the federal government. It was the President and Congress who prosecuted the military and political aspects of the Civil War, ultimately leading to the conclusion of the war. With a goal of preserving the Union and securing an acceptable and lasting peace, it again was the President and Congress who chose to amend the Constitution and enact civil rights legislation in an effort to provide legal equality to the newly freed slaves. Although the Representative Branches decided to take this particular course of conduct in lieu of providing reparations to former slaves, the historical record clearly demonstrates that the Constitution commits this decision to the Representative Branches. See Alperin v. Vatican Bank, 242 F. Supp. 2d 686, 692 (N.D. Cal. 2003) (noting that "a court must consider the totality of the circumstances in determining whether a claim is one committed to the political branches for resolution"). By requiring the court to second-guess the decisions of the Representative Branches made more than a century ago, Plaintiffs' Complaint presents a non-justiciable

political question.  See Cato, 70 F.3d at 1110 (affirming the dismissal of plaintiffs' slavery reparations complaint on political question grounds based on Congress' desire "to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort") (internal quotations and citations omitted).          **(2).  *Judicially Discoverable and Manageable Standards***

There also exists a lack of "judicially discoverable and manageable standards" for resolving Plaintiffs' claims in this case.  Baker, 369 U.S. at 217.  Defendants argue, and the court agrees, that the historical issues raised in Plaintiffs' Complaint "involve too broad a span of conduct over too broad an expanse of time to be susceptible to any manageable judicial standards for resolution."  See Mem. in Supp. of Defs.' Mot. to Dismiss I, at 35; Mem. in Supp. of Defs.' Mot. to Dismiss II, at 3.  As stated in the Complaint, the relevant events took place as far back as the year 1619.  See SCAC, ¶ 5.  Absent a political framework, the court is ill-equipped to determine many issues posed in a dispute covering a period of almost 400 years. This includes, for example, determining such issues as consanguinity and apportionment of liability given the multiple generations associated with the litigation.  See, e.g., Eric A. Posner and Adrian Vermeule, Reparations For Slavery and Other Historical Injustices, 103 COLUM. L. REV. 689, 702 (2003) (discussing the limited effect of the restitutionary theory of reparations where the claim is made several generations removed from the actual wrongdoing).

In support of their claims, Plaintiffs rely on In re Holocaust Victim Assets Litig., 105 F. Supp. 2d 139 (E.D.N.Y. 2000), to support their assertion that this type of case is "extremely well suited to judicial resolutions."  See Mem. in Opp. to Defs.' Mot. to Dismiss I, at 30 n.47; see also Mem. in Opp. to Defs.' Mot. to Dismiss II, at 1.  In the Holocaust Victim case, the district court

approved a class action settlement between Holocaust victims and two leading Swiss banks after the plaintiffs brought suit alleging, among other things, that the defendants "collaborated with and aided the Nazi regime in furtherance of war crimes, crimes against humanity, crimes against peace, slave labor and genocide." 105 F. Supp. 2d at 141. However, the <u>Holocaust Victim</u> case is clearly distinguishable from the present action because in its Opinion, the court noted that because the settlement was reached while the defendants' motions to dismiss were pending, the court did not have to decide the issues raised in the motions. <u>Id.</u> at 142. Thus, the <u>Holocaust Victim</u> court never considered whether the issues raised in the plaintiffs' complaint implicated a non-justiciable political question.

Moreover, although it can be argued that in certain cases such issues similar to those presented in Plaintiffs' Complaint are not entirely inappropriate for judicial resolution, this case does not present such issues. Because the events surrounding the institution of slavery and the Civil War are so deeply rooted in our Nation's history, the issues that may appear to be capable of judicial resolution in an ordinary case move beyond the province of this court given the magnitude of the events that preceded them. <u>Cf.</u> <u>Nazi Era Cases Against German Defendants Litig.</u>, 129 F. Supp. 2d at 389 (stating that the magnitude of World War II has placed plaintiffs' claims for reparations beyond the province of judicial determination and "into the political realm").

Ultimately, the court is persuaded by the reasoning adopted by other courts that have considered the issue in the context of reparations for forced labor during World War II and have held that such claims are not suitable for judicial resolution. <u>See</u>, <u>e.g.</u>, <u>Kelberine</u>, 363 F.2d at 995; <u>Iwanowa</u>, 67 F. Supp. 2d at 489; <u>Burger-Fischer</u>, 65 F. Supp. 2d at 283-84; <u>Alperin</u>, 242 F.

70

Supp. 2d at 695; Anderman v. Federal Republic of Austria, 256 F. Supp. 2d 1098, 1115 (C.D.

Cal. 2003). In Kelberine, while discussing whether a private corporation should be liable for its

involvement in the Nazi conspiracy of 1933-45, the Appeals Court for the D.C. Circuit stated:

> We are of the opinion the thesis is not presently susceptible of judicial implementation. It may be that the Congress might enact a program and a procedure by which the objectives prayed for could be achieved. But we think the courts alone cannot do it. As presently framed, the problem is not within the established scope of judicial authority . . . . The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought – adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power – is too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed . . . . The events, the witnesses, the guilty tortfeasors, their membership in the conspiracy are all so potentially vague at this point as to pose an insoluble problem if undertaken by the courts without legislative or executive guidance, authorization or support. The whole concept is too uncertain of legal validity to sustain the self-establishment of the proceedings by a court in the absence of specific legislative or executive formulation.

Kelberine, 363 F.2d at 995.

The issues raised by the Kelberine court, particularly those relating to the impracticality

of judicially resolving disputes covering vast time periods and containing numerous

unidentifiable tortfeasors, are clearly present in the underlying litigation. Although Plaintiffs

attempt to distinguish the World War II reparation cases from their case, many of the issues

raised in Kelberine and its progeny are plentiful in the underlying litigation. As such, the second

Baker factor also requires dismissal of Plaintiffs' Complaint.

### (3). Remaining Baker Factors

As stated above, the issues raised in Plaintiffs' Complaint involve events that have had a

significant impact on our Nation's historical development. See infra Part II. Both during and

after the Civil War, the Representative Branches implemented various policies aimed at resolving the problems and challenges stemming from the abolition of slavery within the United States. These policies included, among others, the enactment of several Civil Rights Acts and the ratification of the Civil War Amendments – all of which were intended to provide legal equality to the newly freed slaves. Even throughout the twentieth century, the Representative Branches continued to establish these policies by enacting further civil rights legislation and by implementing various relief programs intended to benefit minorities – many of whom are descendants of former slaves.

By bringing their claims for slavery reparations before the court, Plaintiffs require the court to criticize or question actions or decisions or policies made by the Representative Branches over a period spanning more than a century. Given our constitutional structure, policy determinations of this type are for elected officials, not the courts. Moreover, during and after the bloodiest war in this country's history, the Representative Branches grappled with these issues while simultaneously trying to conclude the war and ensure lasting peace. Allowing Plaintiffs, through private litigation, to seek reparations for wrongs committed prior to and during the Civil War clearly expresses a lack of respect for the Representative Branches and their attempted resolution of such issues over the past century and one-half.[32] Although

---

[32]Plaintiffs argue that President Bush recently gave "implicit support" for their claims in a major policy speech given on Goree Island in Senegal on July 8, 2003, where he declared that slavery was "one of the greatest crimes in history." See Mem. in Opp. to Defs.' Mot. to Dismiss I, at 31; Mem. in Opp. to Defs.' Mot. to Dismiss II, at 1. Plaintiffs fail to develop this argument or support it in any way. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) (stating that courts should not consider undeveloped or unsupported arguments). In any event, Plaintiffs' use of the President's speech is not persuasive because such statements may support the proposition that the Representative branches of our government should continue their historical efforts to advance civil rights for all citizens.

