CERTIFIED COP

# In the
# United States Court of Appeals
## for the Seventh Circuit

FILED

Nos. 05-3265, 05-3266, 05-3305

JAN – 4 2007 /H

IN RE:

MICHAEL W. DOBBINS

AFRICAN-AMERICAN SLAVE DESCENDANTS LITIGATION. CLERK, U.S. DISTRICT COURT

APPEALS OF:

> DEADRIA FARMER-PAELLMANN, *et al.,* and
> TIMOTHY HURDLE, *et al.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern District.
No. 02 C 7764—Charles R. Norgle, Sr., *Judge.*

---

ARGUED SEPTEMBER 27, 2006—DECIDED DECEMBER 13, 2006

---

Before EASTERBROOK, *Chief Judge*, and POSNER and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* Nine suits were filed in federal district courts around the country seeking monetary relief under both federal and state law for harms stemming from the enslavement of black people in America. A tenth suit, by the Hurdle group of plaintiffs, makes similar claims but was filed in a state court and then removed by the defendants to a federal district court. The Multidistrict Litigation Panel consolidated all the suits in the district court in Chicago for pretrial proceedings. 28

U.S.C. § 1407. Once there, the plaintiffs (all but the Hurdle plaintiffs, about whom more shortly) filed a consolidated complaint, and since venue in Chicago was proper and in any event not objected to by the parties (other than the Hurdle group, whose objection we consider later in the opinion), the district court was unquestionably authorized, notwithstanding *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 28 (1998), to determine the merits of the suit. *In re Carbon Dioxide Industry Antitrust Litigation*, 229 F.3d 1321, 1325-27 (11th Cir. 2000); cf. *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167-68 (1939).

We are also persuaded that a district court to which a case is transferred under section 1407 can rule on a motion to dismiss the case even if the plaintiff has not agreed to let the court decide the merits. *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 460 F.3d 1217, 1230-31 (9th Cir. 2006); 15 Charles W. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3866 (2006). While it is true that the Supreme Court held in the *Lexecon* case that a transfer under section 1407 does not authorize the district court to retain the case for trial, the Court left open the question whether pretrial proceedings, which *are* the business (the exclusive business) of the transferee court, include rulings on dispositive pretrial motions, such as motions to dismiss. But the Court hinted that they do include them. Section 1407(a) states that "each action so transferred [by the multidistrict litigation panel] shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." Concerning this "provision of § 1407(a) limiting the Panel's remand obligation to cases not 'previ-

ously terminated' during the pretrial period," the Court remarked that "this exception to the Panel's remand obligation indicates that the Panel is not meant to issue ceremonial remand orders in cases *already* concluded by summary judgment, say, or dismissal," 523 U.S. at 37 (emphasis added)—implying that the transferee court can indeed decide the entire case at the pretrial stage.

And rightly so. The duty to conduct the pretrial proceedings in a multidistrict litigation entails the transferee court's ruling on a host of pretrial motions, many of which, whether or not formally dispositive, can shape the litigation decisively. There is no reason to exclude from the court's authority rulings on motions to dismiss—especially a motion to dismiss on the ground that there is no federal jurisdiction. It would be odd to require a court to transfer a case to another federal court when it was apparent that neither court had jurisdiction over the case.

Were it not for the Hurdle suit, we wouldn't have to decide whether the district judge could have dismissed the transferred suits had the parties not agreed, by filing a new complaint, to his retaining them after completion of pretrial proceedings. But the Hurdle plaintiffs did not agree, so we cannot duck the question.

The suits are a series of mostly identical class actions on behalf of all Americans descended from slaves with whom one or more of the defendants or their corporate predecessors may have been directly or indirectly involved. The consolidated complaint (the Hurdle complaint is similar, so need not be discussed separately) alleges the following facts, for which we do not vouch, but merely summarize, the complaint having been dismissed before the truth or falsity of the allegations was determined.

4

Nos. 05-3265, 05-3266, 05-3305

The defendants are companies or the successors to companies that provided services, such as transportation, finance, and insurance, to slaveowners. At least two of the defendants *were* slaveowners; the predecessor of one of the bank defendants once accepted 13,000 slaves as collateral on loans and ended up owning 1,250 of them when the borrowers defaulted, and the predecessor of another defendant ended up owning 346 slaves, also as a consequence of a borrower's default. Even before the Thirteenth Amendment, slavery was illegal in the northern states, and the complaint charges that the defendants were violating the laws of those states in transacting with slaveowners. It also claims that there were occasional enslavements long after the passage of the Thirteenth Amendment and that some of the defendants were complicit in those too. By way of relief, the complaint seeks disgorgement to the class members of the profits that the defendants obtained from their dealings with slaveowners.