Plaintiffs question the choices made by the Representative Branches and the effectiveness of these decisions in providing equality to descendants of former slaves, the fact remains that these are political questions which the court must decline to determine. Cf. Burger-Fischer, 65 F. Supp. 2d at 282 (concluding that courts cannot re-examine the adequacy of reparation agreements between the United States and other World War II combatants because doing so implicates a political question in which the court must decline to intervene).

### (4) Efficiency and Legitimacy

Principles of efficiency and legitimacy also play an important role in the political question doctrine. Prudential limits on the exercise of power protect the separate branches of government from the potential embarrassment of being unnecessarily overruled by one another, and from the inherent waste that would result from one branch conducting the business of another. See Baker, 369 U.S. at 210. The drafters of the Constitution understood that various branches of our federal government would be better equipped, more knowledgeable, and have greater resources to deal with certain specific matters than other branches. See Saldano v. O'Connell, 322 F.3d 365, 369 (5th Cir. 2003).

For example, the drafters assigned the judicial branch a very small role in the arena of foreign relations. See United States v. Plummer, 221 F.3d 1298, 1309 (11th Cir. 2000) ("the role of the judiciary in foreign affairs is limited: 'Matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference'") (quoting Regan v. Wald, 468 U.S. 222, 242 (1984)). Issues related to foreign affairs are thus best left to Congress, as it has the resources and tools necessary to handle foreign policy issues. The House or Senate thus has the power to convene

hearings or conduct investigations in any foreign relations area. To allow judicial intervention in foreign policy areas that are designated to the Representative branch would be an ineffective allocation of resources, and render the Congressional role in foreign policy moot. See Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1235 (11th Cir. 2004).

### c. Conclusion

The federal court system is insulated from the political process by, in part, granting federal judges lifetime appointments. These lifetime appointments are thought to insure that federal judges remain objective and neutral in their interpretation of the law.

> By freeing federal judges from continuing review by appointing authorities, conflicts of interest are minimized. An independent judiciary is the hallmark of the constitutional state . . . . From an interbranch conflict of interest perspective, this requirement ensures that judges confine themselves to concrete cases *and do not needlessly decide matters that are the business of political branches.*

Paul R. Verkuil, The American Constitutional Tradition of Shared and Separated Powers: Separation of Powers, The Rule of Law and the Idea of Independence, 30 WM. & MARY L. REV. 301, 308 (1989) (emphasis added).

It is undisputed that Congress has taken the initiative to deal with issues arising from the slave trade in the decades after the Civil War. See e.g., CONG. GLOBE, 40th Cong., 1st Sess. 15, 49-56, 79, 114, 147, 203-08, 304-08, 463 (1867) (statements of Senator Sumner advocating land distribution to freed slaves). Moreover, in recent years, Congress has considered and rejected Representative Conyers' calls for the establishment of a commission to study the effects of slavery on the modern day African-American community. See, e.g., H.R. 40, 108th Cong. (2003), H.R. 40, 107th Cong. (2001). This district court will therefore not substitute its judgment for that of Congress on the matter of slave reparations. See Baker, 369 U.S. at 210;

see also Kashani v. Nelson, 793 F.2d 818, 827 (7th Cir. 1986); Flynn v. Shultz, 748 F.2d 1186, 1189 (7th Cir. 1984); Calvin v. Conlisk, 520 F.2d 1, 5 (7th Cir. 1975) (all emphasizing the constitutional principle of separation of powers, and the policy of judicial self-restraint).

It is also worthwhile in this context to again mention that, for the past 60 years, when the issue of reparations has arisen in regard to other minority groups, Congress has dealt with the issue. In 1946, Congress created the first reparations program "in order to redress a wide range of claims pressed by Indian tribes, including violations of treaties for which a judicial remedy was denied, and the loss of lands under treaties signed under duress." Posner and Vermeule, supra, at 695 (quoting Nell Jessup Newton, Compensation, Reparations, & Restitution: Indian Property Claims in the United States, 28 GA. L. REV. 453, 468 (1993)). In addition, in 1988, Congress authorized payment to Japanese-Americans interred during World War II. See Eric K. Yamamoto, Racial Reparations: Japanese American Redress and African American Claims, 40 B.C. L. REV. 477, 477-78 (1998).

In sum, the issues raised in Plaintiffs' Complaint are more properly addressed by Congress and state legislatures. The question of slave reparations, and reparations for other historic injustices perpetrated on minority groups, has been addressed numerous times by various legislative branches of our government. See H.R. 40, 108th Cong. (2003), H.R. 40, 107th Cong. (2001); C. Jeanne Bassett, House Bill 591: Florida Compensates Rosewood Victims and Their Families for a Seventy-One-Year-Old Injury, 22 FLA. ST. U. L. REV. 503 (1994) (explaining how the Florida legislature passed a bill granting reparations to African-American victims, and their descendants, of the 1923 Rosewood, Florida massacre). Most importantly, however, Plaintiffs' Complaint implicates all of the factors established by the Supreme Court identifying a non-

justiciable political question.  See Baker, 369 U.S. at 217.  As such, each Baker factor provides a separate and independent basis for the court to dismiss Plaintiffs' Complaint under the well-settled political question doctrine.  See id.

## B.  Failure to State a Claim Upon Which Relief Can be Granted

As discussed infra, Part IV, A.1., one of the fundamental defects of Plaintiffs' Complaint is lack of standing, as the Complaint fails to allege any constitutionally cognizable injury that is fairly traceable to Defendants.  As an additional argument in support of dismissal, Defendants argue that Plaintiffs' Complaint fails to state a claim upon which relief can be granted.  Although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, and that these claims present a non-justiciable political question, with an abundance of caution, the court will next determine whether the Complaint fails to state a claim upon which relief can be granted as an independent basis for dismissal.

The sufficiency of a complaint may be tested in a number of ways pursuant to Federal Rule of Civil Procedure 12: a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6); a motion for a more definite statement of a vague or ambiguous complaint pursuant to Rule 12(e); or a motion to strike redundant, immaterial, impertinent, or scandalous matter in a complaint pursuant to Rule 12(f).  In this matter, Defendants have elected to proceed pursuant to Rule 12(b)(6), challenging whether Plaintiffs' Complaint states a claim upon which relief can be granted.

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2); see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,

507 U.S. 162, 168 (1993) (discussing "notice pleading" standards under the Federal Rules of Civil Procedure). Under this liberal notice pleading standard, "'[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)).