The legal basis for the plaintiffs' federal claim is 42 U.S.C. § 1982, which provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." See *City of Memphis v. Greene*, 451 U.S. 100, 119-20 (1981); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). A claim based on a federal statute invokes the federal-question jurisdiction of the federal courts. But since most of the conduct of which the plaintiffs complain occurred prior to the passage of the Thirteenth Amendment, and indeed prior to the Civil War, section 1982 does not provide a sturdy basis for the retention of federal jurisdiction over the plaintiffs' nonfederal claims. A frivolous

federal law claim cannot successfully invoke federal jurisdiction. *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974); *Turner/Ozanne v. Hyman/Power*, 111 F.3d 1312, 1317 (7th Cir. 1997); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 276-77 (7th Cir. 1988); *Lovern v. Edwards*, 190 F.3d 648, 654-55 (4th Cir. 1999). So it cannot provide a perch on which to seat nonfederal claims in the name of the federal courts' supplemental jurisdiction, 28 U.S.C. § 1367. And very few of the plaintiffs *have* a nonfrivolous claim under section 1982.

But with one exception, all the nonfederal claims are within the federal diversity jurisdiction and so do not require a federal-law handle. The exception is Richard E. Barber, Sr.'s suit; for both he and Brown Brothers, one of the defendants in his suit, are citizens of New Jersey. Since he thus cannot invoke diversity as a basis for federal jurisdiction and does not have a colorable section 1982 claim (in fact he makes no section 1982 claim at all), his suit must be dismissed for want of federal jurisdiction without regard to the other challenges that the defendants mount to federal jurisdiction over these suits.

The district judge ruled that by virtue of both the political-question doctrine and the requirement of standing to sue derived from Article III of the Constitution, there was no federal jurisdiction over any of the suits and that in any event they had no merit because the applicable statutes of limitations had lapsed and anyway the complaint failed to state a claim. 375 F. Supp. 2d 721 (N.D. Ill. 2005). The dismissal was with prejudice. But if the judge was correct that there is no jurisdiction, he should have dismissed the suits without prejudice and thus not decided their merits.

6                                    Nos. 05-3265, 05-3266, 05-3305

The political-question doctrine bars the federal courts from adjudicating disputes that the Constitution has been interpreted to entrust to other branches of the federal government. The earliest and still the best example is *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). Rhode Island had not adopted a new constitution after the break with England, but instead continued to govern itself under its colonial charter. Restive citizens convened a constitutional convention not authorized by the charter. The convention adopted a new constitution to which the charter government refused to submit, precipitating rebellion and the establishment in 1842 of a rival state government. The Supreme Court refused to decide which of the two competing governments was the legitimate one. It would have been exceedingly difficult to gather and assess, by the methods of litigation, the facts needed for such a decision. *Id.* at 41-42. It would have been even more difficult to formulate a legal concept of revolutionary legitimacy to guide the decision. Formulating and enforcing a remedy would have presented additional stumbling blocks. The case simply exceeded judicial capabilities. So the Court left the matter to the President, to whom Congress had delegated the duty of resolving it. *Id.* at 43; see also *Ohio ex rel. Bryan v. Akron Metropolitan Park District*, 281 U.S. 74, 79-80 (1930); *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 133-50 (1912).

A case that sought reparations for the wrong of slavery would encounter similar obstacles, but the plaintiffs have been careful to cast the litigation as a quest for conventional legal relief. All they are asking the federal judiciary to do is to apply state law (plus the one federal statute, 42 U.S.C. § 1982) to the defendants' conduct. They face, of

course, formidable obstacles, quite apart from the severely limited applicability of section 1982. To name just one of those obstacles, it is highly unlikely that antebellum laws in northern states were intended to confer financial or other benefits on the twenty-first century descendants of slaves. But the obstacles to the vindication of the plaintiffs' legal claims have the form at least of conventional defenses to a lawsuit. If one or more of the defendants violated a state law by transporting slaves in 1850, and the plaintiffs can establish standing to sue, prove the violation despite its antiquity, establish that the law was intended to provide a remedy (either directly or by providing the basis for a common law action for conspiracy, conversion, or restitution) to lawfully enslaved persons or their descendants, identify their ancestors, quantify damages incurred, and persuade the court to toll the statute of limitations, there would be no further obstacle to the grant of relief.