The main function to be performed by the complaint is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). "While federal notice-pleading allows for a generous reading of a complaint, in order to resist a motion to dismiss, the complaint must at least set out facts sufficient to 'outline or adumbrate' the basis of the claim." Panaras v. Liquid Carbonic Industries Corp., 74 F.3d 786, 792 (7th Cir. 1996). The Federal Rules of Civil Procedure require the plaintiff to disclose adequate information regarding the basis of the claim for relief as distinguished from a bare averment that the plaintiff wants relief and is simply entitled to it. See 5 Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1202 (2d ed. 1990). A complaint contains adequate information regarding the basis of the claim for relief if it contains even "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002). To provide a defendant with fair notice, "a complaint must allege facts bearing on all material elements necessary to sustain a recovery under some viable legal theory." Looper Maintenance Service, Inc. v. City of Indianapolis, 197 F.3d 908, 911 (7th Cir. 1999) (citation omitted).

Plaintiffs claim that Defendants illegally profited from slavery without identifying the act or acts claimed to support this broad charge. This is insufficient to state a claim even under

liberal notice-pleading standards. See Higgs, 286 F.3d at 439. As already indicated, Plaintiffs' Complaint fails to connect any alleged injury of any one of the Plaintiffs or their ancestors to alleged conduct by any one of the Defendants or their predecessors. Rather, Plaintiffs seek to hold Defendants liable for an entire era of history simply because their alleged predecessors were purportedly doing business in nineteenth century America. Plaintiffs' Complaint can be reduced to the following syllogism: Defendants or their predecessors allegedly profited from the unpaid labor of former slaves, and Plaintiffs are descendants of former slaves, therefore, Plaintiffs are entitled to some of Defendants' profits. However, the allegations in a complaint must be those relating to the plaintiff, not those of someone else. See Kyle v. Morton High School, 144 F.3d 448, 455 (7th Cir. 1998). The broad allegations of Plaintiffs' Complaint fail to give Defendants fair notice of what conduct is alleged to have injured which persons, in what manner, and when over the past four centuries covered in the Complaint.

In light of this omission failing to link any alleged conduct of Defendants or their alleged predecessors to Plaintiffs or their ancestors, Plaintiffs' Complaint relies in part on a conspiracy theory. Plaintiffs' Complaint alleges that Defendants or their alleged predecessors conspired with certain unnamed malefactors to violate the legal rights of certain unnamed victims – presumably all persons held in slavery – and thus are somehow liable based on a theory of third-party liability. However, Plaintiffs' Complaint fails to allege even the faintest outline of this conspiracy, let alone its members and Defendants', or their predecessors', alleged roles in that conspiracy. Even under liberal notice pleading standards, the pleading of a conspiracy requires a plaintiff to "indicate the parties, general purposes, and approximate date, so that the defendant has notice of what he is charged with." Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir.

2002). Plaintiffs' conspiracy theory is similar to that in Albiero v. City of Kankakee, 122 F.3d 417, 420-21 (7th Cir. 1997), where the plaintiffs alleged a conspiracy, but did not elaborate or provide any other allegations to support the conspiracy.

Plaintiffs' SCAC also brings two new common law claims - replevin and negligent infliction of emotional distress. Replevin is a cause of action "which lies to gain possession of *personal chattels* which have been taken from the plaintiff unlawfully." In re Braun, 3 F.2d 247, 249 (7th Cir. 1924) (emphasis added). In other words, replevin actions seek the return of tangible items to their rightful owner. See 66 AM. JUR. 2d *Replevin* § 1 (2004) ("Replevin is a remedy stemming from the common law and it is a proceeding by which the owner or one who has an interest in a chattel taken or detained seeks to recover possession of the chattel"); see also Smith v. United States, 293 F.3d 984, 987 (7th Cir. 2002); Ruslan Shipping Corp. v. Coscol Petroleum Corp., 635 F.2d 648, 650 n.5 (7th Cir. 1980); Phillips v. Money, 503 F.2d 990, 993 (7th Cir. 1974). In this case, Plaintiffs identify no specific, tangible items that have been taken or detained by Defendants. See SCAC, ¶ 290. To the extent that Plaintiffs seek the return of money from Defendants, such recovery is generally not allowed under replevin. See 66 AM. JUR. 2d *Replevin* § 9 (2004) ("Money is not subject to replevin unless it is marked or designated in some manner so as to become specific, as it regards the power of identification, such as being in a bag or package"); see also Daenzer v. Wayland Ford, Inc., 193 F. Supp. 2d 1030, 1041 (W.D. Mich. 2002) ("replevin is an action used to effect the return of the subject property taken, not for the return of money"). Plaintiffs' new count of Replevin therefore fails to state a claim upon which relief could be granted. See Looper, 197 F.3d at 911.

79

Claims of negligent infliction of emotional distress can only succeed if the plaintiff can establish that the defendant owed plaintiff a particular, identifiable, duty of care. See Schrott v. Bristol-Myers Squibb Co, 403 F.3d 940, 944 (7th Cir. 2005); Corgan v. Muehling, 574 N.E.2d 602, 606 (Ill. 1991) (finding that a psychologist owed his client such a duty of care). In this case, Plaintiffs fail to allege any facts from which the court could find that Defendants' pre-civil war actions breached any duty of care to the present day Plaintiffs. Plaintiffs' new count of negligent infliction of emotional distress therefore fails to state a claim upon which relief could be granted. See Looper, 197 F.3d at 911.

Plaintiffs also, in their SCAC, include new allegations that certain Defendants made "intentional misrepresentations" in connection with alleged violations of various state consumer protection laws. SCAC, ¶¶ 227-256. Plaintiffs, however, still fail to allege a specific, concrete harm or an ascertainable loss as a result of Defendants' alleged violations of these statutes. See SCAC, ¶ 104 ("Some or all of the Plaintiffs are presently consumers of defendants. Due to the unconscionable, fraudulent and deceptive public communications made by defendants, plaintiffs suffered the harm of being misled, confused, and deceived about the roles the defendants played in the enslavement of African people"); SCAC, ¶ 106 ("Some or all of the Plaintiffs have suffered the harm of being unconscionably denied the benefits of a competitive market for the goods and services they purchase from defendants"); SCAC, ¶¶ 321, 331, 339, 348, 357, 365 (alleging that these misrepresentations caused "monetary and other economic damages to Plaintiffs"). Plaintiffs thus fail to state a claim upon which relief can be granted under the state consumer protection statutes of New York, Texas, Illinois, and Louisiana. See, e.g., Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (N.Y. 2000); Chandler v. Gene Messer Ford, Inc., 81 S.W.3d

493, 501 (Tx. App. 2002); <u>Jenkins v. Mercantile Mortg. Co.</u>, 231 F. Supp. 2d 737, 747 (N.D. Ill. 2002); <u>Inka's S'Coolwear, Inc. v. School Time, L.L.C.</u> 725 So. 2d 496, 501 (La. Ct. App. 1998) (all indicating that plaintiffs must have suffered actual, ascertainable damages in order to sue under state consumer protection statutes).