But we think that the district court was correct, with some exceptions to be noted, in ruling that the plaintiffs lack standing to sue. It would be impossible by the methods of litigation to connect the defendants' alleged misconduct with the financial and emotional harm that the plaintiffs claim to have suffered as a result of that conduct. See generally James R. Hackney, Jr., "The Jurisprudence of Slavery Reparations: Ideological Conflict, African American Reparations, Tort Causation, and the Case for Social Welfare Transformation," 84 B.U. L. Rev. 1193 (2004). For example, Aetna is alleged to have written several insurance policies on slaves in the 1850s in violation of state law applicable to the company, and to have obtained premiums from the insureds—the slaveowners—that (we'll assume) exceeded the cost of the insurance to Aetna (its

Nos. 05-3265, 05-3266, 05-3305

expenses plus the payment of proceeds if the insured event came to pass). The plaintiffs argue that Aetna's net income from this insurance was a wrongful profit that the company should be ordered to restore to the plaintiff classes.

If the insurance business was competitive back then (and the plaintiffs do not argue that it was not), Aetna did not profit in an economic sense from the transactions of which the plaintiffs complain (its "profit" would just be its cost of equity capital), and in any event it would have distributed any profits from the transactions to its shareholders long ago. All that to one side, there is a fatal disconnect between the victims and the plaintiffs. When a person is wronged he can seek redress, and if he wins, his descendants may benefit, but the wrong to the ancestor is not a wrong to the descendants. For if it were, then (problems of proof to one side) statutes of limitations would be toothless. A person whose ancestor had been wronged a thousand years ago could sue on the ground that it was a continuing wrong and he is one of the victims.

The plaintiffs introduce another claim of injury by asserting that had the defendants refused to violate their own states' laws by doing business with slaveowners, there would have been less slavery because the refusal would have been tantamount to subjecting the slaveowners to a partial boycott. That would have raised their costs, and, by making slavery less profitable, might have reduced the amount of it. ("Might," not "would," because the higher costs might simply have depressed the price of a slave.) And had there been less slavery, the argument continues, some of the ancestors of the members of the plaintiff classes would not have been slaves, but instead free laborers, and they would have had some disposable

income part of which they might have saved rather than spent, and left to their heirs.

But this causal chain is too long and has too many weak links for a court to be able to find that the defendants' conduct harmed the plaintiffs at all, let alone in an amount that could be estimated without the wildest speculation. It is impossible to determine how much, if any, less slavery there would have been had the defendants not done business with slaveowners, what effect a diminution of slavery would have had on bequests by ancestors of the class members, and how much of the value of those bequests would have trickled down to the class members.

Suppose a class member could prove that he was descended from one of the slaves insured by Aetna or transported by the Union Pacific Railroad (another defendant) or bought with money lent to the buyer by the predecessor of the JPMorgan Chase Bank (still another defendant), and that these transactions were illegal and that the descendants of slaves are among the people whom the laws were intended to protect. Had he not been insured or transported or bought with a bank loan, how would the financial welfare of his remote descendant be affected? Would this ancestor have been freed, or perhaps never enslaved in the first place? As the plaintiffs stress, slavery was profitable; is it conceivable that slaveholders would have been unable to insure, transport, and finance the purchase of slaves if northern companies had been excluded from the provision of these services or had refused to violate their states' laws that sought to keep them from providing the services?

Even if compliance with those laws would have curtailed slavery and even if it could be shown (it could

not be) that as a result of that hypothetical curtailment a plaintiff's remote ancestor would not have been a slave but instead a free laborer, how could the wages that the ancestor would have earned as a free laborer be shown to have influenced the wealth of his remote descendant? Economists actually study such issues, under the rubric of "intergenerational mobility," see, e.g., Kerwin Kofi Charles & Erik Hurst, "The Correlation of Wealth Across Generations," 111 *J. Pol. Econ.* 1155 (2003); Keith N. Hylton, "The Jurisprudence of Slavery Reparations: Slavery and Tort Law," 84 *B.U. L. Rev.* 1209, 1239-41 (2004), but these are studies of aggregate effects, not of the effects of particular acts, affecting particular individuals, on the wealth of specific remote descendants. There is no way to determine that a given black American today is worse off by a specific, calculable sum of money (or monetized emotional harm) as a result of the conduct of one or more of the defendants.

Nor are the problems of measuring and tracing elided by recasting the relief sought as restitution rather than damages. Restitution—the transfer of the wrongdoer's gain to his victim—is an alternative to damages, the monetization of the victim's loss. *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 957-58 (7th Cir. 2006); *Charter Communications Entertainment I, DST v. Burdulis*, 460 F.3d 168, 182 (1st Cir. 2006); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 944 (8th Cir. 1999); 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.1, pp. 551, 555 (2d ed. 1993). It is a sensible remedy for egregious misconduct because it makes the conduct worthless to the defendant by taking away his profit even if it exceeds the loss to the plaintiff. But it presupposes an injury—it is a remedy for a legal wrong—and there is no way in which to determine what if any injury the defendants inflicted on the members of the plaintiff classes.