In addition, Plaintiffs fail to allege that any Defendant made any allegedly false representation to a Plaintiff regarding a specific product or service; Plaintiffs thus fail to state a claim under Illinois' deceptive advertising and misleading trade identification statute. <u>See Lynch Ford, Inc. v. Ford Motor Co.</u>, 957 F. Supp. 142, 147 (N.D. Ill. 1997). Plaintiffs also fail to allege any commercial practice with the capacity to mislead any Plaintiff regarding identifiable products or services; Plaintiffs thus fail to state a claim under New Jersey's state consumer protection statutes. <u>See Island Mortgs. v. 3M</u>, 373 N.J. Super. 172, 177 (N.J. Super. Ct. Law Div. 2004). Finally, Plaintiffs' allegations as outlined in paragraphs 227-256 of the SCAC indicate only that Defendants have responded publicly to Plaintiffs' claims. The making of these public statements in response to a lawsuit is simply not "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;" Plaintiffs thus fail to state a claim under California's consumer protection statutes. <u>See Wolfe v. State Farm</u>, 46 Cal. App. 4th 554, 561 (Cal. Ct. App. 1996). The court therefore dismisses all of these state law claims. <u>See Goetzke v. Ferro Corp.</u>, 280 F.3d 766, 779 (7th Cir. 2002) ("If a state substantive law has denied a plaintiff a remedy for his cause of action, the district court must dismiss the complaint for failure to state a claim upon which relief may be granted").

Plaintiffs' Complaint in its entirety thus fails to meet the notice pleading requirements set forth in the Federal Rules of Civil Procedure. "This is not a case where the plaintiff has been

tripped up by 'mere technicalities,' but rather, the plaintiff has omitted the gravamen of his complaint." Kyle, 144 F.3d at 457. Plaintiffs' Complaint is a pastiche of the generally acknowledged horrors of slavery, totally devoid of allegations of concrete, specific, ascertainable injury to the Plaintiffs or corresponding conduct committed by Defendants. "This glaring gap in the complaint leaves total speculation as the only alternative for the court to come up with any set of facts justifying relief." Id. at 454. Defendants cannot be deemed to have fair notice of Plaintiffs' claims when they are based solely on speculation. Further, the court cannot indulge this speculation and attempt to determine whether Plaintiffs' Complaint could set forth any set of facts justifying relief, as "[t]hat is not the court's job." Id. In short, Plaintiffs fail to present a well-pleaded complaint that can withstand scrutiny under Rule 12(b)(6), even under liberal notice pleading standards.

## C. Statutes of Limitations

As an additional argument in support of dismissal, Defendants argue that Plaintiffs' claims are time-barred by operation of various statutes of limitations. Once again, although the court has dispositively determined that Plaintiffs lack standing to bring the claims raised in their Complaint, that these claims present a non-justiciable political question, and fail to state a claim upon which relief can be granted, with an abundance of caution, the court will also determine whether statutes of limitations defenses would also constitute an independent basis for dismissal.

### 1. Overview of Statutes of Limitations

The concept of limitations periods to the bringing of legal actions has been well-established in the law for centuries. Limitations on actions can be traced back to early Roman law. See Developments in the Law: Statutes of Limitations 63 HARV. L. REV. 1177 (1950)

(citing Sohm, The Institutes of Roman Law 318-22 (Ledlie's trans., 3d ed. 1907)). As part of our Anglo-American common law system of law, statutes of limitations can be traced as far back as 1189 for actions concerning property right disputes. See Thomas E. Atkinson, Some Procedural Aspects of the Statute of Limitations, 27 COLUM. L. REV. 157, 162 (1927) (chronicling the history of statutes of limitations). While the concept of statutes of limitations has evolved over the centuries well beyond the realm of property law, the general principles behind this concept remain the same.

One principle behind statutes of limitations is the promotion of justice. In his work The Path of the Law, Oliver Wendell Holmes reflected on statutes of limitations, asking: "What is the justification for depriving a man of his rights, a pure evil as far as it goes, in consequence of the lapse of time?" Oliver W. Holmes, Jr., The Path of the Law, 10 HARV. L. REV. 457, 476 (1897).[33] To answer Holmes' question, the justification is fairness to litigants. This fairness is achieved through two goals of statutes of limitations: first, to provide the defendant notice of the plaintiff's claims; and second, to provide repose to the defendant. "Statutes of limitations . . . in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348-49 (1944). Statutes of limitations are based on "[t]he theory that even if one has a just claim it is unjust not to put the adversary on notice to defend within the

---

[33]Also reflecting on the purposes served by statutes of limitations, the Supreme Court once stated: "Statutes of limitations always have vexed the philosophical mind for it is difficult to fit them into a completely logical and symmetrical system of law." Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 313.

period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Id. at 349. In addition, the Supreme Court has explained that:

> Statutes of limitations find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. [citation omitted] They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what is now called a 'fundamental' right or what used to be called a 'natural' right of the individual. [Plaintiffs] may, of course, have the protection of the policy while it exists, but the history of pleas of limitations shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

Chase Sec. Corp., 325 U.S. at 314.

The procedural requirements established by various legislatures for gaining access to the courts are not to be disregarded out of a vague sympathy for particular litigants. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 2071 (2002) (citing Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984)). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application." Cada v. Baxter HealthCare Corp., 920 F.2d 446, 453 (7th Cir. 1990). Statutes of limitations are regulations set by the legislature, designed to set a time period in which to file an action. "They protect important social interests in certainty, accuracy, and repose." Id. "Though rarely the subject of sustained scholarly attention, the law concerning statute of limitations fairly bristles with subtle, intricate, and often misunderstood issues . . . ." Wolin v. Smith Barney Inc., 83 F.3d 847, 849 (7th Cir. 1996).

> A plaintiff may not base [the] suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations.

National R.R. Passenger Corp., 536 U.S. at 117 (quoting Galloway v. General Motors Service Parts Operations, 78 F.3d 1164 (7th Cir. 1996)).

Two important concepts frequently addressed by litigants when dealing with statutes of limitations are accrual and tolling. Accrual denotes the point in time when an action can be maintained. "A cause of action 'accrues' when a suit may be maintained thereon, and the law in this regard differs from state-to-state and by nature of action." Deluxe Black's Law Dictionary, 6th edition at 21 (1990). The proverbial clock starts to run when the action accrues. It is not the date on which the wrong that injures the plaintiff occurs, but the date – often the same, but sometimes later – on which the plaintiff discovers that he has been injured. While discovery of the injury in some cases may be complex, in others it would be immediately obvious, as in the case of the brutal application of the lash, the turning of the screw, or the tightening of the leg chains nightly to a post. As a complement to accrual, tolling is a concept which suspends the running of a limitations period to an accrued action. The proverbial clock is stopped when the action is tolled.

### 2. Statutes of Limitations as Applied to Plaintiffs' Claims

Since statutes of limitations are defenses to claims, a plaintiff ordinarily need not anticipate or attempt to defuse these defenses in a complaint. See Gomez v. Toledo, 446 U.S. 635, 640 (1980). However, "[a] litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense . . . ." United States Gypsum Co. v. Indiana Gas Co.,

Inc., 350 F.3d 623, 626 (7th Cir. 2003) (citation omitted); see also Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998) ("Litigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail."); Soo Line R.R. Co. v. St. Louis S.W. Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997) (indicating that a "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts").

The allegations of Plaintiffs' Complaint do admit the ingredients of a statute of limitations defense. Plaintiffs allege that their claims arise out of the institution of human chattel slavery as it existed in America, and acknowledge that this institution ended in 1865. SCAC, ¶ 5. Plaintiffs, however, claim that these injuries are recurring as long as Defendants do not provide a proper accounting of the profits allegedly gained by them or their predecessors throughout the years from commercial activities relating to the institution of slavery. See, e.g., id. ¶ 58, 3(a) (demanding that Defendants "provide a full accounting of their actions, including, but not limited to, turning over all documents in their possession related in any way to the slave trade and slavery").