And again, if there were a legal wrong, it would not be a wrong to any living persons unless they were somehow the authorized representatives to bring suits on behalf of their enslaved ancestors. With some exceptions to be noted, the plaintiffs are suing to redress harms to third parties (their ancestors), without being authorized to sue on behalf of those parties. It is like a suit by a descendant of a Union soldier, killed in battle, against a Civil War era gun manufacturer still in business that sold guns to the Confederacy in violation of federal law. A federal court could not entertain the suit because the plaintiff would be unable to prove a harm to an interest of his (such as his bank account) that the law protects. E.g., *Raines v. Byrd*, 521 U.S. 811, 818-19 (1997); *Sierra Club v. Morton*, 405 U.S. 727, 739-40 (1972). It is possible that had the ancestor not died when he did he would have become a wealthy person and left bequests so immense that his remote descendant, the plaintiff, would have inherited more money from his parents or grandparents than he actually did. But that is too speculative an inquiry to provide a basis for a federal suit. See *McConnell v. FEC*, 540 U.S. 93, 225-26 (2003); *Branton v. FCC*, 993 F.2d 906, 909 (D.C. Cir. 1993).

The two cases just cited, and others, treat remoteness as a limitation on Article III standing. Still other cases treat it as a nonjurisdictional limitation on who may sue in federal court—but still a limitation. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476-77 (1982); *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1257 (7th Cir. 1995); *Allegheny General Hospital v. Philip Morris, Inc.*, 228 F.3d 429, 435 (3d Cir. 2000). Another group of cases would deem the suit barred by

Article III because one function of the Article III standing doctrine is to prevent parties with slight interests in a litigation from crowding those who have the main interests. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982); *Morlan v. Universal Guardian Life Insurance Co.*, 298 F.3d 609, 621 (7th Cir. 2002); *Illinois DOT v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997); *People Organized for Welfare & Employment Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167, 173 (7th Cir. 1984); *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1268 (10th Cir. 2006). In our hypothetical case of the Union soldier, the litigant with the paramount interest in the case would be his estate and the damages that the estate could recover would include whatever amount of money he would have wanted his descendant to inherit. If the descendant could sue the tortfeasor directly for that amount (or for the tortfeasor's profit, in a suit for restitution), there would be either double recovery or an impossible task of allocating the monetary recovery between the descendant and the estate.

A few of the plaintiff's claims, however, as we noted at the outset, are claims of subjection to involuntary servitude after it was outlawed by the Thirteenth Amendment, and indeed into the twentieth century. Cain Wall, Sr. claims that "during the time that [he] was enslaved"— which he contends extended into the 1960s—"one or more of the defendants were doing business in Mississippi or Louisiana. Some of the defendants had reason to know of the enslavement of Cain Wall and yet failed to take steps to eliminate same, while they continued to inure benefits from the illegal, but sanctioned system of servitude post-emancipation." But there is no claim that the defendants subjected Wall (or any other class member) to

involuntary servitude or did anything to perpetuate or exacerbate his condition. The claim is that they took no steps to free him. The briefs suggest no basis for thinking that there is any kind of Good Samaritan legal duty to eliminate a violation of the Thirteenth Amendment committed by someone else.

The limitations that Article III places on the right to sue in a federal court require us to affirm, on the basis of lack of standing, the greater part of the district court's judgment. But there are three qualifications. First, although most of the plaintiffs and class members are suing as descendants rather than as representatives of their ancestors' estates authorized to sue on those ancestors' behalf, a few do claim to be suing in such a representative capacity. It is highly unlikely that the estate of anyone who died a century or more ago, or indeed more than half a century ago (for although many former slaves survived into the twentieth century, very few would still have been alive 50 years ago, which is to say in 1956, 91 years after the end of the Civil War), has not yet been closed. But the district judge accepted that the purported representatives had a right to sue on behalf of their ancestors, and the defendants offer only a perfunctory rebuttal. We shall assume without deciding that some of the plaintiffs are legal representatives of their slave ancestors. These plaintiffs not only escape the objection to standing that the suits seek damages for injuries actually suffered by third parties (the ancestors—no longer third parties, but the real parties in interest, merely represented by the plaintiffs), but have less to prove. They just have to prove the injury to the ancestors; the trickle-down question is elided.