Plaintiffs' claims fall into three groups: common law claims, state statutory claims, and federal statutory claims.[34] Plaintiffs' common law claims include: Count I: Conspiracy, Count II: Conversion, Count III: Unjust Enrichment, Count IV: Replevin, Count V: Intentional

---

[34]The court notes that neither Plaintiffs nor Defendants engage in a choice of law analysis. As to Plaintiffs' state law claims, the court normally would apply the choice of law principles of the state in which each transferor court sits. See Ferens v. John Deere Co., 494 U.S. 516, 518-19 (1990) (indicating that in actions transferred pursuant to 28 U.S.C. § 1407(a), the transferee court applies the choice of law principles of the state where the transferor court sits for an analysis of state law claims). The court notes that the vagueness of Plaintiffs' Complaint prevents a thorough choice of law analysis.

Infliction of Emotional Distress, and Count VI: Negligent Infliction of Emotional Distress. Plaintiffs sole federal statutory claim is Count IV: 42 U.S.C. § 1982.[35]  Plaintiffs' state statutory claims, included in Counts VII through XIII, allege violations of consumer protection laws in New York, Texas, California, Illinois, Louisiana, and New Jersey.

Defendants point to the law of Illinois as an example to show that Plaintiffs' state common law claims are time-barred by many years, and extrapolate that all of Plaintiffs' claims would also be time-barred under any conceivable choice of law analysis using the law of any given state, or federal law.  Mem. in Supp. of Defs.' Mot. to Dismiss II, at 1, 4.  Plaintiffs fail to object to Defendants' argument, and do not argue that there is any material conflict among the various state choice of law principles that could be applied in this case.  Therefore the statutes of limitations for Plaintiffs' claims are as follows:

- **Civil Conspiracy** – **five years**.  See e.g., Wilson v. Giesen, 956 F.2d 738, 740-41 (7th Cir. 1992).

- **Conversion** –  **five years**.  See, e.g., Bontkowski v. Smith, 305 F.3d 757, 763 (7th Cir. 2002); 735 ILL. COMP. STAT. 5/13-205.

- **Unjust Enrichment** – **five years**.  See, e.g., Burns Philp Foods, Inc. v. Cavalea Cont'l Freight, Inc., 135 F.3d 526, 527 (7th Cir. 1998); 735 ILL. COMP. STAT. 5/13-205.

- **Replevin** – **five years.**  See, e.g., Hitt v. Stephens, 675 N.E.2d 275, 277 (Ill. App. Ct. 1996); 735 ILL. COMP. STAT. 5/13-205.

- **Intentional Infliction of Emotional Distress** – **two years**.  See, e.g., Dahl v. Fed. Land Bank Ass'n of W. Ill., 572 N.E.2d 311, 314 (Ill. App. Ct. 1991); 735 ILL. COMP. STAT. 5/13-202.

---

[35]Plaintiffs allege two separate versions of "Count IV."

- **Negligent Infliction of Emotional Distress – two years**.  See 735 ILL. COMP. STAT. 5/13-202.

- **42 U.S.C. § 1982 – two years**.  See, e.g., Honorable v. The Easy Life Real Estate Sys., Inc., 182 F.R.D. 553, 563 (N.D. Ill. 1998).
- **New York Consumer Protection from Deceptive Acts and Practices Laws**, **N.Y. Gen. Bus. Law §§ 348, 350 – three years**.  See, e.g., Soskel v. Handler, 736 N.Y.S.2d 853, 855 (N.Y. Sup. Ct. 2001); N.Y. C.P.L.R. § 214.

- **Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41 – two years**.  See TEX. BUS. & COM. CODE § 17.565.

- **California Business and Professions Code § 17200 et seq. – four years.**  CAL. BUS. & PROF CODE § 17208.

- **Illinois Consumer Fraud and Deceptive Business Act**, **815 Ill. Comp. Stat. 505/1 – three years**.  See, e.g., Dreisilker Elec. Motors, Inc. v. Rainbow Elec. Co., 562 N.E.2d 970, 972-3 (Ill. App. Ct. 1990); 815 ILL. COMP. STAT. 505/10a(e).

- **Louisiana Unfair Trade Practices and Consumer Protection Law**, **La Rev. Stat. Ann. § 51:1401 – one year**.  See LA. REV. STAT. § 51:1409(e).

- **New Jersey Unfair Trade Practice Law**, **N.J. Stat. Ann. § 56:8-1 – six years**.  See, e.g., Mirra v. Holland Am. Line, 751 A.2d 138, 140 (N.J. Super. Ct. App. Div. 2000).

Given that the institution of chattel slavery in the United States ended in 1865, Plaintiffs' century-old claims would have accrued by 1865 at the latest.  The longest limitations period for any of Plaintiffs' century-old claims is five years, which would have run well over a century prior to the filing of the instant Complaint.  If cognizable claims ever existed, those claims were owned by former slaves themselves, and became time-barred when the statutes of limitations expired in the nineteenth century.  As such, Plaintiffs' century-old claims are barred by the statutes of limitations in every jurisdiction.

88

Plaintiffs, however, also allege that Defendants are currently making intentional misrepresentations regarding Defendants' past involvement in the institution of slavery, and that these misrepresentations presently violate various state consumer laws. The court finds, however, that Plaintiffs have not alleged that any concrete, material misrepresentations were made to any specific Plaintiffs within the various statutory periods. Plaintiffs' allegations of continuing misrepresentations by Defendants include the following. "Two years ago, Aetna expressed regret for 'any involvement' it 'may have' had in insuring slaves. Today it stands by that statement and says it has been able to find only seven policies insuring 18 slaves." SCAC, ¶ 230. "While abhorring slavery, Richmond, Virginia-based CSX offered an online statement that noted the lawsuit filed against it and 'other corporations demanding financial reparations is wholly without merit and should be dismissed.'" Id. ¶ 233. "J.P. Morgan spokesman Thomas Johnson said that the 'allegations are without merit' and that the company's archives don't support the claims in the litigation." Id. ¶ 236. "CN's Chicago-based spokesperson, Jack Burke, denies up and down that the company, or any of its predecessors, profited from slave labor." Id. ¶ 239. "A FleetBoston spokesman said it appears there is no connection to Brown's bank, though FleetBoston doesn't have records that date back 200 years." Id. ¶ 243. "R.J. Reynolds spokeswoman Maura Payne said the allegations are 'completely without merit' because the company was founded in 1876, a decade after slavery was abolished." Id. ¶ 245.