In all likelihood it would still be impossible for them to prove injury, requiring as that would connecting the

14                                    Nos. 05-3265, 05-3266, 05-3305

particular slavery transactions in which the defendants were involved to harm to particular slaves. But in any event, suits complaining about injuries that occurred more than a century and a half ago have been barred for a long time by the applicable state statutes of limitations. It is true that tolling doctrines can extend the time to sue well beyond the period of limitations—but not to a century and more beyond. Slaves could not sue, and even after the Thirteenth Amendment became effective in 1865 suits such as these, if brought in the South, would not have received a fair hearing. However, some northern courts would have been receptive to such suits, and since the defendants are (and were) northern companies, venue would have been proper in those states. Even in the South, descendants of slaves have had decades of effective access to the courts to seek redress for the wrongs of which they complain. And it's not as if it had been a deep mystery that corporations were involved in the operation of the slave system. See, e.g., Edgar J. McManus, *Black Bondage in the North* 174 (1973); Kenneth M. Stampp, *The Peculiar Institution: Slavery in the Ante-Bellum South* 397 (1956).

The second qualification concerns a claim, rather buried in the complaint but not forfeited, that in violation of state fraud or consumer protection law members of the plaintiff classes have bought products or services from some of the defendants that they would not have bought had the defendants not concealed their involvement in slavery. This claim has nothing to do with ancient violations and indeed would be unaffected if the defendants' dealings with slaveowners had been entirely legal. It is a complaint of consumers' being deceived because sellers have concealed a material fact. The injury is the loss

incurred by buying something that one wouldn't have bought had one known the truth about the product.

It is true that under no consumer protection law known to us, whether a special statute or a doctrine of the common law of contracts or torts, has a seller a general duty to disclose every discreditable fact about himself that might if disclosed deflect a buyer. To fulfill such a duty he would have to know much more about his consumers than he possibly could. But the plaintiffs are charging the defendants with misrepresenting their activities in relation to slavery. A seller who learns that some class of buyers would not buy his product if they knew it contained some component that he would normally have no duty to disclose, but fearing to lose those buyers falsely represents that the product does not contain the component, is guilty of fraud. An example would be a manufacturer who represented that his products were made in the United States by companies that employ only union labor, whereas in fact they were made in Third World sweatshops. See *Kasky v. Nike, Inc.*, 45 P.3d 243, 248 (Cal. 2003); *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 19 (Ill. 2005); *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 154-55 (Ill. 2002); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993).

We do not offer an opinion on the merits of the consumer protection claims, but merely reject the district court's ruling that they are barred at the threshold.

The third qualification concerns the Hurdle suit and is related to the second qualification. Unlike the other plaintiffs, the Hurdle plaintiffs didn't want to remain in the district court in Chicago. They wanted to return to the California district court from which their case had been transferred to Chicago for pretrial proceedings, when the

16                                        Nos. 05-3265, 05-3266, 05-3305

pretrial proceedings concluded. Actually they wanted to return to the California *state* court from which the defendants had removed their case to the district court, but that is an issue for that district court to resolve if and when the case is returned. As we pointed out at the beginning of this opinion, the district court, as the transferee court in a transfer pursuant to 28 U.S.C. § 1407, was authorized to rule on a motion to dismiss the Hurdle suit. But though the district judge in the exercise of that power rightly dismissed so much of that suit as attacks wrongs done to the plaintiffs' ancestors, the Hurdle plaintiffs are among the plaintiffs who have consumer protection claims as well. As to them there will be further pretrial proceedings, and they will be conducted in Chicago. So the Hurdle plaintiffs can't go back to California, at least not yet.

To summarize, the district court's dismissal, for want of standing, of all but the claims brought by legal representatives of slaves plus the consumer protection claims is modified to be a dismissal without prejudice, and as so modified is affirmed. (Barber's suit is dismissed, also without prejudice, for want of diversity.) The dismissal of the claims brought by the plaintiffs who claim to be legal representatives is affirmed, but on the merits (statute of limitations) and so with prejudice. The dismissal of the consumer protection claims is reversed and the case remanded to the district court for further proceedings on those claims consistent with this opinion. The district court is authorized to retain those claims for the duration of the litigation, except in the case of the Hurdle plaintiffs, as to whom the court is authorized only to conduct pretrial proceedings under 28 U.S.C. § 1407.

MODIFIED AND AFFIRMED, IN PART;
REVERSED IN PART AND REMANDED.

Nos. 05-3265, 05-3266, 05-3305                                        17

A true Copy:

Teste:

_____
Clerk of the United States Court of
Appeals for the Seventh Circuit

---

USCA-02-C-0072—12-13-06