In essence, Plaintiffs allege that Defendants have made intentional misrepresentations about their involvement with slavery for many years, and that Defendants continue to do so today. However, the specific statements alleged in Plaintiffs' Complaint, as listed in paragraphs 227-256, reveal no more than that Defendants have made generalized denials of the merits of

Plaintiffs' lawsuit. Plaintiffs point to no concrete instances of material misrepresentations that have been made by Defendants within any of the statutory periods prescribed under the state consumer law counts. See Harley-Davidson Motor Co. v. Powersports, Inc., 319 F.3d 973, 989 (7th Cir. 2003) (a misrepresentation occurs where a party makes an assertion "that does not accord with facts as they exist"); Neder v. United States, 527 U.S. 1, 22 (1999) (a statement is material if a reasonable individual would believe it to be important in "determining [a] choice of action . . . ."). Plaintiffs, in fact, fail to allege that Defendants have engaged in any actionable fraudulent or deceptive business practice under the respective state statutes within the respective statutory time frames. See infra IV.B. Plaintiffs' state law consumer claims are therefore barred by the above cited statutes of limitation.[36]

### 3. Doctrines to Extend Statutes of Limitations Periods

Plaintiffs attempt to avoid having their claims deemed time-barred by arguing a number of doctrines. Specifically, Plaintiffs contend that all of the respective statutes of limitations should be categorically tolled based on several undeveloped theories, including either the discovery rule, the continuing violation doctrine, equitable estoppel, or equitable tolling. Mem. in Opp. to Defs.' Mot to Dismiss I, 16-24; Mem. in Opp. to Defs.' Mot. to Dismiss II., 1, 5-8. These four principles, in one way or another, allow a plaintiff to bring a claim that on its face falls outside a statute of limitations. Both the discovery rule and the continuing violations

---

[36] Nothing in Plaintiffs' Complaint suggests that these State consumer law claims were even remotely contemplated by any Defendant or predecessor during the time slavery existed as an institution in the United States. The court also notes that Plaintiffs' first Complaint alleged Counts of Accounting and the Alien Torts Claims Act. The court found that these Claims were also barred by the applicable statutes of limitations. See In re Slave Descendants Litigation, 304 F. Supp. 2d 1027, 1068-1070 (N.D. Ill. 2004).

doctrine deal with when the accrual of a claim is established. In contrast, the doctrines of equitable estoppel and equitable tolling allow a plaintiff to assert a claim after it has accrued by tolling the respective statutes of limitations. However, as the court will discuss below, these doctrines cannot revive claims already barred by a statute of limitations.

### a. *Discovery Rule*

The discovery rule postpones the beginning of a limitations period until such time as the plaintiff discovers the injury, or through reasonable diligence should have discovered the injury. See Cada, 920 F.2d at 450. The discovery rule thus keeps a claim from accruing until the plaintiff knows or through reasonable diligence should have known of the injury. See TRW Inc. v. Andrews, 534 U.S. 19, 27 (2001).

In support of their argument that the discovery rule should delay accrual of their claims, Plaintiffs argue that "[slaves] were not privy to every legal harm they suffered, nor the causes and extent of those harms." SCAC, ¶ 44. Specifically, Plaintiffs argue that "in their miserable condition which was a direct result of slavery . . . although intimately familiar with their pitifully horrific condition, [they] were not aware of the nature of the investments, insurance policies, joint ventures and other schemes and conspiracies developed and utilized by these defendants . . . to profit from slavery." Mem. in Opp. to Defs.' Mot. to Dismiss I, at 17; Mem. in Opp. to Defs.' Mot. to Dismiss II, at 1.

In response, Defendants assert that Plaintiffs' Complaint fails to allege any act committed by any specifically named Defendant or their predecessors which was intended to conceal any cause of action from any Plaintiffs or their ancestors. Mem. in Supp. of Defs.' Mot. to Dismiss II, at 5. Further, Defendants argue that since the alleged injuries were known, or knowable, to

Plaintiffs' ancestors over a century ago, the discovery rule is simply inapplicable in this case. Mem. in Supp. of Defs.' Mot. to Dismiss I, at 23-24.

Plaintiffs are attempting to recover for injuries incurred by their ancestors over a century ago. Plaintiffs' ancestors knew or should have known that they were being brutalized and wrongfully forced to work for people, plantations, companies, and industries without being compensated. If they did not know of their exact injury at the time it occurred, they certainly should have known of it after the Civil War, the passing of the Civil War Amendments, or even the Civil Rights Movement of the 1960s. Furthermore, there is evidence that other former slaves were aware of their injuries and previously have attempted to recover for them well before this action was filed. See, e.g., Johnson v. McAdoo, 45 App. D.C. 440 (D.C. 1916) (evidencing a claim for slavery reparations nearly a century ago).

Plaintiffs would have the Court extend the applicable statutes of limitations indefinitely, or at least until all of the discovery Plaintiffs desire is completed. "By tying the start of the limitations period to a plaintiff's reasonable discovery of a pattern rather than to the point of injury or its reasonable discovery the [discovery] rule would extend the potential for most . . . cases well beyond the time when a plaintiff's cause of action is complete." Rotella v. Wood, 528 U.S. 549, 558 (2000). The mere fact that Plaintiffs' ancestors did not know exactly how much profit was made from their slave labor is not enough to establish that the discovery rule should apply in this case. "The federal common law discovery rule does not permit the plaintiff to delay filing its lawsuit until all foreseeable harms arising from the injury are actually experienced, but only until the plaintiff discovers the predicate injury." Brademas v. Indiana Housing Finance Authority, 354 F.3d 681, 687 (7th Cir. 2004). The predicate injury in this instance was the

institution of slavery itself. Plaintiffs make a veiled attempt to tie the beginning of the statutes of limitations periods to the discovery of the damages that flowed from slavery, rather than the predicate injury itself. Again, the discovery doctrine only extends the statutes of limitations until the predicate act is discovered, not until all discovery of its consequences is completed. See Rotella, 528 U.S. at 558. Therefore, the discovery rule, when applied in this instance, does not delay accrual of the claims alleged.

### b. Continuing Violation Doctrine

The continuing violations doctrine, although slightly different from the discovery rule, allows the plaintiff to file an action when there is a continuous series of injuries stemming from the same injury. Under this doctrine, the statutes of limitations are not tolled per se, but rather left open until a final injury has accrued. See Heard v. Sheahan, 253 F.3d 316, 319 (7th Cir. 2001). "The plaintiff must show a 'continuing violation,' which the Seventh Circuit has described as a 'continuous series of events giving rise to a cumulative injury.'" Hoagland v. Town of Clear Lake, Ind., 344 F. Supp. 2d 1150, 1162 (N.D. Ind. 2004) (quoting Heard, 253 F.3d at 320). "The continuing violation doctrine allows a complainant to obtain relief for a time-barred act of discrimination by linking it with acts that fall within the statutory limitations period." Filipovic v. K&R Exp. Systems, Inc., 176 F.3d 390, 396 (7th Cir. 1999) (citing Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992)). Courts will then treat the series of acts as one continuous act ending within the limitations period. See id. "Unlike tolling principles, this doctrine is not equitable in nature; rather, it is 'best described as a doctrine governing the accrual of a claim.'" Macklin v. United States, 300 F.3d 814, 824 (7th Cir. 2002) (quoting Pitts v. City of Kankakee, 267 F.3d 592, 595 (7th Cir. 2001)). The continuing violation doctrine is applicable

only if it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct.  See id.; see also Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167 (7th Cir. 1996).  "In other words, a plaintiff who feels discriminated against by a discrete act, but fails to timely file charges on that act, cannot later reach back to those events when the statute of limitations expires in order to form a continuing violation claim."  Tinner v. United Ins. Co. of Amer., 308 F.3d 697, 708 (7th Cir. 2002).

As a preliminary matter, Plaintiffs assert that the continuing violation doctrine should be applied to their demand for an accounting.  See Mem. in Opp. to Defs.' Mot. to Dismiss II., at 7-8.  Plaintiffs assert that they are continually hurt because they have not received an accounting of the monies owed to them and their ancestors for work they did while enslaved, and that Defendants continue to profit from the revenue they earned from the labor of Plaintiffs' ancestors.  In support of their argument that the continuing violations doctrine should delay accrual of their claims, Plaintiffs argue that Defendants' failure to provide a proper accounting of the profits allegedly gained by them or their predecessors throughout the years from commercial activities relating to the institution of slavery constitutes a continuing violation. In response, Defendants argue that Plaintiffs do not allege a continuing violation; rather, they are alleging a single event with purported continuing injuries.  Mem. in Supp. of Defs.' Mot. to Dismiss I, at 25; Mem. in Supp. of Defs.' Mot. to Dismiss II, at 1.

With respect to this assertion, the underlying injury concerns the denial of payments for the forced labor of Plaintiffs' ancestors.  All of the other ills and consequences that flowed from this injury, no matter how dreadful, do not constitute new or continuing claims.  They are merely the alleged effects of an injury that occurred over a century ago, and not a continuing series of

94

acts. See Diliberti v. United States, 817 F.2d 1259, 1264 (7th Cir. 1987) (citing Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981) ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation."); Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C. Cir. 1978) (without any continuing unlawful actions by defendant, plaintiff's claim accrued when he was "first harmed")).

Plaintiffs also assert that Defendants' present day failure to produce an accounting of whether they profited from the slave trade constitutes a new and continuing violation. Mem. in Opp. to Def.'s Mot. to Dismiss II, at 7-8. Again, Plaintiffs' assertions are incorrect. Plaintiffs' assertions are merely a veiled attempt to circumvent the statutes of limitations for their underlying claims. Plaintiffs have not alleged any new unlawful conduct by Defendants; but have merely alleged a continuing adverse consequence of prior unlawful conduct. See Diliberti, 817 F.2d at 1264. Therefore, the continuing violation doctrine, when applied in this instance, does not delay the accrual of the claims alleged.

### c. Equitable Estoppel

Equitable estoppel allows a plaintiff to bring a cause of action after a statute of limitations has expired when the "'defendant takes active steps to prevent the plaintiff from suing on time.'" Brademas, 354 F.3d at 686-87 (quoting Sharp v. United Airlines, Inc., 236 F.3d 368, 372 (7th Cir. 2001)); see Lucas v. Chicago Transit Auth., 367 F.3d 714, 722 (7th Cir. 2004). For example, a defendant can prevent a plaintiff from filing his or her claim on time either by informing the plaintiff that the defendant will not assert the statute of limitations as a defense, or by fraudulently concealing the injury after the fact. See Holmberg v. Armbrecht, 327 U.S. 392, 396-97 (1946); Brademas, 354 F.3d at 686-87 (citing Sharp, 236 F.3d at 372). "The 'granting of equitable estoppel should be premised on a defendant's improper conduct as well as a plaintiff's

actual and reasonable reliance thereon.'"  Hentosh v. Herman M. Finch Univ. of Health Sci. /
The Chicago Medical School, 167 F.3d 1170, 1174 (7th Cir. 1999) (quoting Wheeldon v. Monon
Corp., 946 F.2d 533, 537 (7th Cir. 1991)).

Plaintiffs do not assert, nor is there any indication, that Plaintiffs failed to file their claims
within the appropriate time limitations because Defendants promised not to plead the statutes of
limitations as a defense.  Rather, Plaintiffs assert that they did not properly file their claims
within the appropriate time frame because of Defendants' unwillingness to divulge information
about their ties to slavery, and that Defendants actively misled them; in other words, Plaintiffs
allege that Defendants fraudulently concealed their involvement with slavery.  See SCAC, ¶
227; Mem. in Opp. to Defs.' Mot. to Dismiss I, at 22-23.  Specifically, Plaintiffs assert that:

> (1) defendants withheld documents and information related to their illegal profits
> from slavery and/or lied about their participation in slavery; (2) the fact that the
> defendants benefitted from concealing the information and that the concealment
> was so complete, provides a sufficient basis to conclude that they were aware of
> the concealment; (3) plaintiffs did not know of the defendants conduct or illegal
> profits and therefore could not have known of the concealment and/or
> misrepresentations; (4) defendants in concealing the information knew that this
> concealment would protect them from accountability for their actions; (5)
> plaintiffs' lack of information was reasonable and in good faith given the nature
> of defendants' conduct and plaintiffs' conditions; and (6) clearly justice would
> not be served by allowing the defendants to benefit from their concealing
> behavior as measured against the extreme harm suffered by plaintiffs and their
> ancestors.

Mem. in Opp. to Defs.' Mot. to Dismiss I, at 23.  In response, Defendants assert that Plaintiffs
fail to plead, let alone particularize, the required elements of equitable estoppel.

Plaintiffs have not asserted any facts alleging that any Defendant concealed information
in a way that would have prevented Plaintiffs' ancestors from asserting their claims within the
proscribed statutes of limitations periods.  Plaintiffs do not allege that Defendants concealed the

injury. In fact, the injury was not concealed, but rather quite obvious when inflicted. Plaintiffs merely make vague generalizations about Defendants and their perceived practices. Plaintiffs' vague assertions are not enough to satisfy the requirements for equitable estoppel. See Hentosh, 167 F.3d at 1174; see also Williamson v. Indiana Univ., 345 F.3d 459, 463 (7th Cir. 2003) (denying equitable estoppel based on plaintiff's failure to present any evidence that defendant took active steps to prevent her from bringing her charge within the allotted time). Therefore, equitable estoppel, when applied in this instance, does not toll the statutes of limitations. See Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1095 (7th Cir. 1992) (fraudulent concealment requires some sort of trick or contrivance by a defendant).

### d. Equitable Tolling

"Equitable tolling applies when a plaintiff, despite due diligence, is unable to obtain enough information to conclude that there is a basis for a claim." Brademas, 354 F.3d at 686-87 (citing Sharp, 236 F.3d at 373). As distinguished from equitable estoppel, equitable tolling "permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before, even though the defendant took no active steps to prevent him from suing." Singletary v. Continental Ill. Nat'l. Bank & Trust Co., 9 F.3d 1236, 1241 (7th Cir. 1993) (citing Heck v. Humphrey, 997 F.2d 355, 357 (7th Cir. 1993)); see also Cada, 920 F.2d at 451 (indicating that equitable tolling does not require a finding of any conduct on the part of the defendant). "Equitable tolling is frequently confused with both fraudulent concealment [equitable estoppel] on the one hand and with the discovery rule -- governing, as we have seen, accrual -- on the other hand." Cada, 920 F.2d at 451.

Equitable tolling "halts the running of the limitations period so long as the plaintiff uses reasonable care and diligence in attempting to learn the facts that would disclose the defendant's fraud or other misconduct." 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedures § 1056, at 239 (3d. ed. 2002); see also Cada, 920 F.3d at 451. When dealing with equitable tolling between two innocent parties, "the negligence of the party invoking the doctrine can tip the balance against its application . . . ." Jackson v. Rockford Housing Auth., 213 F.3d 389, 397 (7th Cir. 2000) (quoting Cada, 920 F.2d at 453). A plaintiff invoking equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information.

Plaintiffs assert that in this instance the only relevant question as to equitable tolling is "whether the circumstances preventing the plaintiffs from gaining equal access to the justice system over the past decades are sufficiently extraordinary to justify application of the equitable tolling doctrine." Mem. in Opp. to Defs.' Mot. to Dismiss I, at 19. Plaintiffs base this assertion on the fact that they were only recently able to obtain the necessary information to assert their claims, as a result of the "uniquely catastrophic historical context from which their class is still seeking to advance and from which the defendants are still profiting." Id. at 20.

It is true that because of the institution of slavery, the Jim Crow laws, and the lingering bigotries and separatist views following the Civil War, African-Americans were obstructed from obtaining necessary information on their claims and in some instances access to the legal system. Nevertheless, Plaintiffs' ancestors knew of their injury at the time that it occurred. They knew, or should have known, that they were wrongfully being forced to work without compensation, and that somebody was making a profit from their labor. Yet, neither Plaintiffs nor their

ancestors ever asserted these claims in a court of law until now. Plaintiffs have not shown that they acted with all due diligence in attempting to obtain vital information about their claims, and assert them timely. See Marbury, 5 U.S. at 163 ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury").

Plaintiffs' contentions fly in the face of numerous well-settled legal principles and history. African-Americans, as well as various other ethnic groups, have previously brought claims seeking reparations in one form or another, against both public and private entities. See Johnson, 45 App. D.C. at 440; see also Deutsch, 317 F.3d at 1028-29 (affirming dismissal of slave labor claims against private corporations as, *inter alia*, time-barred), amended by 324 F.3d 692; Wolf, 95 F.3d at 544 (dismissing claims against private defendant on standing grounds); Kelberine, 363 F.2d at 992 (dismissing on justiciability and statute of limitations grounds reparations claims for World War II era slave labor against a private company); In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d at 389 (dismissing slave and forced labor claims as nonjusticiable); Iwanowa, 67 F. Supp. 2d at 424; Burger-Fischer, 65 F. Supp. 2d at 248. Plaintiffs merely make vague assertions and generalizations as to their claims and the state of the legal system. Plaintiffs' vague assertions and generalizations are not enough to toll the statutes of limitations on their claims. Plaintiffs' Complaint is nothing more than an attempt to by-pass the various statutes of limitations by chronicling the social inequities and injustices that have befallen African-Americans as a result of slavery. The statutes of limitations, however, "are not to be disregarded by courts out of a vague sympathy for particular litigants." Morgan, 122 S. Ct. at 2071. The doctrine of equitable tolling therefore does not apply in this instance.

99

### 4. Conclusion

Plaintiffs' attempt to bring claims over a century old are barred by the applicable statutes of limitations. Plaintiffs have failed to assert any factual or legal basis for allowing them to proceed with their cause of action in light of when their claims accrued or when, with due diligence, Plaintiffs found that they would have accrued. Plaintiffs attempt to avoid this legal reality by pleading vague factual generalities and chronicling the social and economic injustices that have befallen African-Americans due to slavery. However, statutes of limitations serve to promote justice for litigants, see Donaldson, 325 U.S. at 314, which cannot be disregarded out of vague sympathy for Plaintiffs and their claims. See Morgan, 122 S. Ct. at 2071. Therefore, the court finds that Plaintiffs' claims are barred by the applicable statutes of limitations.

## V. CONCLUSION

It is beyond debate that slavery has caused tremendous suffering and ineliminable scars throughout our Nation's history. No reasonable person can fail to recognize the malignant impact, in body and spirit, on the millions of human beings held as slaves in the United States. Neither can any reasonable person, however, fail to appreciate the massive, comprehensive, and dedicated undertaking of the free to liberate the enslaved and preserve the Union. Millions fought in our Civil War. Approximately six hundred and twenty thousand died. Three hundred and sixty thousand of these individuals were Union troops. Union soldiers, sailors, and marines gave their lives on bloody battlefields and the sea to maintain one sovereign nation in which slavery would be eradicated. The impact of this struggle on the families of the wounded and the dead was immeasurable and lasting. The victorious and the vanquished together shared the cup of suffering. Death deprived the youthful warriors of the opportunities that survivors of the War

100

would enjoy. The impact of this struggle on the Union as a whole was also significant. The enslavers in the United States who resisted or failed to end human chattel slavery sustained great personal and economic loss during and following the four years of the War. Generations of Americans were burdened with paying the social, political, and financial costs of this horrific War.

Finally, in 1865, this great human and economic tragedy ended. The ultimate objectives, the preservation of the Union and the eradication of slavery, were accomplished. The "yoke of bondage" was removed from Garrison Frazier, to whom we earlier referred, and millions of other slaves. The freed slaves then began another journey, this time not from captivity to slavery, but from slavery to citizenship and equality under the law. All of the participants had endured great suffering in this momentous conflict. It takes little imagination to understand the tremendous disruption and destabilization the Civil War caused America's existing social and political institutions. And yet, the dark clouds following the War were giving way to a future brighter than the great majority could have imagined in 1865. The extremely difficult task of amending the Constitution three times was accomplished in approximately five years, granting former slaves freedom, citizenship, and the right to vote. The citizens of the Union would move onward to meet the challenge made by President Lincoln on March 4, 1865, "to achieve and cherish a just and lasting peace, among ourselves and with all nations."

Plaintiffs' Complaint, which seeks reparations for Defendants' alleged roles in chattel slavery, the institution that precipitated this great conflict, fails based on numerous well-settled legal principles. First, Plaintiffs' claims are beyond the constitutional authority of this court. Without alleging any specific connection between themselves and the named Defendants,

Plaintiffs lack essential constitutional standing requirements to bring their claims. Second, prudential limitations prohibit the court from deciding such broad questions of social importance when such claims are brought on behalf of absent third parties, as Plaintiffs attempt here. Third, the long-standing and well-reasoned political question doctrine bars the court from deciding the issue of slavery reparations, an issue that has been historically and constitutionally committed to the Legislative and Executive branches of our government. Fourth, Plaintiffs' claims are untimely. Conceding that many of the torts alleged in the Complaint occurred prior to the formal end of slavery, Plaintiffs fail to show how any of these claims fall within the applicable statutes of limitations. Finally, under the rules of procedure which guide the federal judicial system, Plaintiffs' Complaint fails to state a claim upon which relief can be granted, a serious defect the court cannot overlook regardless how egregious the circumstances giving rise to the claims.

In summary, Plaintiffs' attempt to bring these claims more than a century after the end of the Civil War and the formal abolition of slavery fails; this determination is consistent with the position taken by numerous courts which have considered the issue over the last century. Ultimately, the legal obstacles prohibiting judicial resolution of such claims cannot be circumvented by the courts. Moreover, from the onset of the Civil War until present, the historical record clearly shows that the President and Congress have the constitutional authority to determine the nature and scope of the relief sought in this case, not the courts. This is historically manifested in the signing of the Emancipation Proclamation, the enactment of the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, and the promulgation of over a century of civil rights legislation and governmental programs. The

sensitive ear has heard the collective "thank you" from those who were freed, as well as the historic apologies in words and deeds from persons of good will for the evils of slavery.

The court therefore finds that the defects in Plaintiffs' Second Consolidated and Amended Complaint cannot be cured by further amendment. For the foregoing reasons, Defendants' Joint Motion to Dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) is granted with prejudice.


IT IS SO ORDERED.

_____
CHARLES RONALD NORGLE, Judge
United States District Court


DATED: July 6, 2005